Receipt number AUSFCC-11368904

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| INCLUSIVE PROSPERITY CAPITAL, INC., | |
| Plaintiff, | Civ. No. ___26-1031 C___ |
| v. | |
| UNITED STATES OF AMERICA, | **COMPLAINT** |
| Defendant. | |

Plaintiff Inclusive Prosperity Capital, Inc. ("IPC") brings this action against the United States, acting through the Environmental Protection Agency ("EPA"), for breach of a binding grant agreement, violation of a money mandating statute, and violation of the Fifth Amendment's Due Process Clause (an illegal exaction) or, in the alternative, violation of that amendment's Takings Clause.

## NATURE OF ACTION

1.      This case arises from EPA's unlawful termination of a competitively awarded grant to IPC as part of EPA's Solar for All ("SFA") program and the unlawful seizure of the remaining balance of its $249,300,000 which had been properly obligated under that grant. The SFA program was created as part of EPA's implementation of the Congressionally mandated Section 134 of the Clean Air Act, which directed EPA to make competitive grants to "spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans . . . ." Exhibit A, Funding Opportunity No. EPA-R-HQ-SFA-23-01. A competitive grant provides funding through a discretionary, merit-based selection process, to recipients that commit to use the money

1

to meet congressionally identified goals. EPA awarded such a grant to IPC on July 12, 2024, EPA Grant Number (FAIN) 84087901 (the "Grant Agreement").

2.      By August 2, 2024, EPA had deposited the entire grant amount,[1] into IPC's Automated Standard Application for Payment ("ASAP") account. Both EPA and IPC understood (1) that the funds would remain available through the performance period, unless expended earlier, and (2) IPC would use the funds as required by its grant agreement. In reliance on its completed grant award, IPC then undertook enormous financial commitments in furtherance of the SFA program.

3.      On August 7, 2025, without warning or engagement, EPA terminated IPC's grant, invoking for justification the July 3, 2025, passage of the One Big Beautiful Bill Act[2] (the "OBBBA"). In a memorandum accompanying the termination (the "Termination Memorandum"), EPA claimed the OBBBA "repeal[ed] the underlying authority for the [SFA] program . . . and rescind[ed] *unobligated* amounts to carry out Section 134." Exhibit B (emphasis supplied).

4.      EPA's only claimed authority for its termination fails because the funds awarded to IPC *were obligated* as soon as IPC accepted the EPA grant. Accordingly, the OBBBA did not authorize EPA to terminate IPC's Grant Agreement or rescind its funding.

5.      EPA's August 7, 2025, Termination Memorandum stated that as a result of the OBBBA, "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing" the SFA program, and for that reason as well, it was terminating IPC's grant. *Id.* That justification fails as well. The OBBBA did not disturb obligated SFA grant funds—including those EPA obligated to IPC—or Congress' already appropriated funding to EPA to administer the SFA

---

[1] Less its allotment of $400,000 of in-kind services from the National Renewable Energy Laboratory.

[2] Pub. L. 119-21, 139 Stat. 72 (July 4, 2025).

program. Regardless, IPC's Grant Agreement included express language identifying the specific, limited circumstances under which EPA could terminate the Grant Agreement. A purported lack of funding to administer SFA Awards was not one of them.

6.    Because the funds were already obligated, they were property in IPC's possession. Indeed, they were available for IPC to use at its discretion, provided the use was consistent with the Grant Agreement. Accordingly, any effort to seize these funds lacked statutory authority and, thus, violated the Fifth Amendment's Due Process Clause.

7.    As a result, EPA's termination of the agreement was (1) a breach of the express terms of IPC's Grant Agreement, as well as the implied duty of good faith and fair dealing arising therefrom; (2) unauthorized by law and inconsistent with the money mandating provisions of Section 134 of the Clean Air Act (the source of EPA's authority to establish the SFA program); and (3) an illegal exaction where EPA improperly seized money obligated to IPC and deposited in its ASAP account; or (4) in the alternative, an unconstitutional taking when EPA took funds in IPC's ASAP account without providing just compensation.

## JURISDICTION

8.    This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491, because the claims against the United States are founded upon an agreement between IPC and the United States.[3] *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (Barrett, J., concurring) ("[P]laintiffs' challenges to the grant terminations belong in the [Court of Federal Claims]"). The Tucker Act also provides jurisdiction over claims that plaintiff is entitled to compensation from the government grounded in a money mandating statute, *112*

---

[3] IPC does not waive any rights to challenge any agency action related to the SFA in any other forum. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660–62 (2025) (Barrett, J., concurring).

*Genesee St., LLC v. United States*, 166 F.4th 1017, 1022 (Fed. Cir. 2026), as well as illegal exaction actions where a plaintiff seeks to "recover the sums exacted illegally . . . due to [the government's] misinterpretation or misapplication of statutes, regulations or forms." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1578 (Fed. Cir. 1996); *Northern Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 115-17 (2015) ("Jurisdiction to recover an exaction is provided when the exaction is based on an asserted statutory power . . . ." (internal quotation marks omitted)). Finally, the Tucker Act provides jurisdiction for takings claims under the Fifth Amendment. *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1092 (Fed. Cir. 2018).

*9.* IPC seeks neither specific relief nor reinstatement of the Grant Agreement, as such claims would belong in federal district court. *See Bowen v. Massachusetts*, 487 U.S. 879, 894-95 (1988). IPC seeks only monetary damages for EPA's breach of the express terms of IPC's Grant Agreement and compensation due to the money mandating provisions of Section 134 of the Clean Air Act and for the Government's illegal exaction or taking of IPC's funds.

## **PARTIES**

10. IPC is a national 501(c)(3) nonprofit organization, headquartered in Hartford, Connecticut, and established in 2018. IPC seeks to provide a gateway to inclusive prosperity by partnering with and investing in communities seeking energy security, resilience solutions, and sustainable economic growth, creating replicable market solutions to increase participation and reduce transaction costs, and forging relationships with American developers, manufacturers, and workers. To that end, IPC aligns investment capital and financing programs with organizations, projects, and initiatives that serve underdeveloped markets while supporting economic growth. In particular, IPC helps build energy capacity through deployment of solar, storage, and energy efficiency improvements while reducing energy costs for families across the country. IPC received the Grant Agreement.

11.    Defendant is the United States of America, acting through EPA—an independent agency within the executive branch of the United States government, and its Administrator, Lee Zeldin. EPA is a party to the grant agreement at issue in this case.

## FACTUAL BACKGROUND

### Inclusive Prosperity Capital, Inc.

12.    IPC is a national mission-driven nonprofit clean energy financing organization. IPC scales solutions that channel investment capital to communities that need it most, both through its own investments and those of its mission-aligned partners.

13.    IPC was formed to lessen the burdens of government and to protect, promote, and preserve the natural environment by, among other things, developing and supporting programs to finance and stimulate the demand for clean energy investments. IPC directs private and public capital to low-income and disadvantaged communities across the United States by deploying clean energy solutions, including solar installations ranging from small residential to large commercial and community-scale projects.

14.    IPC arose out of the Connecticut Green Bank, the nation's oldest state-chartered green bank.[4] Since its establishment in 2018, IPC has helped underserved markets reduce energy burdens and increase energy resilience; these beneficiaries include churches, schools, nonprofit organizations, small companies, and residents of single family and multifamily homes.

15.    Because IPC has extensive expertise in solar and clean energy underwriting as well as in asset management, IPC can effectively structure and deploy renewable energy, energy

---

[4] "Green banks" are public, quasi-public, or nonprofit financing entities that leverage public and private capital to pursue clean energy projects that reduce emissions. To achieve these objectives, green banks leverage private capital through financial services such as credit enhancements and co-investments.

efficiency, and energy resilience projects and measures. In addition to supporting its own direct community investment, IPC uses its expertise to promote and support standardization of clean energy underwriting and lending in the marketplace. These efforts increase market participation by smaller financial institutions, like credit unions, community banks, and Community Development Financial Institutions ("CDFI").

16.    IPC deploys philanthropic and public capital nationwide with: (1) partner support to CDFI, credit unions, green banks and community lenders; (2) tools to de-risk local lenders for funding projects in low to moderate income communities; (3) its "Smart-E Loan," a financing platform and program that helps connect contractors and lenders to fund homeowners' energy-efficiency and -resilience upgrades; (4) direct financing products, including specialized loans and financial structures to projects and property owners; (5) solar project financing for developers who provide savings and ownership models to low income and disadvantaged households; (6) construction and term loans, enabling upgrades to multifamily, nonprofit, and municipal buildings; and (7) solar power purchase agreements and leases.

### Congress Establishes the Greenhouse Gas Reduction Fund

17.    Between 2021 and 2022, both chambers of Congress debated, drafted, amended, and ultimately passed the Inflation Reduction Act ("IRA"), which the President signed into law on August 16, 2022. Pub. Law 117-169, 136 Stat. 1818 (Aug. 16, 2022).

18.    As part of the IRA, Congress added Section 134 to the Clean Air Act, which established a $27 billion "Greenhouse Gas Reduction Fund" ("GGRF"). 136 Stat. at 2065–66.

19.    As part of the GGRF, Congress appropriated $7 billion for EPA to support "zero-emission technologies." 136 Stat. at 2066. Congress directed EPA to deploy this $7 billion by making "grants, on a competitive basis . . . to States, municipalities, Tribal governments and eligible recipients for the purposes of providing grants, loans, or other forms of financial

assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." *Id.* "Eligible recipients" included nonprofit organizations such as IPC. *Id.* at 2067.

*20.* Congress further directed EPA to begin awarding the contemplated grants "not later than 180 calendar days after August 16, 2022," and provided that the appropriated funds would "remain available until September 30, 2024." *Id.*

21. Congress also appropriated $30 million to EPA—"[i]n addition to amounts otherwise available"—for the "administrative costs necessary to carry out activities under" the GGRF. *Id.*

### EPA Creates the *Solar for All* Grant Program

22. In October 2022, EPA began a months-long engagement process to inform stakeholders of the planned GGRF appropriations.[5]

23. On June 28, 2023, EPA published a Notice of Funding Opportunity (the "NOFO") for the zero-emissions competitive grant program called "Solar for All."

24. On August 31, 2023, EPA revised the NOFO, extending the SFA application deadline and adjusting the award size requirements. A true and correct copy of the amended NOFO is attached as Exhibit A.[6]

25. The NOFO invited eligible applicants to apply for one of up to 60 SFA awards—totaling approximately $7 billion—that would "advance the three overarching [GGRF] program

---

[5] *See* Cong. Rsch. Serv., IF12387, *EPA's Greenhouse Gas Reduction Fund (GGRF)* (May 21, 2024), https://www.congress.gov/crs-product/IF12387.

[6] *See also* Envt'l Prot. Agency, *Funding Opportunity No. EPA-R-HQ-SFA-23-01* (Aug. 31, 2023; accessed July 16, 2026), https://www.grants.gov/search-results-detail/348957.

objectives": (1) "[r]educ[ing] emissions of greenhouse gases and other air pollutants"; (2) "[d]eliver[ing] benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities"; and (3) "[m]obiliz[ing] financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects." *Id.* at 6–7, 24.

26.    The NOFO made clear that the competitive SFA grant awards were "designed to spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans and catalyze transformation in markets serving low-income and disadvantaged communities." *Id.* at 5. The SFA grants were intended to help "transform the clean financing ecosystem in the United States, especially in low-income and disadvantaged communities." *Id.*

27.    The NOFO required applicants to submit Notices of Intent that described, among other things, the number of applications they expected to submit (applicants could submit more than one), the program locations, and the likely amount of funding requested. *Id.* at 18–20, 35–36.

28.    As for the SFA applications themselves, the NOFO required applicants to (1) explain "how [they would] develop and execute a robust and equitable program that enable[d] the rapid deployment of distributed solar and associated storage with meaningful benefits to low-income and disadvantaged communities"; (2) explain "how [they would] administer the grant program and demonstrate [they had] the policies, procedures, tools, and capabilities to successfully achieve the program goals"; and (3) provide their "plan to execute against the grant's reporting requirements, including tracking and measuring progress in achieving expected environmental outputs and outcomes." *Id.* at 44–49.

29.    The NOFO permitted applicants to "propose a financial assistance strategy which generates program income," *id*. at 9 n.11, meaning "gross income earned by the [grant recipient]

that is directly generated by a supported activity or earned as a result of the grant award." *Id*. at 13 (citing 2 C.F.R. § 200.1). The NOFO directed that any such program income was to be "retain[ed] and reuse[ed] . . . for additional capital deployment." *Id.* at 27.

**IPC's SFA Application**

30.    In response to the NOFO, on August 11, 2023, IPC timely provided a Notice of Intent on behalf of the "Community Power Coalition" (the "CPC") and then on October 12, 2023, IPC timely applied on behalf of the CPC. A true and correct copy of IPC's application narrative is attached as Exhibit C. The CPC originally consisted of 10 named members,[7] each of which would help the SFA program succeed: IPC; Black Owners of Solar Services; Clean Energy Group, Inc.; Coalition for Community Solar Access; Community Housing Capital, Inc.; GRID Alternatives; Interstate Renewable Energy Counsel; People's Solar Energy Fund, Inc.; ROC USA, LLC; and the University of New Hampshire Carsey School's Center for Impact Finance—all experienced community solar experts who have worked with the EPA's Community Power Accelerator as developers, lenders, trainers and technical assistance providers, as well as members that bring expertise in workforce development, entrepreneurship, affordable housing, and policy. *Id.* at 2–4.

31.    IPC's application explained how the CPC would meet the three GGRF program objectives:(1) reduce greenhouse gas emissions and air pollutants; (2) deliver benefits to low income and disadvantaged communities ("LIDAC"); and (3) mobilize additional financing and private capital. *Id.* at 1. It proposed to establish revolving loan funds to provide low-cost capital to residential-serving community solar projects and multi-family residential solar projects, technical assistance to the marketplace to overcome barriers, grow pipelines, and coordinate with local

---

[7] IPC's EPA-approved Workplan included additional named CPC members: NeighborWorks Capital Corporation and, for corporate structural purposes, three IPC affiliates: IPC SFA Holdings, LLC, Inclusive Lending, LLC, and Sustainable Underwriting for Resilience & Efficiency, LLC.

workforce ecosystems to support training and apprenticeship programs and create quality jobs. *Id.* at 5–7. IPC and the CPC proposed a comprehensive program that was designed to live well beyond the funding period and provide infrastructure for lasting market building capacity and impact. *Id.*

32.    Specifically, IPC's application explained that during the performance period the CPC, with a requested grant award of $399.2 million, would: (1) serve 62,500 households in LIDAC; (2) finance approximately 833 solar projects; (3) deploy 250 total megawatts of solar capacity; (4) avoid 297,000 tons of carbon dioxide emissions annually; (5) achieve $8.7 million in annual household energy savings (a minimum of 20% savings across all households, as required by the IRA); and (6) seek to leverage the SFA grant into another $450 million in additional investment. *Id.* at 1.

33.    IPC's application proposed to serve 42 states plus the District of Columbia and Puerto Rico, and to implement a "race to the top" community solar financing program to incentivize states to reduce regulatory barriers to community solar projects.

34.    The SFA application process closed in October 2023, after which EPA began a six-month review process. According to EPA, "[t]his multi-stage process included review from hundreds of experts in climate, power markets, environmental justice, labor, and consumer protection" from across multiple agencies.[8]

35.    On April 16, 2024, EPA notified IPC that it had been awarded a grant under the SFA program. A true and correct copy of that award notification is attached as Exhibit D.

---

[8] *Biden-Harris Administration Announces $7 Billion in Solar for All Grants to Deliver Residential Solar and Lower Energy Costs for Low-Income and Disadvantaged Communities Across America*, U.S. Envt'l. Prot. Agency (Apr. 22, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.

36.     On Earth Day, April 22, 2024, EPA issued a press release stating that IPC was one of 60 applicants to receive SFA grants.[9]

**IPC's SFA Grant Agreement (July 12, 2024)**

37.     On July 12, 2024, EPA officially awarded IPC an SFA grant valued at $249,300,000. A true and correct copy of the Grant Agreement is attached as Exhibit E. The Grant Agreement was signed by EPA Associate Award Official Barbara Procter. *See* Exhibit E at 1.

38.     Effective August 2, 2024, EPA deposited $248,900,000—the entirety of the amount provided under IPC's Grant Agreement[10]—into IPC's ASAP Account.

39.     The Grant Agreement instructed that IPC could "demonstrate[] its commitment to carry out this award by either: (1) drawing down funds within 21 days after EPA award or amendment mailing date; or (2) not filing a notice of disagreement with the award terms and conditions within 21 days after EPA award or amendment mailing date." *See id.*. IPC did not file a notice of disagreement with the terms and conditions of its grant and began drawing down funds on October 17, 2024.

40.     As soon as EPA entered into the Grant Agreement with IPC, the funds under that grant were "obligated." "'An agency incurs an obligation . . . when it . . . awards a grant, or takes other actions that require the government to make payments to the public.'" *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 307-08 (2020) (quoting U.S. Gov't Accountability Off., A Glossary of Terms Used in the Federal Budget Process, GAO-05-734SP, at 70-72 (Sept. 2005)).[11]

---

[9] *Id.*

[10] This does not include the $400,000 of promised in-kind assistance from the National Renewable Energy Laboratory (now the National Laboratory of the Rockies).

[11] *See also* Cong. Rsch. Serv., R47106, *The Appropriations Process: A Brief Overview* (May 17, 2023), https://www.congress.gov/crs-product/R47106 (financial agreements entered into by federal agencies "obligate the Treasury to make payments").

Indeed, EPA's own grant policy guidance instructs that "EPA properly obligates an appropriation for a grant program by creating a definitive liability against the appropriation during the period."[12]

41.    IPC's Grant Agreement imposed a series of requirements and conditions on the award, all of which IPC satisfied. For example, the Grant Agreement required IPC to submit performance reports and transaction-level and project-level data, *see* Exhibit E at 6; "implement this grant in accordance with its EPA-approved Solar for All Workplan," *id.* at 16; "only use the award to support . . . allowable activities," *id.* at 17; and "ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies," *id.*

### IPC's Workplan Negotiations with EPA

42.    Within 90 days of its award, IPC's Grant Agreement required the nonprofit to work with EPA to submit (1) a Revised SF-424A form, (2) Budget Information for Non-Construction Programs, (3) an Indirect Rate Proposal or Agreement, (4) a Revised Budget Narrative, and (5) a Revised Project Specific Workplan (*i.e.*, the EPA-approved Solar for All Workplan) to align IPC's prior workplan with EPA's downward adjustment to the award amount and increase in number of covered geographies.[13] Exhibit E at 15. All of this was required before IPC could begin program implementation and funding projects. *See* Exhibit E at 15–16. Until EPA had approved IPC's workplan, the Grant Agreement only permitted IPC to draw down 2% of its obligated funds. *See id.* at 15.

---

[12] Envt'l Prot. Agency, *Grants Policy Issuance 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds* (Dec. 4, 2024), https://www.epa.gov/grants/grants-policy-issuance-12-06-timely-obligation-award-and-expenditure-epa-grant-funds.

[13] IPC's NOFO application had been for $399.2M serving 42 states, Washington D.C. and Puerto Rico. Upon award, EPA granted IPC $249.3M and negotiated the inclusion of four additional states by IPC to expand the reach of the SFA program to other unserved geographies.

43.     After submitting these materials, as required by the Grant Agreement, IPC worked at length with EPA to finalize IPC's submitted project-specific work plan and budget. That process included EPA review, negotiation, and clarification of the revised workplan's content.

44.     By November 26, 2024, IPC had submitted final drafts of all required grant documents. On December 4, 2024, the EPA Project Officer assigned to IPC's grant confirmed that all required grant documents had been submitted and were in the Grants Office for final approval.

45.     Ultimately, IPC's EPA-approved Solar for All Workplan ("IPC's EPA-approved Workplan") provided details for projected activities and outcomes over the project period, running from May 1, 2024, through April 30, 2029. *See* Exhibit E at 1, § Project Period. A true and correct copy of IPC's EPA-Approved Workplan is attached as Exhibit F. IPC's EPA-approved Workplan identified numerous "[o]utputs and outcomes" flowing from the grant, including but not limited to: (1) just over 31,000 households served; (2) 124 megawatts of new generation capacity; (3) 146,682 tons of carbon dioxide emissions reduced annually; (4) an estimated household savings of $146.76 annually; and (5) with respect to workforce development, 500 developers supported through the technical and/or financial assistance IPC would deploy through the grant. *See* Exhibit F at 3–4. Every construction project funded by the grant was required to support domestic manufacturing, through compliance with the Build America, Buy America Act, and quality jobs, through compliance with the Davis Bacon and Related Acts. Exhibit E at 32. Any grant funds that were deployed by IPC or other CPC lenders as financial assistance, which generate program income, were considered by EPA to be capitalization of a revolving loan fund. *Id.*

46.     IPC's EPA-approved Workplan explained that its financial assistance awards— which would flow from the SFA grant—would take the following forms: (1) Developer Lines of Credit; (2) Pre-Development Loans; (3) Construction Financing; (4) Bridge Financing;

(5) Permanent Financing; (6) Credit Enhancements; and (7) Grants. IPC also indicated its intent to deploy that financial assistance quickly, explaining that it had "set a goal of deploying ~$15 million [financial assistance] dollars to serve ~2,000 households and generate over 8MW of solar energy" in year one of performance on the grant. *Id.* at 45. Indeed, IPC's EPA-approved Workplan explained that out of $187 million in financial assistance to be deployed over the five-year period of grant performance, nearly $131 million (70% of the total) would be deployed by the end of year three. *See id.*

**IPC's Grant Amended Agreement (January 7, 2025)**

47.    On January 7, 2025, EPA issued an "Assistance Amendment" to IPC's Grant Agreement ("Amended Grant Agreement"). A true and correct copy of IPC's Amended Grant Agreement is attached as Exhibit G. The Amended Grant Agreement modified IPC's Grant Agreement in two notable ways. First, it represented EPA's approval of IPC's Solar for All Workplan along with approval of the other documentation required in the Grant Agreement by "incorporat[ing] the necessary budget and workplan documentation." *Id.* at 1. Second, it lifted the 2% restriction on obligated grant funds. *Id.* IPC's Amended Grant Agreement was digitally signed by an EPA award official on behalf of the United States on January 7, 2025. *Id.*

48.    IPC's Amended Grant Agreement clarified that with IPC's EPA-approved Workplan in place, IPC could now access 100% of the total value of the grant—$249,300,000, with no proportion constraints. And whereas IPC's Grant Agreement initial budget included no specific dollar value for Program Income, the Amended Grant Agreement now included a line item for Program Income totaling an additional $46,069,745.[14] *Id.* at 3.

---

[14] Although the Amended Grant Agreement contains a line-item for Program Income, Exhibit E at 3, the Grant Agreement and governing regulations permitted IPC to deduct the costs associated with the generation of program income from gross income to determine that Program Income. *Id.*

49.     With respect to EPA's termination rights, IPC's Amended Grant Agreement stated as follows:

> EPA maintains the right to terminate the Assistance Agreement *only as specified in* 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions *is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status*, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination.

Exhibit G at 36–37 (emphases supplied).[15] Accordingly, under the "clear[] and unambiguous[]" specific terminations (2 C.F.R. § 200.340(b)) included in IPC's grant, the only basis upon which EPA could unilaterally terminate IPC was for "noncompliance" with the terms of the grant, and even then only if that purported noncompliance "Materially Impaired" performance or evidenced "Waste, Fraud, or Abuse, or material misrepresentation of eligibility status."

### IPC's Immediate Performance Upon Grant Notification

50.     Following notification of its award in April 2024, IPC began necessary pre-contracting work with EPA. During this period, IPC staff (1) updated the SF-424 at EPA's request, (2) completed EPA-required training modules for awardees, (3) updated IPC's budget to align with

---

at 12; 2 CFR 1500.8(b). There are, therefore, other sources of gross income contributing to the Grant Award.

[15] 2 C.F.R. § 200.339 sets forth remedies for when a grant recipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award. Section 200.339 provides that an agency may impose, upon a determination of noncompliance with grant terms by grant recipient, specific conditions on the recipient including, but not limited to temporarily withholding payment, disallowing certain costs, and suspending or terminating the grant in part or in its entirety. *Id.* at § 200.339(a)-(f). 2 C.F.R. § 200.340 identifies possible bases for the termination of a grant award (of which noncompliance is one; another is if the federal agency pursuant to the terms and conditions of the Federal award, finds an award no longer effectuates the program goals or agency priorities). Section 200.340 expressly directs that "[t]he Federal agency . . . *must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.*" *Id.* at § 200.340(b) (emphasis supplied).

a reduced award from the application, (4) engaged with EPA on its Pre-Award Certification Review pursuant to EPA Order 5700.8, (5) agreed to expand its geographic coverage under the grant at EPA's request, and (6) worked with EPA to determine if modifications to the application would be necessary based upon the grant's award size and increased geographic coverage. Exhibit H; Exhibit I; Exhibit J; Exhibit K.

51.    In July 2024, following receipt of IPC's Grant Agreement and while also completing the workplan and other negotiations process described above, IPC simultaneously worked to prepare for grant implementation through extensive allowable pre-implementation planning activities, including: (1) hiring a program director and a compliance manager, (2) restructuring current staff and other resources to focus on SFA, to the exclusion of other business lines, (3) aligning internal processes to federal grant requirements, (4) developing financial assistance requirements, (5) convening subrecipients regularly to update them on the process and seek input on workplan development and the subrecipients' progress toward developing their own SFA implementation and deployment strategies, (6) working with outside counsel to develop a template subrecipient agreement and then with each subrecipient on their subrecipient agreement and related statements of work, (7) digesting EPA guidance, and (8) creating the procurement process for both administrative resources and for financial assistance under the program.

52.    This intensive preparation, combined with IPC's and CPC's members' market experience, allowed for deployment to begin immediately under IPC's EPA-approved Workplan.

53.    Through the first months of 2025, IPC implemented its EPA-approved Workplan and drew down funds from its ASAP account. A true and exact copy of a statement from IPC's ASAP account is attached as Exhibit L.

54.    IPC's grant application was submitted on behalf of a coalition of non-profit organizations, as was encouraged by the NOFO. When the grant was awarded to IPC, one of the revisions to the application workplan was to affect the coalition approach in line with the issued grant terms and conditions. IPC issued subawards, in the form of Subrecipient Agreements ("SRAs"), to all identified non-affiliate members of the CPC. *See* IPC's EPA-approved Workplan at 1.

55.    Following incorporation of IPC's EPA-approved Workplan on January 7, 2025, IPC issued SRAs to 10 entities named in IPC's EPA-approved Workplan, nine of which were also named in IPC's grant application. By February 7, 2025, IPC had executed SRAs with those 10 subrecipients; the aggregate committed value under those SRAs was $59.97 million. Those SRAs represent legally binding contracts that obligate IPC to its subrecipient counterparties. From the notice of award, each of those CPC members had engaged in performance similar to IPC's own performance in reliance on EPA's award based on the group's grant application.

56.    Also in February 2025, IPC hosted its first webinar for interested applicants to provide an overview of IPC's Financial Assistance program (*i.e.*, the deployment of IPC's SFA grant funding). IPC held multiple webinars, in addition to contacting its network of partners and business contacts, making e-blasts and social network posts, and activating IPC's subrecipients to engage in similar outreach, thereafter for prospective applicants. With this market outreach and EPA's own press surrounding the SFA program, the interest and expectations of the solar industry, contractor networks, and community developers across the country pivoted toward applying for SFA grant funding.

57.    In April 2025, IPC launched its first RFP process for eligible project applicants seeking Financial Assistance for qualifying projects. IPC's RFP process had two steps. In Step 1,

IPC screened applicants to assess whether they had the requisite qualifications and experience to use the financial assistance IPC intended to deploy, while recognizing that part of the EPA-approved Workplan was to train nascent developers. In Step 2, IPC conducted a review of qualified applications before making final award decisions. Both steps involved multiple individual evaluators who considered applications pursuant to a specific set of criteria established by IPC in line with SFA program and IPC's EPA-approved Workplan requirements.

58.    IPC anticipated funding approximately 13 projects totaling roughly $15.5 million in awards in the first year of performance on the grant, which ended on April 30, 2025. IPC anticipated funding an additional 36 projects, with an additional roughly $43.6 million in awards for the second year of performance which would have ended April 30, 2026. But in response to its first RFP, IPC received 43 submissions—30 of which advanced to the Step 2 evaluation process. IPC reviewed these applications on a rolling basis. The complete review process for an individual application—from initial submission to issuance of a Commitment Package—averaged 80 days.

59.    Pursuant to this process, by August 7, 2025—when EPA unlawfully terminated IPC's grant—IPC had committed $48 million in Financial Assistance to 10 projects from five applicants, well on the way to meeting IPC's year-one and year-two targets of deploying $59.1 million in awards by March 31, 2026. Those financial commitments were formalized in Commitment Packages containing signed Letters of Intent, including term sheets, between IPC and the awardees. These Commitment Packages aligned with SFA requirements for "Contracts for Delivery of Financial Assistance." SFA Terms and Conditions, Section III.I ("The Recipient may provide Financial Assistance . . . in the form of procurement contracts (Contracts for Financial Assistance).").

60.     As of August 7, 2025, another 19 applications remained in Step 2 of IPC's evaluation process. The total collective value of the projects in those applications was $117.9 million.

61.     At this time, one CPC member had already committed to build and fund a project using SFA financial assistance and several other members were on the verge of finalizing commitments under their SRAs. CPC members were also deploying technical assistance under their SRAs.

62.     Both the SRAs and Commitment Packages IPC entered represent binding legal obligations. IPC undertook these obligations with the expectation that the entirety of its $249 million grant would be available for such outlays. IPC's expectations were echoed and magnified by the expectations of the CPC members and the communities, developers, manufacturers, and residential electric customers who would benefit under the SFA, including IPC's existing commitments to date.

**Congress Repeals Section 134 of the Clean Air Act but Only Rescinds *Unobligated* Funds**

63.     On July 3, 2025, Congress passed the OBBBA, a budget reconciliation bill, H.R. 1.[16] Section 60002 of the OBBBA provides:

> Section 134 of the Clean Air Act (42 U.S.C. [§] 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

139 Stat. 72, 154.

64.     Because the OBBBA's express terms rescinded only *unobligated* funds under Section 134, Congress made clear that funds already obligated—such as the funds awarded and

---

[16] Pub. L. 119-21, 139 Stat. 72 (July 4, 2025)

disbursed to IPC under its SFA Grant Agreement—were legally unaffected by the statute. Put simply, these funds belonged to the recipients, to be used in furtherance of the SFA program.

65. The OBBBA's legislative history confirms that Congress never intended to rescind funds that had already been awarded—and therefore, "obligated"—under SFA grants.

66. On May 13, 2025, during the Energy and Commerce Committee's markup of H.R. 1, Representative Morgan Griffith, then-Chair of the House Energy and Commerce Committee's Subcommittee on the Environment, emphasized that the OBBBA would not impact already obligated grants:

> [T]hese provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. ***So if a grant was already given, as far as this bill is concerned, then that would still be going forward*** . . . . If the grant has already been granted and the money is obligated, then . . .then our language does not affect that ***[W]e can't rescind expenditures that have already been obligated***.

171 Cong. Rec. S4282–83 (July 9, 2025) (emphases supplied).

67. Representative Brett Guthrie, Chair of the House Energy and Commerce Committee likewise confirmed the OBBBA "does not close the grants on any obligated funds." *Id.* at S4283.

68. In the same vein, the Committee Print from the House Committee on Energy and Commerce included in the Budget Committee's Report on the OBBBA stated that the bill "would decrease the federal deficit by approximately $104,934"—a rounding error in the scheme of the federal budget—"as a result of repealing authorizations and rescinding unobligated funds that were appropriated to the [EPA] under the Inflation Reduction Act[.]" Rep. No. 119-106(I), 119th Cong., 1st Sess., at 556 (May 20, 2025). The Minority Views section of the Report clarified that "most, if not all, of the IRA funds have already been invested in communities across the country[,]" *id.* at 626, meaning that "[t]he budgetary significance of" the OBBBA's "repeal [of] section 134 of the

20

Clean Air Act and resci[ssion] [of] unobligated funds for the Greenhouse Gas Reduction Fund" was "questionable, as only $19 million is available out of the entire $27 billion appropriated" for SFA and other programs. *Id.* at 627. In short, the anticipated $104,934 in savings from repeal and rescission of IRA funds could not have included the $7 billion in SFA funds that were already obligated to specific awards, including the $249 million awarded to IPC.

69.     As further confirmation, after enactment of the OBBBA, the Congressional Budget Office ("CBO") issued a July 21, 2025, report estimating that repealing and rescinding unobligated funds from all three of the GGRF grant programs would *only net $19 million in savings*.[17]

70.     The OBBBA also did not eliminate EPA's entire administrative budget. In seeking fiscal year 2025 appropriations in 2024, EPA specifically requested additional funds "to support implementation of the Greenhouse Gas Reduction Fund under the Inflation Reduction Act."[18] In response, on March 15, 2025, Congress passed a continuing resolution, appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" in fiscal year 2025, which the OBBBA did not touch. *See Full Year Continuing Appropriations and Extensions Act*, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

### EPA Unlawfully Terminates IPC's Grant Agreement

71.     On August 7, 2025, EPA sent IPC a Termination Memorandum notifying IPC that its SFA grant had been terminated. Exhibit B. The Termination Memorandum explained that via the OBBBA, Congress "made its intent clear . . . that the SFA program is no longer to operate,"

---

[17] *See* Cong. Budget Off., *Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline*, tab Title VI, lines 19–21 (July 21, 2025) https://www.cbo.gov/publication/61570.

[18] Env't Prot. Agency, *Fiscal Year 2025, Justification of Appropriation Estimates for the Committee on Appropriations*, Tab 5: Environmental Programs and Management at 40 (March 2024) https://www.epa.gov/system/files/documents/2024-04/fy25-cj-05-epm.pdf.

and therefore EPA "made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing" the program. *Id.*

72.    EPA acted without statutory authorization to terminate IPC's grant, because the OBBBA—the only authority EPA invoked—provided no such authorization.

73.    As explained above, by way of the OBBBA, Congress rescinded only "the *unobligated* balances of amounts made available to carry out [Section 134 of the Clean Air Act]." 139 Stat. at 154 (emphasis supplied). Funds awarded under SFA grants *were already obligated*, and the legislative history of the OBBBA expressly confirms that the statute did not, nor was it intended, to terminate any awarded grants, or rescind any money paid out under them.

74.    In addition to the Termination Memorandum, on August 7, 2025, EPA sent IPC a Termination Amendment to IPC's Amended Grant Agreement. A true and exact copy of IPC's Termination Amendment is attached as Exhibit M.

75.    The Termination Amendment stated: "This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added." Exhibit M at 1.

76.    As authority for the termination, EPA's Termination Amendment repeatedly referred broadly to 2 C.F.R. § 200.340. *See* Exhibit M at 1 ("Per 2 CFR 200.340(a)(4) and the administrative terms and conditions of this agreement, EPA is terminating this award."); *id*. at 4 ("The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award.").

77.    2 C.F.R. § 200.340 does not provide agencies with unfettered termination authority. Instead, the regulation directs that "[t]he Federal agency . . . must clearly and unambiguously

specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b). The "terms and conditions of the Federal award" here placed significant constraints on EPA's termination authority—it could only terminate IPC's grant for noncompliance that "materially impaired" effective performance, or adequate evidence of fraud, waste, or abuse, or a "material misrepresentation" of IPC's eligibility status. Exhibit E at 36–37. EPA's Termination Amendment identified none of those things.

78.     EPA violated the law as well as the terms and conditions set forth in IPC's Grant Agreement when EPA terminated the grant based solely upon the enactment of the OBBBA, a statute which did not provide EPA with the authority to take these actions.

### IPC Timely Submitted an Administrative Dispute to EPA

79.     EPA's Termination Memorandum and Termination Amendment, both dated August 7, 2025, provided different deadlines for IPC to challenge the termination. The Termination Memorandum directed IPC to file a dispute "no later than 30 calendar days from the date this termination notice is electronically sent to you," meaning no later than September 6, 2025. Exhibit B at 2. The Termination Amendment, on the other hand, directed that if IPC "disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to EPA Award Official within 21 days after EPA award or amendment mailing date," meaning "no later than August 28, 2025." Exhibit M at 1. On August 27, 2025, IPC timely filed a dispute submission and notice of disagreement with the Termination Amendment. A true and exact copy of IPC's Notice of Dispute and Disagreement is attached as Exhibit N. In the notice of disagreement, IPC explained that "both the purported termination of IPC's Award and EPA's seizure or conversion of IPC's fully obligated Award funds (and any later derived Program Income) is illegal" because the OBBBA "has no effect on the fully obligated

Award funds, nor does it credibly alter or impair EPA's authority or ability to administer the Award." Exhibit N at 1–3.

80.     On September 15, 2025, EPA acknowledged, via email, IPC's dispute submission. A true and exact copy of EPA's acknowledgment email to IPC is attached as Exhibit O. EPA's email stated that "in accordance with 2 C.F.R. 1500-17, a decision will be issued regarding this dispute by February 23, 2026," and promising an update "[i]f this timeline changes." Exhibit O.

81.     On December 1, 2025, IPC, through counsel, submitted a request for discussion related to its Notice of Disagreement, but received no response. On December 16, 17, and 18, and then again on January 7, 2026, representatives for IPC attempted to reach EPA officials by telephone to discuss IPC's Notice of Disagreement, and willingness to discuss a resolution, but received no response. IPC made follow-up requests via email on March 23, 2026, and again via telephone and email on April 2, April 7, April 9, April 16, April 21, April 28, May 6, May 19, May 21, May 26, June 3, June 9, June 16, June 23, June 30, and July 7, 2026. As of the date of this filing, EPA has neither issued a decision nor provided an update on the status of its review of this dispute.[19]

### EPA's Unlawful Actions Harmed IPC

82.     On August 7, 2025, EPA terminated IPC's Grant Agreement, ordered IPC to stop working, seized large sums of money from IPC's ASAP account, and froze the remaining balance

---

[19] Although IPC chose to submit an administrative dispute, neither its grant agreement nor applicable statutes or regulations require IPC to exhaust administrative remedies or otherwise obtain administrative decisions before filing an action in this Court. *See, e.g.*, 2 C.F.R. § 200.342 (requiring agencies to "maintain written procedures for processing objections, hearings, and appeals" with no requirement for administrative exhaustion); 2 C.F.R. § 1500, Subpart E (EPA disputes procedures, with no requirement for requiring administrative exhaustion).

in IPC's ASAP account, all of which harmed IPC and its grant subrecipients. A true and correct screenshot of IPC's ASAP account from August 7, 2025, is attached as Exhibit P.

83.    On the morning of August 11, 2025, IPC's suspended ASAP account had an available balance of $246,271,964.21. Later that day, IPC's ASAP account was reduced by $229,257,032.66 (93%) and had an available balance of only $17,014,931.55. A true and correct screenshot of IPC's ASAP account from August 11, 2025, is attached as Exhibit Q.

**EPA Seized IPC's Grant Funding Without Authorization**

84.    EPA's illegal termination of IPC's Grant Agreement with EPA deprived IPC of the benefit of its bargain. IPC is therefore entitled to "the difference between the amounts they should have received under their contracts and the amounts they actually received." *See Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1363, 1369–70 (Fed. Cir. 2021); *see also Hous. Auth. of the Cnty. of Santa Clara v. United States*, 125 Fed. Cl. 557, 569–70 (2016). IPC's expectation damages encompass the full remaining balance of its $249,300,000 award, less expended amounts, plus program income and amounts allocated to in-kind services, with an on-going balance sheet encompassing SFA loans and related income in perpetuity.

85.    And EPA's actions—including terminating IPC's Grant Agreement and ordering IPC to stop work—have harmed IPC well beyond the loss of the funds awarded in IPC's Grant Agreement.

86.    At the time of the unauthorized grant termination, IPC had entered SRAs with 10 third-party organizations. The total value of those SRAs is $59.97 million. IPC had also committed $48 million in Financial Assistance to five applicants, across 10 different projects. That Financial Assistance was memorialized in Commitment Packages executed by IPC and each applicant.

25

87.     Those SRAs and Commitment Packages represent binding, legal commitments IPC entered with the understanding and expectation that the entirety of the amount of the SFA Grant Award would be available to IPC over the life of the grant.

88.     At the time of the unauthorized termination, IPC was implementing a solar program, as Congress mandated and the grant required, intended to give low-income residents new energy affordability options through community and multi-family residential solar projects. IPC's SFA program was forecasted to serve just over 31,000 households, each of which would benefit from an average of $3,668.92 in total savings. *See* Exhibit F at 3–4.

89.     With the seizure of the funding previously deposited in IPC's ASAP account, IPC, and its CPC members with executed SRAs, currently cannot use those funds to offer (1) low-interest construction and permanent loans to build and own community and multifamily solar projects; (2) lines of credit and predevelopment financing to support emerging market participants; (3) credit enhancements and grants to unlock deeper energy savings and reduce energy costs to affordable multifamily properties and low-income households; (4) technical assistance to incorporate meaningful benefits such as community ownership and workforce development initiatives within the solar projects; (5) investment in domestic manufacturing through the required purchasing of Build America, Buy America Act compliant materials; (6) increased energy resilience for rural and vulnerable sections of the electric grid; and (7) magnified long-term impact through replication of methods and market transformation by trained developers, communities, and lenders.

90.     IPC's reasonable reliance on the Grant Agreement, as well as EPA's expected good faith and fair dealing, caused IPC to direct internal resources, align business practices, and forgo other opportunities to implement its binding commitments to EPA's SFA program. Each of its CPC

members and countless communities, developers, manufacturers, and residential electric customers relied on EPA disbursing the congressionally mandated SFA funds to grant recipients.

91.     And for the same reasons, EPA's illegal actions have caused substantial damage to IPC's reputation, brand, and goodwill. EPA's unlawful termination has (1) forced IPC to suddenly cease offering low-interest solar loans to mission-aligned developers that provide low-income families with household savings, (2) prevented IPC from fulfilling its contractual obligations with CPC members and numerous third-party organizations, and (3) prevented IPC from honoring the millions of dollars in financial assistance that it had committed to applicants. IPC's forced abandonment of these multiple projects has seriously damaged IPC's relationship with these third-party organizations and applicants, and caused at least one known developer to default on its own obligations.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of the Express Terms of IPC's Grant Agreement

92.     IPC incorporates by reference the allegations contained in Paragraphs 1 through 91.

93.     A plaintiff seeking to recover for breach of a binding grant agreement must establish four elements: "(a) a valid contract between the parties; (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Ingham Reg. Med. Ctr. v. United States*, 163 Fed. Cl. 384, 397 (2022) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)). "Damages are always the default remedy for breach of contract." *Boaz Housing Authority v. United States*, 994 F.3d 1359, 1364 (Fed. Cir. 2021) (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 885 & n.30 (1996)).

94.     IPC's Grant Agreement is a binding agreement that awarded IPC $249,300,000 for use in furtherance of the SFA program, plus recognized that IPC would be able to generate an additional $46 million in Program Income.

95.     IPC's Grant Agreement was entered into by EPA officials with authority to bind the United States.

96.     EPA termination of IPC's Grant Agreement violated the agreement's express terms.

97.     IPC's Grant Agreement contained a provision by which EPA agreed to make a specified amount of federal funds available to IPC for its SFA projects.

98.     In IPC's Grant Agreement, EPA and IPC mutually agreed to limit EPA's unilateral termination rights under 2 C.F.R. § 200.339 and § 200.340 to situations involving (1) substantial noncompliance that materially impairs performance, (2) adequate evidence of waste, fraud, or abuse, or (3) a misrepresentation of eligibility status.

99.     The termination provisions in IPC's Grant Agreement did not allow EPA to unilaterally terminate on any other grounds. Accordingly, the United States is liable for breach of the agreement.

100.    EPA's breach of IPC's Grant Agreement has caused IPC to suffer damages in an amount to be determined at trial.

## COUNT II
### Breach of the Duty of Good Faith and Fair Dealing

101.    IPC incorporates by reference the allegations contained in Paragraphs 1 through 91.

102.    IPC's Grant Agreement is functionally equivalent to a contract with the United States.

103.    "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (other citations omitted)).

104.    The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

105.    IPC's Grant Agreement was a binding agreement that contemplates money damages, and was entered into by EPA officials with authority to bind the United States.

106.    By way of IPC's Grant Agreement, EPA agreed to award a grant of $249,300,000 of federal funds to IPC for its SFA program. Upon award of the grant, those funds were "obligated" to IPC. *See Me. Cmty. Health Options*, 590 U.S. at 307-08 ("An agency incurs an obligation . . . when it . . . awards a grant, or takes other actions that require the government to make payments to the public." (quoting U.S. Gov't Accountability Off., A Glossary of Terms Used in the Federal Budget Process, GAO-05-734SP, at 70-72 (Sept. 2005))); *see also* Cong. Rsch. Serv., R47106, *The Appropriations Process: A Brief Overview* 1 (May 17, 2023) (financial agreements entered into by federal agencies "obligate the Treasury to make payments").

107.    IPC entered into its Grant Agreement with EPA with the reasonable expectation that the EPA would comply with the terms of the Grant Agreement and that EPA would act in good faith and deal fairly with IPC.

108.    EPA did not comply with the terms of IPC's Grant Agreement knowing the basis of termination was not supported by the Grant Agreement itself or by the OBBBA.

29

109.    Accordingly, EPA breached the duty of good faith and fair dealing associated with IPC's Grant Agreement.

## COUNT III
### Violation of Money-Mandating Statute (Section 134 of the Clean Air Act)

110.    IPC incorporates by reference the allegations contained in Paragraphs 1 through 91.

111.    "A statutory claim falls within the Tucker Act's sovereign immunity waiver if it is money-mandating—i.e., if it can 'fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *112 Genesee St.*, 166 F.4th at 1022 (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (cleaned up)). Specifically, if the Court of Federal Claims "can provide an adequate remedy—if a money judgment will give the plaintiff essentially the remedy he seeks—then the proper forum for resolution of the dispute is . . . the Court of Federal Claims under the Tucker Act." *Suburban Mortg. Assocs., Inc. v. United States*, 480 F.3d 1116, 1126 (Fed. Cir. 2007).

112.    On August 12, 2022, the President signed the IRA into law.

113.    Through the IRA, Congress created a $27 billion Greenhouse Gas Reduction Fund, adding Section 134 to the Clean Air Act.

114.    As part of this legislation, Congress appropriated $7 billion for EPA to use to support zero-emission technologies, which EPA was to disperse via competitive grants. Congress directed EPA to make grants not later than 180 calendar days after August 16, 2022, as the funds would remain available only until September 30, 2024.

115.    Congress further appropriated $30 million in administrative costs relating to these activities under the GGRF. On June 28, 2023, EPA published the SFA NOFO.

116.    The NOFO invited eligible applicants to apply for one of up to 60 SFA awards—totaling approximately $7 billion—to achieve Congress's stated goals. The NOFO recognized that,

30

under Section 134(a)(1) of the Clean Air Act, 100% of SFA funds must be deployed to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.

117.  Ultimately, EPA entered into IPC's Grant Agreement pursuant to its statutory mandate to "make grants . . . for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." 136 Stat. at 2066.

118.  As explained above, neither the plain language of IPC's Grant Agreement (as issued or as amended), nor the OBBBA, authorized EPA to terminate IPC's grant on the stated grounds.

119.  Nevertheless, EPA—absent any regulatory or statutory authority—terminated IPC's obligated grant on August 7, 2025.

120.  In so doing, EPA violated Section 134 of the Clean Air Act's mandate to disburse $7 billion dollars in grant funding, and thereby violated Congress' clear, unequivocal intent in appropriating the funds that they would be used to establish and implement the SFA program.

## COUNT IV
### Illegal Exaction

121.  IPC incorporates by reference the allegations contained in Paragraphs 1 through 91.

122.  The Due Process Clause of the Fifth Amendment of the United States Constitution bars the government from appropriating "property without due process of law." U.S. CONST. amend. V.

123.  An illegal exaction occurs where a plaintiff "seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed.

31

Cir. 1996) (emphasis supplied). Simply put, an illegal exaction is when "the government has the citizen's money in its pocket." *Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1348 (Fed. Cir. 2020).

124.    EPA awarded IPC the $249,300,000 SFA grant on July 12, 2024, in furtherance of the IRA, and deposited the full $248,900,000[20] in IPC's ASAP account, effective August 2, 2024, for IPC's use in accordance with the SFA program. At all times after July 12, 2024, IPC had a property interest in the monies EPA provided pursuant to IPC's Grant Agreement, including the ability to withdraw and use the funds as needed to pursue the grant's objectives.

125.    The July 2025 passage of the OBBBA only authorized EPA to rescind "any ***unobligated*** amounts" in connection with the SFA program. Pub. L. 119-21, 139 Stat. 72 (July 4, 2025) (emphasis supplied). Because the grant funding awarded to IPC had already been obligated, the OBBBA did not authorize EPA's termination of IPC's grant, or rescission of its awarded funds.

126.    EPA disregarded the OBBBA's unambiguous language and illegally exacted IPC's monies from its designated ASAP account.

127.    When EPA seized $229,257,032.66 from IPC's designated ASAP account, EPA exceeded its statutory and regulatory authority under the IRA and the OBBBA. Thus, EPA has illegally exacted $229,257,032.66 from IPC and has deprived IPC of its property without due process of law in violation of the Due Process Clause of the Fifth Amendment. IPC is entitled to payment of the monies illegally exacted from IPC's designated ASAP account in violation of Section 134 of the Clean Air Act, the OBBBA, and the Due Process Clause.

---

[20] The remaining $400,000 of the award being promised in-kind assistance.

**COUNT V**
**Unconstitutional Taking**
*In the alternative*

128.    IPC incorporates by reference the allegations contained in Paragraphs 1 through 91.

129.    For all the reasons stated in the preceding paragraphs, IPC is entitled to damages based on EPA's breach of the Grant Agreement or compensation based on the Due Process Clause. However, if the Court finds otherwise, then EPA's actions constitute an unconstitutional taking.

130.    The Takings Clause of the Fifth Amendment provides that no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment protects property owners from, and requires just compensation for, physical takings, whether permanent or temporary.

131.    IPC has a valid, protected, and legally cognizable property interest and property rights in the funds held in its ASAP account and the income therefrom. *Phillips v. Washington Legal Found.*, 524 U.S. 156 (1998) (interest income generated by funds held in accounts is private property of owner of principal for purposes of Takings Clause).

132.    The government, acting through EPA, has denied IPC access to, and use of, its property for more than a year.

133.    EPA's invasion of IPC's account and seizure of IPC's funds constitutes a taking of IPC's private property in violation of the Fifth Amendment. *Darby Dev. Co., Inc. v. United States*, 112 F.4th 1017, 1024 (Fed. Cir. 2024).

134.    The Constitution requires just compensation for the taking.

135.    EPA has not provided just compensation for the taking of IPC's property and property rights, and thus the government has violated the Fifth Amendment's Takings Clause.

136. IPC is entitled to full and just compensation for the government's taking of its property and property rights, including the full amount of principal remaining in its ASAP account and income therefrom.

137. As a result of EPA's actions, IPC is entitled to interest, costs, and expenses, as well as legal fees.

## PRAYER FOR RELIEF

WHEREFORE, IPC prays that this Court enter judgment against the United States as follows:

i.    Award money damages or compensation to IPC in an amount to be determined at trial;

ii.   Award any allowable pre- and post-judgment interest;

iii.  Award IPC its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

iv.   Grant other such relief as this Court may deem proper.


Dated: July 20, 2026                                    Respectfully submitted,


                                                        /s/ Issac D. Schabes
                                                        Issac D. Schabes

Stacey P. Geis
CROWELL & MORING LLP                                    Kenneth Dintzer
3 Embarcadero Center 26th Floor                         Alexandra Barbee-Garrett
San Francisco, CA 94111                                 Nicholas L. Roberti
(415) 986-2800                                          CROWELL & MORING LLP
sgeis@crowell.com                                       600 Fifth Street, NW
                                                        Washington, D.C. 20001
                                                        (202) 624-2500
                                                        ischabes@crowell.com

                                                        *Attorneys for Plaintiff*