# Exhibit A

**FEDERAL AGENCY AND OFFICE:** U.S Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund

**FUNDING OPPORTUNITY TITLE:** Solar for All

**ANNOUNCEMENT TYPE:** Request for Applications (RFA)

**FUNDING OPPORTUNITY NUMBER:** EPA-R-HQ-SFA-23-01

**ASSISTANCE LISTING NUMBER:** 66.959

**IMPORTANT DATES:**

| | |
|---|---|
| **October 12, 2023** | **Closing Date** |
| **March 2024** | **Anticipated Notification of Selections** |
| **July 2024** | **Anticipated Awards** |

**Deadline:** Application packages must be submitted on or before October 12, 2023 at 11:59 PM (Eastern Time) through Grants.gov. Please refer to *Section IV.A: Due Date and Submission Instructions* and *Appendix A: Grants.gov Application Submission Instructions* for further instructions.

Applicants are required to submit a **Notice of Intent (NOI)** to be eligible to participate in the Solar for All competition. The deadline for the NOI is July 31, 2023 at 11:59 PM (Eastern Time) for states, the District of Columbia and Puerto Rico; August 14, 2023 at 11:59 PM (Eastern Time) for territories (specifically, The Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands), municipalities, and eligible nonprofit recipients; and August 28, 2023 at 11:59 PM (Eastern Time) for Tribal governments and Intertribal Consortia. Refer to *Section I.F: Required Notice of Intent* and *Section III. Eligibility Information* for additional information NOI requirements and about applicant eligibility.

**NOTE:** A grantee who transfers funds awarded through this competition must comply with the Procurement Standards in 2 CFR Parts 200 and 1500, EPA's Subaward Policy, and EPA's Guidance on Participant Support Costs, as applicable, depending on the vehicle that the grantee uses to transfer funds, as well as the Participation by Disadvantaged Business Enterprises in EPA Programs requirements in 40 CFR Part 33. Before naming contractors (including consultants) or subrecipients in your application, please carefully review Section IV.d, "Contracts and Subawards," of EPA Solicitation Clauses as well as the guidance in *Section III.B: Named Contractors and Named Subrecipients*. In accordance with 2 CFR § 200.320(c)(2) and (4), the Agency does not accept justifications for sole source contracts for services or products available in the commercial marketplace based on a contractor's role in preparing an application or existing relationships that an applicant may have established without complying with competitive procurement requirements. However, as provided in 2 CFR § 200.317 *States* as defined in 2 CFR § 200.1 follow the same competitive policies and procedures they use for procurements with non-Federal funds, so EPA defers to state determinations on sole source contracting.

# Contents

**Section I. Funding Opportunity Description** .................................................................. **4**
    A.    Background ...................................................................................... 4
    B.    Statutory Authority and Assistance Listing ................................................ 6
    C.    GGRF Solar for All Program Objectives .................................................. 6
    D.    Competition Terminology ................................................................... 7
    E.    Scope of Work ............................................................................... 13
    F.    Required Notice of Intent.................................................................... 18
    G.    Environmental Results and Strategic Plan Information.................................. 20
    H.    Measuring and Reporting Environmental Results: Example Outputs, Outcomes, and Performance Measures ..................................................................... 21
    I.    Additional Provisions for Applicants Incorporated into the Funding Opportunity ...... 23
**Section II. Federal Award Information** ...................................................................... **24**
    A.    Number and Amount of Awards............................................................ 24
    B.    Period of Performance ...................................................................... 27
    C.    Partial Funding............................................................................... 27
    D.    Additional Awards ........................................................................... 27
    E.    Funding Type ................................................................................. 28
**Section III. Eligibility Information**............................................................................ **29**
    A.    Eligible Applicants........................................................................... 29
    B.    Named Contractors and Named Subrecipients .......................................... 31
    C.    Threshold Eligibility Criteria ............................................................... 32
    D.    Allowable and Unallowable Costs.......................................................... 36
    E.    Cost Sharing or Matching .................................................................. 38
**Section IV. Application and Submission Information**..................................................... **39**
    A.    Due Date and Submission Instructions ................................................... 39
    B.    Application Materials......................................................................... 40
    C.    Content of Application Submission ........................................................ 42
    D.    Pre-Application Assistance .................................................................. 50
**Section V. Application Review Information**.................................................................. **51**
    A.    Evaluation Criteria .......................................................................... 51
    B.    Review and Selection Process.............................................................. 62
**Section VI. Award Administration Information**............................................................ **64**
    A.    Award Notification ........................................................................... 64
    B.    Administrative and National Policy Requirements....................................... 64
    C.    Program Performance Reporting Requirements ......................................... 65
    D.    Administrative Reporting Requirements .................................................. 68
    E.    Remedies for Non-Compliance............................................................. 69
**Section VII. Contact Information**............................................................................. **70**
**Appendix A. Grants.gov Application Submission Instructions**.......................................... **71**
    A.    Requirement to Submit through Grants.gov and Limited Exception Procedures.......... 71
    B.    Submission Instructions ..................................................................... 71
    C.    Technical Issues with Submission .......................................................... 73

**Appendix B. Program Budget**................................................................................ **74**
   A.     Guidance for Detailed Budget Table ................................................ 74
**Appendix C. Household Savings Guidance** ........................................................ **79**
**Appendix D. Consumer Protection Examples**.................................................... **80**
**Appendix E. Equitable Workforce Development and Job Quality** ...................... **81**
**Appendix F. Guidance for Carbon Dioxide Avoided Calculations** ..................... **83**

# Section I. Funding Opportunity Description

## A. Background

Residential distributed solar generation and energy storage, including rooftop residential and residential-serving community photovoltaic (PV) solar and storage, reduces energy costs for American households, abates pollution from power generation, generates wealth and jobs for local communities, improves public health, and provides resilient and secure power.

Yet, to date low-income and disadvantaged households have been left behind in the rapid deployment of residential distributed solar generation, despite the benefits that this technology can provide to these communities. According to data from the U.S. Department of Energy's (DOE's) Low-Income Energy Affordability Tool, the national average energy burden for low-income households is 8.6%, three times higher than the energy burden for non-low-income households, and, in some cases, can be as high as 30%.[1] Despite this significant opportunity for lower-cost electricity generation and the falling cost of solar PV systems in recent years, low-income households have not benefitted from solar equally. DOE's Solar Futures Study found that only 31% of residential solar adopters are households that earned less than the area median income (AMI).[2] There are numerous barriers to low-income and disadvantaged communities adopting residential distributed solar energy. The barriers are financial as well as non-financial such as community engagement, site suitability, and policy and regulatory.[3] Investing in solar energy and project-deployment services to enable residential distributed solar projects for low-income and disadvantaged households will expand access to the benefits of clean energy—benefits that include household savings, energy resilience, improved air quality, wealth building, and quality jobs.

Solar energy investments in and benefitting low-income and disadvantaged communities support the climate and equity goals of the United States. Achieving the Biden-Harris Administration's goal of a 100% clean-electricity grid by 2035 requires a cumulative solar deployment of 760 to 1,000 gigawatts (GW$_{dc}$), serving 37% to 42% of electricity demand.[4] Distributed generation is expected to satisfy at least 20% of this deployment.[5] Solar deployment is also critical for achieving the 2030 and 2050 climate goals outlined in the U.S. Nationally Determined Contribution by enabling the zero-emissions transition in other sectors including buildings and transportation.[6]

Similarly, solar generation in and benefitting low-income and disadvantaged communities advances the Biden-Harris Administration's equity and environmental justice priorities as detailed in Executive Order 14091 (*Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*) and the President's Justice40 Initiative, established in Executive Order 14008 (*Tackling the Climate Crisis at Home and Abroad*), which sets the goal that 40% of the overall benefits from certain investments flow to disadvantaged

---

[1] U.S. Department of Energy, "Low-Income Community Energy Solutions", accessed May 2023; Energy burden is defined as the percentage of gross household income spent on energy costs.
[2] U.S. Department of Energy, "Solar Futures Study", September 2021
[3] National Renewable Energy Laboratory (NREL), "Affordable and Accessible Solar for All: Barriers, Solutions, and On-Site Adoption Potential", September 2021
[4] U.S. Department of Energy, "Solar Futures Study", September 2021
[5] U.S. Department of Energy, "Solar Futures Study", September 2021
[6] The United States has set bold climate targets to reduce greenhouse gas emissions 50-52% below 2005 levels in 2030 and net-zero emissions no later than 2050.

4

communities. Residential rooftop and residential-serving community solar generation create meaningful benefits for overburdened households and communities. These benefits include household savings, equitable access to clean energy, power resiliency, asset wealth building, investment in local businesses, and quality jobs in alignment with the Department of Labor's Good Jobs Initiative. Traditional energy communities, a priority focus of the President's Interagency Working Group on Coal and Power Plant Communities, are in a prime position to benefit from solar deployment.

President Biden's Inflation Reduction Act authorized the U.S. Environmental Protection Agency (EPA) to implement the Greenhouse Gas Reduction Fund (GGRF), a historic $27 billion investment to combat the climate crisis by mobilizing financing and private capital for greenhouse gas- and air pollution-reducing projects in communities across the country. As part of this program, EPA is launching a $7 billion Solar for All competition — designed to spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans and catalyze transformation in markets serving low-income and disadvantaged communities. Solar for All will tackle the financial and non-financial barriers that limit the ability of low-income and disadvantaged communities across the country to benefit from the rapid growth in distributed solar capacity, thus advancing the Biden-Harris Administration's climate and environmental justice goals.

To support a broader suite of greenhouse gas-reducing projects, EPA is also launching a $14 billion National Clean Investment Fund competition to finance clean technology deployment nationally as well as a $6 billion Clean Communities Investment Accelerator competition to finance clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities. These three grant competitions are complementary programs and will work together to transform the clean financing ecosystem in the United States, especially in low-income and disadvantaged communities. All competitions are covered under the President's Justice40 Initiative, which sets the goal that 40% of the overall benefits from certain federal investments in climate, clean energy, and other areas flow to disadvantaged communities. Per Section 134(a)(1) of the Clean Air Act, 100% of Solar for All funds must be deployed "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies".

**This Notice of Funding Opportunity (NOFO) is for the $7 billion Solar for All competition.** This competition will award up to 60 grants to states, territories, Tribal governments, municipalities, and eligible nonprofit recipients to expand the number of low-income and disadvantaged communities primed for distributed solar investment—enabling millions of low-income households to access affordable, resilient, and clean solar energy. Grantees will use funds to expand existing low-income solar programs or design and deploy new Solar for All programs nationwide.[7] EPA will not fund individual projects under this competition.

EPA's $7 billion Solar for All competition will help deliver on the climate and environmental justice goals of the United States. To achieve these goals, Solar for All grantees will provide subsidies and other financial assistance to residential rooftop and residential-serving community

---

[7] The Clean Air Act defines "state" to mean a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

5

solar projects in and benefiting low-income and disadvantaged communities in addition to project-deployment technical assistance such as workforce development, community outreach, and other project-deployment support (e.g., interconnection technical assistance, siting and permitting support) to help overcome barriers to solar deployment.

## B. Statutory Authority and Assistance Listing

The Inflation Reduction Act amended the Clean Air Act to include Section 134 (42 U.S.C. § 7434), which authorizes the EPA to make competitive grants under the Solar for All competition with appropriations funded by Section 134(a)(1), called Zero Emissions Technologies. The law appropriates $7 billion to EPA to make competitive grants to states, Tribal governments, municipalities, and eligible recipients, as defined in the statute, to provide subgrants, loans, or other forms of financial assistance as well as technical assistance to enable low-income and disadvantaged communities to deploy and benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities.

Section 134(c)(4) defines zero-emission technology as any technology that produces zero emissions of air pollutants listed under Section 108(a) (i.e., particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead), or any precursor to such an air pollutant, or greenhouse gases, defined under Section 134(c)(2) as carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

## C. GGRF Solar for All Program Objectives

Solar for All will advance the three overarching GGRF program objectives:

1. **Program Objective 1: Reduce emissions of greenhouse gases and other air pollutants.** GGRF program grantees will support projects, activities, and technologies that reduce emissions of greenhouse gases and other air pollutants that harm communities and contribute to climate change. As part of the GGRF program, the Solar for All program grantees will deploy and enable deployment of residential-serving solar, storage, and enabling upgrades across the country, directly supporting the climate goal of the United States to achieve a carbon pollution-free electricity sector by 2035.

2. **Program Objective 2: Deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities.** GGRF program grantees will invest in projects that directly benefit American communities. All Solar for All funds will enable low-income and disadvantaged communities to deploy and benefit from distributed solar. EPA expects Solar for All grantees will deliver meaningful benefits, such as household savings, quality jobs, and community ownership to American communities and households. EPA expects Solar for All grantees to maximize the breadth and diversity of households served in the program, including rural, urban, and suburban communities; energy communities; and persistent poverty counties, while

prioritizing investing in the most disadvantaged and low-income households in the communities the program is designed to serve.[8]

3. **Program Objective 3: Mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects.** GGRF program grantees will facilitate market transformation by addressing the barriers to mobilizing private capital into clean technology projects in undercapitalized markets. Grantees will catalyze additional investment in underinvested project types critical to achieving our climate goals and in underinvested communities that have long faced barriers to accessing capital. Solar for All grantees will stimulate additional deployment of solar by strengthening the overall market for residential-serving solar by not only providing access to low-cost capital but also providing project-deployment services, such as community outreach and workforce development. Solar for All will catalyze the deployment of residential distributed solar by developing favorable market environments for low-income and disadvantaged communities to deploy and benefit from solar across the country.

Grantees must align their programs with these three objectives, including setting targets as described in *Section IV.C: Content of Application Submission*.


## D. Competition Terminology

This section defines competition terminology referenced throughout this funding opportunity. Some of this terminology includes important requirements of the grant award that should be carefully considered in preparing the application.

**Capital Mobilization:** For this competition, capital mobilization refers to additional capital contributions made toward qualified projects as a result of the grant's activities. Applicants may define methodologies to set goals and targets for capital mobilization for the purposes of their applications. An example methodology is provided below; applicants that do not use this methodology will not be penalized.

Capital mobilization is defined as the total capital contributions toward projects that are financed by the grantee, excluding grant funds; under this definition, capital mobilization for a particular project may be calculated as total capital contributions toward the project, less grant funds committed to the project by the grantee. Total capital contributions may include financing provided by the grantee with funds raised from private capital providers (including through balance-sheet leverage and securitizations), additional sources of financing provided to project sponsors from private capital providers, equity contributions from project sponsors, and sources of public capital including tax increment financing and other tax incentives. Private capital mobilization is defined as a subset of capital mobilization, excluding capital contributions from public entities, including federal, state, and local government entities (such as tax credits and other financial incentives) other than grant funds provided under this competition.

---

[8] Energy communities are coal mining and power plant communities, including but not limited to the 25 energy communities identified by the Interagency Working Group on Coal & Power Plant Communities & Economic Revitalization.

7

For this competition, the capital mobilization ratio is defined as the grantee's capital mobilization (as defined above), divided by the grantee's capital commitments through financial assistance (i.e., total financial contributions to the project). The private capital mobilization ratio is defined as the grantee's private capital mobilization (as defined above), divided by the grantee's capital commitments through financial assistance. These ratios exclude the grantee's expenditures for project-deployment technical assistance and program administration activities.

**Coalition Application:** A coalition application is one of the two types of eligible applications under this competition. A coalition application is composed of one lead applicant, which partners with one or more non-lead coalition member(s) that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities if the application is selected. The lead applicant must be an eligible applicant and submit the application on behalf of the coalition. The non-lead coalition member(s) may be eligible applicants as defined in Section 134(c)(1) as well as other types of nonprofits, governmental entities, and Institutions of Higher Education[9] that are entities eligible for subawards under the EPA Subaward Policy.[10] **An application submitted by a coalition should describe the overall coalition's program plan, including the role of each coalition member in the Program Narrative**.

If selected, the lead applicant will become the grantee, administer the grant as a pass-through entity for the purposes of 2 CRF Part 200, and be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members). Additionally, if selected, as provided in 2 CFR § 200.332, non-lead coalition members will become subrecipients accountable to the lead applicant for proper use of EPA funding. Applicants do not need to identify all subgrantees at the time of application (only coalition members must be named), yet applicants should identify in the budget narrative and the Budget Table the intent to award subawards even if the subgrantee is not identified. **Note that pursuant to 2 CFR § 200.332(a)(2), as implemented in Items 2 and 4 of EPA's *Establishing and Managing Subawards* General Term and Conditions, successful lead applicants of coalitions must ensure that the terms and conditions of the grant agreement "flow down" to any coalition members as well as other eligible subrecipients that are provided subawards.**

**Eligible Zero-Emissions Technology:** Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. EPA is implementing this statutory language by identifying the four technology categories that exclusively qualify for financial and technical assistance from Section 134(a)(1). These technology categories are defined below. Note: "distributed solar" is used to refer to residential rooftop and residential-serving community solar throughout this NOFO.

---

[9] See definition of *Institution of Higher Education* at 2 CFR § 200.1. Proprietary colleges and universities and similar for-profit providers of educational services are not eligible for subawards under this program.
[10] For profit firms and individual consultants may not be coalition members.

8

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that support individual households in existing and new single-family homes, manufactured homes, and multifamily buildings. The definition of residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits individual households either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW nameplate capacity, that delivers at least 50% of the power generated from the system to multiple residential customers within the same utility territory as the facility. There are a variety of community solar ownership models that can be considered, including community-owned solar, third-party-owned community solar, and utility-owned community solar.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment, delivering demand response needs, aggregating assets into virtual power plants, and delivering residential power during grid outages. Financial assistance for associated storage must be deployed in conjunction with financial assistance for a solar PV system and the storage asset must be connected to the solar PV system.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy and/or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades can include, but are not limited to, electrical system upgrades, structural building repairs and energy efficiency. Applicants may decide the exact types of enabling upgrades that are eligible for Solar for All financial assistance, yet all enabling upgrades should be energy and building infrastructure related and deployed in conjunction with financial assistance for an eligible solar PV system. **Financial assistance for enabling upgrades may comprise up to 20% of the total financial assistance deployed during the lifetime of the program.**

**Grant Fund Activities:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for financial assistance and technical assistance as well as program administration costs allowable under federal awards. These three cost activities are defined below.

- **Financial Assistance:** Financial assistance is defined as subgrants, rebates, subsidies, other incentive payments, debt (including loans, partially forgivable loans, forgivable loans, soft loans, subordinate debt), and other financial products consistent with the definition of *Federal financial assistance* in 2 CFR § 200.1 and *Participant support costs* in 2 CFR § 1500.1.[11] Solar for All financial assistance is intended to enable low-income and disadvantaged communities to deploy and benefit from solar, storage, and enabling upgrades, while ensuring all projects

---

[11] An applicant may propose a financial assistance strategy which generates program income (as defined at 2 CFR § 200.1 and includes, but is not limited to, repayments of the principal on loans, interest on loans, loan origination fees and may include other income from investments of GGRF grant funds). EPA specific rules on program income are provided at 2 CFR § 1500.8. EPA will negotiate terms and conditions governing program income with a successful applicant who will use EPA funding to capitalize revolving loan funds.

9

deliver household savings, among other benefits. Most applicants should use **at least 75% of program funds on financial assistance** and should maximize solar deployment funded by this program. **EPA will evaluate proposals more favorably if the applicant proposes to use 75% of program funds or more on financial assistance. Please see** *Section I.E: Scope of Work* **for additional guidance and details on applicability.**[12]

- **Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "project-deployment technical assistance" and is services and tools provided by grantees to communities and energy stakeholders to overcome non-financial barriers to solar deployment. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support (including procurement of services and tools from National Labs), and coordination with utilities for the purposes of project deployment.

- **Program Administration Activities:** Consistent with 2 CFR § 200.403, expenditures such as program administration costs are allowable under federal awards provided they are necessary and reasonable for the performance of the award—in this program, for the provision of financial assistance and project-deployment technical assistance. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit subrecipients, contractors, and program beneficiaries. Program administration costs include procuring services and tools that support the grantee in program design (e.g., technical assistance from the DOE National Laboratories to support the grantee directly for program design).[13]

**Low-Income and Disadvantaged Communities:** Section 134(a)(1) of the Clean Air Act appropriates $7 billion for the purposes of providing financial and technical assistance to enable "low-income and disadvantaged communities" to deploy and benefit from residential distributed solar. GGRF defines low-income and disadvantaged communities as encompassing the following four categories, as defined below: (a) communities identified as disadvantaged by the CEJST mapping tool; (b) a limited number of additional communities identified as disadvantaged by the EJScreen mapping tool; (c) geographically dispersed low-income households; and (d) properties providing affordable housing.

a. **CEJST-Identified Disadvantaged Communities:** The Climate and Economic Justice Screening Tool (CEJST) is a publicly-available mapping tool developed by the White House

---

[12] Further in this document, EPA explains how Solar for All has three different award options for applicants. Applicants will determine their relevant award option based on the type of communities the applicants are designing a program to serve. Most applicants should use at least 75% of program funds for financial assistance; applicants applying to serve Indian and Alaska Native communities should use at least 65% of program funds for financial assistance. Thus, programs serving Indian and Alaska Native communities may use up to 35% of program funds for project-deployment technical assistance and program administration.

[13] As provided in section 7.0(a) of EPA's Subaward Policy, Federally Funded Research and Development Centers are eligible subrecipients provided the substance of the transaction is consistent with the guidance at 2 CFR § 200.331 and Appendix A: Distinctions Between Subrecipients and Contractors.

10

Council on Environmental Quality. GGRF's definition of "disadvantaged communities" includes all communities identified as disadvantaged through the CEJST.

b. **EJScreen-Identified Disadvantaged Communities:** EJScreen is a publicly-available, place-based environmental justice screening and mapping tool developed by the EPA. GGRF's definition of "disadvantaged communities" includes (1) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes[14] when compared to the nation or state or (2) geographic areas within Tribal lands as included in EJScreen.

c. **Geographically Dispersed Low-Income Households:** GGRF's definition of "geographically dispersed low-income households" includes low-income individuals and households that fall within either of the two categories listed below.

- Individuals and households with incomes at or below the greater of:

  o *For Metropolitan Areas:* (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Level

  o *For Non-Metropolitan Areas:* (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level

- Individuals and households currently approved for assistance from or participation in at least one of the following income-based or income-verified federal assistance programs, with an award letter within the last 12 months: (1) U.S. Department of Health and Human Services' (HHS) Low Income Home Energy Assistance Program; (2) U.S. Department of Agriculture's (USDA) Supplemental Nutrition Assistance Program; (3) U.S. Department of Energy's (DOE) Weatherization Assistance Program; (4) Federal Communications Commission's Lifeline Support for Affordable Communications; (5) USDA's National School Lunch Program; (6) U.S. Social Security Administration's Supplemental Security Income; or (7) any other verified government or non-profit program serving Asset Limited, Income Constrained, Employed (ALICE) individuals or households designated by the EPA Administrator

d. **Properties Providing Affordable Housing:** GGRF's definition of "properties providing affordable housing" includes properties serving low-income individuals and households defined as properties that fall within either of the two categories listed below.

- Multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on the

---

[14]The EJ Supplemental Indexes cover 12 environmental indicators: Particulate Matter 2.5, Ozone, Diesel Particulate Matter, Air Toxics Cancer Risk, Air Toxics Respiratory Hazard Index, Traffic Proximity, Lead Paint, RMP Facility Proximity, Hazardous Waste Proximity, Superfund Proximity, Underground Storage Tanks, and Wastewater Discharge. Within EJScreen, the EJ Supplemental Indexes can be found on the "Maps" tab by clicking the "Threshold Map."

11

goal of ending homelessness funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally-designated housing entity, as defined in Section 4(21) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. § 4103(22); or (5) any other housing assistance program designated by the EPA Administrator

- Naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units[15]

**Meaningful Benefits of Residential Rooftop and Residential-Serving Community Solar:** Consistent with Section 134(a)(1), this program must "enable low-income and disadvantaged communities to deploy or benefit" from solar. This program defines "benefit" as the five meaningful benefits of residential rooftop and residential-serving community solar defined below. EPA will evaluate applications on their vision and ability to maximize the following benefits received by low-income and disadvantaged communities.

1. **Household Savings:** Delivering a minimum of 20% household savings to all households served under the program, including households in multi-family, master-metered buildings; 20% household savings is defined as 20% of the average household electricity bill in the utility territory. Household savings can be delivered as a direct financial benefit or, for households without an individual utility bill, a direct non-financial benefit equivalent in value to the program's household savings target in the utility territory. Additional detail on how to calculate household savings is included in *Appendix C: Household Savings Guidance*. Applicants may propose preliminary estimates in the financial assistance model for household savings and explain how they plan on refining those estimates during the first year of the program if more analysis is needed. EPA expects to work with grantees to refine estimates for household savings

2. **Equitable Access to Solar:** Ensuring the program increases access to residential distributed solar generation in low-income and disadvantaged communities through financing products and project-deployment technical assistance, maximizing the breadth and diversity of the households that can benefit from solar

3. **Resilience Benefits:** Increasing the resilience of the power grid by creating capacity that can deliver power to low-income and disadvantaged households and/or to critical facilities serving low-income and disadvantaged households during a grid outage

4. **Community Ownership:** Facilitating ownership models that allow for low-income households and disadvantaged communities to access the additional economic benefits of asset ownership

5. **Workforce Development and Entrepreneurship:** Investing in high-quality jobs and businesses in low-income and disadvantaged communities by supporting prevailing wages, investing in effective workforce training programs for underserved populations (e.g., pre-

---

[15] Applicants will be evaluated on their strategies to ensure the long-term housing affordability for properties that receive Solar for All financial assistance.

apprenticeship and registered apprenticeship programs), and prioritizing equitable economic opportunities for women and minority-owned businesses and contractors

**Program Income:** Consistent with 2 CFR § 200.1, program income means gross income earned by the grantee that is directly generated by a supported activity or earned as a result of the grant award. For this competition, program income includes but is not limited to origination fees, interest payments, income from principal and interest payments on loans made with federal award funds (e.g., repayments from revolving loan funds), interest from short-term securities (e.g., cash deposits of program income), asset sales, and other sources of program income (e.g., proceeds from bonds issued by governmental entities that were financed with EPA grant funds). EPA-specific rules on program income are provided at 2 CFR § 1500.8.

## E. Scope of Work

The Solar for All competition will fund applicants applying to expand existing or develop new Solar for All programs. A Solar for All program is a program that ensures low-income households have access to residential rooftop and residential-serving community solar energy, often through providing financial support and other incentives. These programs ensure low-income households receive the benefits of residential distributed solar by providing customers household savings, community ownership, energy resilience, and other meaningful benefits. Solar programs can extend beyond solar generating capacity to include associated storage and enabling upgrades that allow for the deployment of solar energy in low-income and disadvantaged communities. Programs may also include solar project-deployment technical assistance such as workforce training programs that enable underserved communities to participate in the economic opportunity created by the energy transition. All financial and technical assistance funded through GGRF's Solar for All competition must enable low-income and disadvantaged communities to deploy and benefit from solar and storage. The Solar for All competition will fund multi-year programs that subsidize many projects while laying the groundwork to transform distributed residential solar generation markets in low-income and disadvantaged communities.

Existing low-income solar programs are considered existing Solar for All programs, which can be expanded with funding from this competition.[16] Applicants that operate existing Solar for All programs should detail in their application how they will expand their existing program. Examples of expansion strategies include, but are not limited to, increasing program caps or carveouts; reevaluating the current subsidy size; expanding eligibility; introducing new subsidies for storage of solar energy and enabling upgrades; increasing household savings for subscribers; expanding community ownership opportunities; funding workforce training programs; and introducing new project-deployment technical assistance.

---

[16] Grant funds from this competition statutorily must enable low-income and disadvantaged communities (as defined in *Section I.D: Competition Terminology*) to deploy or benefit from distributed solar. GGRF Solar for All program funds can augment existing programs so long as the funds are deployed to enable low-income and disadvantaged communities as defined in this document. This requirement may not be entirely congruent with an existing Solar for All program's definitions, and grantees will need to ensure that GGRF funds are deployed according to the statutory requirements.

13

Both new and existing programs funded by this competition should align with the scope and vision of the GGRF Solar for All program. This vision includes delivering meaningful benefits, as described in *Section I.D: Competition Terminology*, and achieving the program objectives defined in *Section I.C: GGRF Solar for All Program Objectives*. Solar for All programs funded in this competition will provide financial and technical assistance to enable low-income and disadvantaged communities to deploy and benefit from solar and storage projects over a five-year period of performance. EPA expects all funds to be deployed within the five-year period of performance. Applicants may elect to include a program planning period in their application that should not exceed one year. This planning period can give the grantee time to refine program plans after receiving an award from EPA and before beginning to deploy financial and technical assistance. Using time and grant funds for program planning should help applicants create a strong foundation for a low-income solar program that is sustainable and long-lasting and fundamentally reshapes local solar markets to better serve low-income and disadvantaged communities.

EPA intends to make up to 60 awards under this competition with three award options for applicants. The approximate guidance on number of awards in each bucket are estimated maximums for each award option. EPA intends to limit the total number of awards across all three award options to 60 awards.

(1) Up to 56 awards, one to serve each of the 56 states/territories eligible for this competition[17]

(2) Up to 5 awards to serve American Indian and Alaska Native Communities

(3) Up to 10 awards to serve similar communities across multiple states

The table below explains the eligible applicants for each award option, the number of awards available, and a summary of the different scope of work for each award option.

---

[17] Under this competition, all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands are eligible to compete under the definition of a "State" in section 302(d) of the Clean Air Act.

14

| | | Award Option #1 – State and Territory Programs | Award Option #2 – American Indian and Alaska Native Programs | Award Option #3 – Multi-state Programs |
|---|---|---|---|---|
| **Eligible applicants** including coalitions with a lead applicant that is an eligible applicant | States | ✓ **Eligible** | | |
| | Territories | ✓ **Eligible** | | |
| | Tribal governments | ✓ **Eligible** | ✓ **Eligible** | ✓ **Eligible** |
| | Municipalities (including councils of governments) | ✓ **Eligible** | | ✓ **Eligible** |
| | Eligible nonprofit recipients | ✓ **Eligible** | ✓ **Eligible** | ✓ **Eligible** |
| **Number of awards** | | Up to 56 | Up to 5 | Up to 10 |
| **Geographic scope of work** | | Develop Solar for All programs that **serve a specific state/territory or a portion of a state/territory** (e.g., a coalition of municipalities within a state/territory) | Develop Solar for All programs that **serve American Indian and Alaska Native Communities** | Develop Solar for All programs that **serve similar communities in multiple states** |

EPA reserves the right to modify this award allocation based on the quality of applications that are received and other program considerations. EPA aims to maximize national geographic coverage of the program across all three award options. Note that only activities that serve communities within the boundaries of the United States (including Puerto Rico) and its territories are eligible for funding under the Solar for All program.

All low-income and disadvantaged communities nationwide should be able to access the benefits of this program. Solar policies, economics, and market conditions vary significantly across states and territories. EPA has designed three award options to account for these varying contexts, while also leaving room for innovative programs to serve multiple markets and solve shared challenges. To apply to award option #1, an application must cover only <u>one</u> state or territory. If an applicant is interested in serving multiple states and/or territories and is not designing a program to serve similar communities in multiple states as described in award option #3, the applicant must submit an application for each state and/or territory that the applicant proposes to serve. In award option #1, applicants will be ranked against other applicants applying to serve the applicable state or territory. To apply to award option #2, an application must propose a program to serve American

15

Indian and Alaska Native Communities. To apply to award option #3, an applicant must submit a program that serves similar communities in multiple states that face similar barriers to distributed solar deployment. Additional detail on award option requirements can be found in *Section II.A: Number and Amount of Awards*.

EPA anticipates issuing awards of varying amounts. Applicants for all three award options can apply for a small-sized program ($25 - $100 million), a medium-sized program ($100 - $250 million), or a large-sized program ($250 - $400 million). Applicants must follow the guidance in *Section II.A: Number and Amount of Awards,* which describes the program size(s) an applicant is eligible for by reference to the total population of the census tracts identified as disadvantaged by CEJST in the geography the program is applying to serve. The below table summarizes these requirements. Please refer to *Section II.A: Number and Amount of Awards* for additional details on how to determine what size program for which applicants may apply.

| | **Small Programs** | **Medium Programs** | **Large Programs** |
|---|---|---|---|
| **Award range** | $25 million and up to $100 million | Greater than $100 million and up to $250 million | Greater than $250 million and up to $400 million |
| **Total population of disadvantaged census tracts identified by CEJST in the geography the program will cover** | Fewer than 1 million people | Between 1 million people and 5 million people, inclusive | Greater than 5 million people |
| **Number of awards EPA anticipates making** | Up to 35 | Up to 20 | Up to 5 |

EPA reserves the right to modify the award allocation based on the quality of applications that are received and other program considerations. EPA encourages applicants to maximize households served with the funds requested in their application.

EPA expects applicants to maximize financial assistance to projects. Applicants to award option #1 and award option #3 should aim to use at least 75% of the award for financial assistance to solar projects. Applicants to award option #2 – American Indian and Alaska Native programs should aim to use at least 65% of funds for financial assistance to solar projects. These targets for financial assistance to solar projects includes financial assistance for associated storage and enabling upgrades in conjunction with a solar project supported under this program. The remaining funds may be used for project-development technical assistance and program administration.

16

Since American Indian and Alaska Native Communities face additional challenges in deploying solar, EPA intends to provide additional flexibility in their use of funds for project-deployment technical assistance. For applicants to award option #2 – American Indian and Alaska Native Programs, applicants may use up to 35% of award funds for project-development technical assistance and program administration. Consequently, these applicants should ensure that at least 65% of the program budget is allocated for financial assistance to solar projects.

The table below summarizes the guidance on share of funds that can be used for financial assistance.

| | **Award Option #1** – State and Territory Programs | **Award Option #2** – American Indian and Alaska Native Programs | **Award Option #3** – Multi-state Programs |
|---|---|---|---|
| **Financial Assistance**, share of funds | Target at least **75%** of funds | Target at least **65%** of funds | Target at least **75%** of funds |

As defined in *Section I.D: Competition Terminology*, eligible financial assistance includes subsidies, grants, rebates, forgivable loans, and recyclable financial products such as loans (including soft loans and subordinate loans). Applicants should detail how they expect to deliver this financial assistance to projects in their application. Some examples of how existing low-income solar programs offer financial assistance include developer subsidies for customer acquisition and installation, subsidies on subscription prices for residential-serving community solar, and supplemental credits on energy bills for new solar deployment.

All financial assistance must enable low-income and disadvantaged communities to deploy and benefit from residential-rooftop and residential-serving community solar capacity, associated storage, and enabling upgrades.

Strategies to integrate financial assistance for storage and enabling upgrades should be designed to maximize solar deployment to the greatest extent possible. EPA encourages that financial assistance for storage be designed to maximize energy resilience for households. In addition, EPA recommends that applicants adopt a flexible definition of enabling upgrades to address the various infrastructure barriers inhibiting solar deployment for low-income and disadvantaged communities. Financial assistance for enabling upgrades should be no more than 20% of the total program financial assistance in the lifetime of the program.

As defined in *Section I.D: Competition Terminology*, eligible project-deployment technical assistance includes community engagement strategies, including education, outreach, and dissemination of information to the public; customer acquisition support; management and verification requirements; cross-program coordination specific to project deployment (e.g., engaging with DOE's WAP); workforce training; and other wrap-around program support

17

elements. Applicants should detail in their application the market barriers in the geography they are applying to serve and how they will use project-deployment technical assistance to address those barriers.

To achieve the statutorily defined role of this program "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies," EPA expects applicants to consider how market structures and regulatory policies in the applicable service area may impact the deployment of solar and storage in low-income and disadvantaged communities. These market structures and policies include net metering, third-party ownership, and renewable portfolio standards, among others. Applicants will be evaluated on their strategies and plans to overcome any relevant structural barriers to maximize the number of households served, including by catalyzing additional solar deployment beyond projects directly funded by Solar for All financial assistance. Strong applicants will have plans to collaborate with relevant market stakeholders such as utilities, public utility commissions, and other jurisdictional entities to address these barriers.

Market transformation is needed to overcome current deployment inequalities—and realization of the associated benefits—in the distributed solar and storage generation market. Solar for All applicants should consider how their proposed program will catalyze public sector and private sector participation in their program design—through financial and technical assistance.

Lastly, Solar for All grantees can also use awards for program administrative activities—such as program personnel, technology, and procuring services and tools that support program design. Additional information on administrative costs is in *Section III.D: Allowable and Unallowable Costs*.

## F.  Required Notice of Intent

Applicants are required to submit a Notice of Intent (NOI) to be eligible to apply to the Solar for All competition. An NOI is required for every application you anticipate submitting. You must answer all questions listed in this section to complete the NOI. A list of the organizations that submit NOIs will be made public on epa.gov/GGRF and updated frequently during the NOI open period. EPA will <u>not</u> publicly share which award option the applicant is applying for nor information on the estimated EPA funding requested. NOIs must be submitted by email to GGRF@epa.gov according to the following deadlines and requirements. **In your email, please include one document as an attachment that has both a letter signed by an authorized official based on the instructions and the answers to questions #1 through #3 below.**

- **States, the District of Columbia, and Puerto Rico:** July 31, 2023 11:59 PM (Eastern Time). NOIs must include an attached letter or memo in support of the entity applying to the competition signed by one of the following authorized officials.
    - An official within the relevant governor's (or District of Columbia mayor's) office, or
    - The director of the agency that will respond to the Solar for All competition

- **Territories (specifically, The Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands), Municipalities, and Eligible Nonprofit Recipients:** August 14, 2023 11:59 PM (Eastern Time). NOIs must include an attached letter or memo in support of the entity applying to the competition signed by one of the following authorized officials, depending on the applicant type.
  - **Territories:**
    - An official within the relevant governor's office, or
    - The director of the agency that will respond to the Solar for All competition
  - **Municipalities:**
    - The office of the chief executive (e.g., mayor, county manager)
    - The director of a designated municipal agency in the municipality
    - The executive director or equivalent senior management level official of a council of governments
  - **Eligible Nonprofit Recipients:**
    - The executive director or equivalent senior management level official of the nonprofit (e.g., executive director, chief executive officer, chief operating officer)
- **Tribal Governments and Intertribal Consortia:** August 28, 2023 11:59 PM (Eastern Time). NOIs must include an attached letter or memo in support of the entity applying to the competition signed by one of the following authorized officials.
  - The chief executive of the Tribe (e.g., chairperson) or executive director or equivalent senior management level official of an intertribal consortium that meets the requirements of 40 CFR 35.504.

**NOIs for coalitions:** If applying in a coalition, regardless of the type of applicant, only the lead applicant is required to submit an NOI according to the applicable requirements above, depending on the type of lead applicant. EPA recommends that coalition applicants include the names of all the entities involved in the coalition, but it is not required as part of the NOI.

**In the NOI, applicants must include the following information for every application they plan to submit to the competition:**

1. **Applicant Name.** Identify the name of the organization submitting the application.
2. **Applicant Eligibility.** Indicate whether the applicant is a state/territory, Tribal government, municipality, or eligible nonprofit recipient using the criteria outlined under *Section III.A: Eligible Applicants*.
3. **Number and Type of Applications:** State the number of applications you anticipate submitting. For each application, include:
   a. **Award Option.** State the specific award option (award option #1, #2, or #3) you will apply to as defined in *Section II.A: Number and Amount of Awards*.

19

    b. **Program Location.** Describe the geographic coverage (i.e., which states, territories, Tribes, municipalities your program will cover) for the program.

    c. **Estimated EPA Funding Requested.** Provide an estimate of the award amount you expect to request in your application based on the guidance defined in *Section II.A: Number and Amount of Awards.* (Note: EPA will not make this information public).

**Applicants that do not submit a NOI by the above deadlines will be deemed ineligible. Information submitted in the NOI must be identical to information submitted in the application, except answers to question 1 (applicant name) for some applicants and answers to question 3.c (estimated EPA funding amount requested) for all applicants. These exceptions are explained in *Section III.C: Threshold Eligibility Criteria*.**

## G. Environmental Results and Strategic Plan Information

Pursuant to Section 6.a of EPA Order 5700.7A1, Environmental Results under Assistance Agreements, EPA must link proposed assistance agreements with the Agency's Strategic Plan. EPA must also require applicants and grantees to adequately describe environmental outputs and outcomes to be achieved under assistance agreements.

Awards made under this funding opportunity will support the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.

- **Goal 1: Tackle the Climate Crisis**
  - Objective 1.1: Reduce Emissions that Cause Climate Change
  - Objective 1.2: Accelerate Resilience and Adaptation to Climate Change Impacts
  - Objective 1.3: Advance International and Subnational Climate Efforts

- **Goal 2: Take Decisive Action to Advance Environmental Justice and Civil Rights**
  - Objective 2.1: Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels
  - Objective 2.2: Embed Environmental Justice and Civil Rights into the EPA's Programs, Policies, and Activities

- **Goal 4: Ensure Clean and Healthy Air for All Communities**
  - Objective 4.1: Improve Air Quality and Reduce Localized Pollution and Health Impacts

## H. Measuring and Reporting Environmental Results: Example Outputs, Outcomes, and Performance Measures

Pursuant to EPA Order 5700.7A1, Environmental Results under Assistance Agreements, EPA must require applicants and grantees to adequately describe environmental outputs and outcomes to be achieved under assistance agreements. Outputs and outcomes differ both in their nature and in how they are measured.

- **Outputs:** The term "output" means an environmental activity, effort, and/or associated work product related to an environmental goal or objective that will be produced or provided over a period or by a specified date. Outputs may be quantitative or qualitative but must be measurable during the period of performance.

- **Outcomes:** The term "outcome" means the result, effect, or consequence that will occur from carrying out an environmental program or activity that relates to an environmental or programmatic goal or objective. Outcomes may be environmental, behavioral, health-related, or programmatic in nature; may be quantitative or qualitative; and may not necessarily be achievable within the period of performance.

Applicants will discuss environmental outputs and outcomes in the Program Narrative as described in *Section IV.C: Content of Application Submission*. Examples outputs and outcomes, that align with the three GGRF program objectives are detailed in the below table. EPA will further describe the required outputs and outcomes, as well as how grantees will measure against those outputs and outcomes, in the reporting requirements defined in the grant's terms and conditions. *Section VI.C: Program Performance Reporting Requirements* details initial guidance on these anticipated requirements.

| Category | Example Solar for All Outputs | Example Solar for All Outcomes[18] |
|---|---|---|
| Climate and Air Pollution Benefits | <ul><li>**Number of projects financed** by geography and type of project (residential rooftop solar, residential-serving community solar) (#)</li><li>**Solar capacity installed** by geography and type of project (MW)</li><li>**Storage capacity installed** by geography, type of project (MWh)</li></ul> | <ul><li>**Clean energy generation** by geography, type of project, and technology (MWh)</li><li>**Greenhouse gas emissions reduced and avoided** by geography and type of project (tons $CO_2e$)</li><li>**Other air pollution reduced and avoided** by geography and type of project (tons other air pollutants such as particulate matter, nitrogen dioxide, ozone, etc.)</li></ul> |

---

[18] EPA will work with recipients to develop a standardize methodology for measuring and estimating outcome metrics which may include standardized equations, tools such as EPA's Avoided Emissions and Generation Tool (AVERT), and standardized assumption sources.

21

| Equity and Community Benefits[19] | • **Number of households benefitting** from projects by geography and type of project (#)<br>• **Amount of household savings delivered** by geography and type of project ($)<br>• **Workers trained by workforce development programs** by geography (#) and their starting wages and benefits ($)<br>• **Projects executed using tools to promote good jobs and community benefits** (e.g., Community Workforce Agreement, Community Benefits Agreement, Project Labor Agreement) by geography, project-type (#)<br>• **Investments in or in partnership with women- and minority-owned businesses** by geography, type of engagement (e.g., investment in a business, partnership on a deal, procurement of services), type of project (# of businesses engaged) ($ of procurement costs) | • **Number of households with resiliency benefits** by geography (#)<br>• **Clean energy capacity owned by communities** in direct ownership models by geography, type of project, type of community owner (household, community-based organization) and technology (MW, MWh)<br>• **Number of solar jobs created** by geography (#)<br>• **Reduced disparities in energy burden between low-income and non-low-income households** by geography ($)<br>• **Increased wages for individuals working in solar energy** by geography (%) |
| Market Transformation Benefits | • **Grant funds deployed** by type of cost (financial assistance, technical assistance, program administration) ($)<br>• **Financial assistance deployed** by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, loans), type of project, type of technology ($)<br>• **Total private sector financing mobilized**, alongside projects funded directly by Solar for All by geography, type of project ($) | • **Changes in net metering caps** by geography by type of project (MW, %)<br>• **Changes in interconnection timelines** by geography (days)<br>• **Changes in Solar Renewable Energy Credit (SREC) values** by geography ($)<br>• **Distributed clean energy capacity deployed benefitting communities** not directly financed by Solar for All by geography, type of project, type of technology, and recipient-type (households, community-serving |

---

[19] Equity and Community Benefits are defined as the meaningful benefits of residential rooftop and residential-serving community solar as defined in *Section I.D: Competition Terminology*.

22

| | | |
|---|---|---|
| | • **Number of community-based organizations engaged by Solar for All services** (e.g., technical assistance programs for solar deployment, education programs) by geography (#)<br>• **Financial assistance deployed to consumers with limited credit history** by geography, type of financial assistance, type of project, type of technology ($) | institutions), type of community (low-income and disadvantaged communities, other communities) (MW, MWh)<br>• **Capital deployed to finance distributed clean energy capacity** <u>not</u> directly financed by Solar for All by geography, type of project, type of technology, and recipient-type (households, community-serving institutions), type of community (low-income and disadvantaged communities, other communities) ($) |

EPA expects applicants to integrate program evaluation activities into their program design as described in *Section IV.C: Content of Application Submission*. Applicants should include plans for conducting evaluations of their GGRF program administration and project portfolios. Program evaluations should include assessment of effectiveness and efficiency in achieving outputs, outcomes, and objectives as described in the logic model. All evaluations must be conducted in adherence with ORDER 1000.33 03/25/2022 U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings.

Grantees will also be expected to report, on an ongoing basis, the underlying methodologies, technologies, data sources, inputs and assumptions, and other significant analytical choices used to calculate or estimate outputs and outcomes. EPA will work with grantees to ensure standardized reporting requirements and identifying tools to support reporting.

## I.  Additional Provisions for Applicants Incorporated into the Funding Opportunity

Additional provisions that apply to Sections III, IV, V, and VI of this funding opportunity and/or awards made under this funding opportunity, can be found at EPA Solicitation Clauses. These provisions are important for applying to this funding opportunity and applicants must review them when preparing applications for this funding opportunity. If you are unable to access these provisions electronically at the website above, please contact the EPA point of contact listed in *Section VII: Contact Information* to obtain the provisions.

EPA recommends that you do not include confidential business information (CBI) in your application. However, if CBI is included, it will be treated in accordance with 40 CFR § 2.203. Applicants must clearly indicate which portion(s) of their application they are claiming as CBI. EPA will evaluate such claims in accordance with 40 CFR Part 2. If no claim of confidentiality is made, EPA is not required to make the inquiry to the applicant otherwise required by 40 CFR § 2.204(c)(2) prior to disclosure under the Freedom of Information Act prior to or after selections are made.

## Section II. Federal Award Information

### A. Number and Amount of Awards

EPA anticipates awarding approximately $7,000,000,000 under this announcement, depending on Agency funding levels, the quality of applications received, agency priorities, and other applicable considerations.

EPA anticipates making up to 60 awards under this announcement—up to 56 awards for each state/territory eligible in this competition, up to 5 awards set aside to serve American Indian and Alaska Native Communities, and up to 10 awards for multi-state programs. EPA aims to maximize geographic coverage across all three award options. The award options, eligible applicants, and scope of work are explained below.

1. **Award option #1 - up to 56 awards to serve state and territory geographies:** All eligible applicants (i.e., states, territories, Tribal governments, municipalities, and eligible nonprofit recipients, as defined in Section III.A.) can apply to serve a single state or territory. Geographic areas that Solar for All can serve include each of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Applicants interested in serving more than one state and/or territory and not serving similar communities in multiple states as described in award option #3 should submit one application for every geography they aim to serve. EPA is requiring applicants to submit one application per geography to ensure differences in state energy market policies are evaluated in context. A coalition of municipalities in the same state/territory should apply under award option #1. Note: programs under this award option do not need to serve the entirety of the state or territory, yet EPA will evaluate applications that maximize geographic coverage more favorably.

2. **Award option #2 - up to 5 awards to serve American Indian and Alaska Native Communities:** Tribal governments and/or eligible nonprofit recipients can apply for this award option. Eligible nonprofit recipients must have Tribal leadership at the senior management level (e.g., Chief Executive Officer, Chief Operating Officer, at least one Member of the Board of Directors) and experience serving American Indian and Alaska Native Communities to compete under this award option. EPA aims to maximize the ability of this program to serve the broadest population of American Indian and Alaska Native Communities, and EPA will evaluate applications on the extent to which they maximize the number of households served and geographic coverage.

3. **Award option #3 - up to 10 awards to serve similar communities across multiple states:** Tribal governments, municipalities and eligible nonprofit recipients can apply for awards to serve municipalities in multiple states. Applications for award option #3 should explain how the program proposes to address similar market challenges specific low-income and disadvantaged communities face in many states. Grantees will be expected to coordinate with state governments and regulators where applicable. Given the limited number of grants EPA can award under this competition, EPA will evaluate applications that maximize geographic coverage more favorably.

24

| | | Award Option #1 – State and Territory Programs | Award Option #2 – American Indian and Alaska Native Programs | Award Option #3 – Multi-state Programs |
|---|---|---|---|---|
| **Eligible applicants** including coalitions with a lead applicant that is an eligible applicant | States | ✔ **Eligible** | | |
| | Territories | ✔ **Eligible** | | |
| | Tribal governments | ✔ **Eligible** | ✔ **Eligible** | ✔ **Eligible** |
| | Municipalities | ✔ **Eligible** | | ✔ **Eligible** |
| | Eligible nonprofit recipients | ✔ **Eligible** | ✔ **Eligible** | ✔ **Eligible** |
| **Number of awards** | | Up to 56 | Up to 5 | Up to 10 |
| **Geographic scope of work** | | Develop Solar for All programs that **serve a specific state/territory or a portion of a state/territory** (e.g., a coalition of municipalities within a state/territory) | Develop Solar for All programs that **serve American Indian and Alaska Native Communities** | Develop Solar for All programs that **serve similar communities in multiple states** |

There is no limit on the number of applications an applicant can submit to this program. An entity may submit more than one application for the Solar for All competition and more than one application to a particular award option so long as each application is for a different program (serving a different geography and different scope of work) and is separately submitted.

Note: the threshold eligibility differs between the three award options. Please refer to *Section III.C: Threshold Eligibility Criteria* to confirm application eligibility for each of these options. Applicants should clearly state in the Summary Program Cover Sheet the award option for which they are applying.

EPA expects award amounts to vary based on the geography of the proposed program. Awards will range from $25 million to $400 million, broken down by small, medium, and large-sized program awards as described below.

Applicants must submit proposals requesting funding amounts that do not exceed the award ranges described in the table below, a requirement which is based on the total population within

disadvantaged census tracts identified by CEJST in the geography the applicant proposes to serve.[20] For example, an applicant proposing a program covering a geography with a population of four million people in census tracts that are identified as disadvantaged per CEJST may apply for a medium-sized program award up to $250 million.

|  | **Small Programs** | **Medium Programs** | **Large Programs** |
|---|---|---|---|
| **Award range** | $25 million and up to $100 million | Greater than $100 million and up to $250 million | Greater than $250 million and up to $400 million |
| **Total population of disadvantaged census tracts identified by CEJST in the geography the program will cover** | Fewer than 1 million people | Between 1 million people and 5 million people, inclusive | Greater than 5 million people |
| **Number of awards EPA anticipates making** | Up to 35 | Up to 20 | Up to 5 |

**Applicants may not request funding amounts that exceed those prescribed in the table above.** For example, an applicant with a program qualifying for a small program award (i.e., such applicant's proposed program covers a geography that includes census tracts identified by CEJST as disadvantaged with a total population less than one million people) **may only** apply for a small program award.

**However, applicants may request funding amounts that are smaller than those prescribed in the table above**. For example, an applicant with a proposed program that qualifies for a large program award (i.e., such proposed program covers a geography that includes more than five million people in census tracts identified by CEJST as disadvantaged) may choose to apply for a large, medium, or small program award.

**All applicants should state clearly in the Summary Program Cover Sheet the geography that the proposed program will cover as well as the total population of the census tracts identified as disadvantaged by CEJST in the identified geography**. To determine the population of census tracts identified by CEJST as disadvantaged, applicants can download an Excel file, titled "Communities list data," from the CEJST downloads webpage. This Excel file includes population data for all census tracts and identifies the census tracts that are disadvantaged according to CEJST.

---

[20] Population size as published by CEJST at the time of application.

26

Applicants can use column "T," titled "identified as disadvantaged," of the communities list data Excel to determine if a census tract is identified as disadvantaged. If this column is "TRUE," the census tract is disadvantaged according to CEJST. Applicants can refer to column "W," titled "total population" of the communities list data Excel to determine the total population of people by census tract. Importantly, the communities list data Excel includes both disadvantaged census tracts and other census tracts. Applicants should only consider the population in census tracts identified as disadvantaged by CEJST to determine their award range.

To determine the applicable program award size for a program, applicants must use the population of disadvantaged census tracts identified by CEJST within the geography the program will serve. Applicants may not augment CEJST identified disadvantaged community population with other population data when determining the applicable program award. EPA is choosing to use CEJST population as a proxy metric to determine the appropriate award range for applications, so all applicants are using the same readily available metric to identify the appropriate award range. Applicants may still serve other categories of low-income and disadvantaged communities as defined in *Section I.D: Competition Terminology* in their programs and proposed workplans.

EPA reserves the right to modify the award allocation described in the table above based on the quality of applications that are received and other program considerations. EPA encourages applicants to maximize households served with the funds requested in their application.

## B. Period of Performance
EPA anticipates the start date for programs funded under this funding opportunity will be July 2024. All activities funded with the initial grant award must be completed within the negotiated program performance period of up to five years, meaning all program grant funds must be deployed as described in the application. In addition, if program income is generated from the program, grantees will be required to retain and reuse program income for additional capital deployment.

## C. Partial Funding
In appropriate circumstances, EPA reserves the right to partially fund applications by funding discrete portions or phases of proposed projects. If EPA decides to partially fund an application, it will do so in a manner that does not prejudice any applicants or affect the basis upon which the application, or portion thereof, was evaluated and selected for award, and therefore maintains the integrity of the competition and selection process.

## D. Additional Awards
EPA reserves the right to make additional awards under this funding opportunity, consistent with Agency policy and guidance, if additional funding becomes available after the original selections are made. Any additional selections for awards will be made no later than six months after the original selection decisions.

27

## E. Funding Type

EPA anticipates awarding cooperative agreements under this funding opportunity. Cooperative agreements provide for substantial involvement between the EPA Project Officer and the selected applicant(s) in the performance of the work supported. Although EPA will negotiate precise terms and conditions relating to substantial involvement as part of the award process (program specific forms of substantial involvement by employees of EPA and other Federal agencies (e.g., DOE) are likely), generally substantial federal involvement for these projects may include any or all the below activities.

- Closely monitoring the successful applicant's performance to verify the results proposed by the applicant

- Collaborating during performance of the scope of work

- Reviewing proposed procurement, in accordance with 2 CFR § 200.317 and 2 CFR § 200.318

- Approving qualifications of key personnel (EPA will not select employees or contractors employed by the award recipient)

- Approving completion of project phases before the recipient can draw down funding for subsequent project phases

- Reviewing and commenting on reports prepared under the cooperative agreement (the final decision on the content of reports rests with the recipient)

EPA does not have the authority to select employees or contractors employed by the recipient. The final decision on the content of reports rests with the recipient.

# Section III. Eligibility Information

## A. Eligible Applicants

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

Consistent with Assistance Listing No. 66.959, Section 134(a)(1) of the Clean Air Act, and EPA's Policy for Competition of Assistance Agreements (EPA Order 5700.5A1), eligible applicants for this competition include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit recipients. Applicants are required to be eligible applicants at the time of application. The definitions of a state, municipality, Tribal government, and eligible nonprofit recipient are described below.

1.   **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

2.   **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Note: if an applicant is applying as a COG, the applicant must provide a legal opinion from the State Attorney General's Office of the state of the COG's incorporation or charter, or the COG's Chief Legal Officer, confirming that the entity is a public body created by or pursuant to state law. The applicant must describe how they are an eligible applicant in the applicant's Summary Program Cover Page, as described in *Section IV.C: Content of Application Submission*.

3.   **Tribal Government:** In defining this term, EPA will use Section 302(r) of the Clean Air Act, which defines "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."[21] EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible applicant under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian tribe" in Section 302(r) of the Clean Air Act. Note: Intertribal consortia must provide documentation that it meets the requirements in 40 CFR 35.540(c) through signed memoranda of agreement, charters, copies of emails or conference call minutes establishing that the members of the consortium have authorized applying for Solar for All funding or similar documentation that meets regulatory requirements. The applicant

---

[21] EPA has determined that based on the exclusion of Alaskan Native Corporations (ANCs) from the definition of "Indian tribe" in section 302(r) of the Clean Air Act that ANCs are not eligible for direct grants from EPA under this program. ANCs may, however, receive "non-coalition member" subawards from eligible Solar for All grantees.

29

must describe how they are an eligible applicant in the applicant's Summary Program Cover Page, as described in *Section IV.C: Content of Application Submission*.

4. **Eligible Recipient** (titled "Eligible Nonprofit Recipient"): Section 134(c)(1) of the Clean Air Act provides that an eligible recipient (a) is a non-profit organization; (b) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (c) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this program; (d) is funded by public or charitable contributions; and (e) invests in or finances projects alone or in conjunction with other investors. An applicant must describe how they are an eligible recipient in the applicant's Summary Program Cover Page, as described in *Section IV.C: Content of Application Submission*. The applicant must provide supporting evidence (including organizational documents, such as articles of incorporation or similar documents filed with a governmental authority as a condition of carrying out its activities; tax filings; financial statements; investment records; and/or any other information the applicant deems appropriate) demonstrating that it satisfies <u>all</u> the requirements listed below.

   a. Meets the definition of nonprofit organization set forth in 2 CFR § 200.1[22]

   b. Has an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services"

   c. Does not receive any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act)

   d. Is funded by public or charitable contributions

   e. Has the legal authority to invest in or finance projects

   Further, to be an eligible nonprofit recipient, an applicant cannot be controlled by one or several entities that are not eligible nonprofit recipients, such as for-profit commercial banks or asset managers. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions); or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions, as determined by the EPA.[23] A term and condition specifying compliance with this requirement—and the other requirements of being an eligible recipient—may be

---

[22] 2 CFR § 200.1 states that a *nonprofit organization* "means any corporation, trust, association, cooperative, or other organization, not including Institutes of Higher Education, that: (1) is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest; (2) is not organized primarily for profit; and (3) uses net proceeds to maintain, improve, or expand the operations of the organization."

[23] EPA may use the indicia of control described in the 2 CFR § 180.905 definition of "Affiliate" as a basis for making such determinations.

30

included in the grant agreement and in the closeout agreement to ensure that grantees remain eligible recipients while they retain grant funds.

An eligible applicant, as described above, may apply to this competition as either an individual applicant or a "lead applicant" in a coalition.[24] Please see *Section I.D: Competition Terminology* for additional details on the definition of a coalition applicant.

An organization may submit more than one application for the Solar for All competition and more than one application to a particular award option so long as each application is for a different program (i.e., the program is in a different geography or for a different scope of work) and is separately submitted. As a reminder, an applicant interested in receiving funds from Solar for All should consider which award option the applicant will apply to and consult the guidance on the differences between each award option described in *Section II.A: Number and Amount of Awards*.

## B. Named Contractors and Named Subrecipients

A grantee who transfers funds awarded through this competition must comply with the Procurement Standards in 2 CFR § 200 and 1500, EPA's Subaward Policy, and EPA's Guidance on Participant Support Costs, as applicable, depending on the vehicle that the grantee uses to transfer funds, as well as the Participation by Disadvantaged Business Enterprises in EPA Programs requirements in 40 CFR § 33. Before naming contractors (including consultants) or subrecipients in your application, please carefully review Section IV.d, "Contracts and Subawards," of EPA Solicitation Clauses as well as the guidance in this section. In accordance with 2 CFR § 200.320(c)(2) and (4), the Agency does not accept justifications for sole source contracts for services or products available in the commercial marketplace based on a contractor's role in preparing an application or existing relationships that an applicant may have established without complying with competitive procurement requirements. However, as provided in 2 CFR § 200.317 *States* as defined in 2 CFR § 200.1 follow the same competitive policies and procedures they use for procurements with non-Federal funds, so EPA defers to state determinations on sole source contracting.

**Named Contractors.** EPA does not require or encourage applicants to name procurement contractors (including consultants) in applications for grant funding. However, if an applicant chooses to identify a procurement contractor(s) to conduct work proposed in this application, the applicant must comply with the following requirements even if the entity is referred to as a "partner" in the application.

Applicants (other than states) that identify a procurement contractor(s) in their application where the amount of the contract will be more than the micro-purchase threshold in 2 CFR § 200.320(a)(1) ($10,000 for most applicants) must demonstrate, in their application, how the contractor (including consultants) was selected in compliance with the fair and open competition

---

[24] In either case, the individual applicant or lead applicant may make additional subawards to carry out a portion of the grant's activities, even if those subrecipients were not named in the application, provided that they are consistent with the grant's terms and conditions and with all applicable requirements, including the EPA Subaward Policy. EPA provides additional guidances in the EPA Subaward Policy Frequent Questions.

requirements in 2 CRF § 200 and 2 CFR § 1500. EPA provides guidance on complying with the competition requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements. For example, EPA will not accept sole source justifications for proposed procurement contracts for services such as environmental consulting and engineering that are available in the commercial marketplace. Applicants (other than states) must describe the procurement procedures that were followed to hire the contractor(s) that is named in this application and include information on where and when the Request for Proposals/Request for Qualifications was posted in the Summary Program Cover Sheet, as described in *Section IV.C: Content of Application Submission*.

**Failure to demonstrate compliance with these requirements for named contractors in the application will result in rejection of the application.**

*Successful applicants that do not name procurement contractors in their applications must also comply with these requirements, regardless of if the contractor was procured before or after the EPA grant agreement is awarded. For example, firms or individual consultants that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals must be excluded from competing for such procurements as provided in 2 CFR § 200.319(b).*

**Named Subrecipients.** With the exception of coalition applications, defined in *Section I.D: Competition Terminology*, EPA does not require nor encourage applicants to name subrecipients in applications for grant funding. For this competition, the EPA requires any named subrecipient to be part of a coalition application as a non-lead coalition member, which must be eligible for a subaward in compliance with Appendix A of EPA's Subaward Policy. This policy provides, among other requirements, that transactions between grantees and for-profit firms and individual consultants are procurement contracts rather than subawards when the transaction involves the acquisition of services from the firm or individual.

**Failure to demonstrate compliance with these requirements for named subrecipients (including coalition members) in the application will result in rejection of the application.**

*Refer to EPA's Contracts and Subawards Solicitation Clause for additional guidance on these requirements, which must be met for all contractors (except for micro-purchases) and/or subrecipients specifically named in the application. EPA staff may contact the applicant to clarify issues or obtain additional information before making a final determination of non-compliance and rejection of the application.*

## C. Threshold Eligibility Criteria

All applications must meet the eligibility requirements described in this section. If necessary, EPA may contact applicants to clarify threshold eligibility questions prior to making an eligibility determination. Applicants deemed ineligible for funding consideration because their applications fail to satisfy the threshold eligibility review will be notified within 15 calendar days of the ineligibility determination.

Applications must meet the following threshold criteria to be considered eligible:

- Applications must comply with the content and submission requirements, as listed below.

  - Applications must substantially comply with the application submission instructions and requirements set forth in *Section IV.B: Application Materials* else they will be rejected. Where a page limit is expressed in *Section IV.B* with respect to the application, or parts thereof, pages in excess of the page limitation will not be reviewed. Applicants are advised that readability is of paramount importance and should take precedence in application format, including selecting a legible font type and size for use in the application.

  - Applications must be submitted through Grants.gov as stated in *Appendix A: Grants.Gov Application Submission Instructions* of this funding opportunity (except in the limited circumstances where another mode of submission is specifically allowed for as explained *Appendix* A) on or before the application submission deadline published in *Section IV.A: Due Date and Submission Instructions* of this funding opportunity. Applicants are responsible for following the submission instructions in *Section IV.A* and *Appendix A* of this funding opportunity to ensure that their application is timely submitted. Please note that applicants experiencing technical issues with submitting through Grants.gov should follow the instructions provided in *Section IV.A* and *Appendix A*, which include both the requirement to contact Grants.gov and email a full application to EPA prior to the deadline.

  - Applications submitted outside of Grants.gov will be deemed ineligible without further consideration unless the applicant can clearly demonstrate that it was due to EPA mishandling or technical problems associated with Grants.gov or SAM.gov. An applicant's failure to timely submit their application through Grants.gov because they did not timely or properly register in SAM.gov or Grants.gov will not be considered an acceptable reason to consider a submission outside of Grants.gov.

- Applicants, including lead applicants for coalitions, must submit a Notice of Intent (NOI) by the listed deadline and according to the instructions in *Section I.F: Required Notice of Intent*. Information submitted in the NOI must be identical to information submitted in the application, except answers to question 1 (applicant name) for some applicants and answers to question 3.c (estimated EPA funding amount requested) for all applicants. These exceptions are explained below.

  - For question 1 (applicant name): units of government that are states (including the District of Columbia and Puerto Rico), territories (i.e., The Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands), Tribal governments, and individual municipalities may change which government agency submits an application after the NOI is submitted, so long as each unit of government submits only one NOI or application. If more than one agency of a unit of government submits an NOI, EPA staff will contact the agencies and advise them to coordinate to

33

decide which agency(ies) will withdraw the NOI(s) such that EPA receives only one NOI per unit of government.

- Applicants that are eligible nonprofits recipients, councils of government, and intertribal consortia must be the same legal entity that submitted an NOI unless EPA's Selection Official or designee grants a waiver to this requirement based on an unanticipated change in circumstances that have taken place since the submission of the NOI.

- For question 3.c (estimated EPA funding amount), all applicants may change the EPA requested funding amount submitted in the NOI in their application. If applicants change their EPA requested funding amount, applicants must explain why the requested funding amount in the application is different than the requested funding amount in the NOI.

- Applicants must be an eligible applicant as described in *Section III.A: Eligible Applicants* and, if required according to *Section III.A*, must provide supporting evidence that demonstrate this eligibility, as described in *Section III.A* and below.

  - Intertribal consortia must provide documentation that it meets the requirements in 40 CFR 35.540(c) through signed memoranda of agreement, charters, copies of emails or conference call minutes establishing that the members of the consortium have authorized applying for Solar for All funding or similar documentation that meets regulatory requirements.

  - Councils of Government (COGs) must provide a legal opinion from the State Attorney General's Office of the state of the COG's incorporation or charter, or the COG's Chief Legal Officer, confirming that the entity is a public body created by or pursuant to state law.

  - Eligible nonprofit recipients must provide supporting evidence (including organizational documents, such as articles of incorporation or similar documents filed with a governmental authority as a condition of carrying out its activities; tax filings; financial statements; investment records; and/or any other information the applicant deems appropriate) demonstrating that it satisfies all the requirements listed below.

    a. Meets the definition of nonprofit organization set forth in 2 CFR § 200.1[25]

    b. Has an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services"

---

[25] 2 CFR § 200.1 states that a *nonprofit organization* "means any corporation, trust, association, cooperative, or other organization, not including Institutes of Higher Education, that: (1) is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest; (2) is not organized primarily for profit; and (3) uses net proceeds to maintain, improve, or expand the operations of the organization."

34

    c. Does not receive any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act)

    d. Is funded by public or charitable contributions

    e. Has the legal authority to invest in or finance projects

- Applications must comply with the requirements for named contractors and subrecipients, as described in *Section III.B: Named Contractors and Named Subrecipients*. The EPA does not require nor encourage applicants to name procurement contractors (including consultants) or subrecipients in applications for grant funding. However, if an applicant chooses to identify a procurement contractor(s) to conduct work proposed in this application or subrecipient(s) to participate in a coalition application to carry out the substantive activities listed in the grant application, the applicant (other than a state applicant) must demonstrate compliance with the requirement.

- Applicants must submit an application for a program that provides grants, loans, and other forms of financial assistance (e.g., participant support costs), as well as technical assistance, to enable low-income and disadvantaged communities to deploy and benefit from residential rooftop and residential-serving community solar, associated storage, and enabling upgrades as defined in *Section I.D: Competition Terminology*.

- Applicants must request funds for activities that serve communities within the boundaries of the United States (including Puerto Rico) and its territories.

- Applicants must request an award to be expended over a period of performance of five years or less.

- Applications for an award must be for no less than $25 million.

- Applicants must submit proposals for funding amounts that do not exceed the program award ranges requirements described in *Section II.A: Number and Amount of Awards* according to the population of disadvantaged census tracts identified by CEJST in the geography the applicant is covering with their proposed program.

- Applications must not include unallowable costs, as described in *Section III.D: Allowable and Unallowable Costs*. If an application is submitted that includes any unallowable costs, including those described in *Section III.F,* as well as unallowable costs described in 2 CFR § 200, Subpart E and the applicable provisions of 2 CFR § 1500 EPA's Guidance on Selected Items of Cost for Recipients, that portion of the application will be ineligible for funding and may, depending on the extent to which it affects the application, render the entire application ineligible for funding.

- **Coalitions:** Coalition applications must include a signed Memorandum of Agreement (MOA) that confirms participation of each coalition member in their application.

- Applications must only address one of the three award options as described in *Section II.A: Number and Amount of Awards*. Applicants may submit multiple applications, as long as

35

each application only addresses one award option. Applications that address more than one award option will be deemed ineligible.

- **For applications to award option #1 - (up to 56 awards to serve state and territory geographies):**

  - Applications must propose a program that serves low-income and disadvantaged communities in only <u>one state or territory</u>. A coalition of municipalities in the <u>same state/territory</u> should apply under award options #1. Note: programs under this award option do not need to serve the entirety of the state. For example, a municipality or coalitions of municipalities in the same state/territory can apply for award option #1. Similarly, a Tribal government may propose a program in one state.

- **For applications to award option #2 - (up to 5 awards to serve American Indian and Alaska Native communities):**

  - Applicants must be a Tribal government (including intertribal consortia), an eligible nonprofit recipient, or a coalition with a lead applicant that is either a Tribal government or an eligible nonprofit recipient as defined in *Section III.A: Eligible Applicants*. If the applicant is an eligible nonprofit recipient, the applicant must have Tribal leadership at the senior management level (e.g., Chief Executive Officer, Chief Operating Officer, at least one Member of the Board of Directors) and experience serving American Indian and Alaska Native Communities.

  - Applications must propose a program that serves American Indian and Alaska Native Communities.

- **For applications to award option #3 - (up to 10 awards to serve similar communities across multiple states):**

  - Applicants must be a Tribal government (including intertribal consortia), a municipality (including councils of governments), an eligible nonprofit recipient or a coalition with a lead applicant that is either a Tribal government, municipality, or an eligible nonprofit recipient as defined in *Section III.A: Eligible Applicants*.

  - Applications must propose a program that serves low-income and disadvantaged communities in multiple states and territories.

## D. Allowable and Unallowable Costs

The following list outlines **allowable costs** for this competition.

- Costs for eligible financial assistance, as defined in *Section I.D: Competition Terminology* as subgrants, rebates, subsidies, other incentive payments, or loans, consistent with the definition of "federal financial assistance" in 2 CFR § 200.1

- Costs for eligible technical assistance as defined in *Section I.D: Competition Terminology*. Eligible technical assistance examples include workforce training, customer outreach and education, project development & deployment assistance (including services and tools from National Labs), and coordination with utilities for the purposes of project deployment

- Participant support costs for trainees in workforce development programs may be allowable with prior approval by the EPA award official pursuant to the EPA Guidance on Participant Support Costs

- Costs for acquiring or improving real property, including related equipment purchases with the prior approval of EPA's Award Official. As provided in 2 CFR § 200.316 EPA will require that grantees " . . . record liens or other appropriate notices of record to indicate that personal or real property has been acquired or improved with a federal award and that use and disposition conditions [described in 2 CFR § 200.311 and 2 CFR § 200.313] apply to the property"

- Costs for fund-raising and preparation of proposals for funding from private foundations, federal agencies, and states may be allowable with prior EPA approval if the funds acquired will be used to meet the statutory objectives of the Solar for All grant program. Additional information is available in Items 4 and 6. b. of EPA's Selected Items of Cost Guidance

- Costs for program administration, including but not limited to:

    o Costs for staff salaries, technology, and other office supplies, as either direct or indirect costs, in accordance with 2 CFR § 200 Subpart E and the applicant's Federally-approved indirect cost rate under 2 CFR § 200.414; note that costs must be consistently characterized as either direct or indirect as provided in 2 CFR § 200.412

    o Costs for advisory councils to meet the GGRF program objectives. Advisory councils are groups of individuals who are not employees of the grantee or a subgrantee that provide strategic and policy advice to the organization; refer to Item 2 of EPA's Selected Items of Cost Guidance for additional information on the allowability of costs for Advisory councils

    o Costs for reporting and compliance, including those to support, monitor, oversee, and audit subrecipients, contractors, and program beneficiaries

    o Costs for program evaluation activities including the personnel and equipment needed for data infrastructure and expertise in data analysis, performance, and evaluation

    o Indirect costs to the extent authorized by applicable provisions of 2 CFR § 200.414 and EPA's Indirect Cost Policy

All costs must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. EPA's Guidance on Selected Items of Cost for Recipients provides additional details on the allowability of costs for advisory councils to meet program objectives for this competition.

The following list outlines **unallowable costs** for this competition.

- Costs for financial and technical assistance for technologies other than projects included as "Eligible Zero-Emissions Technologies" defined in *Section I.D: Competition Terminology*

37

- Costs that are unallowable under 2 CFR Part 200, Subpart E and under applicable provisions of 2 CFR Part 1500 (i.e., consultant fees in excess of those allowable under 2 CFR § 1500.10)

- Costs for supporting or opposing union organizing, whether directly or as an offset for other funds

- Costs for cost sharing, as defined in 2 CFR § 200.306, absent authorization in a Federal statute

- Costs of acquiring "intangible property," as defined in 2 CFR 200.1, including equity investments, such as purchases of ownership interests in companies

- Direct costs for preparing the application to this competition

If an application is submitted that includes any unallowable costs, that portion of the application will be ineligible for funding and may, depending on the extent to which it affects the application, render the entire application ineligible for funding.

## E.  Cost Sharing or Matching

Cost sharing is not a requirement to be eligible to apply to this solicitation.

38

# Section IV. Application and Submission Information

## A. Due Date and Submission Instructions

An application package may be obtained by visiting this funding opportunity (EPA-R-HQ-SFA-23-01) on Grants.gov. Applicants will be prompted to initiate the application process by generating a Workspace for this opportunity.

Your organization's Authorized Organization Representative (AOR) must submit your complete application package[26] electronically to EPA through Grants.gov. Only person(s) with the AOR role can submit applications to Grants.gov. Please review the Intro to Grants.gov – Understanding User Roles and Learning Workspace – User Roles and Workspace Actions for details on this process.

Application packages must be submitted on or before October 12th, 2023, at 11:59 PM (Eastern Time) through Grants.gov. Applications received after the closing date and time will not be considered for funding. Please allow enough time to successfully submit your application package and allow for unexpected errors that may require you to resubmit. Occasionally, technical and other issues arise when using Grants.gov.

Refer to *Appendix A: Grants.gov Application Submission Instructions* for the requirements to apply through Grants.gov. In order to submit an application through Grants.gov, your organization must satisfy all of the requirements listed below.

- Have an active System for Award Management (SAM) account in SAM.gov and a Unique Entity Identifier (UEI) assigned by SAM.gov

- Be registered in Grants.gov

- Have the E-Business Point of Contact designate an AOR in Grants.gov

**The registration process for all the above items may take a month or more to complete. Applicants should begin this process as soon as possible.**

In concert with EPA's commitment to conducting business in an open and transparent manner, copies of applications selected under this funding opportunity may be made publicly available on the GGRF website or another public website for a period of time after the selected applications are announced. EPA recommends that applications not include trade secrets or commercial or financial information that is confidential or privileged, or sensitive information, if disclosed, that would invade another individual's personal privacy (e.g., an individual's salary, personal email addresses, etc.). However, if such information is included, it will be treated in accordance with 40 CFR § 2.203 (refer to *Section IV.a* of EPA Solicitation Clauses for additional information).

*Clearly indicate which portion(s) of the application you are claiming as confidential business information. As provided at 40 CFR § 2.203(b), if no claim of confidential treatment accompanies*

---

[26] Note, for the purposes of this competition, the "application package" includes the required federal forms available at www.grants.gov as well as the Program Narrative and associated attachments.

*the information when it is received by EPA, it may be made available to the public by EPA without further notice to you.*

## B. Application Materials

The following forms and documents are required under this announcement and are included in the Workspace you generate on Grants.gov.

**Mandatory Documents:**

1. Application for Federal Assistance (SF-424)

2. Budget Information for Non-Construction Programs (SF-424A)

3. EPA Key Contacts Form 5700-54

4. EPA Form 4700-4 Preaward Compliance Review Report

5. Grants.gov Lobbying Form

6. Program Narrative: Use "Project Narrative Attachment Form" in your Workspace on Grants.gov to submit your Program Narrative, prepared as described in *Section IV.C: Content of Application Submission.* As described in *Section IV.C,* the Program Narrative has a limit of 40 pages. **Please upload the Program Narrative as one document.**

7. Attachments: Use "Project Narrative Attachment Form" in your Workspace on Grants.gov to submit the attachments listed below that must be included in the application package and do **not** count toward the 40-page limit for the Program Narrative. **Please limit the number of files for the attachment items by consolidating all attachment items (excluding Excel uploads if using optional Excel templates EPA has provided) into one document in the order presented below.**

    - **Attachment A:** Summary Program Cover Page

    - **Attachment B:** Copy of the submitted Notice of Intent, which was submitted by the listed deadline and according to the instructions in *Section I.F: Required Notice of Intent*

    - **Attachment C:** Eligibility evidence documents supporting that the applicant is an eligible applicant as described in *Section III.A: Eligible Applicants*. Note: applicants applying as eligible nonprofit recipients, municipalities under the definition of a council of government (COG), or Intertribal Consortia are required to provide evidence documents as described in *Section III.A*.

    - **Attachment D:** Program Planning Timeline and Workplan described in Section 1.7 of the Program Narrative; an optional Excel template is included for applicants to download on epa.gov/GGRF

    - **Attachment E:** Budget Table described in Section 2.1 Budget Narrative of the Program Narrative; guidance on how to build the Budget Table is included in *Appendix B.A: Guidance for Detailed Budget Table*; an optional Excel template is included for applicants to download on epa.gov/GGRF

- **Attachment F:** Programmatic Capability and Environmental Results Past Performance described in Section 3 of the Program Narrative

- **Attachment G (for coalition applications only):** Memorandum of Agreement (MOA) as evidence of coalitions as described in *Section III.C: Threshold Eligibility Criteria*

- **Attachment H (for applications with proposed subgrants only):** Organizational table, which includes all entities by name (if known) or by description/type (e.g., community-based organization, utility) and explains in two to three sentences or bullets what activities each entity will perform for the program

**Optional Documents:**

8. Other Attachments: Use "Other Attachments Form" in your Workspace on Grants.gov to submit the following documentation, which is not required, but encouraged to be submitted, and will **not** count toward the 40-page limit for the Program Narrative. **Please limit the number of files for the attachment items by consolidating all attachment items into one document in the order presented below.**

   - **Attachment I:** Letters of support from potential partnerships with community-based organizations, unions, industry associations, workforce development programs, worker centers, and other partners who are interested in helping the program execute the Section 1.2 Meaningful Benefits Plan as described in *Section IV.C: Content of Application Submission*

   - **Attachment J:** Letters of support from public utility commissions, utilities, governor's offices, lead sponsors on legislative text, or other evidence of support for the proposed scope of work in the Section 1.3 Distributed Solar Power Market Strategy of the Program Narrative, as described in *Section IV.C: Content of Application Submission*, that enable low-income and disadvantaged communities to deploy and benefit from residential rooftop and residential-serving community solar and storage

   - **Attachment K:** Letters of support from potential partnerships with community-based organizations, nonprofits, unions, industry associations, worker centers, workforce development programs, and other partners who are interested in helping the program execute the Section 1.5 Project-Deployment Technical Assistance Plan as described in *Section IV.C: Content of Application Submission*

   - **Attachment L:** Letters of support from potential partnerships with community-based organizations, public housing authorities, utilities, rural electric utilities, affordable housing developers, unions, industry associations, workforce development programs, and other partners who are interested in helping the program execute the Section 1.6 Equitable Access and Meaningful Involvement Plan as described in *Section IV.C: Content of Application Submission*

9. Disclosure of Lobbying Activities (SF-LLL), if applicable - See Grants.gov Lobbying Form to determine applicability

41

## C. Content of Application Submission

The forms and documents required as part of the application submission are described in *Section IV.B: Application Materials*. Below are the instructions for **Attachment A: Summary Program Cover Page** and the **Program Narrative**.

**Instructions:** The Summary Program Cover Page and Program Narrative should comply with the instructions, format, and content described below. The Program Narrative should also address the criteria in *Section V.A: Evaluative Criteria*. The Program Narrative must follow all the requirements listed below.

- Must not exceed the aforementioned page limits

- Must only rely on the text in the above-mentioned page limits. **While attachments do not count toward the above-mentioned page limits, they may only serve as reference documents** for content described in the Program Narrative; attachments that provide new content, rather than serve as reference documents, will not be reviewed or considered. Links to external websites or content will not be reviewed or considered

- Must be Letter size (8 ½ inches x 11 inches) typed, single-spaced pages in 12-point Times New Roman font with one column per page with 1-inch margins on all sides

It is strongly advised that applicants organize their applications in the order presented in *Section IV.B: Application Materials*, appropriately number and label the sections of the Program Narrative per the numbers and labels used below, and limit the number of attachments when submitting via Grants.gov. **Please upload the Program Narrative as one document and limit the number of files for the attachment items by consolidating all attachment items into one document in the order presented in *Section IV.B: Application Materials*; attachment items that are Excel files (such as the optional template EPA has provided to complete Attachment D: Program Planning Timeline and Workplan and Attachment E: Budget Table available for download on www.epa.gov/GGRF) may be submitted separately as an attachment as Excel files and the file name and title should be clearly titled and lettered according to the attachment item the document addresses.**

**To assist EPA reviewers, applicants are strongly encouraged to reference the numbers and titles of the evaluation criteria in their Program Narratives to help identify where the criteria are being addressed.**

**Summary Program Cover Page** (maximum of four pages) provides an overview of the application and must include the below components.

1. **Program Title:** Provide a name for the program.

2. **Brief Program Summary:** Provide a four- to five-sentence summary of the program, including the program's mission, geography, scope of work, and other relevant summary points. Include in your description an explanation of how the proposed program will deliver on the GGRF program objectives described in *Section I.C: GGRF Solar for All Program Objectives*. If selected, EPA may use this summary publicly describe the program.

3. **Applicant Name:** Identify the name of the organization applying.

4.  **Award Option Type:** Identify if you are applying to Award Option #1, Award Option #2, or Award Option #3, as described in *Section II.A: Number and Amount of Awards*. Describe in three to four sentences why you are applying to the specific award option considering the eligibility criteria defined in *Section III.C: Threshold Eligibility Criteria*. *Note: for eligible nonprofit recipients applying to award option #2, please provide evidence for how the applicant has Tribal leadership at the senior management level (e.g., Chief Executive Officer, Chief Operating Officer, at least one Member of the Board of Directors) and experience serving American Indian and Alaska Native Communities (e.g., previous investments in American Indian and Alaska Native Communities).*

5.  **Applicant Eligibility:** Indicate whether you are a state/territory, Tribal government, municipality, or eligible nonprofit recipient using the criteria outlined under *Section III.A: Eligible Applicants*. Summarize in two to three sentences the supporting evidence the applicant uses in Attachment C to prove applicant eligibility according to the evidence described in *Section III.A*.

6.  **Program Location:** Describe the geographies the program will serve. *Note: applications applying to award option #1 should address only one state/territory geography as described in *Section II.A: Number and Amount of Awards*.*

7.  **Program Scope of Work:** Describe in three to four sentences how the proposed program will deliver on the activities described in *Section I.E: Scope of Work*, including a summary of the types of financial and technical assistance the program will perform.

8.  **EPA Funding Requested:** Specify the amount you are requesting from EPA and the associated award tier (as specified in *Section II.A: Number and Amount of Awards*). You should specify the amount of funding you stated in your NOI response, and if the funding amount changed between the NOI and the application, explain why the funding requested has changed.

9.  **Population of census tracts identified by CEJST as disadvantaged:** Specify the sum total population of the census tracts identified by CEJST as disadvantaged in the geography the program is applying to serve. Applicants can download an Excel file, titled "Communities list data" with population data for all disadvantaged census tracts from the CEJST downloads webpage in order to determine the total population of census tracts identified as disadvantaged.[27] Describe the geography applicants used to determine this population—either at the state/territory, county, or Census tract 2010 ID level. The description of geography should be no different than the program location above.

10.  **Impact Targets:** Detail the impact you expect to have through the entire program period by stating (1) the number of households projected to benefit from the solar program (both as an absolute number of households and award funding requested per household); (2) the

---

[27] Please refer to *Section II.A: Number and Amount of Awards* for guidance on how to use the CEJST communities list data Excel. To determine the applicable program award size for a program, applicants must use the population of disadvantaged census tracts identified by CEJST within the geography the program will serve. Applicants may not augment CEJST identified disadvantaged community population with other population data when determining the applicable program award. EPA is choosing to use CEJST population as a proxy metric to determine the appropriate award range for applications, so all applicants are using the same readily available metric to identify the appropriate award range. Applicants may still serve other categories of low-income and disadvantaged communities as defined in *Section I.D: Competition Terminology* in their programs and proposed workplans.

megawatts of solar capacity deployed over time (both as an absolute number of megawatts of solar deployed and dollars of award funding requested per megawatts of solar); (3) megawatt hours of storage capacity deployed over time (both as an absolute number of megawatt hours of storage deployed and dollars of award funding requested per megawatt hours of storage); (4) short tons of annual carbon dioxide ($CO_2$) emissions avoided over time (both as an absolute number of tons of $CO_2$ reduced and dollars of award funding requested per tons of $CO_2$ reduced); and the (5) absolute amount of household savings realized over time (both as an absolute number of dollars saved and dollars of award funding requested per dollars of household savings).

11. **Program Period:** Provide the estimated beginning and ending dates for the period of performance for the program.

12. **Contact Information:** Include a name, title, address, email address, and phone number. You can list both a primary and an administrative contact.

13. **Coalition Partners:** Include the names of all organizations in this application if applying as a coalition. For each organization, include contact information as described above. Include a memorandum of agreement for the entire coalition in Attachment G.

14. **Named Contractors.** Include all named contractors that are part of this application. For each named contractor (for applicants other than state), describe the procurement procedures followed to hire the contractor(s) and include information on where and when the Request for Proposals/Request for Qualifications was posted. If this application does not have named contractors, please write "not applicable."

15. **Additional Named Subrecipients:** Include all named subrecipients that are part of this application, other than the coalition partners covered above. For each organization, explain how that organization is eligible for a subaward under the EPA Subaward Policy. If there are no named subrecipients in this application, please write "not applicable."

**Program Narrative** (maximum of 40 pages) addresses each of the evaluation criteria in *Section V.A: Evaluative Criteria* and must include the below components. Reminder: Any attachments to the Program Narrative referenced below are not considered part of the 40-page limit.

1. **Program Strategy Narrative:** Explain how you will develop and execute a robust and equitable program that enables the rapid deployment of distributed solar and associated storage with meaningful benefits to low-income and disadvantaged communities. Include the below components.

    1. **Impact Assessment:** Describe the market environment for residential-serving distributed solar and storage deployment in the geography you are applying to serve, including market-wide historical deployment rates and participation of low-income and disadvantaged households and communities in the market. Based on past deployment rates in the geography you are applying to serve or comparable market data, you should set reasonable output and outcome targets for capacity of solar and storage deployed, households served, projected annual carbon dioxide ($CO_2$) emissions avoided (short tons) according to EPA's Avoided Emissions and Generation Tool (AVERT), annual household savings realized, as well as any additional output and outcome metrics as detailed in *Section I.H: Measuring and*

44

*Reporting Environmental Results*. If AVERT does not support your geography, please refer to the equation in *Appendix F: Guidance for Carbon Dioxide Avoided Calculations*.[28] If projected outputs and outcomes are evaluated and influence the selection decision, you are expected to achieve them during period of performance.

2. **Meaningful Benefits Plan:** Describe how you will ensure the program delivers meaningful benefits as defined in *Section I.D: Competition Terminology* for low-income and disadvantaged households. The meaningful benefits of solar with storage include (1) delivering a minimum 20% of household savings to program beneficiaries; (2) increasing low-income and disadvantaged households' access to solar through financing products and deployment options; (3) increasing resiliency and grid benefits by creating capacity that can deliver power to low-income and disadvantaged households and/or critical facilities serving low-income and disadvantaged households during a grid outage; (4) facilitating ownership models that support low-income households and communities building equity in projects; and (5) investing in quality jobs and businesses in line with the Administration's Good Jobs Principles and Executive Order 14082 *(Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022)*. You should articulate a plan for creating high quality, middle-class jobs in the rapidly growing residential-serving distributed solar energy industry that pay family-sustaining wages and include strong labor standards, including benefits, safe working conditions, and the free and fair choice to join or form a union. You should describe how these plans are centered on delivering meaningful benefits to low-income and disadvantaged communities where solar energy is being deployed through the creation of high-quality jobs and shared economic opportunity in those communities. Strong applications will include multi-sectoral partnerships with key stakeholders in the workforce development ecosystem needed to execute on this vision for a robust and inclusive clean energy workforce, and applicants may include letters of support from these partners in Attachment I of their application. Additional details on job quality are included in *Appendix E: Equitable Workforce Development and Job Quality*.

3. **Distributed Solar Market Strategy:** Describe the market barriers to residential-serving distributed solar deployment in the geography you are applying to serve and how you plan to address those barriers to enable low-income and disadvantaged communities to deploy and benefit from residential rooftop and residential-serving community solar and storage. Examples of market barriers include net metering policies, third party ownership policies, and opaque interconnection processes. In Attachment J of the application, you may include letters of support from stakeholders, such as Governor's offices, public utility commissions, utilities, in the geography you propose to serve, to evidence that the proposed Distributed Solar Market Strategy is achievable.

4. **Financial Assistance Strategy:** Describe how you will use Solar for All funds to provide eligible financial assistance, as defined in *Section I.D: Competition*

---

[28] AVERT does not include data for Alaska, Hawaii, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, nor the Commonwealth of the Northern Mariana Islands.

45

*Terminology*, to enable low-income and disadvantaged communities to deploy and benefit from residential rooftop and residential-serving community solar and storage. You should include a financial assistance model that defines the type, size, and deployment strategy of financial assistance. You should specify which solar projects the program will provide financial assistance for (i.e., rooftop residential solar and/or residential-serving community solar) and, if the program will include both project-types, the anticipated share of funding for each project-type. You should detail if and how the program will financially support storage (including storage deployment targets) and prudently provide financial assistance for enabling upgrades—while maximizing solar deployment. You should describe how the program will complement, and not duplicate, existing subsidies, tax credits, and other sources of financing and support deployment that would not have occurred otherwise.

5. **Project-Deployment Technical Assistance Strategy:** Describe how you will support communities and other solar market stakeholders (e.g., solar developers, contractors, affordable housing developers, owners) with technical assistance to develop project pipeline and deploy solar, as defined in *Section I.D: Competition Terminology*. Project-deployment technical assistance services should include investments in workforce development, project deployment technical assistance (e.g., siting, permitting, interconnection), and other technical assistance. You should consider what project-deployment technical assistance services are already provided by federal, non-profit, and other market actors to minimize duplication and plan to leverage existing resources. EPA has included a non-exhaustive list of reports and resources on epa.gov/GGRF to help applicants identify potential project-deployment technical assistance resources and tools. As part of catalyzing a robust and inclusive solar energy market, you should demonstrate a plan for developing the necessary workforce to install solar in the geography you propose to serve. In line with the job quality goals discussed in Section 1.2 Meaningful Benefits Plan, training plans should articulate how participants will be trained for and placed in high-quality careers. To meet the labor needs of the rapidly growing solar industry, you should propose workforce training models that prepare individuals from low-income and disadvantaged communities for middle-class career pathways in partnership with workforce partners. See *Appendix E: Equitable Workforce Development and Job Quality* for expanded descriptions and resources for high-quality training models and partnerships.

6. **Equitable Access and Meaningful Involvement Plan:** Describe how your customer acquisition strategy will maximize solar deployment across the geography you will serve, ensuring equitable access to and participation in the program. Equitable access means all communities, especially historically underserved households and communities, can benefit from this program. Explain how you will educate and engage communities on the benefits of solar energy. Describe how your outreach and marketing strategies are culturally appropriate and responsive to the needs of the communities you are proposing to serve. You should consider how you may need to employ different engagement strategies to reach different types of communities, including urban, rural, and suburban communities; communities with limited English proficiency; and different types of residential

46

buildings, including single-family, multi-family, and manufactured homes. To ensure equitable access, you should describe how low-income and disadvantaged communities will be involved in program design and operations. Describe how communities can participate in program and project design, in formal input and feedback structures. These formal structures should include participatory governance and regular, meaningful engagement with community-based organizations and residents of low-income and disadvantaged communities. Applicants applying to award option #2 should center this plan on American Indian and Native Alaska communities. If you are applying to award option #1 and there are American Indian and Native Alaska communities in your geography, you should describe how the program will serve these communities and meaningfully involve these communities in program planning and operations. If you are applying to award option #3 and are choosing to serve American Indian and Native Alaska communities in your geography, you should describe how the program will serve these communities and meaningfully involve these communities in program planning operations.

7. **Program Planning Timeline and Workplan Narrative:** Provide a narrative for your Program Planning Timeline and Workplan to be included in Attachment D of the application. The workplan should describe how you will plan and implement the Solar for All program, including steps and milestones to implement the strategies and plans described in the Meaningful Benefits Plan (Section 1.2), Distributed Solar Market Strategy (Section 1.3), the Financial Assistance Strategy (Section 1.4), the Project-Deployment Technical Assistance Strategy (Section 1.5), and the Equitable Access and Meaningful Involvement Plan (Section 1.6). The workplan may also include steps to refine the program plan during a planning period. If including a program planning period, you should consider existing federal, academic, and philanthropic platforms, tools, and resources you may plan to leverage to support program planning and any partnerships you have established or plan to establish to support program planning and implementation. EPA has included a non-exhaustive list of reports and resources on epa.gov/GGRF to help you identify additional program design questions as well as program planning resources and tools, these examples include DOE's States Collaborative, DOE's National Community Solar Partnership's direct technical expertise and capacity building services. A timely plan will ensure that the planning period is at most one year and that the program spends all funds within five years of the award.

2. **Program Administration Narrative:** Describe how you will administer the grant program and demonstrate you have the policies, procedures, tools, and capabilities to successfully achieve the program goals. You should include the components listed below.

1. **Budget Narrative:** Provide a narrative to describe in more detail the budget found in SF-424A and the Budget Table included in Attachment E of the application. In this narrative, describe how you will deploy funds efficiently and cost-effectively and explain how the costs are prudent and necessary to achieve the outcomes of the program. You should separate out costs (both direct costs and indirect costs charge to the direct costs) for financial assistance to demonstrate in the Budget Table how

the program budget achieves the target minimum funding amounts for financial assistance detailed in the table below. For additional information on how to approach the budget, refer to *Appendix B.A: Guidance for Detailed Budget Table*. Please reference and consider allowable and unallowable costs in *Section III.D: Allowable and Unallowable Costs*. For additional guidance on preparing a program budget, refer to EPA's Indirect Cost Guidance and Budget Detail Guidance.

*The below table summarizes the guidance on minimum share of funds for financial assistance by award option. Note: the cost guidance below applies to both direct costs and the associated indirect costs charged to direct costs.*

|  | **Award Option #1** – State and Territory Programs | **Award Option #2** – American Indian and Alaska Native Programs | **Award Option #3** – Multi-state Programs |
|---|---|---|---|
| **Financial Assistance**, share of funds | Target at least **75%** of funds | Target at least **65%** of funds | Target at least **75%** of funds |

2.  **Fiscal Stewardship Plan:** Describe your approach to ensuring compliance with the grant's terms and conditions, including but not limited to the requirements in 2 CFR § 200.303 and 2 CFR § 200.332(b) and (d) if the applicant intends to provide subawards to eligible subrecipients and the information specified in Section 3 c. of the EPA Guidance on Participant Support Costs for subsidies, rebates or other incentive payments authorized under 2 CFR 1500.1(b). You should have comprehensive policies and procedures to ensure robust risk management across your activities; prevent fraud, waste, and abuse; and prudently manage grant funds. Additionally, you must explain your plan for consumer protection, including how you will ensure program partners and entities that directly interact, transact, or contract with consumers as part of the program, such as through the sales and marketing of solar products or services, and consumer purchase, leasing and financing (including Property Assessed Clean Energy (PACE) financing), will comply with applicable consumer protection laws, including the consumer protection laws in the jurisdiction(s) your program will serve, and federal consumer protection and consumer financial laws, such as laws prohibiting unfair, deceptive, and abusive practices (e.g., the Federal Trade Commission Act (15 U.S.C. § 45), Consumer Financial Protection Act (12 U.S.C. § 5536), and Fair Debt Collection Practices Act (15 U.S. Code § 1692e), and Regulation Z (12 CFR § 1026), which requires the disclosure of terms and cost of consumer credit and offers substantive protections to people who use consumer credit. Your explanation should include descriptions of practices you plan to use for effective consumer protection in your program and processes for screening entities that will directly interact, transact, or contract with consumers in your program. See examples of practices in *Appendix D: Consumer Protection Examples*. If you are proposing to capitalize a revolving

48

loan fund, you should describe the financial management plan for program income in the fiscal stewardship plan.

3.  **Reporting Plan:** Describe your plan to execute against the grant's reporting requirements, including tracking and measuring progress in achieving expected environmental outputs and outcomes described in *Section I.H: Measuring and Reporting Environmental Results* and referenced in *Section VI.C: Program Performance Reporting Requirements.* EPA plans to establish program performance reporting requirements consistent with 2 CFR § 200.329 in the terms and conditions of the grant award. Grantees will also be expected to report, on an ongoing basis, the underlying methodologies, technologies, data sources, inputs and assumptions, and other significant analytical choices used to calculate or estimate outputs and outcomes. For example, such disclosure may include project-level data (e.g., MW capacity installed), key assumptions to translate project-level data into outcomes (e.g., capacity factors, emissions intensity of displaced power generation, global warming potential of greenhouse gases, asset useful life), and relevant sources (e.g., EPA, DOE National Laboratories, peer-reviewed studies) for estimates compared to a no-action baseline and to other reasonable alternatives. EPA may require these data to be subject to third-party verification, audits, and/or assurance. EPA will work with grantees to establish standardized reporting requirements and identifying tools to support reporting. You should have a plan to integrate program evaluation activities into the reporting plan, including assessing effectiveness and efficiency in achieving outputs and outcomes. Evaluations should be conducted in adherence with EPA Order 1000.33, U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings. EPA Order 1000.33 provides a framework to comply with the Foundations for Evidence-Based Policymaking Act of 2018.

3.  **Programmatic Capability and Environmental Results Past Performance:** Submit in Attachment F a list of federally and/or non-federally funded assistance agreements (assistance agreements include federal grants and cooperative agreements but not federal contracts) that your organization performed within the last three years (no more than five agreements) and answer all the below prompts. Note: for coalition applicants, the list of funded assistance agreements must be from the lead applicant.

    -   Whether, and how, you were able to successfully complete and manage those agreements

    -   Your history of meeting the reporting requirements under those agreements including whether you adequately and timely reported on your progress towards achieving the expected outputs and outcomes of those agreements (and if not, explain why not) and whether you submitted acceptable final technical reports under the agreements

    -   Your organizational experience and plan for timely and successfully achieving the objectives of the proposed project, and your staff expertise/qualifications, staff knowledge, and resources or the ability to obtain them, to successfully achieve the goals of the proposed project

In evaluating applicants under these factors in *Section V.A: Evaluation Criteria*, EPA will consider the information provided by applicants and may also consider relevant information from other sources, including information from EPA files and from current/prior grantors (e.g., to verify and/or supplement the information provided by the applicant). If you do not have any relevant or available past performance or past reporting information, please indicate this in the application and you will receive a neutral score for these factors (a neutral score is half of the total points available in a subset of possible points). If you do not provide any response for these items, you may receive a score of 0 for these factors.

## D. Pre-Application Assistance

Applicants are invited to participate in webinars with EPA to address questions about this funding opportunity. Interested parties may access information on these webinars (including dates, times, and registration information) as well as other information on the competition at the following website: www.epa.gov/GGRF.

A recording of each webinar will be posted at the link above along with presented materials. If necessary, EPA may schedule additional webinars. In accordance with EPA Order 5700.5A1, EPA's Assistance Agreement Competition Policy, EPA staff will not meet with individual applicants to discuss draft applications, provide informal comments on draft applications, or provide advice to applicants on how to respond to ranking criteria.

Applicants are responsible for the contents of their applications. However, consistent with the provisions in the announcement, EPA will respond to questions from individual applicants regarding threshold eligibility criteria, administrative issues related to the submission of the application, and requests for clarification about the funding opportunity.

# Section V. Application Review Information

## A. Evaluation Criteria

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

Only eligible entities whose applications meet the threshold criteria in *Section III. Eligibility Information* will be evaluated according to the criteria set forth below. Applicants should explicitly address these criteria as part of their application package submittal in the Program Narrative, following the content requirements set forth in *Section IV.C: Content of Application Submission*. Each application will be rated using a point system. Applications will be evaluated based on a total of **245 points** possible.

**To assist EPA reviewers, applicants are strongly encouraged to reference the numbers and titles of the evaluation criteria in their Program Narratives to help identify where the criteria are being addressed.**

1. **Program Strategy Narrative (175 points total):** Each application will be evaluated on the quality and extent to which it articulates a plan to use grant funds to advance GGRF program objectives described in *Section I.C: GGRF Solar for All Program Objectives* by performing the scope of work described in *Section I.E: Scope of Work*. The application should refer to these program objectives in the below application components.

   1. **Impact Assessment (20 points total):** Each application will be evaluated on the extent and quality to which it explains the program's intended impact on addressing current market barriers to low-income solar deployment and sets achievable outcome metrics for the program based on those barriers. Specifically, EPA will evaluate the extent and quality to which the application:

      • Maximizes the impact of the program relative to the amount of funding requested by setting reasonable and ambitious targets for program output and outcome metrics, specifically the number of households projected to benefit from the solar program (both as an absolute number of households and award funding requested per household); the megawatts of solar capacity deployed over time (both as an absolute number of megawatts of solar deployed and dollars of award funding requested per megawatts of solar); megawatt hours of storage capacity deployed over time (both as an absolute number of megawatt hours of storage deployed and dollars of award funding requested per megawatt hours of storage); short tons of annual $CO_2$ emissions avoided over time (both as an absolute number of tons of $CO_2$ avoided and dollars of award funding requested per tons of $CO_2$ avoided); and the absolute annual of household savings realized over time (both as an absolute number of dollars saved and dollars of award funding requested per dollars of household savings). Applications will be evaluated on the extent and quality to which the application efficiently uses program funds to maximize households served by the program. **(10 points)**

      • Justifies how the proposed outcome metrics are reasonably achievable considering historical data (either past deployment of low-income distributed solar and storage in the geography the applicant is applying to serve or based on deployment in geographies

51

with similar conditions); an assessment of the market barriers (e.g., power market barriers, financial barriers, non-financial barriers) in the geography the program will operate in; a summary of how the program will address these barriers (you may reference other sections of the Program Narrative); and, if relevant, a description of the overall structure of how Solar for All will augment an existing low-income solar program. An application from an applicant without an existing low-income solar program will be evaluated on the extent and quality to which they describe the overall structure of the program they will develop with Solar for All funds. **(10 points)**

2. **Meaningful Benefits Plan (30 points <u>total</u>):** Each application will be evaluated on the quality of the program plan to ensure the solar and storage projects receiving financial assistance from the program will deliver meaningful benefits (as defined in *Section I.D: Competition Terminology*) to low-income and disadvantaged communities and households. Specifically, EPA will evaluate the extent and quality to which the application:

   - Details a plan to ensure all households that benefit from the Solar for All program experience minimum household savings of 20% of the average household utility bill in the utility territory. To ensure household savings are maximized, the application will also be evaluated on the extent of the plan to ensure customers receive a minimum household savings of 20%, even if the financial assistance model will require households to incur costs to benefit from the program either directly (e.g., costs to subscribe to the project or to build the project) or indirectly (e.g., costs through increases in taxes or impacts to other financial subsidies such as affordable housing allowances). Additionally, the application will be evaluated on the quality and extent of the plan to deliver equivalent household savings for projects serving households without individual electricity bills (e.g., master-metered, multi-family buildings)—specifically, how the program will ensure households receive a financial or equivalent non-financial benefit of 20% or greater of the average household's annual electricity expenditure; financial and equivalent non-financial benefit examples are described in recent guidance from U.S. Department of Housing and Urban Development. If the household saving figure included in the financial assistance model is an estimate, the application will be evaluated on the extent and quality of the plan to refine the estimated amount of savings a program beneficiary will receive from the program annually, including considering what data is required to better refine the estimate. If further refinement of the household savings figure included in the financial assistance model is not required, the application will be evaluated on the quality of the assumptions and data used to calculate the amount of savings a program beneficiary will receive from the program annually. **(10 points)**

   - Justifies how the program strategy for financial assistance and project-deployment technical assistance detailed later in the Program Narrative will increase low-income and disadvantaged households' access to solar through financial assistance and deployment options. Applicants may reference other sections of the Program Narrative to support these assertions. **(5 points)**

- Describes how the program will deliver energy resilience and grid benefits by creating capacity that can deliver electricity to low-income and disadvantaged households and/or critical facilities in low-income and disadvantaged communities in the event of a grid outage. Applicants may reference how the Financial Assistance Strategy for solar and storage achieves this meaningful benefit. **(5 points)** *(Note: this criteria point complements the criteria point on associated storage in the Financial Assistance Strategy. This criteria point asks applicants how projects funded by the program will support resilience as an overarching program goal, whereas the Financial Assistance Strategy asks how applicants will make decisions about when and how to use financial assistance to invest in associated storage.)*

- Commits to maximizing household and community ownership models and includes a plan to support low-income and disadvantaged households and communities building equity in projects. If community ownership is not being proposed, applicants will be evaluated on the quality to which they justify why the program will be unable to facilitate community ownership models. **(5 points)**

- States a plan for investing in jobs and businesses in low-income and disadvantaged communities through program operations. The application will be evaluated on the extent to which it details a plan to invest in minority- and women-owned businesses as well as historically underutilized business zones (as defined by the U.S. Small Business Administration's "HUBZone" program). Additionally, the application will be evaluated on the quality and extent of the program's commitment to job quality and expanding opportunities for workers from underserved communities in the use of grant funds for solar projects. The application will be evaluated on the extent and quality of the program's plans, policies, procedures, and concrete goals to work with labor unions, developers, contractors, and other partners that are committed to "high road" labor practices, including providing family-sustaining benefits, predictable work schedules, retirement contributions, safe working conditions, the free and fair choice to join a union, providing supportive services for those who need them, and other characteristics of a good job as discussed in *Appendix E: Equitable Workforce Development and Job Quality*. The application will be evaluated on the extent and quality of the plan to use Registered Apprenticeship labor on projects to grow the skilled workforce and promote job quality. The application will be evaluated on the extent and quality of the program's commitment to workers' free and fair choice to collectively bargain and join a union, such as requiring participating contractors to commit to remaining neutral in union organizing and operations and encouraging the use of Project Labor Agreements when appropriate. The application will be evaluated on the extent the plan is supported by letters of support from quality partners (e.g., labor unions, employers, industry associations, worker centers) in Attachment I of the application. **(5 points)** *(Note: this criteria point complements the criteria point on workforce development strategies in the Project-Deployment Technical Assistance strategy. This criteria point asks applicants how projects funded by the program will support jobs and businesses in low income and disadvantaged communities, whereas the Project-Deployment Technical*

53

*Assistance strategy asks how applicants will invest in workforce development services as part of the technical assistance services the program provides. The strategy for supporting jobs and businesses in low income and disadvantaged communities may include hiring workers trained by the workforce development services explained in the Project-Deployment Technical Strategy).*

3. **Distributed Solar Market Strategy (30 points <u>total</u>):** Each application will be evaluated on the extent to which it identifies and addresses barriers to low-income and disadvantaged community residential distributed solar deployment in relevant power market structures. The application will be evaluated on the extent to which the plans described below are supported with statements of support from governors' offices, public utility commissions, and other energy market stakeholders in the geography the applicant is applying to serve, as included in Attachment J of the application. Specifically, EPA will evaluate the extent and quality to which the application:

   - Describes the net metering polices, including net metering caps, in the program's geography and how supportive those policies are to residential distributed solar deployment. If net metering policies are a barrier to residential distributed solar deployment, the application will be evaluated on the quality and extent of the plan to address this barrier. If net metering policies are supportive of residential distributed solar deployment, the application will be evaluated on the extent to which it justifies why net metering is not a barrier and proposes a plan to maximize and leverage these policies. **(6 points)**

   - Describes the third-party ownership policies in the geography and how supportive those policies are to residential distributed solar deployment and delivering meaningful benefits—specifically community ownership benefits—to low-income and disadvantaged communities and households. If third-party ownership policies are a barrier to communities deploying and benefiting from distributed residential solar, the application will be evaluated on the extent and quality of the plan to address these barriers. If third-party ownership policies are not a barrier to deployment, the application will be evaluated on the extent to which it justifies why this is not a barrier and proposes a plan to maximize and leverage these policies. **(5 points)**

   - Describes barriers to distributed solar deployment from interconnection processes (e.g., excessive fees, limited transparency in processes and timelines) in the geography and describes a reasonable plan to address these barriers. If this barrier is not applicable to the geography, the application will be evaluated on the extent to which it justifies why this is not a barrier and proposes a plan to maximize and leverage these policies. **(5 points)**

   - Describes the plan to maximize and leverage relevant enabling renewable portfolio standard (RPS) mandates in the geography the program will operate to support distributed solar deployment. If the geography does not have a RPS, the application will be evaluated on the extent and quality of the plan to address this barrier. **(5 points)**

54

- Describes the geography's enabling regulatory frameworks that support community solar deployment, specifically, whether the geography has adequate deployment caps and/or carveouts to support the Solar for All deployment targets stated in Section 1.1 Impact Assessment; allows for consolidated billing; and values power generation from community solar at or close to retail rates and/or represents a healthy net metering market. If the geography does not have adequate regulatory frameworks for community solar, the application will be evaluated on the extent to which it describes a reasonable plan to address this barrier. If enabling community solar policies are not relevant for the application because the proposed program will only deploy residential rooftop solar, the application should state that this is not applicable. *If not applicable, the application will receive a neutral score for this criterion.* **(4 points)**

- Describes a plan to ensure the program will maximize deployment breadth and diversity across the geography, despite jurisdictional differences between different utility territories and/or regulatory jurisdictions in the geography the application proposes to serve. If none exist, the application will be evaluated on how well it demonstrates that there are no major regulatory differences across jurisdictions that will impact distributed solar deployment. **(5 points)**

4. **Financial Assistance Strategy (30 points <u>total</u>):** Each application will be evaluated on whether the proposed financial assistance model is efficient, leverages other funds to the greatest extent possible, and maximizes solar deployment. Specifically, EPA will evaluate the extent and quality to which the application:

- Details a reasonable financial assistance strategy that includes defining the type and size of the subsidy and/or other financial assistance strategy for all the technologies the program will fund (i.e., residential rooftop solar, residential-serving community solar, and/or associated storage). The financial assistance model will be evaluated on the quality of the plan to maximize the number of households benefitting from the program relative to the amount of award funds. The application will be evaluated on the extent and quality of the program's proposed targets for deployment of residential rooftop solar and residential-serving community solar and the justification that these targets are appropriate given the characteristics and needs of the communities (e.g., building stock, cost of electricity, homeownership ratios) the program will serve. **(10 points)**

- Ensures that the Solar for All financial assistance strategy proposed in the application complements, and does not duplicate, existing sources of capital and financial assistance; is designed to ensure program longevity and market transformation beyond the program period detailed in this application; plans to leverage innovative financing structures such as renewable energy credits, tax credits, debt financing, leases, power purchase agreements, other third-party ownership options, revolving loan programs, green bonds, guarantees, or other financing products; and includes a strategy to engage with other capital providers to maximize deployment including supporting other public (including the National Clean Investment Fund and the Clean Communities Investment Accelerator) and private sources of capital. **(10 points)**

55

- Details reasonable criteria for when the program will provide financial assistance for associated storage and enabling upgrades that maximizes residential distributed solar capacity deployment, households served by the program, and meaningful benefits. In regard to the associated storage plan, the application will be evaluated on the quality and extent to which it details prudent criteria for deciding which projects receive financial assistance for storage and includes reasonable deployment targets for residential storage. In regard to the enabling upgrades plan, the application will be evaluated on the quality and extent to which it presents a prudent strategy for using financial assistance for enabling upgrades (which the applicant may define for the program) to address barriers that reduce the deployment of residential and residential-serving community solar, such as roof upgrades; energy efficiency; behind-the-meter electrical upgrades; and distribution and transmission infrastructure investment that must be borne by the project (i.e., is not rate-based or part of planned capital improvement by a utility). The application will be evaluated on the plan to ensure financial assistance for enabling upgrades are spent judicially, ensuring that no more than 20% of total financial assistance distributed for the lifetime of the program is used for enabling upgrades. The application will be evaluated on the quality of the plan to ensure the program does not use these funds on costs that could be supported by other sources of capital including other assistance programs at the federal, state, and local level, as well as a plan to refer customers to DOE's Weatherization Assistance Program (WAP), or other local, state, and federal programs for energy efficiency financial assistance. **(5 points)**

- Considers the long-term impacts of program financial assistance. The application will be evaluated on the quality and extent of the plan to integrate housing affordability considerations into the program operations, including but not limited to policies that maintain affordability of existing housing stock, anti-displacement policies, and policies that prevent rapid cost increases for low-income and disadvantaged households and communities. Additionally, the application will be evaluated on the quality and extent of the plan to supporting operations, maintenance, and recycling of the assets funded under the program for the lifetime of the assets (i.e., approximately 20 years), including ensuring maximum energy output of the assets and conducting audits of assets to ensure operations and maintenance is performed. **(5 points)**

5. **Project-Deployment Technical Assistance Strategy (20 points <u>total</u>):** Each application will be evaluated on the plan to address the market barriers defined in Section 1.1: Impact Assessment of the Program Narrative with project-deployment technical assistance. This project-deployment technical assistance includes services defined in *Section I.D: Competition Terminology*. Specifically, EPA will evaluate the extent and quality to which the application:

- Details a robust plan to invest in the skilled workforce needed to deploy solar, including expanding participation from workers in low-income and disadvantaged communities in the solar industry. The application will be evaluated on the quality and extent of the plan to train and place workers in high-quality, long-term careers through high road,

56

worker-centered workforce training models, including one or more Registered Apprenticeship programs, pre-apprenticeship (apprenticeship readiness) programs affiliated with Registered Apprenticeship programs, Labor-Management Training Partnerships or other union-affiliated training programs, and training programs in partnership with local community colleges or Minority Serving Institutions. The application will be evaluated on the quality and extent of the plan to recruit and retain participants from low-income and disadvantaged communities, including how those participants will be supported with wrap-around supportive services (e.g., childcare, transportation), case management, and on-the-job support and mentorship. The application will be evaluated on the extent the plan is supported by letters of support from quality partners (e.g., State workforce board and/or State department of labor, community colleges, labor unions, community-based organizations) in Attachment K of the application. **(10 points)**

- Describes a robust plan to provide solar developers and communities with technical assistance to address interconnection challenges, including detailing what interconnection challenges can and cannot be addressed by the program; explaining a plan for how the program will provide support to stakeholders to address these challenges (e.g., using DOE's i2X Technical Assistance program); and describing a plan to partner with utilities and create efficiencies for program deployment. **(5 points)**

- Describes a robust plan to ensure projects funded under the program are efficiently deployed and resilient by providing solar developers and communities with technical assistance for project siting, land-use, permitting, building codes, inspection, and quality control. To ensure projects are efficiently sited and permitted, the applicant will be evaluated on the extent and quality of the plan to provide technical assistance to stakeholders on engaging with utilities on project siting; leveraging community benefits agreements; considering land use planning and zoning requirements that impact siting strategy; incorporating climate hazards (e.g., flood zones, wildfire risks) into siting strategy; committing to protecting critical pollinator habitats, greenspace, wetlands, and productive farmland; adopting agrivoltaics in siting strategy if relevant; using remediated brownfields for project siting; managing permitting processes and challenges; and adopting existing technical assistance tools such as DOE/NREL's SolarAPP+, SolSmart and/or similar technical assistance programs or strategies. To ensure projects are efficiently and soundly built, the application will be evaluated on the quality and extent of the plan to provide technical assistance to solar stakeholders on meeting the most current, broadly accepted consensus-based building codes and standards; ensuring projects are resilient to any relevant physical climate hazards; and incorporating robust post-construction inspection and quality control processes. **(5 points)**

6. **Equitable Access and Meaningful Involvement Plan (30 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan to ensure the program maximizes access to the program for low-income and disadvantaged communities. The application will be evaluated on the extent to which the plans described below are supported with

57

statements of support from community-based organization, labor partners, and other potential program partners in Attachment L of the application. Specifically, EPA will evaluate the extent and quality to which the application:

- Commits to maximizing the breadth and diversity of communities served in the geography while prioritizing serving the most disadvantaged and low-income households in the communities the program is designed to serve. The application will be evaluated on the extent and quality of the plan to ensure the program serves all types of communities and households, including rural, suburban, and urban communities; traditional energy communities; communities with limited English proficiency; as well as households who do not own their property, including owners of manufactured homes on leased sites, and households who do not have space for residential rooftop solar. If the application is for award option #1 and there are American Indian and Alaska Native communities in the state or territory the program will operate in, the application will be evaluated on the extent and quality of the plan to serve these communities. If the program will not serve one or more of these types of communities, the application will be evaluated on the quality of the rationale for why. **(10 points)**

- Details a robust plan for participatory governance—formalized structures for communities to be involved in the design and decision-making of the program. The application will be evaluated on the extent and quality of the plan to develop meaningful partnerships with community-based organizations that reflect the communities the program intends to benefit and are designed to reach the most disadvantaged or historically marginalized communities. If the application is serving American Indian and Alaska Native Communities, the application will be evaluated on the quality and extent of the plan to meaningfully involve American Indian and Alaska Native Communities in program planning and operations. **(10 points)**

- Plans to meaningfully engage with Solar for All stakeholders including education, outreach, and community engagement. The application will be evaluated on the quality of the plan to collaborate with trusted community-based organizations and ensure the program effectively engages with all communities, such as communities with limited English proficiency by creating culturally appropriate materials and via diverse channels (e.g., online, in-person, paper messaging). **(5 points)**

- Explains a robust strategy for customer acquisition and management for the program. The strategy for customer acquisition will be evaluated on the extent to which it plans to use partnerships with community-based organizations to acquire customers and plans to coordinate with existing need-based federal, state, Tribal, or utility assistance programs (e.g., WAP, SNAP, TANF, Lifeline, LIHEAP) to leverage complementary resources and acquire customers. To reduce risk from fraud and waste, the application will be evaluated on the extent and quality to which the program plans to perform robust income verification above and beyond attestation—such as categorical eligibility; the forthcoming DOE and HHS Community Solar Subscription Tool; or a similar tool/strategy, while minimizing burdens on households. Categorical eligibility consists of obtaining proof of household participation in a needs-based Federal, State, Tribal,

or utility assistance program with income limits at or below the qualifying income level for the program. **(5 points)**

7. **Program Planning Timeline and Workplan Narrative (15 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan to implement the program described in the Program Narrative Sections 1.2 through 1.6 to achieve the impact targets defined in Section 1.1. The application will be evaluated on the extent and quality of both the narrative as described below as well as the supporting Program Planning Timeline and Workplan in Attachment D (as described in *Section IV.B: Application Materials*). EPA has included an optional template Program Planning Timeline and Workplan in Excel on epa.gov/GGRF. Applicants may use this template as Attachment D. Applicants will not be penalized for not using this template. Specifically, EPA will evaluate the extent and quality to which the application:

- Plans on refining the program plan as detailed in an implementation timeline narrative with clear and reasonable milestones for developing the Solar for All program, ensuring the program completes the program planning stage and begins deploying financial assistance to solar projects within one year of the award and expends all funds within five years of the award. The application will be evaluated on the extent to which the implementation timeline narrative includes reasonable steps for planning and implementing the Meaningful Benefits Plan (Section 1.2), Distributed Solar Market Strategy (Section 1.3), the Financial Assistance Strategy (Section 1.4), the Project-Deployment Technical Assistance Strategy (Section 1.5), and the Equitable Access and Meaningful Involvement Plan (Section 1.6). The application will be evaluated on the quality and extent of the plan to dedicate program planning capacity to incorporate forthcoming EPA guidance on how and when to apply Build America, Buy America and Davis-Bacon Act prevailing wage requirements to Solar for All program operations. See *Section VI.B: Administrative and National Policy Requirements* for more information about these requirements. **(5 points)**

- Coordinates with relevant stakeholders and partners including local and/or state governments, utilities, community-based organizations, state-level assistance programs, labor organizations, and other stakeholders referenced in Sections 1.2 through 1.6, as evidenced by including coordination milestones and steps in the planning phase of the workplan. **(5 points)**

- Commits to adopting residential rooftop and residential-serving community solar best practices by planning to leverage existing technical assistance tools and resources for program planning. The application will be evaluated on the extent and quality of the plan to refine elements of the program plan in the application, which may need to be improved or further detailed with analysis, data, or support from solar industry experts and tools. If no assistance is needed for program planning, the application will be evaluated on the quality of the justification for why the program does not need technical assistance for program planning. **(5 points)**

59

*Applicants should attach the Program Planning Timeline and Workplan as Attachment D to their application so it will not count against the 40-page Program Narrative limit. However, the Program Planning Timeline and Workplan Narrative should be included in the body of the 40-page Program Narrative and provide clear, explanatory detail about how the program will be implemented efficiently and effectively to achieve the program objectives and impact targets detailed in 1.1 Impact Assessment of the Program Narrative.*

2. **Program Administration Narrative (50 points <u>total</u>):** Each application will be evaluated on the extent to which it will deploy and manage funds efficiently, responsibly, and transparently.

   1. **Budget Narrative (15 points <u>total</u>):** Each application will be evaluated based on the quality of the description of the budget included in SF-424A as well as the extent and quality of the itemized Budget Table in Attachment E of the application. EPA has provided an optional detailed Budget Table template in Excel available for download on epa.gov/GGRF. Applicants that do not use this template will not be penalized. Specifically, EPA will evaluate the extent and quality to which the application:

      - Demonstrates the procedures and controls for ensuring that awarded grant funds will be expended in a timely and efficient manner and explains how the program costs are cost-effective, allowable, and reasonable to accomplish the proposed program plan. An application for award option #1 or #3 will be evaluated on the extent to which it will use 75% or more of requested funds (both direct costs and the indirect costs charged to direct costs attributable to financial assistance activities) on financial assistance for projects; an application to award option #2, will be evaluated on the extent to which it will use 65% or more of requested funds (both direct costs and the indirect costs charged to direct costs attributable to financial assistance activities) on financial assistance for projects. **(10 points)**

      - Demonstrates that the budget is efficient in the detailed Budget Table, which breaks up costs in the proper budget category for each activity for which the application is requesting funding, in Attachment E of the application. **(5 points)**

      *Applicants should attach the itemized Budget Table as Attachment E to their application so it will not count against the 40-page Program Narrative limit. However, the Budget Narrative should be included in the body of the 40-page Program Narrative and provide clear, explanatory detail about the itemized costs in the attached Budget Table. Both the Budget Table and Budget Narrative should be specific and clear.*

   2. **Fiscal Stewardship (20 points <u>total</u>):** Each application will be evaluated on the quality of program controls to manage taxpayer dollars ethically and efficiently as well as the policies and controls for program oversight. Specifically, EPA will evaluate the extent and quality to which the application:

      - Commits to reducing waste, fraud, and abuse by including plans and policies for program oversight, including confidential reporting (e.g., whistleblower protections) and managing conflicts of interest. The application will be evaluated on the extent and

quality of the plan to comply with requirements in 2 CFR § 200.303 and 2 CFR § 200.332(b) and (d) if the applicant intends to provide subawards to eligible subrecipients. **(10 points)**

- Invests in consumer protection, including a plan explaining how program partners and entities that directly interact, transact, or contract with consumers as part of the program, such as through the sales and marketing of solar products or services, and consumer purchasing, leasing and financing (including Property Assessed Clean Energy (PACE) financing), will comply with applicable consumer protection laws, including the consumer protection laws in the jurisdiction(s) the program will serve, in addition to federal consumer protection and consumer financial laws, such as laws prohibiting unfair, deceptive, and abusive practices (e.g., the Federal Trade Commission Act (15 U.S.C. § 45), Consumer Financial Protection Act (12 U.S.C. § 5536), Fair Debt Collection Practices Act (15 U.S. Code § 1692e), and Regulation Z (12 CFR § 1026) which requires the disclosure of terms and cost of consumer credit and offers substantive protections to people who use consumer credit). The application will also be evaluated on the extent and quality of the plan to screen entities that will directly interact, transact, or contract with consumers in the program and ensure consumers are not charged illegal upfront or cancellation fees; experience transparent and verifiable subscription payment, where applicable, and billing processes; and have accessibility if they have limited English proficiency, in compliance with Executive Order 13166 *(Improving Access to Services for Persons with Limited English Proficiency)*. The application will also be evaluated based on the extent and quality of the plan to actively combat residential rooftop and residential-serving community solar predatory lending activities, which potentially exist in the geography the applicant proposes to serve. **(7 points)**

- Incorporates guardrails to ensure household savings materialize for program beneficiaries by performing audits or spot-checks of bills. **(3 points)**

3. **Reporting Plan (15 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan to execute the anticipated reporting requirement described in *Section VI.C: Program Performance Reporting Requirements*. Specifically, EPA will evaluate the extent and quality to which the application:

- Invests program capacity in performing program evidence and evaluation activities and details a plan to publish data, evidence, and evaluation reports publicly during the program lifetime. Please see *Section VI.C: Program Performance Reporting Requirements* and *ORDER 1000.33 03/25/2022 U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities* for additional information on evidence and evaluation requirements. **(10 points)**

- Demonstrates an understanding of the award reporting requirements, a plan to execute on the reporting requirements, and the capacity to execute on those reporting requirements. **(5 points)**

61

3. **Programmatic Capabilities and Environmental Results Past Performance (20 points total):** Each applicant will be evaluated based on their ability to successfully complete and manage the proposed program plan considering their past performance. Applicants will be evaluated based on their ability to successfully complete and manage the proposed program considering their:

- Past performance in successfully completing and managing the assistance agreements identified in response to *Section IV.C: Content of Application Submission*, Section 3 Programmatic Capabilities and Environmental Results Past Performance of this NOFO (the applicant will have addressed this information in Attachment F of their application). Demonstrates past performance in successfully completing and managing the assistance agreements identified in response to *Section IV.C: Content of Application Submission*, Section 3 Programmatic Capabilities and Environmental Results Past Performance of the NOFO. **(6 points)**

- History of meeting the reporting requirements under the assistance agreements identified in response to *Section IV.C: Content of Application Submission*, Section 3 Programmatic Capabilities and Environmental Results Past Performance of this NOFO, (the applicant will have addressed this information in Attachment F, of their application) including whether the applicant submitted acceptable final technical reports under those agreements and the extent to which the applicant adequately and timely reported on their progress towards achieving the expected outputs and outcomes under those agreements and, if such progress was not being made, whether the applicant adequately reported why not. **(6 points)**

- Organizational experience and a plan for timely and successfully achieving the objective of the proposed program. **(4 points)**

- Staff expertise/qualifications, staff knowledge, and resources or the ability to obtain them, to successfully achieve the goals of the proposed program. **(4 points)**

*Note: In evaluating applicants under the first two factors, EPA will consider the information provided in the application and may also consider relevant information from other sources, including information from EPA files and from current/prior grantors (e.g., to verify and/or supplement the information provided by the applicant). If you do not have any relevant or available past performance or past reporting information, please indicate this in the application and you will receive a neutral score for these factors (a neutral score is half of the total points available in a subset of possible points). If you do not provide any response, you may receive a score of 0.*

## B. Review and Selection Process

Applications will be reviewed and scored under the following process:

62

1. **Threshold Eligibility Review Process:** All applications will be evaluated for eligibility using the threshold eligibility criteria described in *Section III.C: Threshold Eligibility Criteria*.

2. **Review Panel and Evaluation Process:** Review panel(s) will review, score, and rank all eligible applications that pass the threshold eligibility review based on the merit evaluation criteria listed above. Applicants will be ranked in three separate ranking lists based on award option. The review panel(s) will include EPA staff and may also include staff from other federal agencies and external subject matter experts who are free from any actual or apparent conflicts of interest.

3. **Final Selection Process and Other Factors:** The review panel will present final rankings and selection recommendations to the Selection Official, who will then make the final selections for awards. Selections will be made to maximize geographic coverage across all three award options.

   In addition to this information, the Selection Official may also consider any of the following "other factors" in making final selection decisions from among the high-ranking applications, including GGRF program objectives; EPA strategic goals and objectives; availability of funds. The Selection Official may also consider the "other factors" across the multiple ranking lists described above.

4. **Anticipated Announcement and Federal Award Date:** EPA anticipates it will announce selection decisions in March 2024 and tentatively plans to issue awards by July 2024.

# Section VI. Award Administration Information

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

## A. Award Notification

EPA anticipates notification of selected applicants will be made via electronic mail by the end of March 2024, with awards tentatively planned to be issued by July 2024. The notification will be sent to the original signer of the application or the contact listed in the application. This notification, which informs the applicant that its application has been selected and is being recommended for award, is not an authorization to begin work. The official notification of an award will be made by the appropriate EPA Award Official. Applicants are cautioned that only a grants officer is authorized to bind the Government to the expenditure of funds; selection does not guarantee an award will be made. For example, statutory authorization, funding or other issues discovered during the award process may affect the ability of EPA to make an award to an applicant. The award notice, signed by an EPA grants officer, is the authorizing document and will be provided through electronic mail. The successful applicant may be requested to prepare and submit additional documents and forms that must be approved by EPA before the grant can officially be awarded. The time between notification of selection and award of a grant can take up to 90 days or longer.

**Administrative and Programmatic Capability Assessment:** Non-profit applicants that are recommended for funding under this announcement are subject to pre-award administrative capability reviews consistent with Section 8b, 8c, and 9d of EPA Order 5700.8: EPA's Policy on Assessing Capabilities of Non-Profit Applicants for Managing Assistance Awards. In addition, non-profit applicants selected for awards over $200,000 may be required to fill out and submit to the EPA Grants Management Office EPA Form 6600.09, United States Environmental Protection Agency Administrative Capability Questionnaire with supporting documents as required in EPA Order 5700.8.

## B. Administrative and National Policy Requirements

The grantee will be subject to administrative and national policy requirements. Note that EPA plans to establish programmatic requirements in the terms and conditions of the grant award to implement these administrative and national policy requirements, which will include but not be limited to the below policies.

- **Build America, Buy America Act (BABA):** Certain projects under this competition are subject to the Buy America Sourcing requirements under the Build America, Buy America (BABA) provisions of the Infrastructure Investment and Jobs Act (IIJA)(P.L. 117-58, §§70911-70917) that apply when using Federal funds for the purchase of goods, products, and materials on any form of construction, alteration, maintenance, or repair of infrastructure in the United States. The Buy America preference requirement applies to all the iron and steel, manufactured products, and construction materials used for the infrastructure project under an award for identified EPA financial assistance funding programs. Please consider this information when preparing budget information. EPA will provide further guidance on which projects are subject to BABA provisions and will work

with grantees to support implementation as necessary, as applicants comply with applicable Buy America preference requirements or apply for a waiver for each infrastructure project.

- **Davis-Bacon and Related Acts (DBRA):** The Davis-Bacon Act (42 USC §§3141-3144)(DBA) sets out labor standards, including prevailing wages and fringe benefits, and applies to most federally funded contracts for construction of public works. The DBA labor standards and reporting requirements also apply to projects assisted with grants authorized by the Clean Air Act as provided in Section 314 of the Clean Air Act (DBRA)(42 USC §7614). A term and condition specifying DBRA compliance requirements will be included in the grant agreement.

- **Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA):** The URA applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR § 24 require grantees to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. A term and condition specifying URA compliance requirements will be included in the grant agreement.

- **National Historic Preservation Act (NHPA)**: Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant agreement, on historic properties. If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs. A term and condition specifying NHPA compliance requirements will be included in the grant agreement.

- **Justice40 Initiative:** The Justice40 Initiative directs that EPA track and measure program benefits, setting the goal that at least 40% of the overall benefits from certain federal investments in climate, clean energy and other areas flow to disadvantaged communities. The Greenhouse Gas Reduction Fund is a covered program under the Justice40 Initiative.

Note that Section 7(c) of the Energy Supply and Environmental Coordination Act of 1974 (15 U.S.C. § 793(c)(1)) exempts all actions under the Clean Air Act from the requirements of NEPA. This Section states: "No action taken under the Clean Air Act shall be deemed a major federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969." Therefore, as a grant program authorized under the Clean Air Act, NEPA will not apply to projects funded under Solar for All.

## C. Program Performance Reporting Requirements

In accordance with 2 CFR § 200.329, the grantee will be subject to program performance reporting requirements. Reporting requirements during the period of performance will be established in the

grant's terms and conditions, and reporting requirements after the period of performance will be established in the Closeout Agreement. EPA plans to provide reporting templates to assist grantees with compliance against select program performance requirements. **Note that EPA will only collect reporting information from the grantee (rather than from any subrecipients), but the grantee may be required to collect reporting information from subrecipients.**

The grantee will be required to submit annual reports throughout the lifetime of the program within 30 days of the end of each reporting period, as well as a final program report, within 120 days after the end of the project period. EPA will use information from these reports as part of program-wide public reporting, except to the extent such information includes confidential business information (CBI) or personally identifiable information (PII) pursuant to 2 CFR § 200.338. These reporting requirements include requirements detailed in *Section I.H: Measuring and Reporting Environmental Results*.[29] Included below is illustrative information that EPA expects to require in these reports.

| Category | Example metrics and reports[30] |
|---|---|
| **Program activities** | • **Grant funds deployed**, by type of cost (financial assistance, technical assistance, program administration) ($) <br><br> • **Funds for financial assistance deployed**, by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, loans), type of project, type of technology ($) <br><br> • **Funds for technical assistance deployed**, by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, loans), type of project, type of technology ($) <br><br> • **Findings from evidence building activities on program operations, impact, outcomes including but not limited to program evaluation reports**, in adherence with ORDER 1000.33 03/25/2022 U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings <br><br> • **Reports on program feedback from all stakeholders participating in the program** including community-based organizations, households served, workers trained, contractors, etc. |
| **Climate and air pollution benefits** | • **Number of projects financed** by geography and type of project (residential rooftop solar, residential-serving community solar) (#) <br><br> • **Solar capacity installed** by geography and type of project (MW) <br><br> • **Storage capacity installed** by geography, type of project (MWh) |

---

[29] Information claimed as CBI in accordance with this Notice will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B.

[30] EPA will work with recipients to develop a standardize methodology for measuring and estimating outcome metrics which may include standardized equations, tools such as EPA's Avoided Emissions and Generation Tool (AVERT), and standardized assumption sources.

| | |
|---|---|
| | • **Clean energy generation** by geography, type of project, and technology (MWh)<br><br>• **Greenhouse gas emissions reduced and avoided** by geography and type of project (tons $CO_2e$)<br><br>• **Other air pollution reduced and avoided** by geography and type of project (tons other air pollutants such as particulate matter, nitrogen dioxide, ozone, etc.) |
| **Equity and community benefits** | • **Number of households benefitting** from projects by geography and type of project (#)<br><br>• **Amount of household savings delivered** by geography and type of project ($)<br><br>• **Workers trained by workforce development programs** by geography (#) and their starting wages and benefits ($)<br><br>• **Projects executed using tools to promote good jobs and community benefits** (e.g., Community Workforce Agreement, Community Benefits Agreement, Project Labor Agreement) by geography, project-type (#)<br><br>• **Investments in or in partnership with women- and minority-owned businesses** by geography, type of engagement (e.g., investment in a business, partnership on a deal, procurement of services), type of project (# of businesses engaged), ($ of procurement costs)<br><br>• **Number of households with resiliency benefits** by geography (#)<br><br>• **Clean energy capacity owned by communities** in direct ownership models by geography, type of project, type of community owner (household, community-based organization) and technology (MW, MWh)<br><br>• **Number of solar jobs created** by geography (#)<br><br>• **Reduced disparities in energy burden between low-income and non-low-income households** by geography ($)<br><br>• **Increased wages for individuals working in solar energy** by geography (%) |

67

| Market transformation | • **Grant funds deployed** by type of cost (financial assistance, technical assistance, program administration) ($) |
|---|---|
| | • **Financial assistance deployed** by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, loans), type of project, type of technology ($) |
| | • **Total private sector financing mobilized**, alongside projects funded directly by Solar for All by geography, type of project ($) |
| | • **Number of community-based organizations engaged by Solar for All services** (e.g., technical assistance programs for solar deployment, education programs) by geography (#) |
| | • **Financial assistance deployed to consumers with limited credit history** by geography, type of financial assistance, type of project, type of technology ($) |
| | • **Changes in net metering caps** by geography by type of project (MW, %) |
| | • **Changes in interconnection timelines** by geography (days) |
| | • **Changes in Solar Renewable Energy Credit (SREC) values** by geography ($) |
| | • **Distributed clean energy capacity deployed benefitting communities** not directly financed by Solar for All by geography, type of project, type of technology, recipient-type (households, community-serving institutions), type of community (low-income and disadvantaged communities, other communities) (MW, MWh) |
| | • **Capital deployed to finance distributed clean energy capacity** not directly financed by Solar for All by geography, type of project, type of technology, recipient-type (households, community-serving institutions), type of community (low-income and disadvantaged communities, other communities) ($) |

## D. Administrative Reporting Requirements

The grantee will be subject to several administrative reporting requirements, which will be included in the grant's terms and conditions (example of general terms and conditions included on EPA's website). These requirements will include, but not be limited to the below reports.

- **Federal Financial Report:** In accordance with 2 CFR § 200.328 and 2 CFR § 200.344, the grantee must submit the Federal Financial Report (SF-425) at least annually and no more frequently than quarterly. The frequency of reporting and report submission instructions will be specified in the terms and conditions.

- **Single Audit:** In accordance with 2 CFR § 200.501(a), the grantee will be required to obtain a single audit from an independent auditor, if their organization expends $750,000

68

or more in total federal funds. The recipient must submit the form SF-SAC and a Single Audit Report Package within nine months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor. The SF-SAC and a Single Audit Report Package MUST be submitted using the Federal Audit Clearinghouse's Internet Data Entry System available at: https://facides.census.gov.

- **Financial Records Retention:** In accordance with 2 CFR § 200.334, the grantee will be required to retain financial records, supporting documents, statistical records, and all other non-federal entity records pertinent to the grant award for a period of three years from the date of submission of the final expenditure report.

- **MBE/WBE Utilization:** When required, the grantee must complete and submit a "MBE/WBE Utilization Under Federal Grants and Cooperative Agreements" report (EPA Form 5700-52A) on an annual basis.

- **Real Property Status Report:** In accordance with 2 CFR § 200.329, the grantee must submit a "Real Property Status Report" (SF-429) to report real property status or request agency instructions on real property that was/will be provided as Government Furnished Property (GFP) or acquired (i.e. purchased or constructed) in whole or in part under a federal financial assistance award.

## E. Remedies for Non-Compliance

In accordance with 2 CFR § 200.208, 2 CFR § 200.339, and 2 CFR § 200.340, EPA is provided authority for multiple potential responses if a grantee violates the terms of the grant agreement.

## Section VII. Contact Information

Further information, if needed, may be obtained by emailing ggrf@epa.gov. Information regarding this funding opportunity obtained from sources other than the EPA may not be accurate.

# Appendix A. Grants.gov Application Submission Instructions

## A. Requirement to Submit through Grants.gov and Limited Exception Procedures

Applicants must apply electronically through Grants.gov under this funding opportunity based on the grants.gov instructions in this announcement. If your organization has no access to the internet or access is very limited, you may request an exception for the remainder of this calendar year by following the procedures outlined here. Please note that your request must be received at least 15 calendar days before the application due date to allow enough time to negotiate alternative submission methods. Issues with submissions with respect to this opportunity only are addressed in *Appendix A. Section C: Technical Issues with Submission* below.

## B. Submission Instructions

1. SAM.gov (System for Award Management) Registration Instructions

   Organizations applying to this funding opportunity must have an active SAM.gov registration. If you have never done business with the Federal Government, you will need to register your organization in SAM.gov. If you do not have a SAM.gov account, then you will create an account using login.gov[1] to complete your SAM.gov registration. SAM.gov registration is FREE. The process for entity registrations includes obtaining Unique Entity ID (UEI), a 12-character alphanumeric ID assigned an entity by SAM.gov, and requires assertions, representations and certifications, and other information about your organization. Please review the Entity Registration Checklist for details on this process.

   If you have done business with the Federal Government previously, you can check your entity status using your government issued UEI to determine if your registration is active. SAM.gov requires you renew your registration every 365 days to keep it active.

   Please note that SAM.gov registration is different than obtaining a UEI only.  Obtaining an UEI only validates your organization's legal business name and address. Please review the Frequently Asked Question on the difference for additional details.

   Organizations should ensure that their SAM.gov registration includes a current e-Business (EBiz) point of contact name and email address. The EBiz point of contact is critical for Grants.gov Registration and system functionality.

   Contact the Federal Service Desk for help with your SAM.gov account, to resolve technical issues or chat with a help desk agent: (866) 606-8220. The Federal Service desk hours of operation are Monday – Friday 8am – 8pm ET.

2. Grants.gov Registration Instructions

   Once your SAM.gov account is active, you must register in Grants.gov. Grants.gov will electronically receive your organization information, such as e-Business (EBiz) point of contact email address and UEI. Organizations applying to this funding opportunity must have an active Grants.gov registration. Grants.gov registration is FREE. If you have never applied for a federal grant before, please review the Grants.gov Applicant

71

Registration instructions. As part of the Grants.gov registration process, the Ebiz point of contact is the only person that can affiliate and assign applicant roles to members of an organization. In addition, at least one person must be assigned as an Authorized Organization Representative (AOR). Only person(s) with the AOR role can submit applications in Grants.gov. Please review the Intro to Grants.gov-Understanding User Roles and Learning Workspace – User Roles and Workspace Actions for details on this important process.

Please note that this process can take a month or more for new registrants. Applicants must ensure that all registration requirements are met in order to apply for this opportunity through Grants.gov and should ensure that all such requirements have been met well in advance of the application submission deadline.

Contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov to resolve technical issues with Grants.gov. Applicants who are outside the U.S. at the time of submittal and are not able to access the toll-free number may reach a Grants.gov representative by calling 606-545-5035. The Grants.gov Support Center is available 24 hours a day seven days a week, excluding federal holidays.

3. Application Submission Process
To begin the application process under this grant announcement, go to Grants.gov and click the red "Apply" button at the top of the view grant opportunity page associated with this opportunity.

The electronic submission of your application to this funding opportunity must be made by an official representative of your organization who is registered with Grants.gov and is authorized to sign applications for federal financial assistance. If the submit button is grayed out, it may be because you do not have the appropriate role to submit in your organization. Contact your organization's EBiz point of contact or contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov.

Applicants need to ensure that the Authorized Organization Representative (AOR) who submits the application through Grants.gov and whose UEI is listed on the application is an AOR for the applicant listed on the application. Additionally, the UEI listed on the application must be registered to the applicant organization's SAM.gov account. If not, the application may be deemed ineligible.

4. Application Submission Deadline
Your organization's AOR must submit your complete application package electronically to EPA through Grants.gov no later than **October 12, 2023 11:59 PM ET**. Please allow for enough time to successfully submit your application and allow for unexpected errors that may require you to resubmit.

Applications submitted through Grants.gov will be time and date stamped electronically. Please note that successful submission of your application through Grants.gov does not necessarily mean your application is eligible for award. Any application submitted after the application deadline time and date deadline will be deemed ineligible and not be considered.

## C. Technical Issues with Submission

If applicants experience technical issues during the submission of an application that they are unable to resolve, follow the below procedures **before** the application deadline date.

1. Contact Grants.gov Support Center **before** the application deadline date.

2. Document the Grants.gov ticket/case number.

3. Send an email with EPA-R-HQ-SFA-23-01 in the subject line to ggrf@epa.gov **before** the application deadline time and date. Applicants **must** include the following information.

   - Grants.gov ticket/case number(s)

   - Description of the issue

   - The entire application package in PDF format

Without this information, EPA may not be able to consider applications submitted outside of Grants.gov. Any application submitted after the application deadline time and date will be deemed ineligible and **not** be considered.

Please note that successful submission through Grants.gov or email does not necessarily mean your application is eligible for award.

EPA will make decisions concerning acceptance of each application submitted outside of Grants.gov on a case-by-case basis. EPA will only consider accepting applications that were unable to submit through Grants.gov due to Grants.gov or relevant SAM.gov system issues or for unforeseen exigent circumstances, such as extreme weather interfering with internet access. Failure of an applicant to submit prior to the application submission deadline date because they did not properly or timely register in SAM.gov or Grants.gov is not an acceptable reason to justify acceptance of an application outside of Grants.gov.

# Appendix B. Program Budget

## A. Guidance for Detailed Budget Table

The detailed Budget Table should be attached to the Program Narrative and does not count toward the maximum 40-page limit. Applicants should include applicable rows of costs for each budget category in their budget table to accurately reflect the proposed program budget. EPA provides detailed guidance on budget development in the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance, but applicants may use other forms as long as total costs per category (and specific descriptions of costs) are included and will not be penalized in the evaluation process.

Applicants must itemize costs related to personnel, fringe benefits, travel, equipment, installation or labor supplies, contractual costs, other direct costs (i.e., subawards, participant support costs), indirect costs, and total costs. Applicants should be aware that if their proposals include using Federal funds for a project that includes the purchase of goods, products, and materials on any form of construction, alteration, maintenance, or repair of infrastructure in the United States, they must comply with the Build America, Buy America Term and Condition if they are selected for award. For applicants proposing to implement a participant support cost or rebate program, the rebates are appropriately listed under the Other budget category as "Participant Support Costs." See EPA Guidance on Participant Support Costs.

- **Personnel - List all staff positions by title. Give annual salary, percentage of time assigned to the program, and total cost for the budget period.** This category includes only direct costs for the salaries of those individuals who will perform work directly for the program (paid employees of the applicant organization as reflected in payroll tax records). If the applicant organization is including staff time (in-kind services) as a cost-share, this should be included as Personnel costs. Personnel costs do not include: (1) costs for services of contractors (including individual consultants), which are included in the "Contractual" category; (2) costs for employees of subrecipients under subawards or non-employee program participants (e.g., interns or volunteers), which are included in the "Other" category; or (3) effort that is not directly in support of the proposed program, which may be covered by the organization's negotiated indirect cost rate. The budget detail must identify the personnel category type by Full Time Equivalent (FTE), including percentage of FTE for part-time employees, number of personnel proposed for each category, and the estimated funding amounts.

- **Fringe Benefits - Identify the percentage used, the basis for its computation, and the types of benefits included.** Fringe benefits are allowances and services provided by employers to their employees as compensation in addition to regular salaries and wages. Fringe benefits may include, but are not limited to the cost of leave, employee insurance, pensions, and unemployment benefit plans. If the applicant's fringe rate does not include the cost of leave, and the applicant intends to charge leave to the agreement, it must provide supplemental information describing its proposed method(s) for determining and equitably distributing these costs.

74

- **Travel - Specify the mileage, per diem, estimated number of trips in-state and out-of-state, number of travelers, and other costs for each type of travel.** Travel may be: integral to the purpose of the proposed program (e.g., inspections); related to proposed program activities (e.g., attendance at meetings); or to a technical training or workshop that supports effective implementation of the program activities. Only include travel costs for employees in the travel category. Travel costs do not include: (1) costs for travel of contractors (including consultants), which are included in the "Contractual" category; (2) travel costs for employees of subrecipients under subawards and non-employee program participants (e.g., trainees), which are included in the "Other" category. Further, travel does not include bus rentals for group trips, which would be covered under the contractual category. Finally, if the applicant intends to use any funds for travel outside the United States, it must be specifically identified. All proposed foreign travel must be approved by EPA's Office of International and Tribal Affairs prior to being taken.

- **Equipment - Identify each item to be purchased which has an estimated acquisition cost of $5,000 or more per unit and a useful life of more than one year.** Equipment also includes accessories necessary to make the equipment operational. Equipment does not include: (1) equipment planned to be leased/rented, including lease/purchase agreement; or (2) equipment service or maintenance contracts that are not included in the purchase price for the equipment. These types of proposed costs should be included in the "Other" category. Items with a unit cost of less than $5,000 should be categorized as supplies, pursuant to 2 CFR §200.1, "Equipment." The budget table must include an itemized listing of all equipment proposed under the program. If installation costs are included in the equipment costs, labor expenses shall be itemized with the detailed number of hours charged and the hourly wage. If the applicant has written procurement procedures that define a threshold for equipment costs that is lower than $5,000, then that threshold takes precedence.

- **Supplies - Identify all tangible personal property other than "equipment" as "supplies." The budget detail should identify categories of supplies to be procured (e.g., laboratory supplies or office supplies).** Non-tangible goods and services associated with supplies, such as printing service, photocopy services, and rental costs should be included in the "Other" category.

- **Contractual - Identify each proposed contract and specify its purpose and estimated cost.** Contractual services (including consultant services) are those services to be carried out by an individual or organization, other than the applicant, in the form of a procurement relationship. EPA's Subaward Policy and supplemental frequently asked questions has detailed guidance available for differentiating between contractors and subrecipients. Leased or rented goods (equipment or supplies) should be included in the "Other" category. EPA does not require applicants to identify specific contractors. The applicant should list the proposed contract activities along with a brief description of the anticipated scope of work or services to be provided, proposed duration, and proposed procurement method (competitive or non-competitive), if known. Any proposed non-competed/sole-source contracts in excess of $3,500 must include a justification. Note that it is unlikely that EPA will accept proposed sole source contracts for goods and services (e.g., consulting) that are

75

widely available in the commercial market. Refer to EPA's Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements for EPA's policies on competitive procurements and encouraging the use of small and disadvantaged business enterprises.

- **Other - List each item in sufficient detail for EPA to determine the reasonableness and allowability of its cost.** This category should include only those types of direct costs that do not fit in any of the other budget categories. Examples of costs that may be in this category are: insurance; rental/lease of equipment or supplies; equipment service or maintenance contracts; printing or photocopying; participant support costs such as non-employee training stipends and travel, subsidies or rebates for purchases of pollution control equipment (such as a specified amount of funding for subsidies for solar projects); and subaward costs. Applicants should describe the items included in the "Other" category and include the estimated amount of participant support costs in a separate line item. Additional information about participant support costs is contained in EPA Guidance on Participant Support Costs.

  Subawards (e.g., subgrants) and participant support costs are a distinct type of cost under this category. The term "subaward" means an award of financial assistance (money or property) by any legal agreement made by the recipient to an eligible subrecipient even if the agreement is referred to as a contract. Rebates, subsidies, and similar one-time, lump-sum payments to program beneficiaries for purchase of eligible emission control technologies are considered participant support costs. "Other" does not include procurement purchases, technical assistance in the form of services instead of money, or other assistance in the form of revenue sharing, loans, loan guarantees, interest subsidies, insurance, or direct appropriations. Subcontracts are not subawards and belong in the contractual category. Applicants must provide the aggregate amount they propose to issue as subaward work as a separate line item in the "Other" category, and a description of the types of activities to be supported. Refer to EPA's Subaward Policy and supplemental frequently asked questions for additional guidance.

- **Indirect Charges – Indicate the approved rate and base for indirect charges if included.** Indirect costs (IDCs) are those incurred by the grantee for a common or joint purpose that benefit more than one cost objective or program and are not readily assignable to specific cost objectives or projects as a direct cost. Indirect costs may be budgeted and charged by recipients of Federal assistance agreements in accordance with 2 CFR Part 200. EPA's Indirect Cost Policy for Recipients of EPA Assistance Agreements (IDC Policy) implements the Federal regulations, and the following applies to all EPA assistance agreements, unless there are statutory or regulatory limits on IDCs. Examples of Indirect Cost Rate calculations are shown below.
  - Personnel (Indirect Rate x Personnel = Indirect Costs)
  - Personnel and Fringe (Indirect Rate x Personnel & Fringe = Indirect Costs)
  - Total Direct Costs (Indirect Rate x Total direct costs = Indirect Costs)
  - Direct Costs, less distorting or other factors such as contracts and equipment
    (Indirect Rate x (total direct cost – distorting factors) = Indirect Costs)

76

In order for an assistance agreement recipient to use EPA funding for indirect costs, the IDC category of the recipient's assistance agreement award budget must include an amount for IDCs and at least one of the following scenarios must apply.

- With the exception of "exempt" agencies and Institutions of Higher Education as noted below, all recipients must have one of the following current (not expired) IDC rates, including IDC rates that have been extended by the cognizant agency:
  - Provisional;
  - Final;
  - Fixed rate with carry-forward;
  - Predetermined;
  - 10% de minimis rate authorized by 2 CFR § 200.414(f)
  - EPA-approved use of one of the following:
    - 10% de minimis as detailed in Section 6.3 of the IDC Policy; or
    - Expired fixed rate with carry-forward as detailed in Section 6.4.a. of the IDC Policy.
- "Exempt" state or local governmental departments or agencies are agencies that receive up to and including $35,000,000 in Federal funding per the department or agency's fiscal year, and must have an IDC rate application developed in accordance with 2 CFR § 200 Appendix VII, with documentation maintained and available for audit.
- Institutions of Higher Education must use the IDC rate in place at the time of award for the life of the assistance agreement (unless the rate was provisional at time of award, in which case the rate will change once it becomes final). As provided by 2 CFR Part 200, Appendix III(C)(7), the term "life of the assistance agreement", means each competitive segment of the project. Additional information is available in the regulation.

IDCs incurred during any period of the assistance agreement that are not covered by the provisions above are not allowable costs and must not be drawn down by the recipient. Recipients may budget for IDCs pending approval of their IDC rate by the cognizant Federal agency or an exception granted by EPA under Section 6.3 or 6.4 of the IDC Policy. However, recipients may not draw down IDCs until their rate is approved or EPA grants an exception.

The IDC Policy does not govern indirect rates for subrecipients or recipient procurement contractors under EPA assistance agreements. Pass-through entities are required to comply with 2 CFR § 200.331(a)(4) when establishing indirect cost rates for subawards.

Additional indirect cost guidance is available in Indirect Cost Guidance for Recipients of EPA Assistance Agreements.

**Note on Management Fees:** When formulating budgets for applications, applicants must not include management fees or similar charges in excess of the direct costs and indirect costs at the rate approved by the applicant's cognizant federal audit agency, or at the rate provided for by the terms of the agreement negotiated with EPA. The term "management fees or similar charges" refers to expenses added to the direct costs in order to accumulate and reserve funds for ongoing business expenses, unforeseen liabilities, or for other similar costs that are not allowable under

EPA assistance agreements. Management fees or similar charges cannot be used to improve or expand the program funded under this agreement, except to the extent authorized as a direct cost of carrying out the work plan.

EPA has provided an optional template for the detailed Budget Table in Excel available for download on epa.gov/GGRF. Applicants that do not use this table will not be penalized.

# Appendix C. Household Savings Guidance

The first of the five meaningful benefits of residential rooftop and residential-serving community solar is "household savings", which is defined as delivering a benefit of at least 20% of average household's electricity bill, including households that do not have individual electricity bills.

Applicants should calculate 20% household savings from the average electricity expenditures of the average household in the utility territory. This financial benefit does not need to be calculated per each individual household and can be based on averages in the utility territory the applicant is serving. Applicants should calibrate the calculation of this financial benefit to the frequency financial benefits are delivered to the households (i.e., monthly bill credits should deliver 20% household savings based on the monthly electricity bill). Each applicant will need to design a financial subsidy or product that delivers this financial benefit or the equivalent to all households served under this program.

Applicants may consider working with electric utilities and using data from the U.S. Energy Information Administration (including the Residential Energy Consumption Survey and electricity data) to calculate the average household annual utility costs.

Applicants will need to deliver these benefits net of any costs households incur from participating in the program. For example, if the program requires applicants to pay a subscriber fee, then the savings must exceed the fee so that households still experience a financial benefit of 20% the average household electricity bill. Applicants should ensure that if the program incurs any indirect costs on households, such as an increase in tax burden, the household savings calculation incorporates those costs and exceeds the 20% household savings accordingly.

For additional guidance for HUD Multi-Family Housing, see guidance from U.S. Department of Housing and Urban Development (HUD) on how to treat on-bill virtual net metering credits.

Delivering household savings for projects serving households who do not receive individual electricity bills (e.g., households master-metered, multi-family buildings) requires additional consideration since typically these savings are applied to electricity bills. For these households, household savings should be delivered as 20% the average household electricity bill as a financial or non-financial benefit with an equivalent financial value that meaningfully improves the lives of households directly, as described in guidance from U.S. Department of Housing and Urban Development. Applicants should explain how the program will appropriately honor the household savings benefit for households without electricity bills. For example, if a building is delivering household savings as a financially equivalent one-time investment, the value of the one-time investment should be calculated as if households benefiting from the program received 20% household savings for the entire lifetime of the asset.

# Appendix D. Consumer Protection Examples

As described in *Section IV.C: Content of Application Submission* Section 2.2 Fiscal Stewardship Plan, the explanation of Fiscal Stewardship Plan should include descriptions of practices to ensure effective consumer protection throughout your program. Examples of these practices may include but are not limited to plans for the following practices.

- The provision of written materials to program partners and entities that directly interact, transact, or contract with consumers, where such materials contain detailed expectations for those partners' and entities' compliance with applicable consumer protection laws in the jurisdictions served by your program, fair lending laws, and federal consumer protection and consumer financial laws, including laws that prohibit unfair, deceptive, and abusive practices, and Regulation Z (12 CFR § 1026) which requires the disclosure of terms and cost of consumer credit and offers substantive protections to people who use consumer credit

- All in-person and telephone marketing by entities that directly interact, transact, or contract with consumers as part of the program be conducted in a language in which the consumer subject to the marketing is able to understand and communicate

- Consumer complaints that you may receive arising from consumers' interactions, transactions, or contracts with entities involved in your program

- Periodic audits and spot-checks of program partners or entities that directly interact, transact, or contract with consumers

- Entities that directly interact, transact, or contract with consumers as part of the program adopting policies and practices to:
    - Provide written disclosures to consumers containing information in clear and understandable language regarding the purchasing, leasing, or financing, and the costs associated with a consumer's solar project; the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process
    - Submit to you for review, documents relating to the entities' interactions with consumers, including, for example, sales and marketing materials, training materials, policies and procedures, consumer finance contracts, and consumer contracts for solar products or services
    - Have a meaningful process for handling consumer complaints that includes receiving, tracking, monitoring, investigating, and resolving such complaints

# Appendix E. Equitable Workforce Development and Job Quality

**Good Jobs Principles**

Applicants are encouraged to review the U.S. Department of Labor and Commerce's eight Good Jobs Principles for guidance on what constitutes a good job when developing their plans. These principles include, but are not limited to, all workers are paid a stable and predictable living wage, family-sustaining benefits that promote economic security and mobility, the choice to form and join a union, and safe and healthy working conditions. In addition, this program aims to expand workforce opportunity for underserved communities (as defined by the Good Jobs Initiative) who often face disproportionate barriers to training and employment. For additional resources, see the Good Jobs Toolkit.

**Multi-Sectoral Partnerships**

Multi-sectoral partnerships will be key to meeting the job quality and workforce development goals of this program. Examples of valuable partners include: employers that inform training curriculum and commit to hiring, mentoring, and retaining individuals from low-income and disadvantaged communities; State and local workforce boards that inform statewide and regional workforce strategies; labor unions that partner via Labor-Management Partnerships and are contracted on projects, provide training, and/or advise on labor practices; education and training providers, such as such as pre-apprenticeship programs, community colleges, Minority Serving Institutions, and Historically Black Colleges and Universities; worker centers; and trusted community-based organizations that work in low-income and disadvantaged communities and can assist with recruitment, mentorship, training, and supportive services.

**Job Quality**

EPA aims for this program to create high-quality jobs with grant funds. Applicants are encouraged to proactively determine how they will work with contractors that are committed to "high road" labor practices, such as paying at least the prevailing wage, providing family-sustaining benefits, providing predictable work schedules, paid time-off, retirement contributions, safe and healthy working conditions, providing supportive services to those who need them, and other characteristics of a good job. In addition, EPA is committed to upholding workers' free and fair choice to collectively bargain and join a union. Applicants are encouraged to develop strategies for protecting that right, such as requiring participating contractors to commit to remaining neutral in union organizing and operations and encouraging the use of Project Labor Agreements when appropriate (e.g., through aggregating residential projects under this program). Lastly, if applicants intend to leverage the IRA clean energy tax credits, they are encouraged to review resources from the Department of Treasury and Department of Labor about the prevailing wage and Registered Apprenticeship requirements associated with the tax credits, which aim to promote job quality in the clean energy sector.[31] (DOL tax credit resources:).

---

[31] Additional resources from the Department of Labor on tax credit requirements: Prevailing Wage and Registered Apprenticeship

81

**Market Building - Workforce Training and Equitable Participation**
Applicants are encouraged to invest in workforce training models that prepare individuals from low-income and disadvantaged communities for middle-class career pathways in solar energy deployment. These models include, but are not limited to, Registered Apprenticeship programs, pre-apprenticeship (apprenticeship readiness) programs affiliated with Registered Apprenticeship programs, Labor-Management Training Partnerships or other union-affiliated training programs, training programs in partnership with a local community college, and other similar models. Training programs should be developed in partnership with employers that are deploying grant funds and committed to hiring participants.

Training models should include a clear description for how they will recruit participants from low-income and disadvantaged communities, in addition to having a robust plan for supporting those students with wrap-around supportive services, case management, and on-the-job support and mentorship.

Applicants are encouraged to consider the use of Community Benefits Agreements, Community Workforce Agreements, and Access and Opportunity Committees as tools for delivering equitable, community- and worker-driven workforce development solutions.

**Resources from the U.S. Department of Labor**

- The Good Jobs Initiative and Good Jobs Toolkit
- Registered Apprenticeship
- Pre-Apprenticeship
- Labor-Management Partnerships
- Project Labor Agreement Resource Guide
- WorkforceGPS

**Resources from the U.S. Department of Energy**

- Solar Workforce Development
- Solar Energy Resources for Job Seekers

# Appendix F. Guidance for Carbon Dioxide Avoided Calculations

If EPA's AVERT tool does not support your geography (i.e., Alaska, Hawaii, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands) you can consider calculating the $CO_2$ emissions your program estimates it will abate using the following calculation: Total size of project(s) (MW) x Capacity factor (%) x 8,760 hours (*or 8,784 hours for 2024*) x Avoided $CO_2$ emission rate (tons per MWh) = Estimated annual emission reductions (tons).

The recommended capacity factors for residential rooftop solar and avoided emission rates for geographies not in AVERT can be found in the following table. If you are proposing a program serving community solar, you may calculate your own community solar capacity factor and generation values using NREL's PVWatts Calculate or use a simplifying, yet conservative, assumption that the increased capacity factor of a community solar facility is about equal to the resulting transmission and distribution losses.

| | Residential Solar Capacity Factor, (%) | Avoided $CO_2$ Emission Rate (lb/MWh) | Avoided $CO_2$ Emission Rate (ton/MWh) |
|---|---|---|---|
| AK | 14% | 1,278 | 0.639 |
| HI | 18% | 1,748 | 0.874 |
| PR | 22% | 1,618 | 0.809 |
| GU | 21% | 1,691 | 0.846 |
| USVI | 23% | 1,691 | 0.846 |
| AS | 21% | 1,691 | 0.846 |
| CNMI | 23% | 1,691 | 0.846 |

*Capacity factors are estimates derived from NREL's PVWatts Calculator (accessed June 2023). Avoided emissions rates are based on the 2021 eGRID state annual $CO_2$ non-baseload output emission rate (for AK, HI, and PR) and the eGRID state annual $CO_2$ oil output emission rate for Puerto Rico (for Guam, USVI, American Samoa, and CNMI). Values have been converted to short tons (2,000 lb = 1 ton).*

You are invited, but not required, to determine capacity factors specific to your project(s). If you calculate your own capacity factors, you must include data sources and methods for the calculation. If you are using AVERT and wish to use your own capacity factor, you can edit the default capacity factors in AVERT's Excel Main Module.

# Exhibit B



# OFFICE OF MISSION SUPPORT

## WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**   Termination of EPA Assistance Agreement 5H-84087901 under 2 CFR 200.340

**FROM:**   Devon Brown, EPA Award Official

**TO:**   Michele Kunitz, General Counsel
Inclusive Prosperity Capital Inc

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84087901 awarded to Inclusive Prosperity Capital Inc. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Jennifer Brooks, EPA Grant Specialist
    Bridget Kelly, EPA Project Officer
    Musa Collidge-Asad, Grantee Program Manager

# Exhibit C

## The Community Power Coalition "Powering America Together" Program

## Executive Summary

Inclusive Prosperity Capital, Inc. (**IPC**) proposes to lead the new Community Power Coalition (**CPC**) "Powering America Together" Program (the **Program**), a Solar for All (**SFA**) Program, to integrate with, support, and expand the impact of the US Department of Energy's (**DOE**) National Community Solar Partnership (**NCSP**) and Community Power Accelerator (**CPA**) program. Our goal is to greatly increase the number and capacity of mission-driven, community-based solar developers committed to delivering multiple meaningful benefits for Americans in low-income and disadvantaged communities (**LIDACs**) through community solar (**CS**) projects. CPC members are committed to serving the needs of LIDACs and include experienced CS experts who have worked with CPA as developers, lenders, trainers and technical assistance (**TA**) providers, as well as members that bring expertise in workforce development (**WD**), **BIPOC** entrepreneurship, affordable housing, and policy. The Program is designed to live well beyond the funding period and provide infrastructure for lasting market building capacity and impact.

CPC will deliver on all three of EPA's **GGRF Program Objectives**, achieving results consistent with the EPA-cited Executive Orders and Administrative and National Policy Requirements, including the Justice40 Initiative[1] as shown in the table below:

| | |
|---|---|
| Reduce GHG emissions and air pollutants | • Deploy 250MW across 44 geographies<br>• Avoid 297,996 tons of $CO_2$ annually (7.449 million tons over 25-year useful life) |
| Deliver benefits to LIDACs | • Spur deployment of residential distributed solar energy to 62,500 households in LIDACs<br>• At least 20% bill savings for all households<br>• $8.697 million in annual household energy savings ($217.425 million over 25-year useful life)<br>• Quality job training and opportunities, energy resilience to frontline communities, affordable housing, and wealth building for LIDACs |
| Mobilize additional financing and private capital | • $750 million total project investment ($300 million of SFA FA to mobilize $450 million of additional investment)<br>• CPC will utilize tax credits, USDA programs, additional debt from CPC lenders and other mission-driven lenders (e.g., CCIA).<br>• Establish secondary market for CS project debt with National Clean Investment Fund (NCIF) awardees |

We will serve a geography of 42 states, plus Washington, DC, and Puerto Rico (See Section 1.3). We will emphasize supporting CS development in states where CS markets are beginning to develop, including through a pool of "race to the top" CPC financing to incent states to reduce regulatory barriers.

Our scope of work will provide comprehensive supports to help developers overcome barriers to development, grow pipelines, and provide equitable CS access for LIDACs. Key Activities include providing a broad range of project FA to fill project gaps while mobilizing other capital (Section 1.4); promoting expansion of CS in nascent state markets through TA, incentive financing and innovative delivery models (Section 1.3); helping developers coordinate with local workforce

ecosystems (Section 1.5); building developer capacity and tackling barriers to development through training, TA, and peer-to-peer learning communities (see Section 1.5); and supporting community engagement through partnership development and culturally appropriate community outreach and education (Section 1.6).

CPC will test, support, and scale innovative CS models that deliver multiple meaning benefits, and train an ever-growing cadre of developers able to deploy them, such as:

- Community-owned models that seek to build wealth for low-income community members.
- Affordable multifamily housing models to benefit low-income tenants, where policy environments lack enabling support for traditional CS.
- Rural models such as projects hosted by BIPOC farmers and landowners to generate additional wealth and rural electric cooperative ownership of CS.
- CS models that integrate storage for resilience.
- CS owned by resident-owned manufactured housing communities.
- Models that closely link developers to equitable WD programming.

## Community Power Coalition Members

CPC Members are all leaders in their fields and bring critical areas of expertise and track records to their roles in delivering Program objectives.



**Inclusive Prosperity Capital, Inc. (IPC)** (Lead Applicant) - PA&G, FA, TA: a national mission-driven nonprofit clean energy financing platform scaling solutions that channel investment capital to communities that need it most through mission-aligned Program partners. As the Lead Applicant, IPC is the convener of the CPC, bringing together CS experts with a focus on initiatives in traditionally underserved markets. IPC will be providing overall Program administration including reporting, compliance and governance, as well as FA and TA.

**Black Owners of Solar Services (B.O.S.S.)** - CB, E&O: a network of minority business owners and aspiring entrepreneurs with a focus on realizing the renewable energy transition and building generational wealth in communities most impacted by climate change. B.O.S.S. will support CPC by building the capacity of minority businesses and aspiring entrepreneurs to participate in the renewable energy transition and expanding the total addressable market by reaching consumers with the most to gain from the benefits of the transition.

**Clean Energy Group, Inc. (CEG)** - TA, PS: national non-profit advancing resilient solar and energy storage in LIDACs since 2013. CEG will support CPC by providing project-level TA and policy education and will specifically focus on providing assistance to advance solar projects that incorporate energy storage for increased community resilience.

**Coalition for Community Solar Access (CCSA)** - TA, PS: national trade association providing policy support across the Program's geographies, including education on interconnection best practices and reform, docket monitoring, and education to stakeholders. CCSA will provide education for both developer-recipients and policy decision-makers, with a focus on CS enabling policies in launching community-owned CS projects.

**Community Housing Capital, Inc. (CHC)** - FA, E&O: national community development financial institution (**CDFI**) for nonprofits who own and manage over 200,000 units of affordable housing across the NeighborWorks® America network. CHC will provide financing to solar projects within their network, support tenant/subscriber outreach, and educate its network about multifamily solar models.

**GRID Alternatives (GRID)** - FA, TA, WD: CS developer and financing partner with embedded workforce development, which provides project-level TA. GRID will provide TA, WD programming, and consumer education and outreach support.

**Interstate Renewable Energy Council (IREC)** - TA, WD: convener of National Clean Energy Workforce Alliance advancing a 100% clean energy future through local clean energy solutions, regulatory engagement, and workforce development strategies. IREC will provide targeted TA and resources for workforce partners and stakeholders. IREC will also build a shared repository of ecosystem mapping, TA documents, and processes, to help scale and build sustainable workforce development pipelines.

**People's Solar Energy Fund, Inc. (PSEF)** - FA, CB, E&O, TA: member network supporting community-based solar developers in LIDACs to develop, finance, and own solar projects maximizing community benefits. PSEF will contribute to CPC's goal of accelerating the deployment of community-owned and community-led solar projects that provide multiple meaningful benefits to low-income and disadvantaged communities.

**ROC USA, LLS (ROC)** - FA, TA: national 501c3 social venture scaling resident ownership of manufactured home communities since 2008. ROC works with the ROC USA Network, a group

of regional non-profit affiliates and ROC's CDFI lending subsidiary that has provided over $330 million in acquisition and construction financing to resident owned communities.

**University of New Hampshire Carsey School's Center for Impact Finance (UNH)** - PA&G, CB, PE: Tier 1 research institution providing resources for training, education, research, and advising related to its mission to equip the community development finance field with the products, tools, skills, and connections to address inequality and foster economic, social, and environmental resilience. UNH will support product and service design, build out delivery of training to CPC's network of partners, and help organize and evaluate the Program impact.

During the planning period, CPC will identify additional nonprofit subrecipients and procure providers for affordable multifamily housing finance and developer network outreach, community outreach and education, TA, policy education, and workforce support.

# 1.   PROGRAM STRATEGY NARRATIVE

## 1.1.   IMPACT ASSESSMENT

CPC understands a prime goal of SFA funding, RFA # EPA-R-HQ-SFA-23-01 (**NOFO**), is to address current market barriers to low-income solar deployment by setting achievable outcome metrics for the program based on those barriers and historical data. CPC has set reasonable but ambitious goals for Program output and outcome metrics, efficiently utilizing Program funds to maximize impact relative to requested funds with respect to (i) households (**HHs**) served by the Program; (ii) MW of solar deployed; (iii) MW hours of storage deployed, (iv) avoided $CO_2$ emissions, and (v) annual household savings.

### 1.1.1.   Program Impact on Output and Outcome Target

Over the next 5 years, CPC proposes achieving the following **output and outcome metrics** based on a program award size of $399.2 million, of which $300 million will be used for project FA:

- 62,500 HHs in LIDACs (an average of $6,387.21 funding requested per HH);
- 833 estimated projects financed using requested SFA funding;
- 250 total megawatts of solar capacity deployed (an average of 4 kW per household and an average of $1.597M funding requested per MW or $1.200M *FA* per MW);
- 25 megawatt hours of storage deployed (an average of $15.968M funding requested per MWh, at a cost of $250,000 *FA* per MWh);
- 297,996 tons of $CO_2$ emissions avoided annually and 7.449 million tons lifetime (over a 25-year useful life and an average of $53.58 in funding requested per lifetime ton reduced);
- $8.697M in annual household energy savings; $217.425M lifetime household energy savings over a 25-year useful life (average of $1.84 funding requested per dollar of lifetime household energy savings), at a minimum - reflecting at least 20% bill savings for all households;
- $750M of total project investment, using $300M of Program *FA* to mobilize $450M of additional investment.

CPC proposes to serve 42 states, plus Washington, DC, and Puerto Rico. We have categorized these geographies based on their regulatory and market conditions; described in Section 1.3:

- **Fourteen "early action" states and Washington, DC** where CPC has identified shovel-ready pipeline and where regulatory and market conditions are most favorable with 3.04 GW of

installed CS capacity: CA, CT, DC, IL, ME, MD, MA, MN, NV, NJ, NY, OR, VT, VA and WA. CPC is targeting 25% of FA to these jurisdictions.

- **Twenty-four "priority" states and Puerto Rico** where there are opportunities for developers to expand CS "beachheads" if they receive comprehensive support from CPC. CPC has identified a pipeline of potential projects in some of these jurisdictions. This category includes states without enabling legislation that have voluntary utility programs and at least some CS generation capacity already built. These jurisdictions have 2.7 GW of installed CS capacity: AZ, CO, FL, GA, HI, ID, IN, MI, MO, MT, NE, NH, NM, NC, ND, OH, OK, PA, PR, RI, SC, TN, TX, UT, and WI. CPC is targeting 60% of FA to these states.

- **Four "long-term" states** where no CS has been developed and where deployment may not get underway until Years 3-5 of the SFA performance period due to current regulatory constraints that will be addressed as part of CPC's strategy. In the near term, there are still opportunities for developers to pilot new approaches to shared solar that can work in difficult regulatory environments, including new shared-solar technologies for multifamily housing and virtual PPA business models (see Section 1.3). "These states consist of: AK, LA, SD, and WV. CPC is targeting 15% of FA to these states.

If requested by the EPA, CPC can serve LIDACs in all 50 states, Washington DC, and Puerto Rico; among the additional states, one (DE) would be an "early action" state, five (AL, AR, IA, KS, KY) are "priority," and 2 (MS, WY) are "long term."

Using the CEJST-Identified Disadvantaged Communities tool, CPC has identified the total population in disadvantaged census tracts for the proposed geographies. This population is 99,935,203 and meets the EPA requirements for a "large" award.

## 1.1.2.  Justification of proposed outcome metrics: barriers, solutions and pipeline

In total, our multistate target area has over 5.7 GW of installed CS capacity, according to National Renewable Energy Laboratory (**NREL**) "Sharing the Sun" data. Our proposed outcome metrics are reasonably achievable considering historical data from these previously successful solar projects and related historical data. CPC has learned from these past solar projects and identified barriers to successful LIDACs' CS projects, as well as solutions to address them.

**Barrier:** **Financing** – CPC members have invested years directly engaging with mainstream financiers and developers in LIDACs. Mission-driven developers face significant challenges financing projects. Many mission-driven developers lack the needed financial resources for early, pre-development investment and struggle to meet lenders' sponsor equity requirements. They can also face higher total development costs and financing gaps compared to mainstream projects due to smaller project sizes and a commitment to providing meaningful benefits like providing equitable WD and deeper subscriber energy cost savings. Unlike mainstream market projects sold to investors, many mission-driven projects are developed for long-term ownership by community stakeholders. Most lenders are not willing to provide such longer-term permanent debt. Lastly, tax credit financing has been difficult for projects under 5 MW. The new ITC rules provide game-changing opportunities, including direct pay provisions for nonprofits, tribes, and municipalities, and transferability provisions for small for-profit developers. However, developers need access to bridge financing to use these provisions.

- **Solutions**: Tailored and flexible FA to meet the varied financing challenges these developers face (See Section 1.4).

**Barrier:** **Regulatory Environment** – State regulatory environments are significant barriers nationally – 75% of U.S. CS capacity is found in just 4 states. And in any state, negotiating interconnection agreements and investing in required upgrades to local grid infrastructure can present significant challenges directly tied to utility regulatory structures.

- **Solutions**: A multifaceted approach tackling regulatory barriers, including (i) a "race to the top" pool of financing for projects as an incentive to states that reduce barriers, (ii) TA, education, and support for community stakeholders around regulatory design, and (iii) financial and TA support for developers pursuing innovative models of shared solar development for challenging regulatory environments (See Section 1.3).

**Barrier:** **Workforce** – Forty-four percent of companies responding to the IREC 2022 Solar Jobs Census[2], indicated that it was "very difficult" to find qualified applicants. Developers further struggle with fragmented local WD systems. In response, the White House has launched the American Climate Corps, a workforce training and service initiative that ensures more young people have access to skill-based training for jobs in the clean energy economy.

- **Solutions**: A workforce coordination strategy that provides (i) a cadre of "job developers" will help project developers navigate local workforce systems to get needed talent, and (ii) funding for workforce programming implemented by CPC members modelling functional workforce systems in other geographies for replication elsewhere (See Section 1.5).

**Barrier:** **Developer and Market Maturity** – CS is a nascent market, with developed markets in few states. As a result, many mission-driven entities are new to CS development and need training, TA, and mentoring. The NCSP and CPA were created to help advance CS, including for the benefit of LIDACs. CPA programs are oversubscribed, indicating significant demand for developer resources. New entrants range from community development nonprofits seeking to translate real estate skills into CS development to inexperienced mission-driven clean energy developers.

- **Solutions**: A combination of training, hands-on TA, peer-to-peer knowledge sharing and communities of practice, and mentorship to help mission-driven, community-based CS developers (**CBCSDs**), particularly BIPOC developers, overcome barriers around grid interconnection, efficient deployment, project siting and permitting, and other project and business development challenges, especially to orient newer developers (See Section 1.5).

**Barrier:** **Diverse Stakeholders** – Mission-driven, community-based CS development requires significant community engagement to listen to community priorities, gain consensus, and reflect community needs in project design.

- **Solutions**: Support for developers to engage with communities, including creation of culturally inclusive consumer education materials, training and TA support for community engagement and partnership building with national networks of community-based organizations (**CBOs**) and EPA Thriving Communities Technical Assistance Centers (**TCTACs**) (See Section 1.6).

CPC has a strong network of mission-aligned, community-based developer relationships to help identify funding-worthy projects. CPC members have already identified a pipeline of 179 specific CS projects across 16 states with 179 MW of installed capacity, that would serve 42,000 LIDAC households, totaling over $520 million of investment; the projects include 23 MWH of battery storage. Site control is in place on 97 MW. Additionally, CPC members have nationwide lending

relationships with affordable housing nonprofits with over 250,000 units owned and managed, providing site control for potential solar projects as well.

Furthermore, IPC conducted a survey of 10 experienced, mission-driven CBCSDs, (3 CPC members and 7 others). The survey outlined the full range of FA, TA, WD, and community outreach engagement support the Program intends to provide developers. With access to CPC resources over the next 5 years, these 10 developers estimated they could develop 917.5 MW of CS projects serving 185,000 households, totaling over $2 billion of investment. Anticipated projects span 42 states plus Washington, DC, and Puerto Rico and encompass a range of delivery models including cooperatively owned solar; solar for manufactured housing parks and affordable rental housing; solar developed by small, BIPOC-led development companies; and rural-focused models with sites hosted by BIPOC farmers and landowners. Survey respondents are experienced developers and have already developed over 700 solar projects and over 100 MW of capacity.

Assuming SFA funds cover 40% of the project capital stack on average, the anticipated project origination from the surveyed developers alone is more than twice the total project volume required to fully deploy the SFA award. (NB: actual percentage of project costs covered by FA will vary by state and project economics, and whether low-income, domestic content or energy community ITC adders are secured).

Additionally, these 10 surveyed CBCSDs have expressed interest in receiving FA and TA support from the Program and have provided letters of support. CPC could provide FA and TA to these developers, subject to Program guidelines and underwriting analysis. CPC has not pre-committed FA funds to any projects and will comply with federal procurement specifications within 2 CFR 200. Importantly, CPC will reach out to all CS developers participating in the NCSP and CPA to offer them Program FA and TA. CPC intends to make the CPA platform a key way to reach and serve mission-driven developers, and will provide training and/or TA to at least 1,000 developers over the Program period. Our belief that this is achievable is bolstered by high demand for the CPA and ever-growing developer interest given significant new Inflation Reduction Act resources.

While CPC could easily fully deploy FA to confirmed, shovel-ready projects from a pool of experienced developers, we have our sights set on something bigger – helping to build a nationwide mission-driven CS movement to support the NCSP's dream of delivering meaningful community benefits to millions of households. Thus, to help both experienced and new mission-driven developers we only allocate the first $100 million of Program FA towards early mover developers, reserving the remaining $200 million to be allocated as follows: 25% to "early action" jurisdictions, 65% to "priority" jurisdictions, and 10% to "long-term" states where the bulk of development is expected in Years 4-5 (See Section 1.1.1). The last 10% of FA will be held as a "race to the top" pool for states that take steps to reduce regulatory barriers in Years ~3-5.

## 1.2.  MEANINGFUL BENEFITS PLAN

CPC will target CBCSDs seeking multiple meaningful benefits of **solar and storage** for LIDACs. See Attachment I for **letters of support** from potential partners across CBOs, industry associations, WD, solar developers, affordable housing developers and lenders. We will:

1. Provide a minimum of 20% household savings to beneficiaries and equivalent household for projects without individual electricity bills;
2. Develop FA and TA products to increase LIDACs' access to solar;

3. Create capacity to deliver electricity and/or development of critical facilities to serve the target population during grid outages thus increasing resiliency and grid benefits;
4. Facilitate ownership models that support low-income households and communities by building equity in projects; and
5. Invest in quality jobs and businesses through a plan for creating high-quality, middle-class jobs, and involving minority-owned businesses wherever possible.

CPC will use three strategies to deliver meaningful benefits to LIDACs:

**Targeting / building relationships with aligned developers**. Support and scale innovative CS models that deliver multiple meaningful benefits (see list of models we are focused on scaling in Executive Summary) delivered through an ever-growing cadre of mission-aligned developers.

**Requiring and rewarding meaning benefits**. Screen developers for Program participation eligibility based on review of the organization's mission statement, demonstrated commitment to community engagement and inclusive practices, and use of, or willingness to be trained in, business models that generate meaningful community benefits during the Year 1 planning period. CPC, through its Steering Committee (**SC**, see Section 1.6), will develop a project Equity and Meaningful Benefits Scorecard (**EMB Scorecard**) to assure minimum household savings of 20%, and probe for additional meaningful benefits around equitable WD, energy resilience, community ownership, and wealth-building and entrepreneurship for LIDACs. The EMB Scorecard will also evaluate and/or modify the developer's baseline for strong community benefit agreements (or equivalent) with the community served.

**Non-financial assistance around meaningful benefits**. Use various forms of TA to help developers maximize community meaningful benefits on their projects and maximize low-cost financing sources (such as ITC and SREC financing streams) to deepen meaningful benefits (See Section 1.5). Strategies to support CBCSDs and communities to reach deeply into vulnerable communities to generate meaningful benefits are described in Section 1.6.

### 1.2.1   Household Savings for Low Income and Disadvantaged Households

CPC will require a **20% minimum household savings** for all projects assisted, such that the estimated monthly cost of electricity (both CS subscription + any other utility bill costs) after subscription is at least 20% less than customer's monthly cost of electricity beforehand, on average per year. Underwriting will ensure that pro forma revenue assumptions reflect at least a 20% discount, calculated annually, and will review developer's calculations and subscription agreement documentation. CPC will adhere to IRS guidance on proper calculations of the "bill credit discount rate" in underwriting (26 CFR Part 1). The Program will procure the services of a technical consultant to assist in the development of savings methodology calculations in each jurisdiction served and each CS model the Program seeks to scale. The consultant will review and update methodologies annually, in conjunction with the results of customer savings audits that will be conducted and Program evaluations, as discussed in Section 2.3.

IPC and the CPC members have extensive experience in energy burden calculations and understand that a 20% savings may not always bring a vulnerable customer's energy burden to a reasonable level. CPC will focus on maximizing customer savings and energy burden reductions using other resources and SFA FA to fill gaps. Section 1.4 discusses the various CPC FA resources.

For projects serving multifamily buildings, the CPC will require developers to follow the recently implemented U.S. Treasury Department regulations for equitable sharing of financial benefits with tenants for accessing the 20% low-income ITC adder (IRS Rule Document 2023-17078), regardless of whether the developer is using the adder. These regulations also incorporate the HUD guidance on the Treatment of Community Solar Credits on Tenant Utility Bills and on the Treatment of Solar Benefits in Master-Metered Buildings (e.g., provision of community-level programming benefits in instances where utility bill cost savings cannot be shared). CHC will provide training on this, as will UNH and other nonprofit sub-recipients to be identified.

### 1.2.2    Justifying program strategy for FA and TA to increase access to solar for LIDACs

CPC will target CBCSDs whose missions center on improving **low-income access to solar** and generating associated meaningful benefits. FA or TA will only be provided to projects where at least 51% of electricity generated by the project goes to low-income households, including TA to help meet this requirement. CPC's TA program (See Section 1.5) will focus exclusively on projects serving these communities, as will the community education, outreach and engagement supports (See Section 1.6). CPC's FA strategy will require project underwriting to confirm every project meets low-income access requirements before approval (See Section 1.4). CPC expects developers to access additional sources of low-cost financing, such as ITCs, adders, LIHEAP funding, and SREC sales to achieve low-income access and household savings. CPC will provide TA to support this.

### 1.2.3    Energy resilience and grid benefits.

Trade-offs exist between maximizing resilient energy storage for **grid resilience** and maximizing energy cost savings for households[3]; participation in energy services programs (e.g., virtual power plant and demand response agreements) may help to mitigate some tradeoffs. CPC members and other mission-driven developers, together with the communities they serve, are in the best positions to determine the role of resilience in a project's goals. Project-level TA will help developers screen projects for opportunities to add energy storage providing **community resilience benefits**, as guided by their community discussions. CPC efforts include i) **CEG** implementing one-on-one support to help developers gain a better understanding of resilient solar+storage and its costs and benefits, produce feasibility assessments, and serve as an advisor throughout the development process; ii) **GRID** providing TA for microgrids with shared power and storage in communities with regular grid instability such as Puerto Rico; and iii) **UNH** developing a Spanish-language course in microgrid development and finance that will be offered in Puerto Rico and in other energy-vulnerable communities.

Flowing from TA, Program FA will be structured to promote provision of energy resilience that aligns with community priorities. Provision of resilient energy benefiting households and community facilities will be included in the EMB Scorecard, described above.

### 1.2.4    Maximizing community ownership models

CPC will target CBCSDs focused on promising CS models around **community ownership**, including cooperatively owned models and models that convert to community ownership after the ITC period. PSEF serves a network of developers focused exclusively on creating community-owned projects across the US. PSEF estimates its community-owned projects over the next 5 years will serve approximately 20,000 households across 21 of the CPC geographies. Surveyed developers have already developed 20 community-owned projects totaling 11 MW.

ROC, also dedicated to community ownership models, makes loans to help scale resident ownership of manufactured housing communities (mobile home parks) to ensure they have control and stability for their community. ROC has lent to several CS projects through ROC affiliates; 1 ROC in New York installing 4MW and 3 ROCs in New Hampshire installing 216KW AC.

Lastly, some developers are beginning to pursue models of CS in which community members can invest in and receive dividends from solar projects. CPC will make FA and TA available to these models, which can generate wealth-building opportunities that otherwise might not be possible through traditional CS.

The Program will not require community ownership of every project funded, as some other models – such as supporting BIPOC-owned CS developers or helping BIPOC farmers and landowners to build wealth through site leasing – can also create community wealth benefits. CPC will support developers pursuing these and other models of community wealth building. We will also provide training and TA to all developers to understand community ownership models, including tools and templates for community-owned structures. CPC will support and encourage developers to pursue these models with FA. Development of community-owned projects and/or provision of other community wealth building benefits will be included in the EMB Scorecard CPC members will use as a part of all project underwriting, described above.

### 1.2.5   Investing in jobs and businesses in low-income communities

CPC is committed to "high road" labor practices and will incorporate equitable WD and job quality metrics into the EMB Scorecard. CPC will use the EMB Scorecard as part of eligibility screening for all financial and non-financial assistance (above). The EMB Scorecard will evaluate specific dimensions, including, but not limited to, the following:

- Existing experience and relationships with local WD boards and/or higher educational institutions and/or the newly created American Climate Corps to support community-based workforce initiatives.
- Commitment to provision of registered apprenticeship opportunities. Developers' plan to work with partners to provide such opportunities.
- Plan to ensure job opportunities for people from LIDACs.
- Requirements for contractors to provide "quality jobs" to workers that include health and retirement benefits, family-sustaining wages, predictable work schedules, and supportive services for those who need them. Note: CPC will also ensure compliance with Davis-Bacon standards for labor compensation.
- Plan to ensure safe working conditions.
- Commitment to workers' free and fair choice to collectively bargain and enter a union with no support for developers who interfere or allow contractors to interfere with workers' choices about union membership.
- Opportunities for women- and minority-owned businesses to participate in the project.
- Inclusion of Community Benefits and/or Project Labor Agreements or similar.

As discussed in Section 1.5, as a part of its TA and workforce programming, CPC will i) **with IREC's leadership**, provide TA to help all developers coordinate their efforts with their local WD ecosystem, making connections as necessary with players such as unions, community colleges, pre-apprenticeship programs, and other training efforts to maximize opportunities for equitable WD; ii) **through GRID**, provide workforce programming including pre-apprenticeship programs

as a part of their development projects, and many of the developers with whom CPC has working relationships have also identified workforce commitments; iii) **led by B.O.S.S.**, grow and support BIPOC CS developers. B.O.S.S. will create capacity-building programming for BIPOC CS development companies including a mentorship program and TA to help these developers access federal resources; iv) **help identify best practices** for equitable WD and creation of high-quality middle-class jobs among the developers it is supporting.

Finally, CPC will reward projects providing deep equitable workforce meaningful benefits through FA structuring. For example, a project committing to using pre-apprenticeship program construction labor could expect to have higher per-watt total development costs. CPC would ensure the project would receive greater support as needed to cover the increased costs. In short: we are committed to ensuring "high road" practices around WD and quality jobs get funded.

## 1.3.   DISTRIBUTED SOLAR MARKET STRATEGY

CPC is deeply familiar with, and committed to alleviating, the **market barriers** to CS development. See Attachment J for **letters of support** from potential partners in this work. The proposed 44-jurisdictions have significant market and regulatory differences. On the positive side, between 2008-2022, 22 states and Washington, DC adopted policies that enable or require CS development, and in another 19 states, utilities have voluntarily deployed CS projects[4]. Puerto Rico has also adopted new CS and microgrid enabling policies since Hurricane Maria in 2017. As a result of these policy shifts, cumulative national installed CS capacity has more than tripled between 2008 and June 2022, growing from 1.6 GW to 5.7 GW.

However, significant regulatory barriers remain. We will describe below our **approach to addressing these barriers**, but first provide a summary of the regulatory status of our application geographies, focusing on the policy categories laid out by EPA in the SFA NOFO. We use data from the Institute for Local Self-Reliance (**ILSR**) 2023 Community Power Scorecard[5], the NREL 2022 Expanding Solar Access report, the NREL Sharing the Sun data[6], and a summary of virtual net metering policy from Solar Reviews[7].

As discussed in Section 1.1, we categorized jurisdictions into "Early Action," "Priority" and "Long-Term" states based on our evaluation of regulatory conditions. We did so by combining (adding together) the Community Power Scorecard scores for the three most critical policy sets for CS development: CS enabling policy (including virtual net metering), interconnection policies, and renewable portfolio standards. States with a combined score of 8 or more (out of a total of 12 possible points) were categorized as "Early Action" states. Those scoring from 2 to 7 were categorized as "Priority" states, and those scoring 1 or lower were "Long Term" states. We then adjusted the category a state was assigned to, allowing states to be in a "priority" category if they had voluntary utility CS programs in place and at least some actual CS deployment, despite having a low score. Pennsylvania was also added as a "Priority" state due to pending CS enabling legislation. CS development is not easy in "Priority" states, but it is possible, and our goal is to push the door wider open for developers in those states.

### 1.3.1   Net metering: ILSR takes virtual net metering into account when scoring CS enabling policy, discussed below. We also looked at virtual net metering grades assigned to states by the website Solar Review. These grades are consistent with ILSR scoring, with most "Early Action" states receiving an "A," all "Long Term" states receiving an "F," and "Priority" states having a wide range of scores.

Regular (not virtual) net metering can have relevance for certain shared solar models. Specifically, new technologies are allowing on-site rooftop multifamily solar arrays to provide individually-metered electrons to the units in that property. Individual units can then net meter their own utility accounts, even though the project meets the definition of CS in that it is one solar array with multiple electricity offtakers. This strategy may be one of the most promising ways to begin shared solar development in states that have no CS enabling policy but do have stronger regular net metering policy. "Long Term" states in this category include AK, WV and WY, and 10 "Priority" states have stronger regular net metering policy despite not having CS enabling legislation (AZ, FL, ID, MO, MT, NE, NC, OH, PA, and TX).

### 1.3.2    Third-party ownership: ILSR scored states on whether they allow third-party ownership and power purchase agreements (PPAs) as well as the breadth of sectors in which they are allowed.

- Out of "Long Term" States, 5 scored 0 points out of 4 and 2 scored 2 points.
- Out of "Priority States", 12 allow both 3rd party ownership and PPAs in every sector and scored 4 out of 4 points. Six scored 0 points, 8 scored 2 points, and two scored 3 points.
- Out of "Early Action" States, 13 allow both 3rd party ownership and PPAs in every sector and scored 4 out of 4 points. 1 state each scored 0, 1 and 2 points.

### 1.3.3    Interconnection: ILSR assigned grades for each state plus Washington, DC for its standards for connecting renewables to the grid, on a scale of -2 to +2.

- Five "Long Term" states scored -2 points out of 4, with one scoring "0" and one "1"
- 16 "Priority" states scored "0" or worse, with 12 scoring an "1" or "2." Puerto Rico (not graded) recently adopted new interconnection standards for renewables.
- All 16 "Early Action" states scored "1" or "2."

### 1.3.4    Renewable Portfolio Standards (RPS):

- Out of "Long Term" states, none have a meaningful RPS in place and scored 0 points.
- Out of "Priority" states, 19 have no meaningful RPS in place; 7 have an RPS that has plateaued and received 3 points; 2 have an RPS with a meaningful solar or distributed generation (DG) carve-out.
- Out of "Early Action" states, 14 have an RPS with a meaningful distributed solar / DG carve-out and 2 have an RPS that has plateaued.

### 1.3.5    Community solar enabling policy: The ILSR Community Power Scorecard grades states and Washington DC on shared renewables policy, including whether virtual net metering is in place, whether programs are operational and low-income access policies are in place, as well as up to 2 additional points for installed capacity per capita.

- All 4 "Long Term" states scored 0 out of 5 possible points.
- 18 "Priority" states also scored 0, with 6 states scoring between 2 and 4. However, most states scoring 0 do have voluntary utility programs. The one exception, PA is poised to pass CS enabling legislation in 2023. Puerto Rico (not graded) adopted enabling policy in 2019.
- The 15 "Early Action" states score between 2 and 5, with 7 states scoring a 4 or 5.

**Community solar caps and LMI carve-outs** are integrated into ILSR's scoring of CS enabling policy. CPC has compiled detailed data on the status of LMI Community Solar programs, the structure of the programs, LMI minimums and capacity limits, and overall CS capacity limits, using data from the NREL Expanding Solar Access report. LMI focused solar programs are

common in "Early Action" states and some "Priority" states have also had these programs. Caps on CS programs are actually most common in "Early Action" states but are also generally strong (most caps are in the hundreds of megawatts; in NY the cap is 10 GW; NV has a low 10 MW cap).

Regulatory differences are further compounded by differences in electricity pricing, and differences in everyday business practices from utility to utility. Within each category of regulatory conditions in our analysis, retail electricity prices (per EIA data) can vary widely. That said, "Early Action" states tend to have the highest prices, with a median rate of 12.1 cents per kWh, followed by "Priority" states (9.8 cents) and "Long Term" states (9.5 cents).

In states where regulatory barriers are in place, CPC will use a three-pronged strategy to address them, with the leadership of CCSA:

- **Provide education and technical assistance to stakeholders around community solar regulation**. With the leadership of CCSA, CPC will provide training webinars and workshops to developers, utilities, utility regulators and communities around how existing regulatory frameworks and interconnection practices could be updated to facilitate CS development. We will also help these stakeholders connect to existing forums and organizations that compile and disseminate best practices around regulating CS, such as the NCSP States Collaborative for these educational activities.

  CCSA will also provide a docket monitoring service wherein it monitors relevant Commission dockets including interconnection reform, utility system planning proceedings, and any relevant billing and consumer protection actions. CCSA would keep track of the docket's progress and keep developer-recipients apprised of opportunities to provide input on best practices to support community-owned CS deployment.

  Finally, CCSA will develop informational materials for developer-recipients and new markets to use in introducing CS to their communities. CCSA has a wealth of experience and knowledge in CS program design and how to accurately communicate the value proposition to customers and policymakers, ensuring both market development and community support.

- **Incentivize reduction of regulatory barriers through funding**. CPC will set aside 10% of the FA pool - $30 million – to dedicate as "race to the top" FA, including grants, for CS projects in states that take actions to reduce regulatory barriers. Jurisdictions in both "Priority" as well as "Long Term" categories will be eligible. CCSA will provide "matchmaking services" to help developers and lenders meet with energy sector stakeholders in these states to underscore our willingness to boost investment in CS projects, and to highlight positive impacts in other states. At smaller scale, this incentive financing pool will help to extend over time the same kind of strategy that EPA is implementing in this NOFO, encouraging states to take positive steps to facilitating CS in their jurisdiction.

- **Support innovative models that can work in spite of regulatory challenges**. For example. CPC will invest in developers building projects using models that facilitate community members to invest in and financially benefit from solar projects even in states without strong CS enabling legislation. One developer with which we have a working relationship utilizes a profit-sharing model to share solar benefits with customers. The developer builds solar projects in the Southeast and sells the power directly to utilities. However, profits are shared with low-income community members who have an ownership stake in the project. Every 1 MW of capacity installed can generate "dividend" checks to 100 low-income households. Another

developer with which we work is exploring similar models, using Virtual Power Purchase Agreements to construct solar projects in OH.

In states without strong third-party ownership strategies, CPC will also work with Rural Electric Cooperatives to pilot the development of CS projects and demonstrate their efficacy to broader energy sector stakeholders in that state. CPC will also focus on affordable multifamily housing solar models that flow benefits to tenants, including using innovative technology solutions. CPC member CHC and additional unnamed nonprofit subrecipients in the affordable housing space will be excellent implementation partners.

### 1.3.6   Maximizing deployment breadth and diversity across the program geography

CPC is committed to maximizing deployment breadth to ensure national market transformation. Currently, only 4 states – FL, NY, MN and MA - account for 75 percent of national installed CS capacity. To meet the NCSP goal of helping 5 million new households access CS by 2025, it will be critical to establish a strong CS presence in many additional states.

CPC will use the following strategies to maximize deployment across the Program geography:

**Maintain diverse developer relationships**. In all Program geographies CPC members have a working relationship with at least one developer who is targeting that geography for new CS project development with at least 2 meaningful benefits over the next 5 years. We will continue to expand that network of developer relationships, including by reaching out to other participants in the NCSP, applicants to the CPA prize and training cohorts, and other developers that we may become aware of through our extensive relationships with lenders nationwide, such as the American Green Bank Consortium, national peer networks of affordable housing lenders and developers, and the CDFI members of Inclusiv and the Opportunity Finance Network (**OFN**).

**Set aside funding for geographical diversity**. As described earlier, CPC is allocating FA to ensure that "priority" and "long-term" states are served, not just "early action" states where developers already have strong pipelines. Our strategy also includes setting aside a special "race to the top" fund to incent states to lower barriers to CS, as described above.

**Provide TA to developers working in states with lower installed capacity**. In states that have experienced less CS development activity, we will help developers with introductions to utilities and PUCs; help to review and assess policy barriers in that state; and use our national relationships with lenders (e.g., through the CCIA and NCIF programs) to make connections beyond CPC lenders to other mission-driven lenders active in that state. We will pay special attention to states that have recently moved to facilitate CS, but where mission-driven developers have not yet achieved a significant concentration of projects, such as NM, SC and NV, which have enacted CS enabling legislation since 2018. UNH is currently providing Community Power Accelerator Learning Laboratory training (see Section 1.5) to developers from states without strong CS track records and will offer additional such targeted trainings.

**De-risk early-stage project investments in newer states**. CPC will provide early-stage, soft money to support developers to cover predevelopment costs such as feasibility studies, particularly in geographies that are newer to those developers. As discussed in Section 1.4, this could include "recoverable grants" where the financing assistance is only repayable if the project is able to proceed to the development stage. Additionally, CPC will work with developers in newer states to

help them engage with landowners, permitting authorities, and communities to help people see the benefits of CS projects and accommodate them.

**Using networks to spread ideas**. Both the NCSP platform and national networks of affordable housing nonprofits provide channels through which new groups can be exposed to ideas and strategies for solar development in difficult-to-develop states. CHC serves a network of 250 affordable housing nonprofits and can convene members to this end.

## 1.4.  FINANCIAL ASSISTANCE STRATEGY

CPC's FA strategy will expand on our EMB Scorecard (Section 1.2) and allocation methodologies (Section 1.1). Projects will be evaluated on whether the proposed financial model is efficient, mobilizes other funds to the greatest extent possible, including private capital (See Attachment I for **letters of support** from potential lenders partners), and maximizes LIDACs' solar deployment with multiple meaningful benefits.

As dictated by the unique needs of each project, and with the objective of achieving multiple meaningful benefits, FA will cover the full life cycle of project development as discussed below.

### 1.4.1.  Financial assistance strategy

CPC lenders (IPC, CHC, ROC, PSEF, GRID) provide a **full range of FA to developers of community-based CS projects** across the project life cycle shown below, including the initial allocations of FA types for the $300M pool.



Pre-Development (6%, $18M) | Acquisition and construction (5.5%, $18M) | Enabling upgrades financing (15%, $45M) | Bridge financing (12%, $36M) | Permanent debt financing (49.8%, $149.4M) | Grants (11.7%, $35.1M)

A few notes on the FA:

- **Pre-development** loans could be forgivable if the project can't move forward. **Enabling upgrades** are further discussed in Section 1.4.3. **Bridge financing** includes grid interconnection loans and ITC bridge loans, important for nonprofit developers utilizing the ITC direct-pay provisions, as well as developers using the new ITC transfer mechanism. **Permanent debt** with a range of flexible terms to support multiple meaningful benefits and **Grants** where needed to drive deeper impact. **Credit enhancements** would be available for CS models not yet widely accepted.

- **Pre-development, acquisition and construction, and bridge financing will revolve** in the first 3-4 years, and then in Year 4 will begin to transition to permanent project FA, so that all FA is placed into projects by the end of Year 5.
- The **"race to the top" pool** is allocated across all FA types and is 10%, $30 million.

We anticipate that CPC members will use FA predominantly as gap financing to ensure projects are economically viable and maximize the use of both other subsidy sources and private capital, while maximizing multiple meaningful benefits for LIDACs. As Section 1.2 makes clear, this is a balancing act: generating meaningful benefits such as electricity cost savings in low-rate environments, or employing pre-apprenticeship workers with quality job opportunities, adds project costs that FA capital may need to resolve with grants or low-cost debt. Similarly, smaller projects may also deliver significant community benefits – for example, many community-owned projects are smaller in size – but have higher soft costs per watt that need to be covered. We will combine our underwriting procedures with our EMB Scorecard to help achieve the appropriate balance between financial and mission impact considerations. Specific steps CPC members will use in underwriting to maximize the use of amortizing debt within this complex financial structuring challenge include the following:

- Review project revenue streams and Sources and Uses statement to ensure that developers are maximizing other available sources of subsidy (e.g., solar ITC and adders, SRECs, LIHEAP, USDA, etc.) (See Section 1.4.2).
- Review the project pro forma and debt coverage calculations to ensure that the debt coverage ratio (DCR) is reasonable. A high DCR, depending on other pro forma assumptions, may indicate the capacity to service additional debt, and /or change the terms of debt financing.

There are some significant unknown variables that impact the amount and/or form of FA needed for project viability. To the extent that more states adopt RPS standards and simplify interconnection processes, deal economics could become more positive in areas that are currently hard to develop. On the other hand, complying with Davis-Bacon requirements will increase project labor costs significantly for some developers, while Buy American requirements, as well as domestic content requirements related to the ITC, could increase materials costs. As developers expand the geographies in which they work, there is the potential for greater needs for enabling upgrades to local grid infrastructure. Lastly, it is unknown how much of the low-income ITC adder will have already been reserved by the time FA dollars are available to developers. CPC members have years of experience in CS and have interviewed and surveyed a number of developers, reviewing deal-level information on 179 pipeline projects. We estimate that CS total development costs (**TDC**) will average $3/watt across the Program, excluding storage.

CPC estimates that with a SFA award of $399.2 million, of which $300 million is utilized as project FA, it can serve a total of 62,500 households. Key assumptions in this calculation are:

- Above the use of FA for pre-development and bridge loans, SFA will comprise about 40% of the project permanent capital stack, on average across all projects in the 44 geographies. This translates to $300 million in FA supporting $750 million of TDC. (Loans for pre-development, bridge, or construction made using SFA will recycle and by the end of the 5-year Program period we assume that all $300 million will be deployed as permanent gap financing).
- A TDC of $3/watt as noted above, yielding 250 MW of development for $750 million of TDC.
- Based on a detailed survey of developer pipelines, we estimate an average of 4 kW of installed capacity per subscriber household, yielding 62,500 households served.

- To the extent secondary markets are developed (see discussion in 1.4.2 below) there may be opportunities to serve additional households within the Program period.

### 1.4.2. Complementing and Leveraging Other Capital and Financial Assistance

CPC will help to leverage SFA FA in multiple ways, ensuring that this financing **complements and does not replace** other sources of capital. Below we outline strategies to address this complementary financing goal.

**Assisting developers to leverage other financing supports**. Through training, TA, and assistance during loan application, CPC will work to ensure that developers maximize non-Solar-for-All financing supports that are available, including the items below:

| Financial Support | Program Assistance |
|---|---|
| "Direct pay" solar ITC for nonprofit developers, including applicable adders such as the low-income adder | • Help CS cooperatives develop "nonprofit cooperatives" to access direct pay<br>• Connect small for-profit developers to emerging transfer markets and provide bridge financing<br>• Facilitate tax equity investment and increase access to tax credit equity |
| Social Renewable Energy Credit (REC) platforms | • Social REC platforms to provide additional meaningful benefits and opportunities to sell voluntary RECS to investors (often at a premium) |
| USDA-Rural Development resources | • Assist CS projects structured as rural businesses to access USDA REAP grants and loan guarantees, and partially forgivable loans from the USDA Powering Affordable Clean Energy program<br>• Connect rural CS projects to Rural Energy Saving Program funds<br>• Assist rural electric cooperatives with accessing Rural Utilities Service money for CS projects through the newly-enacted Empowering Rural America program |
| National Association of Community Action Programs (NACAP) | • Connect projects serving LIHEAP-eligible customers with NACAP's 1,000 members, many of which operate LIHEAP programs across the country.<br>• Provide TA on using LIHEAP to support CS subscriptions, as new Health & Human Services regulations now allow |
| Green Crowd-funding Platforms | • Connect developers to platforms, such as Raise Green, which pair individual socially-motivated investors support CS projects with opportunities requiring funding |

**Fund-level leverage at Coalition lenders**. CPC lenders including IPC, CHC, ROC-USA, GRID, and PSEF have additional blended sources of capital to draw from including bank and foundation Program Related Investments funding. IPC will be seeking to grow its capital through the GGRF CCIA and NCIF programs, particularly the Justice Climate Fund (**JCF**), which IPC is aligned with and will house the CPC. and will use both SFA and any additional GGRF capital to raise additional balance sheet debt. Total financial facilities available to IPC already exceed $100 million, and IPC will continue to work with foundations to raise debt capital that many philanthropies prefer to invest at the fund level rather than in specific projects. This balance sheet capacity will be available to lend to CS projects. CDFI Coalition members ROC and CHC typically leverage 4-to-1.

**Partnerships with networks of community lenders (CLs)**. We will reach out to our networks of community lenders like green banks, CDFIs, community development credit unions, and community banks including minority depository institutions (collectively, **CLs**) to engage in direct lending or co-lending to Program projects and encourage both these lenders and the developers to use the Community Power Accelerator platform to ensure that developers get the best financing they can on every deal. CPC's lender members will partner with CLs who receive CCIA funding for co-investment opportunities in CPC CS projects, CPC members have long-standing partnerships with CLs including many CCIA applicants such as Inclusiv, OFN, and JCF coalition partners, and various member networks of affordable housing lenders. These community and housing lenders need a knowledgeable partner to help them de-risk what they view as untested lending. CPC is poised to be that partner, opening up additional lending capacity.

**Secondary market development**. With grant funding from the Sea Change Foundation, IPC, in partnership with several NCIF and CCIA applicants, notably JCF, where the CPC will be housed, is building secondary market solutions to help scale inclusive clean energy finance in LIDACs. This market will create standardized loan products for CS. and create lender liquidity, which could be a game-changer especially for equitable CS. Standardized lending terms will also make it easier for new lenders to enter the market either as a direct lender or investor in secondary participations. Finally, standardized loan products will make the financial market easier for CBCSDs by clearly defining the underwriting parameters of a conforming loan – providing additional clarity to the "Credit Ready Checklist" DOE has developed in the CPA program.

### 1.4.3. Prudent use of financial assistance for storage and enabling upgrades

Studies[8] have found that grid infrastructure in LIDACs has received less investment from utilities and has lower hosting capacity, such that utilities may require developers to make upgrades to distribution or transmission infrastructure as a condition of obtaining interconnection permits. Through training and TA, CPC will encourage developers to **work with utilities early on in the process to ensure project sitting in optimal grid locations**. Projects where enabling grid upgrades exceed 20 percent of project costs will be flagged for further review and TA, including CCSA TA to utilities and community stakeholders around **interconnection best practices** and to developers on negotiation with utilities. In the absence of other funding, the Program will finance upgrades to transmission and distribution **infrastructure sited in LIDAC** census tracts and associated with Program projects. Enabling upgrades to buildings may also be required for CS projects serving multifamily affordable housing or other community facilities integrated into CS projects (such as roof or electric service upgrades). Combined, these enabling upgrades will be limited to 15% of total FA deployed during the Program.

CS projects can generate resiliency benefits of two types – "grid-level" resilience (e.g., helping utilities meet peak demand) and the off-taker level resilience, e.g., battery storage for homes and community facilities. CPC will prioritize FA to CS projects that provide off-taker level resilience, and CEG will help developers screen projects for opportunities to incorporate storage and will provide an assessment of the cost-effectiveness of integrating storage.

CPC lenders will require developers to break out costs for both enabling grid upgrades and storage in the sources and uses statement to facilitate review of these costs. IPC will track FA provided for these uses to ensure compliance with EPA deployment caps.

### 1.4.4.  Managing long-term impacts of program financial assistance

CPC is focusing entirely on mission-aligned, CBCSDs who seek to create multiple meaningful benefits for communities through their development work. To the extent that these developers are developing CS projects serving affordable multifamily housing, it would be serving regulated affordable housing, typically owned by a nonprofit affordable housing developer or public housing authority. Regulated affordable housing carries long-term affordability covenants and deed restrictions. As a part of project underwriting, CPC lenders will ensure that if they are lending to a CS project serving such a development, that these covenants are in place, as expected. Both IPC and CHC have **extensive experience lending for energy improvements to affordable housing** and will provide guidance on this topic for the Program.

Long-term CS asset management is of prime importance to CPC lenders, as we expect that many mission-driven projects will require long-term debt. IPC will develop and own CS assets on behalf of developer and community partners. IPC has extensive experience with owning, managing, and overseeing long-lived solar assets, including conducting O&M audits, and will leverage that expertise and that of other CPC lenders and partners in the development of related policies for the Program. As discussed in Section 1.5, long-term asset management and O&M will be key topics covered in CPC's training and TA program. CPC lenders themselves will also implement a long-term asset management function, to be informed by CPC's governance process and overseen by IPC. During Year 1 of planning, long-term asset management concerns – such as maintenance plans, adequacy of replacement reserves, and plans for decommissioning and recycling of solar equipment at the end of project life – will be integrated into project underwriting guidelines and loan portfolio monitoring activities.

### 1.5.  PROJECT-DEPLOYMENT TECHNICAL ASSISTANCE STRATEGY

CPC has designed a robust TA strategy to support CBCSDs across all dimensions of their projects – including interconnection, efficient deployment, resilience, siting, permitting, community benefits agreements, community engagement, financial structuring, subscriber management, development team management, and organizational business planning. CPC's three-pronged TA program, detailed in the Attachment D work plan and the table below, will integrate hands-on project TA; a training program offering multiple ways for developers to engage and learn; and a peer learning "community of practice" and mentorship program. See Attachment I for **letters of support** from potential partners across CBOs, nonprofits, industry associations, WD and others.

| Hands-on project technical assistance |
|---|
| TA provided by CCSA, GRID, CEG, and B.O.S.S. <br> • One-on-one TA during the predevelopment and development on grid interconnection, deployment, siting and permitting, and other project challenges <br> • Identification, vetting, and procurement of TA providers <br> • Provide TA grants to help developers address development process challenges identified <br> • Coordination with Lawrence Berkeley National Labs (TA program provider for CS developers) to ensure maximum coverage and avoid duplication of services |
| **Training** |
| UNH, which manages DOE's Community Power Accelerator Learning Laboratory, will expand their training program to offer: |

|  |
|---|
| • additional courses beyond what is funded by DOE, including a 10-week instructor led online course tailored to content CPC is scaling<br>• at least 2 additional course cohorts per year (serving 25 developers per cohort)<br>• a Massive Online Open Course to provide accessible training to a wider audience<br>• a new course on financing and developing solar+storage, including community microgrids<br>• online workbooks with videos, checklists, documents, and templates<br>CEG to develop solar+storage case studies and conduct educational webinars (promote via CPC's networks, NCSP, and CPA community) |
| **Learning community & mentorship program** |
| • Provided by UNH and partners:<br> • Online learning community<br> • Webinar series with monthly workshops<br> • Curated resource library including the online developers' workbook<br> • Online community (via LinkedIn, Tribe, or NCSP platform) to share learnings, resources, and opportunities<br> • Make connections between existing lender learning community and new learning community for developers via online and in-person networking events<br>• Learning community augmented by<br> • Mentorship program coordinated by B.O.S.S. that pairs new, BIPOC CS developers with experienced developers<br> • Curated market segments and a series of communities of practice around CS models by CHC, PSEF, ROC |

TA is a critical service that de-risks projects while building developer capacity, ultimately attracting more lending and investment capital into the CS market. CPC will create mechanisms for CPC lenders and other lender partners to connect developers to our TA program. CPC will promote its TA program with all developers participating in the NCSP and CPA communities.

## 1.5.1.  Investment in Equitable Workforce Development

WD systems in the US are highly fragmented and lack coordination between employers, job training programs, unions, WD boards, economic development agencies, vocational and higher educational institutions, and wrap-around service providers. This fragmentation can result in duplication of services, as well as poor outcomes where employer needs go unmet while training program graduates are unable to find work for their new skills. Rather than invest SFA money in new stand-alone initiatives, CPC proposes to lead a coordination effort linking developers and their contractors with the workforce ecosystem in their communities while incentivizing the **creation of "high road" career** opportunities.

IREC, a CPC member, will lead the CPC's coordination efforts. IREC is ideally positioned to lead this work, as it convenes the National Clean Energy Workforce Alliance, a **cross-sector effort to improve clean energy education, training, and job placement outcomes**—and ensure that expanding clean energy job opportunities are inclusive of diverse candidates and underserved communities. Since January 2022, the Alliance has been virtually convening more than 500 employers, training providers, community-based recruitment and support organizations, and energy justice organizations. Through structured and intentional meetings, the Alliance is

collectively identifying and sharing resources and information, with a focus on concrete solutions to shared workforce challenges.

The coordination program led by IREC will include, but not be limited to the following:

- Creating resources for developers and their contractors in each state that provide a guide to all of the organizations in the workforce ecosystem for that state and descriptions of what these organizations do. In developing the guide, IREC will identify and disseminate best practices for contractors, developers, and workforce players.
- Conduct an educational initiative for workforce ecosystem organizations about the emerging clean energy economy and opportunities to place workers in quality careers. This initiative would also convene developers and contractors to meet with workforce ecosystem organizations in each state to discuss how players can work together to create equitable workforce outcomes in the clean energy industry, leverage existing programs and funding streams, and identify gaps.
- Assign "job developers" to work with each developer in the CPC pipeline who are familiar with local workforce organizations such as job training programs, unions, workforce boards, community colleges, and wrap-around service providers. The job developers will identify employment needs of the developer and of development team contractors such as EPCs and connect with local workforce players to encourage them to respond to those needs. A key program we will seek to maximize is the new "American Climate Corps" initiative that will support 20,000 young Americans to work on initiatives including solar energy.

IREC will accomplish these goals through activities including workforce ecosystem mapping, identification of best practices and resources, facilitated TA, and by engaging a wide array of workforce and community stakeholders in the clean industry in each state.

Furthermore, CPC will put financial incentives in place for developers to help train and place workers into high-quality career paths. As discussed in Section 1.2, CPC will use the EMB Scorecard to encourage developers, and their contractors, to take a "high road" approach to generating quality jobs and investing in equitable WD. We understand that such a high-road approach can increase project costs, and we will structure SFA FA accordingly to ensure that high-road practices pencil out on the pro forma.

Lastly, the Program will provide support to exemplary WD efforts already undertaken by CPC members. Our intention is that by funding these efforts, we are supporting models that other developers can replicate with partners in their local workforce ecosystem:

- GRID offers a range of workforce programing for LIDACs' solar projects from pre-apprenticeship basic training programs through full apprenticeship programs, with a growing focus on electrical trade apprenticeship training. GRID offers both on-the-job WD as well as remote learning for pre-apprenticeship basic installer training and has provided hands-on experience to over 30,000 trainees and volunteers. GRID requests funding to provide Installer Basic Training to approximately 750 trainees who would then join an installation project and be included as labor (and part of the labor budget for the project).
- B.O.S.S. will lead delivery of a capacity building program for minority businesses to build CS projects and access CPC Program financial and non-financial assistance.

### 1.5.2. Interconnection technical assistance

CPC recognizes that utility interconnection is increasingly one of the most significant barriers to helping otherwise viable projects to move forward. All three prongs of CPC's TA Program will include a focus on overcoming interconnection challenges. CCSA will provide TA to assist developers in negotiation with utilities, explore different cost sharing mechanisms, and help both parties scope interconnection studies and evaluate options. UNH will also work with CCSA to develop supplementary content around interconnection topics for both course content, workbook content, and alumni network workshops. CPC will join i2X, DOE's "Interconnection Innovation e-Xchange," and draw from this critically important initiative to connect developers and communities to its stakeholder engagement, data and TA resources.

TA providers will also be available to work with utility companies in our target geography who may request help improving their interconnection programs, if CPC is actively working with developers in that utility's service area. CPC will conduct outreach activities with NRECA, NARUC and State Energy Offices to raise awareness, as well as seek to identify utilities that may be willing to mentor other utilities to improve interconnection processes.

As discussed in Section 1.3, CCSA will lead CPC efforts to provide education to stakeholders around interconnection best practices. It has 7 years of experience working with CS developers, utilities, and Utility Commissions regarding interconnection best practices.

### 1.5.3. Efficient Deployment and Resilience through TA

CPC will also use all three prongs of its TA Program to address the full range of TA topics that EPA has raised in the NOFO, as well as other topics key to developer success:

- **Land use and design** - managing permitting processes and challenges; building codes compliance and best practices; project siting including mitigating climate risks (e.g., floods, wildfires) and protecting natural resources (e.g., farmland, wetlands, and other critical habitat) through siting decisions; and incorporation of energy resilience into project design.
- **Project and construction management** - EPC selection and management; project design for resilience to climate hazards such as storms; construction inspection and quality control processes; project management throughout the development process, and ongoing physical asset management after project completion.
- **Community engagement** - topics covered will include culturally appropriate community engagement and education; community-driven planning processes; diversity, equity and inclusion tools; negotiating community benefits agreements; structuring community-owned projects; consumer protection; subscriber management and administration.
- **Project finance** - project financial structuring and modeling; monetization of solar tax credits and adders; use of SRECs to fund portions of the capital stack; energy storage revenue streams; and understanding of factors used by lenders and investors in project underwriting (such as the CPA "Credit Ready" checklist).
- **Business growth and management** topics covered will include business planning; organizational financial modeling; incorporation and formation of Special Purpose Entities; legal documents and negotiation; organizational self-assessment and identification of the roles an organization may be best suited to play on a development team; accessing government funding opportunities; and pipeline management.

UNH will work with CPC partners including CCSA, CEG, GRID, IPC and PSEF to augment existing CPA training materials and workbooks as needed to ensure coverage of all relevant topics, and curate a resource bank with links to existing TA tools, resources and documents each with brief descriptions to help users to select the tools most appropriate for their needs. Regular learning community webinars around development topics will introduce key tools and provide time for Q&A and informal sharing around developers' experiences working with these tools.

## 1.6.  EQUITABLE ACCESS AND MEANINGFUL INVOLVEMENT PLAN

CPC has developed a comprehensive plan to maximize solar deployment, educate and engage communities in a culturally appropriate way, and involve LIDACs in program design. See Attachment L for **letters of support** from potential partners across CBOs, nonprofits, affordable housing developers and housing authorities, WD, industry associations and others.

### 1.6.1.  Maximizing the breadth and diversity of communities served

Together, CPC members and the developers with whom we have strong working relationships already serve a broad range of communities through their CS projects, including rural, suburban and urban communities; energy communities; communities with limited English proficiency; renters and homeowners; and manufactured housing residents. To ensure that this diversity of community types makes it into the projects ultimately funded by the program, CPC will:

**Recruit developers from diverse backgrounds and serving diverse community types.** While CPC already has relationships with developers serving a tremendous diversity of communities, we will seek to grow our relationships by reaching out to other participants in the NCSP, applicants to the CPA prize and training cohorts, and other developers that we meet through our extensive relationships with lenders nationwide, for example through the American Green Bank Consortium, national peer networks of affordable housing lenders and developers and the CDFI members of Inclusiv and/or the OFN networks.

**Provide tools through our technical assistance program that assist developers to work with a diverse range of community types.** In compiling and presenting best practices within our Learning Community and training programs, we will ensure that a variety of community types are represented. Moreover, we will seek to develop tools designed specifically for certain community types. For example, the UNH is already developing a course on financing and development solar plus storage, including microgrids, that will be delivered in Spanish in Puerto Rico and additional Spanish-speaking communities such as Colonias in the southwest. As another example, for rural projects, TA will help developers to access funding tools unique to rural communities such as the USDA REAP and PACE programs (See Section 1.4).

**Include representatives from diverse community types in Coalition governance.** See our discussion of participatory governance in Section 1.6.2 below.

The Program does not target Tribal communities, but CPC members have experience with and can serve Tribal communities and welcomes discussion with EPA on this.

### 1.6.2.  Participatory Governance Plan

CPC will use the planning period to finalize a governance agreement that implements a detailed steering committee structure, using a participatory process that (1) engages representatives from mission-driven developers and CBOs that serve LIDACs, and (2) leverages existing best practices from CPC members.

The steering committee (**SC**) will strive to achieve consensus in decisions, encourage active participation of members, and reflect a broad range of interests and expertise. It will ensure transparency and accountability to the communities the Program serves. The SC will be focused on environmental justice, diversity, inclusion and equity, and strategic planning and is currently envisioned as the following:

*SC Purpose*

- **Ensure that the CPC SFA award is invested efficiently and equitably;**
- **Review CPC's policies**, including capital allocation strategies, non-performance, and underwriting criteria and priorities;
- **Assess CPC strategy** and ongoing funding and financing activities;
- **Approve the eligibility criteria for community solar developers**. In order for developers to access financial and non-financial assistance from the CPC, they will need to demonstrate how they maintain accountability to the communities they serve. This will be a core part of the developer eligibility process that the SC will approve. The SC will develop the EMB Scorecard for this purpose.
- **Voting Membership** - CPC members, mission-driven developers the CPC serves, and CBO partners. These stakeholders will nominate prospective SC members and vote in elections. UNH will employ its expertise in participatory governance for community developers facilitate and support SC development; between 11-15 members. At-large members will be elected by representative stakeholder groups, e.g., CBOs that serve LIDACs.

*Membership Characteristics*

- Geographic diversification, LIDAC representation, and appropriate expertise.
- IPC and CPC member representatives, alongside "at large" representatives from CBOs serving LIDACs.
- Representation from all 10 EPA regions, including LIDACs from rural, urban and suburban contexts; and varied cultural and demographic groups.
- The steering committee will have representatives with expertise in lending to LIDACs, knowledge of policy trends, expertise in CS, and community "voice"

*Committees*

- Standing committees such as the Executive Committee, Investment Advisory Committee, and Special Initiatives Committee (SIC);
- The Investment Advisory Committee will review and approve underwriting and asset management criteria and periodically review and re-approve any changes. The Investment Advisory Committee could help CPC establish the initial underwriting criteria
- Ad hoc advisory committees to focus on special issues, e.g., communities in rural regions and culturally-appropriate community outreach

To ensure accountability and transparency, the SC will **approve and publish a performance dashboard** that tracks key deployment metrics (e.g., dollars deployed, location of projects assisted, households served, MW capacity developed) and meaningful benefits achieved (e.g., estimated household savings generated, quality jobs created, resilient storage capacity deployed, and participation of MWBE developers and contractors). The dashboard will be supported by the EMB Scorecard that is used to evaluate every project seeking assistance (Section 1.2).

Lastly, many of CPC members already have participatory governance best practices that CPC will incorporate when it finalizes its Program governance structure, including:

- **Representative democracy.** ROC utilizes a representative democracy structure in which the co-ops elect three representatives from their communities to serve on the national 15-member ROC board of directors. ROC requires a majority vote from a community to approve an investment, providing agency to communities that it serves. "Representative democracy" keeps the SC to a manageable size, in order to make decisions by consensus.
- **Consensus decision-making and Transparency and Accountability Policy**. PSEF board is consensus-driven to include a diversity of opinions into decisions. PSEF is also working on a Transparency and Accountability Policy to ensure that common values and commitments are implemented amongst members and to hold PSEF accountable to the broader EJ process. The PSEF board conducts an annual review of governance process and practices, including lending criteria and procedures, to ensure alignment with PSEF principles.
- **Ensuring accountability to the community**. GRID and its coalition members have developed a community-centered approach to outreach and program implementation, emphasizing trust-building within LIDACs. GRID collaborates with local CBOs and community leaders to establish credibility and relies on dedicated local staff. This holistic approach includes ongoing engagement, avenues for community input, and a robust referral program. GRID also provides multilingual and accessible resources, co-benefits for customers, and has a commitment to data-driven improvement.

### 1.6.3.  Meaningful Education, Outreach and Community Engagement

CPC will prioritize working with developers who have strong community connections and the ability to conduct outreach and engagement activities in the communities they serve, including partnering with organizations that use multiple modalities. Questions around community engagement and diversity, equity and inclusion will form a part of our developer selection process, similar to how the Community Power Accelerator uses such criteria to inform its selection of prize winners. That said, we will also undertake a range of activities intended to support developers to do a stronger job of education, outreach and community engagement, including the following:

- B.O.S.S. will create culturally inclusive consumer education materials describing both the benefits of CS and important consumer protection issues to be aware of. These materials would include videos, educational handouts, and other outreach and education collateral. B.O.S.S. and CPC will build relationships with national networks of consumer financial counselors – examples could include affiliates of the National Urban League, the NeighborWorks network, and the Inclusiv network – to provide these materials for their use. The materials will also help direct consumers to websites where they can find a CS project to sign up for in their area, including CPC financed projects.
- Training and TA materials will help to support developers in their community engagement work. For example, the UNH Community Power Accelerator Learning Laboratory training discussed in Section 1.5 includes an entire module on community engagement, introducing participants to tools such as Groundswells "Low-Income Equity and Access Guide" to CS and community engagement checklists developed by Cooperative Energy Futures. The training further supports participants in developing their own community engagement plans as one of the key assignments of the course, with both instructor and peer feedback as well as class discussion.

- CPC will work with EPA Thriving Communities Technical Assistance Centers (**TCTACs**) to identify community leaders who are interested in CS, and then make connections to CPC's training programs, TA providers and co-developers as appropriate.
- IPC, in consultation with SC, will identify additional subrecipients during the planning period to support multiple modalities for meaningful education, outreach and engagement activities.
- CPC will also seek to develop relationships with national networks of CBOs, creating matchmaking opportunities between local CS developers and local CBOs. For example, CHC has a strong relationship with NeighborWorks America, a national network of 250 community-based affordable housing and housing counseling nonprofits.

### 1.6.4. Customer Acquisition and Management

Customer acquisition and management strategy will also be a criterion which CPC screens developers for access to Program resources. One expectation of participatory, mission-driven CS design is that the community engagement process is also a critical strategy for customer acquisition; the tools and trainings CPC will provide in this arena, discussed in the previous subsection, will also support developers in this process. Additional supports we will provide to help with customer acquisition and subscription management include:

- Ensuring awareness of mission-driven options for subscription management services, such as those available through a number of mission aligned organizations.
- Coordinate and plan, with organizations developing "solar hotline" and web tools to help prospective customers find CS projects. We will work with CPC developer organizations to plan for how these types of customer acquisition services might be procured for the multiple developers served by CPC. We will coordinate with organizations operating hotlines and web directories to include CPC-supported projects and any other mission-driven projects we may become aware of through NCSP and the Community Power Accelerator.
- CPC will develop relationships with national networks of community organizations, which may also help developers with customer acquisition. For example, we will reach out to the national association of Community Action Program (**CAP**), many of whom operate weatherization, nutrition (SNAP), and LIHEAP programs. These programs can be a referral source for customers as well as a financial support for CS in the case of LIHEAP, and the forthcoming DOE / HHS CS Subscription Tool could be used to streamline income verification using categorical eligibility. We will establish similar relationships with other networks of human services program providers including TANF programs. CEG has relationships with Federally Qualified Health Centers that could help connect low-income customers to CS projects and potentially participate themselves as a community facility.
- CCSA will also provide education and outreach to LIHEAP state offices through NEADA to encourage more states to accept CS as a "fuel source." CCSA will create engagement and communications materials that all partners can utilize to help get the message out.
- CHC is dedicated to serving the NeighborWorks America network of housing nonprofits, which own and operate 250,000 units of rental housing and provide financial counseling to over 400,000 people per year. We provide outreach to this network about CPC supported CS projects happening in the communities they serve. Both NeighborWorks and other networks of affordable housing nonprofits frequently income-qualify customers for various types of housing programming and thus may be able to connect customers to CS projects with no further

need for income verification. CPC intends to identify additional affordable housing nonprofits subrecipients that can support customer acquisition in LIDACs.

## 1.7.  PROGRAM PLANNING TIMELINE AND WORKPLAN NARRATIVE

IPC hits the ground running, using a 12-month planning period to create extensive, quality materials, procedures, and reporting mechanisms to implement the Program and ensure full deployment by the end of Year 5 and achieve our impact targets. CPC's Program Planning Timeline is outlined in detail in Attachment D.

### 1.7.1.  Implementation timeline with milestones

Along with execution of lead applicant and CPC subaward agreements, identification of additional nonprofit subrecipients and contracted procurement resources, and hiring program staff, IPC begins implementation of reporting and compliance protocols in Year 1. By leveraging each member's domain expertise during the planning period, CPC refines its program plan, finalizes key execution strategies, and creates reporting guidelines and procedures to ensure Year 1 deployment and full deployment by end of Year 5. This allows us to meet our projected target of serving 62,500 households (Section 1.1) by the end of the Program period.

Key Year 1 Program workplan milestones detailed in Attachment D include:

- Create metrics for our Meaningful Benefits plans. Develop and refine the EMB Scorecard to inform project-level FA and TA. Refine portfolio allocation over geographies. Develop case studies for CS + Storage and related educational webinars. Coordinate efforts in local workforce development.
- Build out our 3-pronged Distributed Solar Market Strategy to addressing barriers to CS development: Prong 1 provides education and TA to stakeholders; Prong 2 establishes rules and procedures for 10% "race to the top" FA is use and education; Prong 3 educates mission-driven developers about successful CS models.
- Finalize FA strategy and deploy FA in Year 1 by standardizing product terms, underwriting, loan documentation, informed by "race to the top", the EMB Scorecard, SC input, and other criteria to support portfolio allocation across geographies.
- Plan and coordinate TA activities including workforce development, hands-on TA to projects, developer training programs, learning communities/communities of practice, and mentorship programs.
- Build-out equitable access and meaningful involvement by forming our participatory governance Steering Committee with diverse community representation, and using it to produce inclusive education, outreach, and community involvement.
- Monitor and update Program protocols for updates to EPA, Build America, Buy America, Davis-Bacon Act prevailing wage guidance for SFA and other changes to policy, to inform modifications to TA strategy and "race to the top" allocations.

In Year 1, we engage developers in 3 "Early Action" states and 2 "Priority States". CPC has set a goal of deploying ~$25 million of FA dollars to serve ~5,000 households and generate over 20MW of solar energy in identified "Early Action" and "Priority States." Over the course of the Program period, CPC will expand its reach to each of our target jurisdictions, with our largest deployment of FA dollars in Year 3. In Year 4 and 5, we start winding down predevelopment, bridge and construction financing for deployment into permanent debt on projects, for final completion at

Year 5. The table below shows the yearly key metrics we will achieve, consistent with the overall targets in Section 1.1:

| | YR 1 | YR 2 | YR 3 | YR 4 | YR 5 | Total |
|---|---|---|---|---|---|---|
| EAJ engaged [i, ii] | 3 | 11 | 15 | 15 | 15 | **15** |
| PJ engaged [i, ii] | 2 | 11 | 16 | 20 | 25 | **25** |
| LTJ engaged [i, ii] | 0 | 1 | 3 | 4 | 4 | **4** |
| # CBCSDs receiving FA | 21 | 59 | 97 | 39 | 34 | **250** |
| # CBCSDs receiving TA | 150 | 200 | 200 | 225 | 225 | **1,000** |
| FA $s deployed | $25.3M | $71.1M | $116.8M | $46.6M | $40.2M | **$300 M** |
| Total $s mobilized | $63.2M | $177.8M | $292.1M | $116.4M | $100.6M | **$750 M** |
| # Households served | 5,269 | 14,813 | 24,338 | 9,700 | 8,381 | **62,500** |
| # MW deployed in EAJ [ii] | 19 | 47 | 37 | 9 | 0 | **112** |
| # MW deployed in PJ [ii] | 2 | 12 | 55 | 28 | 31 | **128** |
| # MW deployed in LTJ [ii] | 0 | 0 | 6 | 2 | 2 | **10** |
| [i] indicates cumulative figure; [ii] "Early Action" Jurisdictions (EAJ), "Priority" Jurisdictions (PJ), "Long Term" Jurisdictions (LTJ) | | | | | | |

Additional key action items supporting Program outputs and outcomes over 5-year performance:

- Annual Program performance review with CPC members and the SC to adjust strategies, tactics and resource allocations to ensure the Program objectives are met.
- Regular audits to ensure 20% resident savings are met.
- Quarterly deployment analysis to ensure geographic, diverse community, "race to the top" and other allocation strategies are met; analysis of private capital mobilized.
- Monitoring of 15% portfolio limit on enabling upgrades.
- Regular review of which CS models (as detailed in the Executive Summary) and States are gaining success or lagging, to inform modifications to TA and FA strategy.

## 1.7.2. Coordinates with relevant stakeholders and partners

CPC will ensure coordination between relevant stakeholders and partners during Year 1 as outlined in each of the 6 tabs in Attachment D. CPC recognizes its FA and TA strategies must account for stakeholder and partner input to drive meaningful benefits and increase equitable access to CS. To that end, within the first six months of Year 1, CPC will align representation from diverse community types in CPC's participatory governance strategy. CPC intends to finalize a governance agreement that implements a detailed participatory structure, using a participatory process to do so that not only engages CPC members, but also representatives from mission-driven developers and representatives from CBOs in LIDACs. In the early months of Year 1, CPC will finalize committee composition and responsibilities among CPC members and partners, including standing-up the CPC's Steering Committee and Investment Advisory Committee. After finalizing the participatory governance strategy and setting up the Steering and Investment Advisory Committees, we expect the responsibilities of each Coalition member to align with our description of member roles detailed in the Executive Summary in support of solar market strategy and TA solutions related to policy, including engagement, education and outreach to key stakeholders and WD programming coordination with local resources.

CPC will utilize the planning period to finalize customer acquisition and management strategies. This includes aligning customer acquisition and management screening criteria into project selection, ensuring developers are aware of existing subscription management services through the creation of a "solar hotline" and web directory, and planning education and outreach to LIHEAP offices through NEADA. CPC's customer acquisition and management strategies will leverage resources from NCSP, CPA, Community Action Plan nonprofits, LIHEAP, and the US Department of Health and Human Services community solar subscription tool.

To maximize the equitable reach of the Program, CPC will continue to recruit a diverse range of developers in Year 1. CPC will leverage prior existing relationships with the NCSP, CPA, American Green Bank Consortium, CDFI members of IPC, and OFN to engage mission-driven CBCSDs and CBOs to build pipeline in difficult geographies.

### 1.7.3. Leverage existing technical assistance tools and resources for program planning

To maximize the impact of SFA funds, CPC will leverage existing TA tools and WD programs to layer in new activities within the local WD ecosystems. IREC, GRID, and B.O.S.S. have extensive experience with WD and will coordinate CPC's WD efforts by building and improving upon existing ecosystems during months 6 to 12 of Year 1. CPC will make connections with unions, community colleges, pre-apprenticeship programs, and other training efforts to maximize meaningful benefits. CPC will also incentivize the creation of "high road" career opportunities for the employees in their respective ecosystems. CPC will leverage existing WD programs and coordinate with the National Clean Energy Workforce Alliance where appropriate.

To help CBCSDs and other CPC partners understand state-specific workforce ecosystems, CPC will plan educational initiatives and work with each partner to become familiar with local workforces. CPC will create a resource bank and ensure its TA screening strategy achieves meaningful benefits to generate quality jobs as well as invest in equitable WD. CPC will also utilize the newly formed American Climate Corps program to begin training a new generation for high-demand skills for jobs in the clean energy sector.

Starting month 6 of Year 1, CPC will begin regular learning community trainings around development topics and will introduce key opportunities for interactive learning. CPC will leverage experience specifically from UNH, CCSA, GRID, and PSEF to lead this effort.

In months 9 to 12 of Year 1, CPC will coordinate with NCSP, DOE's Interconnection Innovation e-Exchange, and Lawrence Berkeley National Labs, and leverage CPC members (UNH, CCSA, GRID, and PSEF, in particular) to create a curated resource bank with existing TA tools, resources, and documents for interconnection TA. CPC will also conduct outreach activities with NRECA, NARUC, and other utilities to raise awareness regarding interconnection TA. CPC will align and coordinate with DOE NCSP, CPA, various national labs including NREL and LBNL, and EPA TCTACs to fully leverage the resources available.

## 2. PROGRAM ADMINISTRATION NARRATIVE
## 2.1. BUDGET NARRATIVE
### 2.1.1. Procedures and controls for management of grant funds

CPC ensures funds are expended in timely and efficient manner using internal controls that meet the standards outlined in GAO-14-704G, found in our Operating Procedures, and a robust, comprehensive fiscal management system, found in Accounting Department Internal Controls and

Procedures (**Accounting Controls**), <u>Procurement Policy For Grants And Cooperative Agreements Funded Directly Or Indirectly By The U.S. Government</u> (**Procurement Policy**), <u>Policy on Accounting for Direct and Indirect Costs on Awards Priced on a Cost-Reimbursement Basis Policy</u> (**Cost Policy**), and other policies meeting the requirements of 2 CFR Part 200. They include provisions for allocating expenditures in line with the budget and corrective measures to ensure funds are expended as projected. Time is accurately assigned between federal and non-federal programs using <u>Policy and Procedures on Employee Time Tracking</u> (**Time Policy**). Contractual services will be subject to the <u>Procurement Policy</u>, which aligns with 2 CFR Part 200 and <u>EPA's Best Practice Guide for Procuring Services, Supplies and Equipment Under EPA Assistance Agreements</u>, including the definitions for "Micro-purchase threshold" and "Simplified Acquisition Threshold" and the related rules.

CPC's costs are cost-effective, prudent, and reasonable to accomplish the Program and allowable under 2 CFR Part 200. IPC reviewed and evaluated each CPC member's budget and proposed Program activities, consulting the <u>EPA Subaward Policy</u> and in light of Program needs for outputs and outcomes within allowable guidelines. As part of budget preparation, CPC carefully reviewed and utilized guidance in <u>Section III.D Allowable and Unallowable Costs</u>, EPA's <u>Indirect Cost Guidance,</u> and <u>Budget Detail Guidance</u>.

As an award option #3 applicant, IPC will ensure that 75% or more of the requested SFA funds (both direct and indirect costs charged to direct costs attributable to FA activities) are expended on Financial Assistance (**FA**) for projects, with the remaining 25% of the budget apportioned to Program administration (**PA**) (17%), Technical Assistance (**TA**) (7%) and Workforce Development (**WD**) (1%).

IPC has extensive expertise in solar and clean energy underwriting, enabling IPC to effectively structure and deploy into renewable energy, energy efficiency, and energy resilience projects. Successfully underwriting and investing in mission-driven projects while managing risks is a core IPC competency. IPC structures its transactions to mitigate risks, including counterparty risk, financing risk, market risk, and project risk. IPC's underwriting process also includes an impact rating analysis. IPC reviews direct environmental and socio-economic impacts, catalytic impacts on the surrounding community, and catalytic impacts on the market. This analysis ensures IPC is directing capital to disadvantaged communities that stand to benefit the most from an investment.

### 2.1.2.  Demonstrates that the budget is efficient

Attachment E demonstrates the budget costs are necessary, reasonable, and efficient to deploy federal funding. Direct costs are broken out by personnel, fringe benefits, travel, equipment, supplies, contracts, and other expenses. Each budget line item includes annual costs for the 5-year Program and is categorized into an activity bucket (FA, PA, TA, or WD). CPC carefully reviewed and utilized <u>EPA's Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance</u> as well as the <u>Indirect Cost Policy for Recipients of EPA Assistance Agreements</u> to ensure costs are allowable and estimates are reasonable. Regulations listed in 2 CFR Part 200 and 2 CFR Part 1500 were also referenced, as applicable.

Please refer to the Excel-based supplement to Attachment E: Budget Table "Detailed Budget Table" for more detail on a line-by-line basis of the following summarized table, all amounts in Millions:

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total | FA $ | FA % |
|---|---|---|---|---|---|---|---|---|
| **Personnel** | 2.1 | 2.4 | 2.5 | 2.6 | 2.6 | 12.2 | - | 0.00% |
| **Fringe** | 0.6 | 0.6 | 0.7 | 0.7 | 0.7 | 3.3 | - | 0.00% |
| **Travel** | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 | - | 0.00% |
| **Equipment** | - | - | - | - | - | - | - | 0.00% |
| **Supplies** | * | * | * | * | * | 0.1 | - | 0.00% |
| **Contractual** | 22.3 | 58.9 | 95.3 | 40.8 | 36.1 | 253.4 | 235.4 | 92.90% |
| **Other** | 19.1 | 31.5 | 25.7 | 25.8 | 24.0 | 126.1 | 64.6 | 51.23% |
| **Total Direct Cost** | 44.2 | 93.5 | 124.3 | 70.0 | 63.5 | 395.6 | 300.0 | 75.83% |
| **Indirect costs** | 0.6 | 0.7 | 0.7 | 0.8 | 0.8 | 3.6 | - | 0.00% |
| **Total Costs** | 44.8 | 94.2 | 125.0 | 70.8 | 64.4 | 399.2 | 300.0 | 75.15% |

\* amount not shown due to rounding

## Notes to Attachment E:

**Personnel:** Existing and Proposed IPC staff with direct time charged to the Program are individually listed, with annualized anticipated Full Time Equivalency. Descriptions and applicability of each role to the Program have been listed. As a small organization, certain senior management and support staff included in the budget are directly involved in PA; Year 1 allocates more time from these individuals to assist with Program implementation and drops off in later years as dedicated Program staff is hired. Actual personnel time will be accurately assigned between federal and non-federal programs according to the Time Policy.

IPC has a time-card entry policy and approval system to ensure that time is accurately assigned between federal and non-federal programs, and only time spent on SFA activities will be charged to the program.

**Fringe:** Without a previously approved rate, IPC calculated fringe benefits on the basis of 27% of personnel cost (includes FICA, retirement, employer share of health costs, vacation, sick, benefits administration and allowable education costs); an estimate based on actual IPC fringe benefits as a percentage of gross personnel cost over the last three years. Actual fringe benefits will be calculated as a percentage of actual personnel time charged to the federal program.

**Travel:** Program Travel costs are to attend conferences and meetings, visit financed projects, and meet with CPC members to facilitate award administration and compliance. Estimates include costs for airfare, hotels, local transportation, meals, and registrations, as applicable, based on an assumed approximate 10-12 activities per year, attended by approximately 2-3 Program staff. No international travel is planned.

**Equipment:** Note equipment expenditures are subject to prior EPA approval (2 CFR §200.439(b)(2)), but IPC does not expect to incur charges for tangible, non-expendable, personal property with greater than 1-year useful life and cost greater than $5,000 per item. Thus, this section indicates "None".

**Supplies:** New staff assigned to the Program are provided with necessary supplies to complete their work, including computers with necessary accessories, monitors, printers, and input devices assigned to Program staff. The expected cost will be less than $5,000 per item.

**Contractual:** IPC will procure contractors in the areas of monitoring, reporting, and compliance. Some contractual services are variable based on project volume, such as UCC-1 filings, title requests, appraisal reports, and development fees. Others should be fixed costs regardless of volume, such as software license fees, impact reporting, accounting, and grants management, and grant and Program compliance specialists, audit and tax preparers, and systems and organization control compliance specialists. For either variable or fixed contractual service, only actual incurred costs directly related to the Program will be charged. FA characterized as "federal financial assistance" (2 CFR § 200.1) will be deployed directly into Program participant projects.

**Other:** Other costs include three distinct categories: *Insurance* – Estimated incremental cost of insurance related to IPC Program administration; *Subgrants to CPC Members* – Coalition members as "named subrecipients" provided budgets to support amounts allocated to their organization. Indirect costs identified by the subrecipient are included and calculated in accordance with 2 CFR § 200.332(a)(4); *Subgrants to eligible subrecipients that are yet to be named* – Reserved amount for future subrecipients, any amounts awarded will follow the same direct and indirect cost guidelines applied to named subrecipients. Named subrecipient details can be found in Attachment H.

**Indirect costs:** IPC does not have an approved indirect cost rate; indirect cost is calculated using the 10% de minimis rate, using the Modified Total Direct Costs basis (2 CFR § 200.414(f)). Indirect costs are intended to cover costs that aren't directly attributable to the federal grant, such as personnel costs for non-program support staff, corporate marketing, website maintenance, and general technology improvements.

## 2.2.　FISCAL STEWARDSHIP PLAN
### 2.2.1.　Plans and policies for program oversight

IPC maintains high ethical and legal standards for itself and its partners and will apply these standards to meet the SFA grant's terms and conditions, including the requirements of 2 CFR § 200.303 and the GAO's Standards for Internal Control in the Federal Government (**GAO Standards**). IPC's Chief Investment Officer, with dedicated staff, is responsible for management of grant funds and ensuring expectations are met. IPC is committed to operating with integrity and transparency in the markets and communities we serve and by reducing waste, fraud, and abuse. Our internal organizational structure is clear, effective, and efficient; management establishes structure, assigns responsibilities, and delegates authority to ensure we meet our objectives. Responsibilities and reporting lines are clearly defined and communicated in a full, 360° manner; the training, learning, and improvement of our organization are high priorities. IPC routinely monitors performance and compliance with internal policies and external requirements. Our financial management system ensures proper accounting of time, resources, costs, budgeting, funds tracing and detection of issues. IPC's comprehensive policies and procedures **ensure robust risk management, prevent fraud, waste, and abuse, and allow for the prudent management of funds. IPC has controls to manage taxpayer dollars ethically and efficiently, including**, our Code of Ethics and Conduct for Grants and Cooperative Agreements with the U.S. Government and Compliance Program (**Code**) and Accounting Department Internal Controls and Procedures (**Accounting Controls**). Our Compliance Officer, who is IPC's General Counsel, oversees this framework to meet compliance obligations, including under the EPA's General Terms and Conditions. Employees must conduct business with honesty and integrity, dealing ethically and fairly with others; read, understand and comply with contract terms; maintain company records

and reports accurately; avoid corruption, or the appearance of corruption, including guidance on bribes, accepting gifts, making political contributions or lobbying, the Foreign Corrupt Practice Act, recruiting government employees, and expectations of standards for employee's personal health and privacy. Personal expectations for conduct and behavior are expanded in our Anti-Harassment and Anti-Discrimination Policy, Equal Employment Opportunity Policy, Policy on Combatting Trafficking in Persons, and Policy and Procedures on Employee Time Tracking (**Time Policy**). Ethical Federal procurement standards are mandated in the Code (economic and efficient, with persons who are neither disbarred nor suspended nor under economic sanctions, without participation in any unsanctioned boycott, or trafficking in persons), and in our Procurement Policy for Grants and Cooperative Agreements Funded Directly or Indirectly by the U.S. Government (**Procurement Policy**) (which meets the requirements of 2 CFR § 200.319 and § 200.320). Expectations include using domestic sources and materials, environmental requirements, not engaging in anti-trust or competitive practices, awareness of import/export laws and regulations, and avoiding real or apparent conflict of interests, in line with our Conflict of Interest Policy (meeting requirements of 2 CFR § 200.318(c)). The Code and ancillary policies work together to (i) ensure awareness and understanding of ethics obligations and obligation to comply; (ii) provide for timely discovery of improper conduct, including an internal reporting mechanism providing for anonymity or confidentiality; (iii) ensure corrective measures are properly instituted and carried out, including appropriate disciplinary action; (iv) provide for periodic reviews of IPC's business practices, procedures, policies and internal controls for compliance with the Code and requirements of government contracting; and (v) provide for timely disclosure to the government under appropriate circumstances, and full cooperation in any government audits, investigations or corrective actions.

IPC has **policies and controls for Program oversight** that meet the requirements of 2 CFR § 200.303 and GAO Standards. Controls for record retention, IT, monitoring, and grievance are found throughout policies, including the Code and others mentioned above. IPC's Accounting Controls, Operating Procedures, Conflict of Interest Policy, Program Partner and Entity Discipline Policy, and Procurement Policy are more directly aimed at internal controls. Our financial management system ensures IPC **prudently manages money and grant funds** including our Accounting Controls; Time Policy; Operating Procedures; and Policy on Accounting for Direct and Indirect Costs on Awards Priced on a Cost-Reimbursement Basis Policy (**Cost Policy**).

Plans and policies for **program oversight and review**, to **reduce fraud, waste, and abuse** are embedded within several policies including, the Code, Operating Controls, Whistleblower Policy, Anti-Retaliation Policy, Program Partner and Entity Discipline Policy, and Conflict of Interest Policy. Our Compliance Officer works with our Chief People and Culture Officer to review performance and correct missteps, take reports and conduct investigations into wrong-doing, educate personnel through on-boarding and trainings, and periodically review policies and procedures to ensure best-practices and compliance with laws. In addition to chain-of-command reporting options, IPC also maintains a **confidential reporting** service, via an anonymous telephone and online reporting option, sited prominently on our website, accessible by employees, contractors, other partners, or the general public to report any ethical, legal, or other concern that may arise; copies of relevant policies are also available for review in the same location. Reporting troubling behaviors or actions is encouraged throughout our policies, and "**whistleblowers**" are explicitly protected by our Whistleblower Policy and Anti-Retaliation Policy.

In addition to CPC member subawards, IPC will be making other subawards as the **pass-through entity** for the purposes of 2 CFR Part 200. IPC understands, as grantee, it is **responsible for proper financial management of the grant** and all subgrants to all subrecipients, which includes CPC members under 2 CFR § 200.332. Each grant subrecipient will be thoroughly vetted to ensure its own internal controls meet the standards of 2 CFR § 200.303 and that all terms and conditions of the grant agreement flow down, as mandated in 2 CFR § 200.332(a)(2). IPC will evaluate the risk of each subrecipient's non-compliance with the grant by considering, among other factors, (i) the subrecipient's prior experience with the same or similar awards; (ii) results, if any, from the audit of a previous award, (iii) whether the subrecipient has new or substantially changed systems, and (iv) the extent and results of Federal awarding agency monitoring of the subrecipient, all as directed by 2 CFR § 200.332(b), and, if appropriate, impose specific subaward conditions as described in 2 CFR § 200.208 or utilize the monitoring tools described in 2 CFR § 200.332(e). IPC will monitor compliance by subrecipients throughout the duration of the grant, in line with the requirements of 2 CFR § 200.332(d). Internally, IPC's Operating Procedures formally commit IPC to complying with our pass-through obligations.

### 2.2.2. Invests in consumer protection and compliance with consumer protection laws

CPC members, other subrecipients, contractors, and entities that directly interact, transact, or contract with consumers as part of the Program (**CPEs**), including, the sales and marketing of solar services and consumer subscriptions to CS, **CPEs** are required to comply with applicable jurisdictions' consumer protection laws and federal consumer protection and consumer financial laws, including laws that prohibit unfair, deceptive, and abusive practices, and Regulation Z (12 CFR § 1026) and fair lending practices laws (collectively, **CP Laws**), which requires the disclosure of terms and cost of consumer credit and offers substantive protections to people who use consumer credit. To ensure compliance by CPEs, IPC, together with procured resources, will: 1) Provide **written materials** explaining IPC's expectations on consumer protection; 2) **Screen** for evidence of compliance and adherence to CP Laws; 3) **Review materials** intended for customer distribution for proper and adequate disclosure of information related to the provision of services to the consumer and consumer protection training; and 4) **Monitor compliance** with IPC policies and CP Laws.

**Written Materials**: IPC's written materials to CPEs will include clear and detailed explanations of IPC's expectations for CPEs compliance with applicable CP Laws. These written materials include the IPC's <u>Program Partner and Entity Compliance with Consumer Protection Laws Policy</u>, which includes the IPC <u>Partner Code on Consumer Protection</u>.

**Screening Program Partners and Entities:** IPC will clearly express expectations for consumer protection through written materials, and screen entities using our EMB Scorecard during the application review and due diligence process for any FA. IPC will update our practices consistent with upcoming recommendations from DOE/HHS regarding the same, if necessary.

Our consumer protection plans can be broken down into three categories of protection: 1) clear and fair financial terms; 2) truthful and transparent marketing and communications; and 3) vigorous and consistent compliance and enforcement.

**Review of Transaction Materials:** All contracts and documents must be provided for review prior to signing and there must be no fee for canceling the contract. IPC will review CPEs' consumer

financial terms for: 1) fair and meaningful estimates of household savings; 2) fees and costs; 3) readability of contracts; 4) remedial provisions; and 5) contract termination provisions.

Any financial terms offered by CPC will provide consumers fair and meaningful estimates of promised bill savings, whether in terms of dollar savings over time, percentage off of distribution price, or other estimate, and that the amount of money a customer saves exceeds what the customer pays (if the subscription includes a subscription fee) on a monthly basis. CPC will not impose any flat subscription fees, whether monthly or one-time sign-up fees, not related to the amount of kWh delivered. Contracts will be in plain English, will not impose termination fees, predatory late fees, send bills to collections without first attempting to work with the consumer on a payment plan to bring a bill into good standing, or impose unreasonably long initial terms. They will have exit clauses and clearly state the amount of notice required to cancel a contract.

**Verification of Communication Training:** Consumer-facing CPEs must ensure marketers and sales staff are trained to understandably communicate all aspects of subscriber agreements for CS, consumer rights, contact information for the solar subscriber manager, and the consumer's complaint procedures for problems with the solar manager or marketing/sales process. Representations must include clear disclosure. CPEs may use state-specific consumer marketing materials and contract disclosure forms, or DOE disclosure forms where no state form exists, to satisfy this requirement; and must use such materials if required by state law without edits or revisions, except as explicitly approved. CPC will require evidence that CPEs employees receive training on CS subscriber agreements and are able to communicate such information in an accurate and accessible manner. For those who operate in areas with significant non-English fluent consumers, written information must be provided in languages consumers communicate in and understand. CPC will seek assurances in-person and telephone marketing or sales interactions or contacts with consumers shall be in languages appropriate to communicate with them clearly and understandably and that if a marketer is unable to determine and communicate in the consumer's language, they must break off engagement. CPEs will be required to provide accurate and up-to-date contact information to customers and their state's program administrator; including contact by email, telephone, voice mail, postal mail, or text message. CPEs must also maintain a process for handling consumer complaints, including methods to receive, track, monitor, investigate and resolve in a timely manner all such complaints and provide potential and actual subscribers with contact information for their state's complaints hotline or office, if any.

**Subscription Managers and Marketers:** Regarding subscription managers and marketers, IPC will ensure compliance with CP Laws through written materials and monitoring. Written materials will clearly communicate in an understandable manner all aspects of financial terms including projected bill savings, subscription fees and flat monthly fees (if applicable), sign-up fees, termination fees, late fees, penalties to customers, and exit clauses. Written materials will also communicate marketing and communications consumer protection requirements concerning the primary language of potential subscribers, making contracts and related documents available for review before subscriber signs, providing relevant documents electronically and in paper format for enrolling households with limited internet access, standardizing marketing materials and contract disclosures, and providing accurate and up-to-date contact information. Marketers will be required to sign and comply with IPC's stated consumer protection requirements, inform subscribers of state-specific enrollment and CS access mechanisms, and track and report data on a frequent basis. Reports will include subscriber count, estimated savings, complaints received and resolved, waiting lists, and any other state-specific required metrics.

To actively combat predatory consumer practices, IPC shall ensure that CPEs sign and comply with any Code of Practice provided by their state for consumer protection and comply with any reporting requirements of their state's program administrator. Marketers will be required to inform consumers of their state's complaint mechanism for enrollees of low-income CS programs and how to access it, including pursuit of complaints if promised bill savings are not realized. We will contractually bind CPEs to comply with the above terms and monitor compliance. We will review and approve written materials that CPEs provide to consumers to ensure they meet the above standards. IPC will also perform spot checks of CPEs consumer interactions by periodically engaging in "mystery-shopper" type visits and calls to CPEs to verify the in-person and telephonic interactions meet CP Laws. Additionally, we shall ask CPEs to report to us data related to consumer complaints and resolutions, and steps taken to prevent similar future complaints.

### 2.2.3. Incorporates guardrails to ensure household savings

CPC will incorporate guardrails into its diligence, documentation, and asset management processes to reach and ensure projected household savings are achieved. CPC will perform audits of household saving realization rates. CPC requires energy performance monitoring and verification of CS projects and utility bill releases from consumer subscription contracts to allow for random audits and spot-checks of bills using our procured audit contractor. Projects are required to submit reports on actual production and other relevant metrics, compared to the projected results for the performance period. This enables CPC, together with data collected by contracted experts, to verify projects are generating the projected household savings, which will be 20% at a minimum. If savings are not achieved, CPC will work with stakeholders to mitigate factors negatively impacting savings on current projects and include learned information to improve future project design, including updates to methodologies for estimating savings.

### 2.3.    REPORTING PLAN
### 2.3.1.    Invests program capacity in performing program evidence and evaluation

IPC executes the reporting requirements of 2 CFR § 200.329 by using multiple sources of program evidence to rigorously collect and track data to describe environmental, geographical, and social outputs and outcomes. Our team is experienced in aggregating, managing, and reporting data internally and externally. IPC will work with EPA to establish standardized reporting requirements and identify tools to support reporting. IPC integrates program evaluation activities into our reporting plan, including assessing effectiveness and efficiency achieving outputs and outcomes.

IPC's subrecipient UNH, a leader in program evaluation and understanding and meeting EPA requirements will lead CPC evaluation efforts. Its evaluation work is characterized by its relevance and utility; rigor; independence and objectivity; transparency; ethical treatment of participants; consideration of equity concerns throughout the evaluation process; and peer review. Evaluation activities will encompass, as a minimum, the following areas: **define output and outcome metrics** – identify clear definitions of outputs and outcomes to ensure consistency of reporting across organizations**: analyze program reporting data** – using large data sets (e.g. CDFI reporting data, Census data, business and consumer credit data) to help distill themes and findings to inform community development practice; **utilize formative evaluation** to improve program implementation; **incorporate participatory research** methods - include voices from LIDACs to ensure implemented programs are relevant and equitable; and **evaluate organizational impacts for investees -** track and evaluate longitudinal data on the health and activity of organizations,

including community lenders, mission-driven CS developers, small businesses, community development corporations, and others, to measure GGRF impact.

CPC will, in addition to submission to EPA, publish data, evidence, and evaluation reports in trade journals and on their publicly available websites and provide feedback to our customers and participants to support research and analysis.

### 2.3.2. Demonstrates an understanding of the award reporting requirements

IPC measures projected versus actual impact data for metrics such as generation, energy savings, and $CO_2$ emissions avoided. Other impact data examples include technology-level reporting (e.g., types and capacity of technologies deployed), customer-level reporting (e.g., credit profiles, customer types, and market segments), environmental reporting (e.g., $CO_2$/NOX/SOX saved), and overall market-level reporting (e.g., job creation and health benefits).

IPC will provide annual reports throughout the Program within 30 days of the end of the reporting period, and a final Program report within 120 days after the end of the project period, subject to the program reporting Requirements established in the grant's terms and conditions and Closeout Agreement. IPC understands that EPA asks SFA applicants to integrate program evaluation activities into our reporting plan, including assessing the program's effectiveness and efficiency in achieving outputs and outcomes using reporting templates EPA may provide or require to achieve compliance with Program performance requirements. IPC will designate dedicated personnel to be responsible for the timely submission of all required reports and will adhere to the requirements of EPA Order 5700.7A1, Environmental Results under Assistance Agreements.

There are several dimensions along which program outputs and outcomes will be tracked and reported, including:

| Metrics and Reporting (by geography, FA/TA type, type of CS project/model,) | | | |
|---|---|---|---|
| **Program Activities** | **Climate and Air Pollution Benefits** | **Equity and Community Benefits** | **Market Transformation** |
| - Grant funds deployed<br>- FA funds deployed<br>- TA funds deployed<br>- Building activities on operations, impacts, outcomes (in adherence with ORDER 1000.33 03/25/2022)<br>- Reports on program feedback from program participants | - No. of projects financed<br>- Solar and storage capacity installed<br>- Clean energy generated<br>- GHGs reduced and avoided<br>- Other air pollution reduced and avoided | - HH served, amount of savings, resiliency benefits<br>- Solar jobs created, workers trained, wages increased<br>- Projects executed using tools promoting good jobs & community benefits<br>- Investment in MWBE owned businesses<br>- CS in community ownership models | - Grant funds deployed<br>- FA funds deployed<br>- Total private sector financing mobilized<br>- No. of CBOs engaged<br>- Changes in net metering caps, interconnection timelines, and Solar Renewable Energy Credit values |

# 3. PROGRAMMATIC CAPABILITY AND ENVIRONMENTAL RESULTS PAST PERFORMANCE

### 3.3.1 Successfully completing and managing the assistance agreements and 3.3.2 History of meeting reporting requirements

IPC has demonstrated past performance successfully completing and managing assistance agreements as detailed in Attachment F. While not directly managing federal assistance agreements, IPC does have experience successfully completing and managing work under federal assistance agreements both as subrecipient and contractor and IPC will draw upon CPC members UNH, GRID, ROC-USA and CHC who do have track records of successful management of multimillion dollar federal awards as we establish grants management systems. IPC has a history of meeting reporting requirements including submission of acceptable final technical reports and adequate and timely progress reports for state and private foundation funding. IPC has demonstrated it is a reliable partner and based on our track record, funders are providing subsequent awards to IPC. We have carefully reviewed EPA's grants management guidance for nonprofits and already operate in compliance with this guidance, including independent audit, and has sophisticated fund management accounting software (Oracle NetSuite) to comply with OMB circulars A-110 and A-122.

IPC was spun out of the Connecticut Green Bank (**CGB**), a quasi-public state financing authority. As a newly formed independent, national nonprofit, IPC managed a $5 million grant from the State of Connecticut Department of Energy and Environmental Protection (**DEEP**) to provide financing for solar in underserved communities in the state. Also, as part of that spin-out, DEEP approved transfer from CGB to IPC of a $1.43M grant for administration of a revolving loan fund for affordable multifamily housing improvements. IPC's formation came with a high degree of public scrutiny, including performance under these DEEP grants. IPC successfully completed and managed both awards, as detailed below (see Assistance Agreement #1 and #2 in Attachment F).

IPC successfully completed a subaward from UNH, a tier 1 research university, under a grant from the Wells Fargo Foundation. Based on our successful performance and achievement of outcomes (see Assistance Agreement #3 in Attachment F), the Wells Fargo Foundation has now directly funded IPC for the continuation of this work.

IPC successfully completed and managed two McKnight Foundation awards related to the expansion of clean energy financing solutions, including solar financing, for underserved markets in the Midwest working with community partners. Upon successful completion of the second award (see Assistance Agreement #4 in Attachment F), McKnight provided a 3rd award to continue work in the Midwest.

The JPB Foundation provided a grant to IPC as fiscal sponsor to EnerWealth Solutions, a Black, woman-owned CS development business working in rural markets with challenging regulatory environments using wealth building models for local communities. IPC successfully managed and completed the first award and JPB subsequently awarded IPC another fiscal sponsorship grant.

Further, IPC has successfully performed on federal grants as a contractor under DOE grants to UNH and CGB. CPC members' experiences managing assistance agreements, include i) CEG supported successful implementation of multiple federally funded projects and currently manages a DOE funded project to develop a climate resilient energy code for multifamily affordable housing properties; ii) CHC has received numerous US Department of Treasury CDFI Fund awards; iii)

GRID managed or participated in over $4M federal funding awards supporting work delivering clean energy benefits to LIDACs. Also, GRID is currently co-administrator of a $1B incentive program for Solar On Multifamily Affordable Housing (SOMAH) in California; iv) ROC has received US Department of Treasury CDFI Fund awards and has been building up internal staffing to prepare for other sources of federal funding; and UNH.

### 3.3.3    Organizational experience and a plan for achieving program objectives

IPC has organizational experience and a plan for timely and successful achievement of our Program's objectives. While not having experience managing an award of this size, IPC is built for national scale. The management team has decades of private sector and government experience, including managing large and complex businesses and projects, and IPC has invested extensively in staff, internal systems and processes to support investment operations, program operations, risk management, compliance, accounting, tax, audit, legal, and reporting. IPC has raised over $80 million of investment platform capital from government, foundation and private capital providers and received numerous operating and program grants, successfully delivering on program objectives and compliance and reporting requirements. Working through community-based partners, lenders and developers is core to IPC's approach and consistent with Program design.

Leveraging existing team and operations, and expanding in line with past practices, IPC's detailed plans to achieve Program objectives in Section 1.7 and Attachment D, including key workstreams and milestones across the 5-year performance period. IPC's Program team will employ i) KPI dashboards to track progress towards outputs and outcomes, ii) regular and frequent check-ins with CPC members, additional subrecipients, and key procured contractors to monitor progress and challenges that arise, and iii) agile project management to adjust resources, strategies and tactics to ensure the Program success.

IPC has assembled a robust coalition of partners who bring substantial organizational experience with CS, as detailed in the Executive Summary and Attachment H.

### 3.3.4    Staff expertise and resources to successfully achieve program goals

As an organization specifically focused on a mission aligned with SFA, IPC is uniquely qualified to achieve the goals of the proposed Program. IPC's senior team is deeply experienced in all aspects of residential-serving solar for LIDACs that deliver multiple meaningful benefits including i) the development, construction, financing, and ongoing management of the solar systems themselves, including performance reporting, ii) the marketing, education, and outreach required to reach consumers, particularly through trusted community-based partners, iii) the policy and regulatory environments for various models of solar deployment, iv) the forms of contracts used across developers, projects sponsors, utilities, incentive providers, and consumers, including consumer protection, v) the variety of innovative business models utilized for residential-serving solar, vi) the types of resources that are needed all across the market ecosystem to ensure communities and developers have the resources they need to deploy solar, and vii) the complementary federal, state, and local funding sources and private capital providers available to integrate to funding these projects.

IPC's multi-disciplinary team and in-house expertise are supplemented with contracted third-party professionals for specialized knowledge and capacity. As reflected in the Budget Narrative (Section 2.1 and Attachment E), IPC has developed a detailed plan to resource the CPC program

in order to achieve the objectives of the project through a combination of existing staff, additions to staff, and procured technical expertise.

IPC's experienced management team includes the following:

- **Kerry O'Neill, Chief Executive Officer:** Former Connecticut Green Bank executive, led low-income initiatives. Expert in data-driven product development, especially for the underserved. Deep experience leading corporate "fast-growth" including spin-outs, large national teams (e.g., 1000+ underwriters), tech-enabled operations, and high performing orgs committed to continuous improvement. Kerry will stand up the Program, coordinate with CPC members and other stakeholders, and provide strategic leadership.

- **Musa Collidge-Asad, Chief Investment Officer:** Former World Bank and Global Environment Facility Senior Officer, and executive for U.S.-based clean energy ventures and environmental finance organizations. Expertise in delivering innovative project development, financing, and risk mitigation solutions to resolve complex challenges at the intersection of technology and real assets. Musa will lead the day-to-day Program operations and cross-functional team and private capital mobilization.

- **John D'Agostino, Managing Director, Clean Energy Transactions:** Clean energy & infrastructure project finance and transaction expert with deep expertise in solar development and affordable multifamily lending. Previous roles included state energy & climate policy development, cleantech VC, and public sector financial and risk management consulting. John will lead the Program transactions team for mission-aligned CBCSD FA.

- **Michele Kunitz, General Counsel:** Over 20 years of experience in project and corporate finance, solar energy start-ups, operations, regulated industries, and corporate work to focus on bringing capital to underserved markets. Michele will lead the team handling all legal aspects of the Program and compliance with EPA.

- **Mark DeBonee, Chief Financial Officer:** CPA with many years of public accounting audit experience for non-profit and for-profit entities, as well as financial reporting and fund administration for private equity investment funds with over $13B of commitments. Mark will lead the teams focused on Program accounting, asset management and reporting.

- **James McIntyre, Chief Strategy Officer:** Former director capital markets New York State Homes and Community Renewal, Neighborly, and 14 years US public finance and affordable housing banker, UBS and Morgan Stanley. Finance and Govtech systems thinker. Expert in ESG finance, board Nasdaq Sustainable Bond Network. James will provide strategic guidance on impactful partnerships for the affordable multifamily housing sector.

---

[1] EPA RFA # EPA-R-HQ-SFA-23-01, Section I.A and Section V1.B

[2] U.S. Dept of Energy "United States Energy & Employment Report 2023" June 2023, pg. 8

[3] https://www.cleangroup.org/publication/understanding-solar-storage/

[4] www.nrel.gov/publications

[5] https://ilsr.org/2023-community-power-scorecard/

[6] https://data.nrel.gov/submissions/203

[7] https://www.solarreviews.com/blog/the-state-of-net-metering-usa-2021

[8] Brockway, Conde, Callaway – 2021; Solar Futures Study, DOE, September 2021.

# Exhibit D

| | |
|---|---|
| **From:** | GGRF_Application_Review |
| **To:** | michele.kunitz_inclusiveteam.org; mark.debonee@inclusiveteam.org; musa.collidgeasad@inclusiveteam.org |
| **Cc:** | GGRF_Application_Review; Kelly, Bridget (she/her/hers); Hitchings, Nate |
| **Subject:** | Application Selected for EPA-R-HQ-SFA-23-01: Solar for All |
| **Date:** | Tuesday, April 16, 2024 2:38:57 PM |

**Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Hello,

EPA is pleased to notify you that Inclusive Prosperity Capital, Inc.'s application to EPA's Notice of Funding Opportunity *EPA-R-HQ-SFA-23-01: Solar for All* has been selected for an award. The selection decision was made after evaluating and scoring your application in accordance with *Section V.B: Review and Selection Process* of the Notice of Funding Opportunity. We look forward to working with you and appreciate the immense time and effort that went into preparing your application.

Currently, we are informing a **small handful** of selected applicants prior to the public release to prepare communications for the announcement. **Very few** Solar for All selected applicants are receiving this email, and we request that you do not inform anyone outside of those who need to know in your organization of this information. **We will email you again with more information about your selection and funding amount when we inform all the other selected applicants, prior to the public announcement.**

We will announce the selections publicly on **Monday 4/22**, and news of the selections will be **embargoed for press until 5:00 AM ET on 4/22. As already mentioned, we ask that you please keep your selection extremely close hold until after this news is released.**

As we look ahead to the public announcement, we have several **immediate** requests (we need this information by **4:00pm ET on Wednesday 4/17**).

1. **Press Quote:** We would appreciate if you shared a quote about your selection that we could potentially use for an EPA press release or other similar public-facing materials. Please plan to share the quote as well as the name and title that it should be attributed to.

2. **Point of Contact:** Please include a communications point of contact for your organization so that EPA Public Affairs can coordinate with your team directly on any media requests.

3. **Storytelling Example:** EPA hopes to highlight successful examples/stories of work that you and any coalition partners have done that is **similar to** the work proposed under your application package. For selected applications, EPA will be specifically interested in telling **people-oriented, on-the-ground** stories that highlight the impact this historic investment will have in areas across the country—especially in low-income and disadvantaged communities. We may want to share these stories with national reporters and connect those reporters with individuals directly impacted. If there is a separate communications point of contact for said individuals, please include that information, too.

Here are several illustrative, fictional examples/stories of what EPA envisions. Please submit factual examples/stories of your own (to the extent available).

a. **EXAMPLE ONE:** In a small, rural community near **[XYZ CITY]**, Jonathan wanted to secure a better future for his children. With funding provided through **[EXISTING SELECTEE PROGRAM]**, **[SELECTEE]** financed a loan for Jonathan to install residential solar panels. In addition to the energy cost savings, tax credits, and environmental benefits, Jonathan will substantially improve his credit score as he pays off the loan and builds wealth for himself and his children.

b. **EXAMPLE TWO: [EXISTING SELECTEE PROGRAM]** operates throughout **[XYZ STATE]**, which has experienced some of the most disastrous effects of the climate crisis. **[SELECTEE]** recently partnered with **[XYZ COUNTY]** to invest in the installation of solar panels and battery backup systems for a 150-unit affordable senior housing project. These investments have helped the community reduce energy costs while also building resiliency, ensuring elderly residents can stay in their homes and remain protected against future climate impacts.

Please note: any information you share with us will not be evaluated as part of the review and selection process, as described in *Section V.B: Review and Selection Process* of the Notice of Funding Opportunity, nor factor into any funding decisions. As indicated in *Section VI.A: Award Notification and Disputes* of the Notice of Funding Opportunity, a selection is not final until all disputes are resolved, and selection does not guarantee funding, as only an authorized Award Official can bind the government to expenditure of funds.

Thank you in advance for your consideration of this request and helping amplify the potential impact from this program. Please let us know if you have any questions.

Sincerely,
David Widawsky
Director, Office of the Greenhouse Gas Reduction Fund
U.S. Environmental Protection Agency

# Exhibit E

5H - 84087901 - 0    Page 1

| | | GRANT NUMBER (FAIN): 84087901 | |
|---|---|---|---|
| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** Grant Agreement | MODIFICATION NUMBER: 0 PROGRAM CODE: 5H | **DATE OF AWARD** 07/12/2024 |
| | | **TYPE OF ACTION** New | **MAILING DATE** 07/17/2024 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** PEND |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| Not for Profit | Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| INCLUSIVE PROSPERITY CAPITAL INC 75 CHARTER OAK AVE STE 1-103 HARTFORD, CT 06106-1903 **EIN:** 83-0808658 | INCLUSIVE PROSPERITY CAPITAL INC 75 Charter Oak Ave Suirw 1-103 Hatford, CT 06106-1903 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Musa Collidge-Asad C/O Inclusive Prosperity Capital 75 Charter Oak Ave Ste 1-103 Hartford, CT 06106 **Email:** musa.collidgeasad@inclusiveteam.org **Phone:** 860-775-2090 | Bridget Kelly 1200 Pennsylvania Ave NW, 31150 Washington, DC 20460 **Email:** kelly.bridget@epa.gov **Phone:** 202-566-0718 | Shana Etheridge OGD - GMBOD, 3903R 1200 Pennsylvania Ave NW Washington, DC 20460 **Email:** etheridge.shana@epa.gov **Phone:** 202-564-9777 |

**PROJECT TITLE AND DESCRIPTION**

The Community Power Coalition "Powering America Together" Program - "Note: A special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.
Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan. The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.
No subawards are included in this assistance agreement.

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 0.00 | **TOTAL PROJECT PERIOD COST** $ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 249,300,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,300,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** Barbara Proctor - Associate Award Official | **DATE** 07/12/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 248,900,000 | $ 248,900,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 249,300,000 | $ 249,300,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41019 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 248,900,000 |
| | | | | | | | | | $ 248,900,000 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---:|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 249,300,000 |
| 15. Total EPA Amount Awarded To Date | $ 249,300,000 |

5H - 84087901 - 0    Page 4

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

*The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:*

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

   Progress towards objectives on key performance metrics over the entire period of performance,

   Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

   Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

   Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

   Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

*The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

*The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

D. Signage Required

1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

II. Additional Programmatic Terms and Conditions

A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

**D. Allowable and Unallowable Activities**

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

**E. Foreign Entity of Concern**

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

**G. Revolving Loan Fund Characterization**

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

### J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

### 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

### K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

C. Recipient Responsibilities When Entering Into and Managing Contracts:

a. Solicitation and Contract Requirements:

i. Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

ii. **Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the <u>DBRA Requirements for Contractors and Subcontractors Under EPA Grants.</u>"

b. **After Award of Contract:**

i. **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in <u>29 CFR 5.5(a)(1)(iii)</u>.

ii. **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by <u>29 CFR 5.6</u>.

D. **Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the <u>DBRA Requirements for EPA Subrecipients.</u>"

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in <u>29 CFR 5.6.</u>

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

E. **Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

a. **Solicitation and Contract Requirements:**

i. **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in <u>29 CFR 1.6(b)</u> when soliciting bids and awarding contracts.

ii. **Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the <u>DBRA Requirements for Contractors and Subcontractors Under EPA Grants.</u>"

**b. After Award of Contract**:

  **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

  **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

### S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

#### 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

#### 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

### 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

### 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

### 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

### 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and

condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# Exhibit F

**Greenhouse Gas Reduction Fund**
**Solar for All**

**The Community Power Coalition "Powering America Together" Program**
**Workplan**

**Project Period: 5/1/24 – 4/30/29**

**Final**

**Project Title:** The Community Power Coalition "Powering America Together" Program

**Grant Number:** 84087901

**Organization Name:** Inclusive Prosperity Capital, Inc. (IPC)

**Geography:** The Program will serve 48 geographies - 46 states, the District of Columbia and Puerto Rico, spanning all 10 EPA regions. States: Alabama, Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin. Other Geographies: Puerto Rico and District of Columbia.

**Definitions:**

Capitalized terms used herein without definition have the meanings given to them in the Solar for All Terms and Conditions.

"**B.O.S.S.**" means Black Owners of Solar Services.

"**CCSA**" means Coalition for Community Solar Access, Inc.

"**CEG**" means Clean Energy Group, Inc.

"**CHC**" means Community Housing Capital, Inc.

"**CPA**" means the Department of Energy Community Power Accelerator

"**CPC**" or the "**Coalition**" is the Community Power Coalition, the coalition of IPC and its named Subrecipients under the award and any other future Subrecipient who become a CPC member by being designated as such under its subrecipient agreement or similar written agreement. Throughout the workplan, when CPC or the Coalition is used it is meant to refer to the actions of that coalition or particular members of that coalition, not the obligations of IPC as the pass through entity.

"**CPC Lenders**" means IPC and the following Subrecipients: CHC, ROC, PSEF, GRID, NWC (each as defined in Section [6.1]), Inclusive Lender, LLC, ISH, and any other entities who become Subrecipient lenders or providers of FA in accordance with this workplan.

"**CPC member(s)**" refers to any member of the Community Power Coalition, which includes IPC, all named Subrecipients, and any other Subrecipient who is designated as a CPC member in the future.

"**CPC TA Providers**" means IPC and the following Subrecipients: UNH, BOSS, CEG, PSEF, GRID, ROC, CHC and SURE.

"**GRID**" means GRID Alternatives, Inc.

"**IPC**" is Inclusive Prosperity Capital, Inc., the awardee and pass through entity under the award. IPC is the prime recipient and lead member of CPC.

"**ISH**" means IPC SFA Holdings, LLC.

"**IREC**" means Interstate Renewable Energy Council

"**Low-Income and Disadvantaged Communities**" and "**LIDAC**": when used generally, encompass all four meanings of the term as provided in the Solar for All Terms and Conditions.

"**LIDAC**" **when used in reference to particular models:** For residential serving community solar projects, LIDAC is defined as any one of the following, so long as a Project uses the same definition throughout: i) CEJST-Identified Disadvantaged Communities, as defined in the SFA terms and conditions, ii) EJScreen-Identified Disadvantaged Communities, as defined in the SFA terms and conditions, or iii) Geographically Dispersed Low-Income Households, as defined in the SFA terms and conditions. For multifamily residential solar projects, LIDAC will be defined as Properties Providing Affordable Housing, as defined in the SFA terms and conditions.

"**NCSP**" means the Department of Energy's National Community Solar Partnership.

"**NWC**" means NeighborWorks Capital Corporation

"**PSEF**" means People's Solar Energy Fund, Inc.

"**ROC**" means ROC USA, LLC

"**Subrecipient**": refers to only the subrecipient members of CPC, whether currently named or identified by type.

"**SURE**": means Sustainable Underwriting for Resilience & Efficiency, LLC.

"**UNH**" means University of New Hampshire Carsey School's Center for Impact Finance

**Project Description:**

**Section 1        Introduction**

### A. Overview

The Community Power Coalition's (**CPC**) Solar for All (**SFA**) program, "Powering America Together," (the **Program**) integrates with, supports, and expands the impact of the US Department of Energy's National Community Solar Partnership and Community Power Accelerator program with a goal of greatly increasing the number of mission-driven community-based solar developers committed to delivering multiple meaningful benefits for Americans in Low-Income and Disadvantaged Communities through Residential-Serving Community Solar and Multifamily Residential Solar projects. Led by Inclusive Prosperity Capital, Inc., CPC members are committed to serving the needs of Low-Income and Disadvantaged Communities and include experienced residential-serving community solar and multifamily residential solar experts who have worked with the Community Power Accelerator as developers, lenders, trainers and technical assistance providers, as well as members that bring expertise in workforce development, LIDAC serving or located entrepreneurship, affordable housing, and policy.

CPC will serve a geography of 46 states, plus Washington, DC, and Puerto Rico, with a particular emphasis on supporting residential-serving community solar and multifamily residential solar development in states where community solar markets are beginning to develop, including through a pool of "race to the top" CPC financing to incent states to reduce regulatory barriers (in compliance with the lobbying restrictions below). Allocation of award funds is based upon CPC analysis of many factors, including current market, policy, and regulatory conditions and pipeline readiness, and will change over the period of performance to reflect the changes in this rapidly developing market. Starting in Year 2, CPC's Steering Committee will use various factors, including progress towards Program-funded project output and outcome targets, lessons learned, pipeline readiness, and then-current market conditions to aid in future allocations. The CPC scope of work will provide comprehensive supports to help developers overcome barriers to development, grow their pipelines, and provide equitable access to residential-serving community solar and multifamily residential solar for Low-Income and Disadvantaged Communities.

### B. Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Environmental Results - Outputs and Outcomes:**

Outputs and outcomes from this grant to include:

| | Initial Financial Assistance Deployment | Revolved short-term Financial Deployment (ONLY) | Cumulative Outputs and Outcomes |
|---|---|---|---|
| Number of households served | 24,717 | 6,295 | **31,012** |

| | | | |
|---|---|---|---|
| New generation capacity (MW) | 98.9* | 25.1 | **124.0** |
| New storage capacity (MWh) | 9.8 | N/A | **9.8** |
| Estimated CO2 emissions reduced and avoided (tons annually) | 116,911 | 29,772 | **146,682** |
| Estimated CO2 emissions reduced and avoided (tons over 25-year project lifetime) | 2,922,763 | 744,296 | **3,667,059** |
| Estimated savings per household per year | $116.97 | $29.79 | **$146.76** |
| Estimated total savings per household | $2,924.25 | $744.67 | **$3,668.92** |
| Workforce development outcome | N/A | N/A | **500 developers supported through Technical and/or Financial Assistance** |

* 79.1 MW will be for residential-serving community solar (80%) and 19.8 MW for multi-family residential solar (20%).

If any other SFA programs are leveraged, IPC will not double count outputs or outcomes.

IPC will, for multiple reasons, including state lending requirements direct ownership of residential-serving community solar and multifamily residential solar projects or organizational or other allowable reasons, make subawards to its affiliates for corporate purposes or for the provision of either financial assistance (FA) or technical assistance (TA), or both. IPC Subawardees will also make such transfers for similar purposes. IPC will, and will cause its Subrecipients to, follow EPA's Financial Assistance Conflict of Interest Policy. If the subrecipient is an affiliate that falls within the scope of the policy, then IPC will follow the disclosure requirements.

DBRA/BABA: IPC will comply with forthcoming EPA guidance with regard to Davis-Bacon and Related Acts and Build America, Buy America Act requirements, including seeking a waiver of some provisions if deemed necessary or appropriate, and communicate those requirements to subrecipients in accordance with the terms and conditions.

Cybersecurity: When IPC collects and manages environmental data under this award, it will protect the data by following all applicable State or Tribal law cybersecurity requirements. IPC will ensure that any connections between IPC's network or information system and EPA networks used by IPC to transfer data under this agreement, are secure. IPC will require the subrecipient

to comply with these requirements. IPC will monitor its systems for cybersecurity compliance and correct such systems as necessary, to the extent that its cyber security measures are not sufficient. IPC will extend this requirement to subrecipients: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary or appropriate by the recipient under 2 CFR 200.332(e), by inquiring whether the subrecipient has contacted the EPA Project Officer.

Quality Assurance**:** IPC will develop and submit a Quality Management Plan and a Quality Assurance Project Plan in accordance with the award and implement such plans once approved by the EPA Project Officer.

Civil Rights: IPC's RFP process will follow EPA's Six Good Faith Effort to ensure that disadvantaged businesses have the opportunity to compete, including:

- Outreach and recruitment efforts;
- Extended bid windows;
- Encouraging bids on multiple components of a bigger project, where feasible;
- Allowing a consortium of DBE's to bid on a project, where applicable;
- Coordinating with the Small Business Administration and the Minority Business Development Agency to make solicitations accessible to disadvantaged businesses; and
- Requiring any prime contractor to make subcontract opportunities accessible to disadvantaged businesses.

**Section 2       Meaningful Benefit Plan**

**A.  Meaningful Benefits Plan** We will:

1. Provide a minimum of 20% household savings to beneficiaries and equivalent household for projects funded under this Program without individual electricity bills;

2. Deploy FA and TA products to increase LIDACs' access to solar;

3. Create capacity to deliver electricity and/or development of critical facilities to serve the target population during grid outages thus increasing resiliency and grid benefits;

4. Facilitate ownership models that support low-income households and communities by building equity in projects funded under this Program; and

5. Invest in quality jobs and businesses through a plan for creating high-quality, middle-class jobs, and involving enterprises serving or located within LIDACs wherever possible.

All residential-serving community solar projects funded under this program will conform to the definition of **residential-serving community solar**, as provided in the SFA terms and conditions**.** The projects will:

1.  have a nameplate capacity of 5 MW ac or less,

2.  deliver at least **50%** of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, by delivering at least **50%** of the benefits and/or credits of the power generated from a community solar system to residential customers in the same service territory.

CPC will use various strategies to deliver meaningful benefits to LIDACs, consisting of:

1.  **Targeting / building relationships with aligned developers.** Support and scale innovative community solar and multifamily solar models that deliver multiple meaningful benefits delivered through an ever-growing cadre of mission-aligned developers. These models consist of:
    o   Community-owned models that seek to build wealth for low-income community members.
    o   Affordable multifamily housing models to benefit low-income tenants, including where policy environments lack enabling support for traditional community solar.
    o   Rural models for projects funded under this Program hosted by LIDAC farmers and landowners to generate additional wealth and rural electric cooperative ownership of community solar.
    o   Community solar models that integrate storage for resilience.
    o   Community solar owned by resident-owned manufactured housing communities.
2.  **Requiring and rewarding meaningful benefits.** Screen developers for Program participation eligibility, based on review of the organization's mission statement, consumer protection practices, demonstrated commitment to community engagement and inclusive practices, and use of, or willingness to be trained in, business models that generate meaningful community benefits. CPC, through its Steering Committee will create a project Equity and Meaningful Benefits Scorecard (**EMB Scorecard**) to assure minimum household savings of 20%, and probe for additional meaningful benefits around equitable workforce development (**WD**), energy resilience, community ownership, and wealth-building and entrepreneurship for LIDACs. The EMB Scorecard will also evaluate and/or modify the developer's baseline for strong community benefit agreements (or equivalent) with the community served.
3.  **Non-financial assistance around meaningful benefits.** Use various forms of TA to help developers maximize community meaningful benefits on their projects and low-cost financing sources (ITC, SREC financing streams, or similar) to deepen meaningful benefits. Strategies to support community-based community solar developers (**CBCSDs**) and communities to reach deeply into vulnerable communities to generate meaningful benefits are described below in the Equitable Access and Meaningful Involvement Plan.

Household Savings for Low Income and Disadvantaged Households

CPC Lenders will require a **20% minimum household savings net of costs incurred by the LIDAC household** over the period of performance for all projects funded under this Program , such that the estimated monthly cost of electricity (both community solar subscription + other utility bill

costs) after subscription is at least 20% less than customer's monthly cost of electricity beforehand, on average per year. To advance this goal, CPC Lenders will review pro forma revenue assumptions in its underwriting that reflect at least a 20% discount on average annually to households benefiting from each project, and will review developer's calculations and subscription agreement or other documentation. CPC Lenders will adhere to IRS guidance on proper calculations of the "bill credit discount rate" in underwriting (26 CFR Part 1).

IPC will develop 20% savings methodologies for both community solar and multi-family residential-serving models. IPC will seek EPA's approval of these methodologies prior to their implementation.

IPC will procure the services of a technical consultant to support ongoing 20% savings activities (including training, project screening, and tracking) in Program jurisdictions for the community solar models and multi-family residential serving models CPC seeks to scale. Additionally, such consultant will also be tasked with the annual review of methodologies and with making suggestions for potential updates, in conjunction with the results of any customer savings audits or Program evaluations, as discussed in Section 5 Reporting Requirements.

As a multi-jurisdiction program with a goal of expanding access to community solar models and multi-family residential serving models, including in markets with little activity to date, CPC will seek to balance the robust savings opportunities in more advantageous markets, where 50%+ savings are possible (due to a combination of high electric rates and incentive environments), with those in less developed markets (due to a combination of low electric rate and minimal incentives), where it will be challenging to meet the 20% savings threshold. Therefore, maximizing household savings will not be the only factor for evaluating projects, geographic considerations will also factor into decision making to ensure FA deployment isn't over-concentrated in more mature markets; however, all projects funded under this Program will be required to meet the 20% household savings, described above.

CPC Lenders will use both non-award resources and SFA FA to enhance customer savings and energy burden reductions. The Financial Assistance Strategy discusses the various CPC FA resources. For projects funded under this Program serving multifamily buildings, the CPC Lenders will require developers to follow the recently implemented U.S. Treasury Department regulations for equitable sharing of financial benefits with tenants for accessing the 20% low-income ITC adder (IRS Rule Document 2023-17078), regardless of whether the developer is using the adder. Community Housing Capital (**CHC**) will provide training on this, as will UNH and potentially other nonprofit subrecipients and contractors to be procured.

### Justifying program strategy for FA and TA to increase access to solar for LIDACs

CPC members will target CBCSDs whose missions center on improving **low-income access to solar** and generating associated meaningful benefits. For residential-serving community solar projects funded under this Program, FA or TA will be provided to developers of projects which forecast at least 50% of electricity generated will benefit low-income households using either i) the CEJST, ii) the EJScreen, or iii) the Geographically Dispersed Low-Income Households methodology for

determining eligibility (per the terms and conditions), including TA to help meet this requirement. For multifamily solar projects funded under this Program, FA or TA will be provided to developers of projects on Properties Providing Affordable Housing (per the terms and conditions), including TA to help meet this requirement. CPC's TA program (See Project-Deployment Technical Assistance Strategy) focuses on projects serving these communities, as will the community education, outreach and engagement supports (See Equitable Access and Meaningful Involvement Plan). CPC's FA strategy uses project underwriting to confirm projects funded under this Program meet low-income access requirements before approval (See Financial Assistance Strategy). CPC TA Providers will provide TA support to developers to access additional sources of low-cost financing, through ITCs, adders, LIHEAP funding, SREC sales and similar to help achieve low-income access and household savings.

Energy resilience and grid benefits.

Project-level TA will help developers screen projects funded under this Program for opportunities to add allowable Associated Storage, as defined in the SFA Terms and Conditions, to residential-serving solar projects to provide **community resilience benefits**, guided by community discussions. The Program will not fund standalone storage, and all energy storage assets will be deployed in conjunction with and connected to an eligible rooftop residential solar project or eligible residential-serving community solar project receiving financial assistance from the Program. All storage will be sited at the solar project location. CPC efforts consist of:

1. Subrecipient Clean Energy Group (**CEG)** will implement supports to help developers understand the value and costs of deploying storage in conjunction with residential-serving solar projects and to produce feasibility assessments. CEG will also serve as an advisor to developers deploying storage in conjunction with eligible solar projects throughout their development process;

2. Subrecipient **GRID Alternatives (GRID)** will provide TA for projects deploying storage in conjunction residential-serving solar in communities with grid instability; and

3. Subrecipient **University of New Hampshire Carsey School's Center for Impact Finance (UNH)** will **co-lead** development of Spanish-language materials for energy resilient development and finance that will be offered in energy-vulnerable communities where Spanish is spoken.

Flowing from TA, CPC has structured Program FA to promote the provision of energy resilience in eligible projects where it aligns with community priorities. Energy resilience will be included in the EMB Scorecard, described above.

Maximizing community ownership models

IPC, PSEF, and CPC TA Providers will target CBCSDs focused on community solar models of **community ownership**, including cooperatively owned models and models that convert to community ownership after the ITC period. Subrecipient PSEF will serve a network of developers

focused on developing community-owned projects across the CPC geographies. Subrecipient ROC will focus on support of cooperative and community ownership models. IPC, PSEF, and CPC TA Providers will make FA and TA available to support these models.

IPC will develop a plan to limit risk to communities where community-ownership project models are pursued.

Community ownership of projects funded under this Program is not required, community wealth building is also aided through support of community solar developers targeting or located within LIDACs and through support of LIDAC farmers and landowners with site leasing arrangements or other methods. CPC TA Providers will provide training and TA to developers and communities regarding the total cost of ownership for a project over the system's useful life. Education modules will focus on helping developers and communities to understand community ownership models, including tools and templates for community-owned structures, as well as community considerations around long-term asset ownership, operations and maintenance. CPC will support and encourage developers to pursue these models with FA; underwriting prior to deployment will address risk mitigation for projects that would be community-owned. Development of community-owned projects and/or provision of other community wealth building benefits will be included in the EMB Scorecard used by CPC Lenders for underwriting all projects funded under this Program, described above.

Investing in jobs and businesses in low-income communities

IPC will ensure compliance with Davis-Bacon and related acts standards for labor compensation by requiring developers and contractors of projects funded under this Program to provide "quality jobs" which include, health and retirement benefits, family-sustaining wages, predictable work schedules, and supportive services for those who need them. CPC members are committed to these "high road" labor practices and will incorporate equitable WD and job quality metrics into the EMB Scorecard, including screening for WD programs where solar is being deployed that place graduates in high-quality jobs. Upon its creation, CPC members will use the EMB Scorecard as part of eligibility screening for all financial and non-financial assistance (above). The EMB Scorecard will evaluate specific dimensions, consisting of the following:

- developer's existing experience and relationships with local WD boards and/or higher educational institutions and/or the newly created American Climate Corps to help support community-based workforce initiatives where solar is being deployed;

- developer's commitment to providing registered apprenticeship opportunities and plans to work with partners to provide such opportunities;

- developer's plans for offering job opportunities or training to persons residing in LIDACs;

- developer or contractor(s)'s provision of "quality jobs" to workers which include providing health and retirement benefits, family-sustaining wages, predictable work schedules, and supportive services for those who need them;

- developer's plans to record and report on Davis-Bacon standards for labor compensation;

- plans to ensure safe working conditions;

- developer or contractor(s)'s commitment to workers' free and fair choice to collectively bargain and enter a union with no support for developers who interfere or allow contractors to interfere with workers' choices about union membership;

- opportunities for enterprises serving or located within LIDACs to participate in the project; and

- inclusion of Community Benefits and/or Project Labor Agreements or similar.

As discussed in the Project-Deployment Technical Assistance Strategy, as a part of its TA and workforce programming, the Program will:

i)  **with Subrecipient Interstate Renewable Energy Council's (IREC's) leadership**, provide TA to help developers coordinate efforts with their local WD ecosystems, helping make connections (if useful) with unions, community colleges, pre-apprenticeship programs, and other training efforts, with the aim of maximizing opportunities for equitable WD where solar is being deployed;

ii) **through Subrecipient GRID**, provide workforce programming, including pre-apprenticeship programs, as a part of GRID's development of projects funded under this Program; additionally to support other developers who have identified to CPC-aligned workforce commitments;

iii) **through Subrecipient Black Owners of Solar Services** (**B.O.S.S.**)**.**, work to create capacity-building programming for solar project development companies serving or located within LIDACs where solar is being deployed to provide mentorship programs and TA to help developers access federal resources;

iv) **across all CPC TA Providers, help identify best practices** for equitable WD where solar is being deployed and help support creation of high-quality middle-class jobs by supported solar developers.

Finally, CPC Lenders will support projects funded under this Program by providing deep equitable workforce meaningful benefits through FA structuring. For example, if a project funded under this Program is committing to using pre-apprenticeship program construction labor which has higher per-watt total development costs, CPC will provide greater support to those projects as needed to cover such increased costs. In short: we are committed to supporting "high road" practices around WD and funding quality job opportunities.

**Financial Assistance Strategy**

IPC will deploy FA as set forth in Section 4: Timeline and Milestones. Once established, CPC Lenders will incorporate the EMB Scorecard (See Meaningful Benefits Plan) into its FA deployment strategy. FA allocation across geographies and models will be based on market readiness with input from the Steering Committee (once established). Projects funded under this Program will be evaluated on a variety of metrics to meet award targets, consisting of the efficiency of the proposed financial model, mobilization of other funding sources, including private capital, readiness and availability of grid and interconnection resources, and the extent of meaningful benefits provided to LIDACs. The Program will not be providing any funds directly to households.

During project underwriting, CPC Lenders will confirm that proposed projects adopt best practices and industry standards for quality installations and include a robust siting plan including, if applicable, climate hazards, avoiding greenspaces, pollinators, etc., building resilient assets, and agrivoltaics considerations.

IPC will use the CPC Steering Committee (See Participatory Governance Plan) to provide oversight and monitor the efficient and equitable investment of CPC SFA funds. Beginning in Year 2, the Steering Committee will review and make recommendations on capital allocation strategies and priorities. Additionally, it will assess CPC's FA Strategy and provide input for ongoing funding and financing activities. This consists of recommending changes to CPC's FA products to better align FA Strategy with Program objectives in light of progress to date on Program outcomes and metrics, lessons learned, pipeline readiness, and changing market conditions.

As dictated by the unique needs of each project funded under this Program, and with the objective of achieving multiple meaningful benefits, FA will cover the full life cycle of project development, as discussed below.

Financial Assistance Products

CPC Lenders will provide a **full range of FA to developers of residential-serving community solar and multifamily residential solar models, to projects funded under this Program** across the project life cycle, shown below, for the entire $186.7M pool. Residential serving community solar will total $149.4M (80%) of financial assistance deployed and multifamily residential solar will total $37.3M (20%) of financial assistance deployed. Please see the charts below for further information.



| | Financial Assistance | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | |
| | Residential Rooftop Solar | Residential-Serving Community Solar | Residential Rooftop Solar | Residential-Serving Community Solar | Residential Rooftop Solar | Residential-Serving Community Solar | Residential Rooftop Solar | Residential-Serving Community Solar | Residential Rooftop Solar | Residential-Serving Community Solar |
| **Short-term FA:** | | | | | | | | | | |
| Developer Lines of Credit | $0 | $0 | $323,660 | $1,294,641 | $380,838 | $1,523,354 | $295,501 | $1,182,006 | $0 | $0 |
| Pre-Development Loans | $126,517 | $506,069 | $355,698 | $1,422,791 | $584,411 | $2,337,644 | $243,063 | $972,251 | $0 | $0 |
| Construction Loans | $504,931 | $2,019,723 | $1,419,590 | $5,678,358 | $2,332,385 | $9,329,539 | $970,063 | $3,880,253 | $0 | $0 |
| Bridge Loans (e.g. Interconnection and Investment Tax Credit) | $263,578 | $1,054,311 | $741,037 | $2,964,148 | $1,217,523 | $4,870,093 | $506,381 | $2,025,523 | $0 | $0 |
| **Total ST FA** | **$895,026** | **$3,580,104** | **$2,839,984** | **$11,359,937** | **$4,515,158** | **$18,060,630** | **$2,015,008** | **$8,060,033** | **$0** | **$0** |
| | | | | | | | | | | |
| **Permanent Financing:** | | | | | | | | | | |
| Permanent Loans | $1,501,583 | $6,006,334 | $4,221,633 | $16,886,531 | $6,936,140 | $27,744,560 | $2,884,814 | $11,539,254 | $3,096,684 | $12,386,734 |
| Power Purchase Agreements, Lease Agreements, etc. | $116,522 | $466,090 | $334,498 | $1,337,990 | $554,343 | $2,217,371 | $246,861 | $987,443 | $638,832 | $2,555,327 |
| **Total Permanent Financing** | **$1,618,106** | **$6,472,424** | **$4,556,130** | **$18,224,522** | **$7,490,483** | **$29,961,931** | **$3,131,674** | **$12,526,697** | **$3,735,515** | **$14,942,062** |
| | | | | | | | | | | |
| **Other forms of FA:** | | | | | | | | | | |
| Credit Enhancements | $1,000,000 | $4,000,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Grants | $384,483 | $1,537,932 | $1,080,956 | $4,323,824 | $1,776,010 | $7,104,041 | $738,661 | $2,954,645 | $642,401 | $2,569,605 |
| **Total Other forms of FA** | **$1,384,483** | **$5,537,932** | **$1,080,956** | **$4,323,824** | **$1,776,010** | **$7,104,041** | **$738,661** | **$2,954,645** | **$642,401** | **$2,569,605** |
| | | | | | | | | | | |
| **Total Annual FA** | $3,897,615 | $15,590,459 | $8,477,071 | $33,908,283 | $13,781,650 | $55,126,602 | $5,885,344 | $23,541,375 | $4,377,917 | $17,511,666 |

*Please note the table above does not include $4.6M of deal-based costs.

To more efficiently meet award goals over the period of performance, IPC will periodically review capital allocations across FA products, including with input from the Steering Committee. Once constituted, the Steering Committee will monitor and track key deployment metrics, consisting of dollars deployed, geographic distribution, households served, MW capacity developed and other metrics IPC determines to be relevant to the administration of the award and ongoing compliance therewith. FA will reflect the top line outputs and outcomes included in this workplan in terms of aggregate FA provided and the volume of greenhouse gas emissions reduced or avoided. CPC FA products are described below.

A few notes on the FA:

- **Developer lines of credit** available for nascent developers that participate in CPC capacity building programs. **Pre-development** loans could be forgivable if the projects funded under this Program can't move forward. **Enabling upgrades** to be captured by permanent financing and will not exceed 20% of the total SFA financial assistance. Enabling upgrades are further discussed below. **Bridge financing,** including grid interconnection loans and ITC and other incentive bridge loans, is particularly important for nonprofit developers utilizing the ITC direct-pay provisions, as well as developers using the new ITC transfer mechanism. **Permanent financing** provided with a range of flexible terms to support multiple meaningful benefits and **Grants** possible where determined to be desirable to drive deeper impact. **Credit enhancements** will be available to facilitate additional financing by other providers, for example for community solar models where a model is not yet widely accepted or for investment tax credit elective pay and transferability recapture risk.

- FA products will be offered to individual projects funded under this Program or as portfolio financing facilities to support multiple projects funded under this Program.

- **Developer lines of credit, pre-development, construction, and bridge financing will revolve** in the first 3-4 years, and then begin to transition to permanent project FA, so that all FA is deployed into projects funded under this Program by the end of the period of performance. The 10% **"race to the top" pool** will be allocated across all FA types (deployed and used in compliance with the lobbying restrictions above). There will be no difference in types of projects funded under "race to the top" or types of FA offered. This is simply a mechanism to reserve some FA funds for the later years of the Program to accommodate some markets in our geographies that will take longer to develop from a policy and developer perspective.

**CPC FA Products**

| | Short-term FA Products | | | |
|---|---|---|---|---|
| **Loan Product** | **Developer Lines of Credit** | **Pre-Development Loans** | **Construction Loans** | **Bridge Loans (e.g. Interconnection and Investment Tax Credit)** |
| **Purpose / Description of Product** | Feasibility. A starter line of credit for select developers that go through TA or capacity building program(s), available for [2 years] then graduate to a traditional banking relationship<br><br>Loan is potentially forgivable. | Feasibility. A loan product for developers and property owners for work conducted and costs incurred during the pre-development phase of projects (prior to commencement of construction)<br><br>Loan is potentially forgivable. | Implementation. A loan product for developers and property owners for project construction<br><br><br><br>Loan is potentially forgivable. | Implementation. A loan product for developers and other entities that acts as a bridge-loan for interconnection payments/deposits payable to the utility and for investment tax credits or incentives<br><br>Loan is potentially forgivable. |
| **Types of projects financed** | Residential Rooftop Solar or Residential- Serving Community Solar | Residential Rooftop Solar or Residential-Serving Community Solar | Residential Rooftop Solar or Residential-Serving Community Solar | Residential Rooftop Solar or Residential-Serving Community Solar |
| **Eligible Borrowers / Transaction Counterparty** | For-profit or nonprofit Project developer | For-profit or nonprofit project or property owner | For-profit or nonprofit project or property owner | For-profit or nonprofit project or property owner |
| **Subaward/PSC/Contract** | Contract | Contract | Contract | Contract |
| **Program Beneficiary (if different from Transaction Counterparty)** | N/A | LIDACs | LIDACs | LIDACs |
| **Loan Amount** | Up to [$500,000]<br><br>Est. size per project/transaction $150,000 | Up to [$2,000,000]<br><br>Est. size per project/transaction $300,000 | Up to [$15,000,000]<br><br>Est. size per project/transaction $2,400,000 | Up to [$10,000,000] |

| | | | | Est. size per project/transaction $1,00,000 for investment tax credits and $250,000 for interconnection |
|---|---|---|---|---|
| **Advance Rate** | N/A | Up to [100%] of pre-development costs | Up to [100%] of project construction costs | Up to [100%] of interconnection deposit(s) and income tax credit(s) or similar |
| **Term / Payback Period** | Up to [24 months / 2 years] | Up to [48 months / 4 years] | Up to [36 months / 3 years] | Up to [48 months / 4 years] |
| **Interest Rate** | [0% to 5%] | [0% to 3%] | [0% to 5%] | [0% to 5%] |
| **Potential Fees** | Closing Fee, Draw Fee, Other Penalty Fees | Closing Fee, Undrawn Commitment Fee, Prepayment Penalty, Other Penalty Fees | Closing Fee, Undrawn Commitment Fee, Prepayment Penalty, Other Penalty Fees | Closing Fee, Undrawn Commitment Fee, Prepayment Penalty, Other Penalty Fees |
| **Potential Sources of Funds and Other Incentives** | Funding allocated for FA under the workplan<br><br>Other capital sources at CPC's sole discretion | Funding allocated for FA under the workplan<br><br>Borrower Cash Reserves<br><br>State rebates<br><br>Other incentives<br><br>Other capital sources at CPC's sole discretion | Funding allocated for FA under the workplan<br><br>Borrower Cash Reserves<br><br>Sponsor Equity<br><br>Third-party project debt<br><br>State rebates<br><br>Other incentives<br><br>Other capital sources at CPC's sole discretion | Funding allocated for FA under the workplan<br><br>Borrower Cash Reserves<br><br>Sponsor Equity<br><br>Third-party project debt<br><br>Other capital sources at CPC's sole discretion |

| Loan Product | Developer Lines of Credit | Pre-Development Loans | Construction Loans | Bridge Loans (e.g. Interconnection and Investment Tax Credit) |
|---|---|---|---|---|
| Potential Uses of Funds | Working capital needs associated with projects | Feasibility, Evaluation, and Design<br><br>Interconnection<br><br>Legal costs<br><br>Environmental and permit fees<br><br>Costs to secure project financing for the improvements<br><br>Lender Reimbursable Expenses<br><br>Closing costs<br><br>Other allowable pre-construction-related project costs | Construction of eligible projects and energy-related health & safety remediation/improvement<br><br>Storage<br><br>Enabling upgrades<br><br>Legal costs<br><br>Lender reimbursable expenses<br><br>Closing costs<br><br>Other allowable project-related construction costs | Interconnection deposits<br><br>Working capital needs associated with projects<br><br>Legal costs<br><br>Lender reimbursable expenses<br><br>Closing costs<br><br>Other allowable project-related costs |
| Potential Program Income[1] | Principal (balloon, has option to be forgivable)<br><br>Interest Payments (payable monthly/quarterly/balloon repayment)<br><br>Closing and Draw Fees | Principal (balloon, has option to be forgivable)<br><br>Interest Payments (payable monthly/quarterly/balloon repayment)<br><br>Closing Fee, Undrawn Commitment Fee, Prepayment Penalty, Other Penalty Fees | Principal (balloon, has option to be forgivable)<br><br>Interest Payments (payable monthly/quarterly/balloon repayment)<br><br>Closing Fee, Undrawn Commitment Fee, Prepayment Penalty, Other Penalty Fees | Principal (balloon, has option to be forgivable)<br><br>Interest Payments (payable monthly/quarterly/balloon repayment)<br><br>Closing Fee, Undrawn Commitment Fee, Prepayment Penalty, Other Penalty Fees |
| Potential Security | Unsecured / Corporate | Cash and Cash Reserves / Corporate / Unsecured<br><br>Senior or Subordinated | Cash and Cash Reserves / Corporate/ project(s)<br><br>Senior or Subordinated | Cash and Cash Reserves / Corporate/ project(s)/ Unsecured<br><br>Senior or Subordinated |

---

[1] Subject to any allowable offsets, netting, or reductions.

| Permanent Financing FA Products | | |
|---|---|---|
| **Product** | **Permanent Loans** | **Power Purchase Agreements,**<br><br>**Lease Agreements, etc.[2]** |
| **Purpose / Description of Product** | Implementation. Term debt / term loan for eligible projects.<br><br>Loan is potentially forgivable. | Implementation. Development, construction, and operation of eligible projects for or on behalf of third-party ownership / Various models employed based on the regulatory environment in the market |
| **Types of projects financed** | Residential Rooftop Solar or Residential Serving Community Solar | Residential Rooftop Solar or Residential Serving Community Solar |
| **Eligible Borrowers / Transaction Counterparty** | For-profit or nonprofit project or property owner | For-profit or nonprofit property owner or eligible off-taker |
| **Subaward/PSC/Contract** | Contract | Contract |
| **Program Beneficiary (if different from Transaction Counterparty)** | LIDACs | LIDACs |
| **Loan or Project Amount** | Up to [$15,000,000]<br><br>Est. size per project/transaction $550,000 | Up to [$15,000,000]<br><br>Est. size per project/transaction $1,700,000 |
| **Advance Rate/Draw Amount** | Up to [100%] of turnkey costs for eligible projects | Up to [100%] of turnkey costs for eligible projects |
| **Term / Payback Period** | Up to [25 years] | Up to [25 years] |

---

[2] Certain CPC Lenders will directly own solar projects and offer the benefits of such products to LIDAC communities.

| Permanent Financing FA Products | | |
|---|---|---|
| **Product** | **Permanent Loans** | **Power Purchase Agreements, Lease Agreements, etc.[2]** |
| **Interest Rate or Payment** | [0% to 5%] | TBD to provide projected 20% minimum savings to households and other meaningful benefits |
| **Potential Fees** | Closing Fee<br><br>Undrawn Commitment Fee<br><br>Prepayment Penalty<br><br>Other Penalty Fees | Early Termination Fees<br><br>Buy-Out Fees<br><br>Other Penalty Fees |
| **Potential Sources of Funds and Other Incentives** | Funding allocated for FA under the workplan<br><br>Borrower Cash Reserves<br><br>Sponsor Equity<br><br>Third-party project debt<br><br>Income Tax Credits<br><br>Renewable Energy Credits<br><br>Carbon offsets<br><br>State rebates<br><br>Other incentives<br><br>Other capital sources at CPC's sole discretion | Funding allocated for FA under the workplan<br><br>Counterparty cash down payment<br><br>Income Tax Credits<br><br>Renewable Energy Credits<br><br>Carbon offsets<br><br>State rebates<br><br>Other incentives<br><br>Other capital sources at CPC's sole discretion |
| **Potential Uses of Funds** | Payoff of construction debt | Eligible project development, engineering, procurement, and construction activities |

| Product | Permanent Loans | Power Purchase Agreements, Lease Agreements, etc.[2] |
|---|---|---|
| **Permanent Financing FA Products** | | |
| | Payments to EPC Contractor | Operating and Maintenance |
| | Operating and maintenance | Cash Reserves |
| | Debt reserves | Lease payments to property owner |
| | Operating reserves | Seller reimbursable expenses |
| | Subscriber management fees | Other allowable project-related costs |
| | Lender reimbursable expenses | |
| | Closing costs | |
| | Other allowable project-related costs | |
| **Potential Program Income[3]** | (Option to be forgivable) | Power Purchase Agreement payments from off-taker(s) |
| | Principal payments | Lease payments |
| | Interest payments | Service payments or other similar payments |
| | Closing fee | Renewable energy certificates |
| | Undrawn Commitment Fee | Dispositions |
| | Prepayment Penalty | Rebates |
| | | Incentives |
| | | Customer buydowns |

---

[3] Subject to any allowable offsets, netting, or reductions.

| Permanent Financing FA Products | | |
|---|---|---|
| **Product** | **Permanent Loans** | **Power Purchase Agreements, Lease Agreements, etc.[2]** |
| **Potential Security** | Project/Property level security<br><br>Senior or Subordinate | Project/Property level security<br><br>Senior or Subordinate |

## Other forms of FA

| Product | Grants | Credit Enhancements |
|---|---|---|
| **Purpose / Description of Product** | Grants for allowable costs for:<br><br>• Pre-development of a project<br>• Construction, ownership, operation or maintenance of a project<br>• Offset the cost of project community solar subscriptions to achieve the minimum 20% savings threshold<br>• Or any allowable expenses related to projects | Implementation. Credit enhancement including loan loss reserves, guarantee(s), etc. to facilitate additional financing by other providers with similar product terms or otherwise supporting projects |
| **Types of projects financed** | Residential Rooftop Solar or Residential-Serving Community Solar | Residential Rooftop Solar or Residential-Serving Community Solar |
| **Eligible Recipient/ Transaction Counterparty** | Nonprofit project or property owner | For-profit or nonprofit project or property owner |
| **Subaward/PSC/Contract** | Contract | Other |
| **Program Beneficiary (if different from Transaction Counterparty)** | LIDACs | LIDACs |
| **Amount** | Up to [$2,000,000]<br><br>Est. size per project/transaction $750,000 | Total Pool - $5,000,000 |
| **Potential Fees** | N/A | Closing Fees<br><br>Unobligated Amount Fee<br><br>Availability Fee |

| Other forms of FA | | |
|---|---|---|
| **Product** | **Grants** | **Credit Enhancements** |
| **Potential Program Income**[4] | N/A | Interest earned on credit enhancement amount on deposit at CPC bank account<br><br>Closing Fee<br><br>Unobligated Amount Fee<br><br>Availability Fee |
| | | |
| | | |
| **Interest Rate** | N/A | N/A |
| **Term / Payback Period** | N/A | N/A |

---

[4] Subject to any allowable offsets, netting, or reductions.

For Residential-Serving Community Solar projects, program beneficiaries will receive financial assistance from transaction counterparties in the form of community solar subscriptions or other similar contractual arrangements. For Residential Rooftop Solar projects, contracts with transaction counterparties will require savings to be passed to tenants as reductions in rents, utility charges, or other direct or indirect financial benefits.

To the extent allowable as Program Income, CPC Lenders will include a reasonable charge on electricity generated from FA to projects funded under this Program that would accrue over time to CPC Lenders to be used to pay necessary or appropriate oversight and administration costs to protect the Program. IPC confirms that it is not government fees and is included in 20% savings calculations.

During the course of FA lifecycle, borrower non-performance can occur. CPC Lenders will address such non-performance in accordance with FA agreements, as necessary or appropriate in accordance with customary rights of lenders and to protect the Program.

CPC Lenders will select projects to fund under the Program that are economically viable and leverage both other subsidy sources and private capital, while providing multiple meaningful benefits for LIDACs. CPC Lenders will combine underwriting procedures with the EMB Scorecard to help balance financial and mission impact objectives.

Specific steps CPC Lenders will use in underwriting to maximize the use of amortizing debt, to the extent feasible within this complex financial structuring challenge, include the following:

- Review revenue streams and Sources and Uses statement of projects funded under this Program to ensure that developers are maximizing other available sources of subsidy in their geographies (e.g., solar ITC and adders, SRECs, LIHEAP, USDA, etc., described below).
- Review pro forma and debt coverage calculations of projects funded under this Program to ensure the reasonableness of the debt coverage ratio (DCR). A high DCR, depending on other pro forma assumptions, could indicate the capacity to service additional debt, and /or change the terms of debt financing.
- Review development timelines of projects funded under this Program for development delay risks (e.g. interconnection) to inform decisions to prioritize more certain deployment horizons in furtherance of the Program's objectives.

CPC Lenders will use diligence checklists to account for required criteria from the EMB Scorecard as well as items that correspond with the statutory requirements enumerated under paragraphs O, P, and Q of the Additional Programmatic Terms and Conditions in the award terms and conditions. EMB Scorecard will include factors evaluating project siting plans including, if applicable, climate hazards, avoiding greenspaces, pollinators, etc., building resilient assets, and agrivoltaics considerations.

Over the past three months with input from industry, IPC confirmed that price assumptions are realistic., IPC estimates that total development costs (**TDC**) of projects funded under this Program will average $3.07/watt across the Program, excluding storage. IPC estimates that with a SFA

award of $249 million, of which 75% (i.e., $187 million) is utilized as project FA, the Program can serve a total of 24,717 households. Key assumptions in this calculation are:

- SFA FA funding is projected to comprise about 60% of the project permanent capital stack, on average across all projects funded under this Program in the 48 geographies. This translates to $187 million in award FA supporting $303 million of TDC.
- Loans for developer lines of credit, pre-development, bridge, or construction will recycle and revolve and by the end of the 5-year Program period, if not sooner, and IPC assumes that all $187 million will be deployed as permanent gap financing. The recycling of short-term FA will meet program income requirements by being redeployed into existing CPC FA products.
- An average TDC of $3.07/watt as noted above, yields approximately 98.9 MW of development for $303 million of TDC.

Revolving short-term FA referenced above (e.g., developer lines of credit, pre-development, construction, bridge financing), will, among other possible uses, be recycled within the Programs' "race to the top" strategy of supporting deployment in jurisdictions that will take longer to implement supportive policy and regulatory frameworks, and to support portfolio allocation across geographies, including less developed markets. Note that the "race to the top" strategy does not include any different activities from a FA or TA perspective – it is simply a mechanism to reserve some FA funds for later Program years for those markets that will take a bit longer to develop.

IPC, across all CPC Lenders, will recycle approximately 25% of its FA, with approximately 10% reserved for the "race to the top" strategy for deployment in less developed markets, currently projected in Years 4-5. Coalition for Community Solar Access (CCSA) will provide "matchmaking services" or other strategies to help developers meet with energy sector stakeholders in these markets to underscore CPC's willingness to boost investment in community solar projects, and to highlight positive impacts in more developed markets (in compliance with the lobbying restrictions above).

CPC Lenders will derive funds for recycled FA from Program Income generated from short-term FA deployed initially for new financing. Program Income generally consists of loan interest payments, fees, and repaid principal balances. Additional details regarding Program Income are presented below in the Budget Narrative.

Complementing and Leveraging Other Capital and Financial Assistance

CPC members will help to leverage SFA FA in multiple ways, seeking to ensure that this financing **complements and does not replace** other sources of capital. Projects to be funded by the Program will be evaluated on whether the proposed financial model is efficient and mobilizes other funds, including private capital. Below we outline strategies to address this complementary financing goal.

**Assisting developers to leverage other financing supports**. Through training, TA, and assistance

during loan application, CPC TA Providers and Lenders will work with Program funded project developers in support of efforts to maximize available non-Solar-for-All financing supports.

| Financial Support | IPC Program Assistance |
|---|---|
| "Direct pay" solar ITC for nonprofit developers, including applicable adders | • Help community solar cooperatives create "nonprofit cooperatives" to access direct pay<br><br>• Connect small for-profit developers to emerging transfer markets and provide bridge financing<br><br>• Facilitate tax equity investment and increase access to tax credit equity |
| Social Renewable Energy Credit (REC) platforms | • Run an RFQ to identify Social REC platforms to provide additional meaningful benefits and opportunities to sell voluntary RECS to investors (often at a premium) |
| USDA-Rural Development resources | • Assist projects funded under this Program structured as rural businesses to access USDA REAP grants and loan guarantees, and partially forgivable loans from the USDA Powering Affordable Clean Energy program<br><br>• Connect rural projects funded under this Program to Rural Energy Saving Program funds<br><br>• Assist rural electric cooperatives with accessing Rural Utilities Service money for projects funded under this Program through the newly-enacted Empowering Rural America program |
| LIHEAP | • Connect projects funded under this Program serving LIHEAP-eligible customers with National Association of Community Action Programs' (**NACAP**'s) 1,000 members, many of which operate LIHEAP programs across the country.<br><br>• Provide TA on using LIHEAP to support community solar subscriptions, as new Health & Human Services regulations now allow |
| Green Crowd- | • Run an RFQ to identify and connect projects funded under this Program developers to platforms, which pair individual socially |

| funding Platforms | motivated investors who wish to support projects with opportunities requesting funding |
|---|---|

**Corporate or project-level leverage at CPC Lenders**. CPC Lenders, except for ISH, have additional blended sources of capital to draw from, including bank and foundation program related investments funding. In order to advance the use of private capital and achieve potential leverage, IPC will seek leverage at the corporate and project levels. For projects seeking funding under the Program which are entering the final stages of due diligence, where appropriate, IPC will use commercially reasonable efforts to include private capital participation for co-investment as discussed below, as well as noted in the table above. Other CPC Lenders will make similar efforts.

In addition, IPC will seek to grow its capital base through the GGRF CCIA and NCIF programs, and will employ commercially reasonable efforts to use its growing balance sheet (based on deployed capital and non-SFA funds) to provide additional corporate-level private capital leverage over time. IPC will continue to work with foundations to raise debt capital that many philanthropies prefer to invest at the corporate level rather than in specific projects. This balance sheet capacity will be made available to lend to IPC projects funded under this Program over time as it materializes. We will not be using SFA funds to fundraise or develop proposals.

**Partnerships with networks of community lenders**. We will develop a list of community lenders, like green banks, CDFIs, community development credit unions, and community banks (including minority depository institutions), to facilitate direct lending or to advance co-lending to projects funded under this Program. In each case, we will encourage both these lenders and the developers to use the Community Power Accelerator platform to assist developers in finding favorable financing on their deals. CPC's lenders will partner with such community lenders and CCIA funding recipients, for co-investment opportunities in projects funded under this Program. In developing these approved vendor lists, IPC will ensure open competition and follow guidelines set forth in 2 CFR 200.319(e).

Prudent use of financial assistance for storage and enabling upgrades

CPC Lenders will require developers to break out costs for, among other things, enabling grid upgrades and storage to facilitate review of these costs.

Prudent Use of FA for Enabling Upgrades: Through training and TA, CPC will encourage developers to **work with utilities early on in the process to seek project siting in favorable grid locations for grid integration, including to reduce interconnection-related delays and costs**. Projects funded under this Program where allowable enabling grid upgrades exceed 20% of project costs will be flagged for further review and due diligence by CPC Lenders and referred to CPC TA Providers for support, including to CPC Subrecipient CCSA who will provide TA to utilities and community stakeholders around **interconnection best practices** and to developers on negotiation with utilities. In the absence of other funding and after exploring alternative

strategies to address hosting capacity constraints, including increasing storage system sizing and evaluating behind-the-meter storage configurations to limit or eliminate exports to the grid, the Program will finance allowable Enabling Upgrades for projects funded under this Program to the transmission and distribution **infrastructure sited in LIDAC** census tracts, as necessary or appropriate, to alleviate grid constraints impeding the installation of those solar and energy storage systems.

Enabling Upgrades, as defined in the SFA terms and conditions, to energy and building infrastructure are sometimes necessary or appropriate to deploy or maximize the benefits of a residential-serving community solar projects funded under this Program which may be located on multifamily affordable housing and integrated into such residential-serving community solar projects. In the absence of other funding and after exploring alternative strategies to fund the allowable Enabling Upgrades, FA for allowable project costs, such as roof or electric service upgrades where the project is sited, will be supported. Enabling upgrades described in the workplan (roof and electric service upgrades) will only be funded for multifamily residential-serving solar and community solar where the project is sited. IPC will not be providing any funding for energy efficiency Enabling Upgrades. Enabling Upgrades will only be funded in conjunction with solar investment.

Accordingly, IPC will track FA provided for these uses to comply with 15% EPA deployment caps for allowable Enabling Upgrades under the SFA terms and conditions, but in no event will the share of financial assistance expended on allowable Enabling Upgrades exceed 20% of the financial assistance over the period of performance.

Prudent Use of FA for Storage: CPC Lenders will prioritize FA to community solar projects funded under this Program that provide off-taker level resilience. CEG will help developers screen such projects for opportunities to incorporate allowable Associated Storage, as defined in the SFA terms and conditions, on eligible rooftop residential solar project or eligible residential-serving community solar project receiving financial assistance from the program and provide assessments of the cost-effectiveness of integrating such storage. FA will only fund allowable Associated Storage, including community solar + battery storage, battery storage for households with medical equipment receiving rooftop residential solar. Associated  Storage projects under this Program will only be deployed in conjunction with and connected to an eligible rooftop residential solar project or eligible residential-serving community solar receiving FA from the Program. The Program will not fund standalone storage, and all energy storage assets will be deployed in conjunction with and connected to an eligible rooftop residential solar project or eligible residential-serving community solar project receiving financial assistance from the program.

IPC estimates new storage capacity of 9.8 MWh or $9.8 million of total development costs using the initial FA deployment.

Managing long-term impacts of program financial assistance

**Post-Construction Quality Control Plan:** CPC Lenders will require third-party independent engineering inspections of constructed systems and ensuing third-party system performance monitoring for projects funded by the Program. CPC strategies to provide such oversight include review of engineering reports, requiring minimum qualifications for contractors, construction documentation, and production reports, and using the governance process to elevate industry best practices and identify broad-based issues in installations.

To the extent that developers are developing projects serving affordable multifamily housing to be funded by the Program, they often will be serving regulated affordable housing, typically owned by a nonprofit affordable housing developer or public housing authority with long-term affordability covenants and deed restrictions. As a part of underwriting those projects, CPC Lenders will review those agreements for expected covenants and restrictions. For naturally-occurring affordable housing, CPC lenders will confirm existence of long-term affordability covenants and restrictions and if not in place will seek them in relation to projects developed on those properties seeking Program funding. Both IPC, CHC and NWC will provide guidance on this topic for the Program.

Long-term asset management of projects funded under this Program is of prime importance to CPC Lenders and many mission-driven projects will require long-term financing. IPC, as well as other CPC Lenders, will develop and own Projects on behalf of developer and community partners, in compliance with all affiliate transfer requirements. As discussed in the Project-Deployment Technical Assistance Strategy, long-term asset management and O&M will be key topics covered in CPC's training and TA program. CPC Lenders will also implement a long-term asset management function, to be informed by CPC's governance process and overseen by IPC. During year 1, IPC will integrate long-term asset management concerns – such as maintenance plans, adequacy of replacement reserves, and plans for decommissioning and recycling of solar equipment at the end of the project life –into project underwriting guidelines and loan portfolio monitoring activities. Long-term asset management concerns related to maintenance plans, adequacy of replacement reserves, and plans for decommissioning and recycling of solar equipment at the end of project life will be required to be included in counterparties' upfront contracts under project financing documents and loan portfolio monitoring activities for solar assets owned by those counterparties, and will be funded by FA.

**Project-Deployment Technical Assistance Strategy**

CPC's three-pronged TA program integrates hands-on project TA; a training program to offer multiple ways for developers to engage and learn; and a peer learning "community of practice" and mentorship program to deploy solar.

| **Hands-on project technical assistance** |
|---|
| TA provided by CCSA, GRID, PSEF, CHC, CEG, B.O.S.S. and IPC<br><br>• One-on-one TA during the predevelopment and development on grid interconnection, deployment, siting and permitting, and other Program project challenges<br><br>• Identification, vetting, and procurement of TA providers<br><br>• Provide TA grants to help developers address development process challenges identified<br><br>• Coordination with Lawrence Berkeley National Labs (TA program provider for community solar developers) to maximize coverage and avoid duplication of services |
| **Training** |
| UNH, which manages DOE's Community Power Accelerator Learning Laboratory, will expand their training program in coordination with other partners to offer:<br><br>• additional courses beyond what is funded by DOE, including a 10-week instructor led online course tailored to content CPC is scaling<br><br>• additional course cohorts per year (serving 25 developers per cohort)<br><br>• a Massive Online Open Course to provide accessible training to a wider audience<br><br>• a new course on financing and developing storage in conjunction with residential-serving solar, including community microgrids<br><br>• online workbooks with videos, checklists, documents, and templates<br><br>CEG to develop case studies on storage deployed in conjunction with residential-serving solar and conduct educational webinars (promote via CPC's networks, NCSP, and CPA community) |
| **Learning community & mentorship program** |
| Led by UNH and supported by the CPC TA Providers:<br><br>• Online learning community<br><br>• Webinar series with monthly workshops<br><br>• Curated resource library including the online developers' workbook<br><br>• Online community (via LinkedIn, Tribe, or NCSP platform) to share learnings, resources, and opportunities<br><br>• Connections between existing lender learning community and new learning community for developers via online and in-person networking events |

Learning community augmented by

- Outreach to new developers serving or located within LIDACs, including Disadvantaged Business Enterprises

- Mentorship program coordinated by B.O.S.S. that pairs new, LIDAC-serving developers with experienced developers

- Curated market segments and a series of communities of practice around project models by CHC, NWC, PSEF, ROC

CPC TA aims to de-risk p while building developer capacity. IPC will create mechanisms for CPC Lenders and other lender partners to connect developers to our TA program. CPC members will promote its TA program in various ways, including with developers participating in the NCSP and CPA communities. IPC will also coordinate with Clean Energy States Alliance and NCSP on a states peer-to-peer mentoring group to facilitate sharing of best practices on policies related to deployment of SFA residential-serving community solar and multifamily residential solar, in support of CPC's "race to the top" program (in compliance with the lobbying restrictions above).

Investment in Equitable Workforce Development

Rather than invest SFA money in new stand-alone initiatives, CPC will lead a *coordination* effort linking developers and their contractors with the workforce ecosystem in their communities to deploy solar while incentivizing the **creation of "high road" career** opportunities.

IREC, a CPC member, will lead the CPC's coordination efforts.

The coordination program led by IREC will include, but not be limited to the following:

- Creating resources for developers and their contractors in each state that provide a vendor list to organizations in the workforce ecosystem for that state to deploy solar and descriptions of what these organizations do. In developing the list, IREC aspires to identify and disseminate best practices for contractors, developers, and workforce players. In developing this approved vendor list, IREC will ensure open competition and follow guidelines set forth in 2 CFR 200.319e.

- Conducting an educational initiative for workforce ecosystem organizations to deploy solar about, the emerging clean energy economy and opportunities to place workers in quality careers. This initiative will also convene developers and contractors to meet with workforce ecosystem organizations in each state to discuss workforce development topics, including how players can work together to create equitable workforce outcomes in the clean energy industry, leverage existing programs and funding streams, and identify gaps to deploying solar.

- Assigning "job developers" who are familiar with local workforce organizations, job training programs, unions, workforce boards, community colleges, and wrap-around service

providers to deploy solar to work with certain developers in the CPC pipeline. These IREC-assigned job developers will identify employment needs of the developer and of development team contractors and EPCs and help connect them with local workforce players to deploy solar.

IREC will use workforce ecosystem mapping, identification of best practices and resources, facilitated TA, and engagement of workforce and community stakeholders in the clean industry to deploy solar in each state in furtherance of its tasks.

Furthermore, CPC members will put financial incentives in place for developers to help train and place workers to deploy solar into high-quality career paths. As discussed in the Meaningful Benefits Plan, CPC members will use the EMB Scorecard to encourage developers and their contractors, to take a "high road" approach to generating quality jobs and investing in equitable WD. IPC understands that such a high-road approach can increase project costs and will structure SFA FA accordingly to account for those high-road practices.

Lastly, the Program will provide support to WD efforts already undertaken by CPC members in LIDACs to deploy solar. By funding these efforts, CPC believes it is supporting models that other developers can replicate with partners in their local workforce ecosystem, some of these include:

- GRID's workforce programming for LIDACs' solar projects from pre-apprenticeship basic training programs through full apprenticeship programs, with a growing focus on electrical trade apprenticeship training. GRID offers both on-the-job WD as well as remote learning for pre-apprenticeship basic installer training. GRID funding will provide WD technical assistance to projects and partners enabling the training of 300 trainees who would then be available to join installation projects and be included as labor (and part of the labor budget for the project).

- B.O.S.S.'s capacity building program for enterprises serving or located within LIDACs with a view toward those enterprises building projects funded under this Program and accessing CPC Program FA and TA.

Interconnection technical assistance

Subrecipient CCSA will provide TA to assist developers in negotiation with utilities to deploy solar, use different cost sharing mechanisms, and help both parties scope interconnection studies and evaluate options. UNH will also work with CCSA to develop supplementary content around interconnection topics, including for course content, workbook content, and alumni network workshops. Certain CPC members will join i2X, DOE's "Interconnection Innovation e-Xchange," as a method to connect developers and communities to its stakeholder engagement, data and TA resources.

CCSA will lead CPC efforts to provide education to stakeholders around interconnection best practices.

CPC TA Providers will work with utility companies in the Program's target geographies who request help improving their interconnection programs if CPC members are actively working with developers in that utility's service areas. CCSA will conduct outreach activities with NRECA, NARUC and State Energy Offices to raise awareness (complying with the lobbying restrictions above), as well as to identify utilities that are willing to mentor other utilities within the Program's target geographies to improve interconnection processes to deploy solar.

Efficient Deployment and Resilience through TA

IPC will develop and implement a robust plan to ensure projects are efficiently deployed and resilient. This plan will be implemented in CPC's TA Program provided by the CPC TA Providers. This plan will assure that projects funded under the Program are efficiently deployed and resilient by providing solar developers and communities a range of TA topics to deploy solar, below:

- **Land use planning and zoning requirements, as they impact siting strategy and design** - managing permitting processes and challenges; building codes compliance and best practices; project design for resilience to climate hazards (e.g., storms); project siting including mitigating climate risks (e.g., floods, wildfires) and protecting natural resources (e.g., productive farmland, wetlands critical pollinator habitats, greenspace and other critical habitat) through siting decisions; using remediated brownfields for project siting, adopting agrivoltaics in siting strategy (if relevant), and incorporation of energy resilience into project design.
- **Project and construction management** - EPC selection and management; construction best practices and industry standards for quality installations, construction inspection and quality control processes; project management throughout the development process, and ongoing physical asset management after projects funded under this Program are complete.
- **Post-construction inspection and quality control processes** - project inspection plans based upon adoption of best practices and industry standards for quality installations to review quality control of assets funded under the Program.
- **Community engagement** - culturally appropriate community engagement and education; community-driven planning processes; diversity, equity and inclusion tools; leveraging community benefits agreements; structuring community-owned projects; consumer protection; subscriber management and administration.
- **Project finance** - project financial structuring and modeling; monetization of solar tax credits and adders; use of SRECs to fund portions of the capital stack; energy storage revenue streams; and understanding of factors used by lenders and investors in project underwriting (such as the CPA "Credit Ready" checklist).
- **Business growth and management -** business planning; organizational financial modeling; incorporation and formation of Special Purpose Entities; legal documents and negotiation; organizational self-assessment and identification of the roles an organization is best suited to play on a development team; accessing government funding opportunities; and pipeline management.

In addition to CPC's TA Program, the efficiency and resilience of projects funded under this

Program will be enhanced by CPC TA Providers encouraging the use of existing technical assistance tools, DOE/NREL's SolarAPP+, SolSmart and/or similar technical assistance programs, or strategies currently available or as they become available over the award period of performance.

UNH will coordinate and collaborate with CPC members, including CCSA, CEG, GRID, IPC, SURE and PSEF, to augment existing CPA training materials and workbooks as needed to provide coverage of relevant topics, and curate a resource bank with links to existing TA tools, resources and documents each with descriptions to help users to select the tools for their needs. Learning community webinars around development topics, including introducing key tools and providing time for Q&A and informal sharing around developers' experiences working with these tools will be offered.

**Equitable Access and Meaningful Involvement Plan**

CPC has a dynamic comprehensive plan which will maximize solar deployment, educate and engage community benefit organizations, nonprofits, affordable housing developers, WD, industry associations and other community stakeholders in culturally appropriate ways, and involving LIDACs in program design.

Maximizing the breadth and diversity of communities served

All CPC activities will be directed toward LIDACs, as defined in the SFA terms and conditions. Using SFA terms and conditions definitions, each of CPC's residential-serving community solar projects funded under the Program shall be in either i) CEJST-Identified Disadvantaged Communities, ii) EJScreen-Identified Disadvantaged Communities, or iii) Geographically Dispersed Low-Income Households. CPC's multifamily residential solar projects funded under the Program shall be in Properties Providing Affordable Housing, as defined in the SFA terms and conditions.

Together, CPC members and its project developers will serve a broad range of communities through projects funded under the Program, including rural, suburban, and urban communities; energy communities; communities with limited English proficiency; renters and homeowners; and manufactured housing residents.

- For residential-serving community solar projects under the Program, at least 50% of the project's solar generation serves households residing in either: i) CEJST-Identified Disadvantaged Communities; ii) EJScreen-Identified Disadvantaged Communities; or iii) Geographically Dispersed Low-Income Households.

- For multifamily residential solar projects under the Program, CPC projects will be for Properties Providing Affordable Housing.

CPC members will prioritize funding projects serving the most overburdened and low-income households by providing analysis to program partners on where these households are located across our 48-jurisdiction footprint and education on how to reach these populations. CPC will

incorporate rubrics into the EMB Scorecard to incentivize developers to serve these households and report progress on this front on the dashboard, which the Steering Committee will use to advise on allocation of Program resources.

CPC's efforts to achieve a diversity of community types within projects funded by the Program will include:

**Recruit developers from diverse backgrounds and serving diverse community types.** While CPC members already have relationships with developers serving a diversity of communities, members will seek to grow relationships, for example by reaching out to participants in the NCSP, applicants to the CPA prize and training cohorts, and other developers met through existing relationships with lenders nationwide (for example, the American Green Bank Consortium, national peer networks of affordable housing lenders and developers and the CDFI members of Inclusiv and/or the OFN networks). Selections will be made in line with procurement requirements.

**Provide tools through our technical assistance program that assist developers to work with a diverse range of community types.** CPC learning community and training programs will include a variety of community types. Moreover, CPC TA Providers will develop tools designed for specific community types. For example, CPC member UNH will further develop its course on financing and developing storage in conjunction with residential-serving solar projects, including microgrids, that will be delivered in Spanish to Spanish-speaking communities. As another example, for rural projects to deploy solar, TA will be provided to help developers access funding tools targeted to rural communities, including the USDA REAP and PACE programs, along with other more broadly available sources (See Financial Assistance Strategy section).

**Include representatives from diverse community types in CPC governance.** See our discussion of participatory governance below.

Note, while the Program does not target Tribal communities, CPC members will serve Tribal communities, if approached or feasible.

Participatory Governance Plan

In order to provide input and oversight of CPC's activities, the governance of the Coalition will be guided by a Steering Committee structure that, (1) includes all CPC members; (2) engages representatives from mission-driven developer industry associations and member networks and community-based organizations that serve the specific LIDACs CPC is targeting and that represent the communities the Program will serve; (3) represents a diversity of investment expertise; and (4) represents a geographic diversity of EPA regions.

IPC, with the support of UNH, will implement a governance agreement establishing the Steering Committee in the second half of Program Year 1.

The Steering Committee will strive to achieve consensus in decisions, encourage active participation of members, and reflect a broad range of interests and expertise. It will endeavor to achieve transparency and accountability to the communities the Program serves. The Steering Committee will focus on strategic planning, environmental justice, diversity, inclusion and equity, and other topics determined to be relevant.

IPC as the grantee will maintain responsibility for monitoring, approving, and implementing any Steering Committee recommendations, including finalization of the EMB Scorecard.

### *Steering Committee Purpose*

- **Provide oversight and advice on efficient and equitable investment of the award;**

- **Create and maintain the EMB Scorecard to inform the eligibility criteria for solar developers and projects seeking TA or FA support**. In order for developers to access financial and non-financial assistance from the CPC, they will need to demonstrate how they will maintain accountability to the communities they serve, among other factors.

- **Review and make recommendations on CPC's policies**, including capital allocation strategies, non-performance, and underwriting criteria and priorities;

- **Assess CPC strategy** and provide input for ongoing funding and financing activities;

- **Solicit the input of communities on design and decision making processes.**

- **Membership of the CPC Steering Committee** – The CPC steering committee will initially be comprised of representatives from IPC and the Coalition members. Within the first year, the Coalition members will then select 10-15 additional community-based Steering Committee members based on the membership characteristics below, who are tasked with collecting their communities' input and bringing it to the Steering Committee. No representative from IPC or Coalition members will be double paid for this work.

### *Membership Characteristics*

- Geographic diversification, LIDAC representation, and appropriate expertise.

- IPC and CPC member representatives, alongside "at large" representatives from community-based organizations serving Program-targeted LIDACs;

- representation from all 10 EPA regions, including LIDACs from rural, urban, and suburban contexts; and varied cultural and demographic groups.

- representatives with financial expertise in lending to LIDACs, knowledge of policy trends, expertise in community solar, and community engagement.

### *Committees*

The Steering Committee will establish standing committees. These committees can include both Steering Committee and non-steering committee members. Standing committees will include:

- an Executive Committee;
- a Special Initiatives Committee;
- an Investment Advisory Committee that will help CPC establish underwriting criteria and asset management guidelines and periodically review and make recommendations to update such criteria and guidelines.
- ad hoc advisory committees focused on discrete issues, e.g., communities in rural regions or culturally-appropriate community outreach.

For accountability and transparency purposes, among others, the Steering Committee will **recommend a performance dashboard** that tracks key deployment metrics (e.g., dollars deployed, location of projects assisted, households served, MW capacity developed) and meaningful benefits achieved (e.g., estimated household savings generated, quality jobs created, resilient storage capacity deployed, and outreach efforts to Disadvantaged Business Enterprises). Upon development, the dashboard will be supported by the metrics collected from the EMB Scorecard used to evaluate projects and developers seeking assistance.

Meaningful Education, Outreach and Community Engagement

CPC members will prioritize working with developers who show strong community connections and the potential to conduct outreach and engagement activities in the communities they serve, including partnering with organizations that use multiple modalities. Developer selection criteria will include, among other criteria, demonstration of community engagement and practices which can increase LIDAC member participation and LIDAC serving enterprises. CPC will undertake a range of activities to support developers to do a stronger job of education, outreach, and community engagement and reaching different types of communities, including urban, rural, and suburban communities; communities with limited English proficiency; and different types of residential buildings, including single-family, multi-family, and manufactured homes, including the following:

- B.O.S.S. will create culturally inclusive consumer education materials describing both the benefits of community solar and bringing awareness to important consumer protection issues. These materials include videos, educational handouts, and other outreach and education collateral. B.O.S.S. and IPC will build relationships with national networks of consumer financial counselors – examples include affiliates of the National Urban League, the NeighborWorks network, and the Inclusiv network – to provide these materials for their use. The materials will also be offered for use by direct-to-consumer websites, where consumers are able to find a community solar project within their area, including CPC funded projects.

- Training and TA materials will support developers in their community engagement work,

such as, the UNH Community Power Accelerator Learning Laboratory training, discussed above, which includes modules on community engagement and supports participants in developing their own community engagement plans to target their community specific needs.

- CPC members will work with EPA Thriving Communities Technical Assistance Centers to identify community leaders interested in community solar, and make connections to CPC's training programs, TA providers and co-developers as appropriate.

- IPC, in consultation with the Steering Committee, will identify budgeted subrecipients and/or procure the services of budgeted contractors to support additional modalities for education, outreach and engagement activities.

- CPC members also will develop relationships with national networks of community-based organizations and create matchmaking opportunities between local community solar developers and such organizations.

## Customer Acquisition and Management

Customer acquisition and management strategy will also be used as a criterion to screen developers for Program participation. Additional supports we will provide to help with customer acquisition and subscription management consist of:

- Providing awareness of mission-driven options for subscription management services available through a number of mission aligned organizations. IPC will run an RFQ to identify service providers to recommend to Program funded project developers. In developing this approved vendor list, IPC will ensure open competition and follow guidelines set forth in 2 CFR 200.319e.

- Coordinating and planning with organizations developing "solar hotline" and other web tools to help prospective customers find community solar projects. IPC will identify subrecipients or run an RFQ to identify such tools to recommend to Program funded project developers. Additionally, CPC members will coordinate with organizations operating hotlines and web directories to include CPC funded projects. In developing this approved vendor list, IPC will ensure open competition and follow guidelines set forth in 2CFR200.319e.

- IPC will develop relationships with national networks of community organizations to help developers with customer acquisition. For example, we will reach out to the National Association of Community Action Programs, many of whom operate weatherization, nutrition (SNAP), and LIHEAP programs. These programs can be a referral source for customers, as well as a potential financial support for community solar in the case of LIHEAP. We will establish similar relationships with other networks of human services program providers, including TANF programs. CEG has relationships with Federally Qualified Health Centers that in some cases will help connect low-income customers to community solar

projects and participate themselves as a community facility as long as their participation does not represent more than 49% of the benefits of the solar project.

- CCSA will also provide education and outreach to LIHEAP state offices (complying with the lobbying restrictions above) through NEADA to encourage more states to accept community solar as a "fuel source." CCSA will create engagement and communications materials that partners can utilize.

- CHC and NWC will provide services to the NeighborWorks America network of housing nonprofits conducting outreach about CPC funded projects located in the communities they serve. . IPC will identify additional affordable housing nonprofits subrecipients that can support customer acquisition in LIDACs.

CPC Lenders and its service providers or subrecipients will perform income verification for Geographically Dispersed Low-Income Households, to ensure low-income individuals and households living in Metropolitan Areas have incomes of not more than 80% AMI or 200% FPL (whichever is higher) and low-income individuals and households living in Non-Metropolitan Areas have incomes of not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI  (whichever is highest). To minimize burdens on households, CPC will consider two options for income verification.

1. We will allow income verification through existing means-tested programs, such as federal assistance programs (LIHEAP, WAP, food stamps, TANF, etc.) or state-regulated income-qualified programs. Both sets of programs are subject to strict regulatory scrutiny and therefore offer a high level of confidence in their accuracy. In addition, the forthcoming DOE / HHS Community Solar Subscription Tool could be used to streamline income verification using categorical eligibility. IPC will confirm that these programs meet the income criteria above.
2. If this option is unavailable, we will conduct a standard income verification process using data points such as a Social Security award letter, pay stub, tax return, or bank statement.

For households located in CEJST-Identified Disadvantaged Communities or EJScreen-Identified Disadvantaged Communities, CPC Lenders and its service providers or subrecipients will verify the location of the household within those LIDAC areas. CPC Lenders and its service providers or subrecipients will screen properties as being Properties Providing Affordable Housing and conduct outreach to households within those properties.

**Section 3      Fiscal Stewardship Plan**

FISCAL STEWARDSHIP PLAN

Plans and policies for program oversight

IPC maintains high ethical and legal standards for itself and its partners and will meet its obligations under all applicable Federal laws, standards, and regulations required by the terms

of this award, including but not limited to: the EPA General Terms and Conditions, the SFA Terms and Conditions, the requirements of 2 CFR §200.303 and 2 CFR §1500, and the GAO's Standards for Internal Control in the Federal Government.

IPC's leadership team maintains an internal organizational structure that is clear, effective, and efficient; management will establish structure, assign responsibilities, and delegate authority to meet award objectives. Responsibilities and reporting lines shall be clearly defined and communicated in a full, 360⁰ manner; with training, learning, and improvement of our organization. IPC will monitor performance and compliance with internal policies and external requirements. IPC's Program Director, with dedicated staff, is responsible for management of award funds. IPC shall operate with integrity and transparency in the markets and communities we serve and shall endeavor to prevent waste, fraud, and abuse. IPC's Chief Financial Officer, with dedicated staff, will maintain a financial management system or systems to ensure proper accounting, prudently manage money and award funds and account for time, resources, costs, budgeting, funds tracing and detection of issues.

IPC's comprehensive policies and procedures **ensure robust risk management, prevent fraud, waste, and abuse, and allow for the prudent management of funds. IPC has controls to manage taxpayer dollars ethically and efficiently, including**, our Code of Ethics and Conduct for Grants and Cooperative Agreements with the U.S. Government and Compliance Program (**Code**) and Accounting Department Internal Controls and Procedures (**Accounting Controls**). Our Compliance Officer, who is IPC's General Counsel, oversees this framework to meet compliance obligations, including under the EPA's General Terms and Conditions. Employees must conduct business with honesty and integrity, dealing ethically and fairly with others; read, understand and comply with contract terms; maintain company records and reports accurately; avoid corruption, or the appearance of corruption, including guidance on bribes, accepting gifts, making political contributions or lobbying, the Foreign Corrupt Practice Act, recruiting government employees, and expectations of standards for employee's personal health and privacy. Personal expectations for conduct and behavior are expanded in our Anti- Discrimination and Anti- Harassment Policy, Equal Employment Opportunity Policy, Policy on Combatting Trafficking in Persons, and Policy and Procedures on Employee Time Tracking (**Time Policy**). Ethical Federal procurement standards are mandated in the Code (economic and efficient, with persons who are neither disbarred nor suspended nor under economic sanctions, without participation in any unsanctioned boycott, or trafficking in persons), and in our Procurement Policy for Grants and Cooperative Agreements (**Procurement Policy**) (which meets the requirements of 2 CFR § 200.319 and § 200.320). Expectations include using domestic sources and materials, environmental requirements, not engaging in anti-trust or competitive practices, awareness of import/export laws and regulations, and avoiding real or apparent conflict of interests, in line with our Conflict of Interest and Confidentiality Policy (meeting requirements of 2 CFR § 200.318(c)). The Code and ancillary policies work together to

(i) ensure awareness and understanding of ethics obligations and obligation to comply; (ii) provide for timely discovery of improper conduct, including an internal reporting mechanism providing for anonymity or confidentiality; (iii) ensure corrective measures are properly instituted

and carried out, including appropriate disciplinary action; (iv) provide for periodic reviews of IPC's business practices, procedures, policies and internal controls for compliance with the Code and requirements of government contracting; and (v) provide for timely disclosure to the government under appropriate circumstances, and full cooperation in any government audits, investigations or corrective actions.

IPC has **policies and controls for Program oversight** that meet the requirements of 2 CFR §

200.303 and GAO Standards. Controls for record retention, IT, monitoring, and grievance are found throughout policies, including the Code and others. IPC's Accounting Controls, Operating Procedures, Conflict of Interest and Confidentiality Policy, Program Partner and Entity Discipline Policy, and Procurement Policy are more directly aimed at internal controls. Our financial management system ensures IPC **prudently manages money and grant funds** including our Accounting Controls; Time Policy; Operating Procedures; and Accounting for Direct and Indirect Costs on Awards Policy (**Cost Policy**).

Plans and policies for **program oversight and review**, to **reduce fraud, waste, and abuse** are embedded within several policies including, the Code, Operating Controls, Whistleblower Policy, Anti-Retaliation Policy, Program Partner and Entity Discipline Policy, and Conflict of Interest and Confidentiality Policy. IPC's SFA Compliance Manager, who reports to the General Counsel, will oversee award compliance, including policy and procedure creation, implementation, training, monitoring, and updating law which impact the award or IPC. Our Grant Compliance Manager will work with our Chief People and Culture Officer to review performance and correct missteps, take reports and conduct investigations into wrong-doing, educate personnel through on-boarding and trainings, and periodically review policies and procedures to ensure best-practices and compliance with laws. In addition to chain-of-command reporting options, IPC also maintains a **confidential reporting** service, via an anonymous telephone and online reporting option, sited prominently on our website, accessible by employees, contractors, other partners, or the general public to report any ethical, legal, or other concern that arise; copies of relevant policies are also available for review in the same location. Reporting troubling behaviors or actions is encouraged throughout our policies, and "**whistleblowers**" are explicitly protected by our Whistleblower Policy and Anti-Retaliation Policy. As best-practice to comply with laws. IPC will regularly monitor internal policies and external requirements to measure performance and compliance, perform trainings, and review findings to improve our organization.

Policies and procedures shall continue to substantively meet our award obligations over time.

IPC will update its board governance plan to conform to the requirements and maintain its composition and independence in line with the award requirements.

**Subrecipients**

IPC, as a pass-through entity for the purposes of 2 CFR Part 200, is responsible for proper financial management of the award and all Subawards to all subrecipients, which includes CPC members under 2 CFR § 200.332. IPC will vet award subrecipients to verify their internal controls meet the

standards of 2 CFR § 200.303 and flow down all award terms and conditions, as mandated in 2 CFR § 200.332(b). IPC's workplan includes all named Subawards and identified types of Subawards.

IPC's subrecipient risk assessment will consider, among other factors: (i) subrecipient's prior experience with the same or similar awards; (ii) results, if any, from previous award audits; (iii) whether the subrecipient has new or substantially changed systems; and (iv) the extent and results of Federal awarding agency monitoring of the subrecipient, all as directed by 2 CFR § 200.332 (c). If appropriate, IPC will impose specific subaward conditions as described in 2 CFR § 200.208 or utilize the monitoring tools described in 2 CFR § 200.332(e). IPC will monitor compliance by subrecipients throughout the duration of the award, in line with the requirements of 2 CFR § 200.332(e).

### Invests in consumer protection and compliance with consumer protection laws

In accordance with the SFA Terms and Conditions, and to the extent IPC directly interacts, transacts, or contracts with consumers, it shall comply with applicable federal consumer protection laws and the SFA Terms and Conditions directly related to consumer protection requirements.

As required by the SFA Terms and Conditions, IPC shall monitor and oversee Subrecipients and contractors with respect to applicable federal consumer protection laws, to the extent any directly interacts, transacts, or contracts with consumers as part of the Program, including through the sale and marketing of solar services and consumer subscriptions (each a "**Consumer Protection Entity**" or "**CPE**"). **CPEs** are required to comply with applicable jurisdictions' consumer protection laws and federal consumer protection and consumer financial laws, including laws that prohibit unfair, deceptive, and abusive practices, and Regulation Z (12 CFR § 1026) and fair lending practices laws (collectively, **Consumer Protection Laws**), which requires the disclosure of terms and cost of consumer credit and offers substantive protections to people who use consumer credit. To ensure compliance by CPEs, IPC, together with procured resources, will implement or effectuate the following: 1) provide written materials explaining IPC's expectations on consumer protection to CPEs, which shall comply with the SFA terms and conditions directly related to consumer protection requirements; 2) screen CPE policies at application stage for evidence of compliance and adherence to applicable federal consumer protection laws; 3) review CPE consumer protection training materials and materials intended for customer distribution for proper and adequate disclosure of information related to the provision of services to consumers; and 4) monitor CPE compliance with 1-3 over the award period.

**Written Materials**: IPC's written materials to CPEs will include clear and detailed explanations of IPC's expectations for CPEs compliance with applicable Consumer Protection Laws. These written materials include the IPC's Program Partner and Entity Compliance with Consumer Protection Laws Policy, which includes the IPC Partner Code on Consumer Protection.

**Screening Program Partners and Entities:** IPC will clearly express expectations for consumer protection through written materials, and screen entities using our EMB Scorecard during the

application review and due diligence process for any FA. IPC will update our practices consistent with upcoming recommendations from DOE/HHS regarding the same, if necessary.

Our consumer protection plans can be broken down into three categories of protection: 1) clear and fair financial terms; 2) truthful and transparent marketing and communications; and 3) vigorous and consistent compliance and enforcement.

**Review of Transaction Materials:** All contracts and documents must be provided for review prior to signing and there must be no fee for canceling the contract. IPC will review CPEs' consumer financial terms for: 1) fair and meaningful estimates of household savings; 2) fees and costs; 3) readability of contracts; 4) remedial provisions; and 5) contract termination provisions.

Any financial terms offered by CPC Lenders will provide consumers fair and meaningful estimates of promised bill savings, whether in terms of dollar savings over time, percentage off of distribution price, or other estimate, and that the amount of money a customer saves exceeds what the customer pays (if the subscription includes a subscription fee) on a monthly basis. CPC will not impose any flat subscription fees, whether monthly or one-time sign-up fees, not related to the amount of kWh delivered. Contracts will be in plain English, will not impose termination fees, predatory late fees, send bills to collections without first attempting to work with the consumer on a payment plan to bring a bill into good standing, or impose unreasonably long initial terms. They will have exit clauses and clearly state the amount of notice required to cancel a contract.

**Verification of Communication Training:** Consumer-facing CPEs must ensure marketers and sales staff are trained to understandably communicate all aspects of subscriber agreements for community solar, consumer rights, contact information for the solar subscriber manager, and the consumer's complaint procedures for problems with the solar manager or marketing/sales process. Representations must include clear disclosure. CPEs will use state-specific consumer marketing materials and contract disclosure forms, or DOE disclosure forms where no state form exists, to satisfy this requirement; and must use such materials if required by state law without edits or revisions, except as explicitly approved. IPC will require evidence that CPEs employees receive training on community solar subscriber agreements and are able to communicate such information in an accurate and accessible manner. For those who operate in areas with significant non-English fluent consumers, written information must be provided in languages consumers communicate in and understand. IPC will seek assurances in-person and telephone marketing or sales interactions or contacts with consumers shall be in languages appropriate to communicate with them clearly and understandably and that if a marketer is unable to determine and communicate in the consumer's language, they must break off engagement. CPEs will be required to provide accurate and up-to- date contact information to customers and their state's program administrator; including contact by email, telephone, voice mail, postal mail, or text message. CPEs must also maintain a process for handling consumer complaints, including methods to receive, track, monitor, investigate and resolve in a timely manner all such complaints and provide potential and actual subscribers with contact information for their state's complaints hotline or office, if any.

**Subscription Managers and Marketers:** Regarding subscription managers and marketers, IPC will ensure compliance with Consumer Protection Laws through written materials and monitoring. Written materials will clearly communicate in an understandable manner all aspects of financial terms including projected bill savings, subscription fees and flat monthly fees (if applicable), sign-up fees, termination fees, late fees, penalties to customers, and exit clauses. Written materials will also communicate marketing and communications consumer protection requirements concerning the primary language of potential subscribers, making contracts and related documents available for review before subscriber signs, providing relevant documents electronically and in paper format for enrolling households with limited internet access, standardizing marketing materials and contract disclosures, and providing accurate and up-to-date contact information. Marketers will be required to sign and comply with IPC's stated consumer protection requirements, inform subscribers of state-specific enrollment and community solar access mechanisms, and track and report data on a frequent basis. Reports will include subscriber count, estimated savings, complaints received and resolved, waiting lists, and any other state-specific required metrics. To actively combat predatory consumer practices, IPC shall ensure that CPEs sign and comply with any Code of Practice provided by their state for consumer protection and comply with any reporting requirements of their state's program administrator. Marketers will be required to inform consumers of their state's complaint mechanism for enrollees of low-income community solar programs and how to access it, including pursuit of complaints if promised bill savings are not realized. We will contractually bind CPEs to comply with the above terms and monitor compliance. We will review and approve written materials that CPEs provide to consumers to ensure they meet the above standards. IPC will also perform spot checks of CPEs consumer interactions by periodically engaging in "mystery-shopper" type visits and calls to CPEs to verify the in-person and telephonic interactions meet Consumer Protection Laws. Additionally, we shall ask CPEs to report to us data related to consumer complaints and resolutions, and steps taken to prevent similar future complaints.

## Incorporates guardrails to achieve household savings

IPC and other CPC Lenders will incorporate guardrails into its diligence, documentation, and asset management processes to achieve projected household savings. CPC Lenders will review or audit provided data of household saving realization rates. CPC Lenders will contractually require energy performance monitoring and verification of projects funded under the Program and utility bill releases from consumer subscription contracts to allow for random audits and spot-checks of bills, or similar, using our procured audit contractor. Projects funded under the Program are contractually bound to submit reports on production and other relevant metrics, to allow for comparison to projected results for the period of performance. This enables IPC, together with data collected by contracted experts, to undertake verification that funded projects are generating the projected household savings, which will be 20% at a minimum. If savings do not reach target, IPC will work with stakeholders to mitigate factors negatively impacting savings on current Projects and include learned information to improve future project design, including updates to methodologies for estimating savings.

**Section 4**       Timeline and Milestones

Implementation timeline with milestones

See the attached Timeline for the timing of activities and milestones across the Program period.

In Year 1, we will engage mission-aligned developers in at least 5 states where CPC members have existing relationships and developers have pipeline that is aligned with project models that are the Program's focus. IPC has set a goal of deploying ~$15 million FA dollars to serve ~2,000 households and generate over 8MW of solar energy. Over the course of the award period of performance, CPC Lenders will expand their reach to each of our target geographies, with our largest deployment of FA dollars in Year 3, subject to adjustment in accordance with this workplan. In Years 4 and 5, we project a winding down of developer lines of credit, predevelopment, bridge and construction financing for deployment into permanent financing on Program funded projects, with full deployment at Year 5. The table below shows the yearly key metrics we will achieve, consistent with the overall targets:

| | YR 1 | YR 2 | YR 3 | YR 4 | YR 5 | Total |
|---|---|---|---|---|---|---|
| Jurisdictions engaged [i] | 5 | 23 | 34 | 48 | 48 | **48** |
| # CBCSDs receiving FA [ii] | 13 | 36 | 59 | 25 | 21 | **154** |
| # CBCSDs receiving TA | 25 | 100 | 205 | 95 | 75 | **500** |
| FA $s deployed | $15.5M | $43.6M | $71.7M | $30.2M | $26.1M | **$187M** |
| Total $s mobilized | $25.2M | $71.0M | $116.6M | $48.5M | $42.2M | **$303M** |
| # Households served | 2,056 | 5,780 | 9,497 | 3,950 | 3,435 | **24,717** |
| MW Deployed | 8.2 | 23.1 | 38.0 | 15.8 | 13.7 | **98.8** |

[i] indicates cumulative figure; "engaged" means either TA provided to developers or stakeholders in that jurisdiction or FA deployed in that jurisdiction

[ii] these include all types of FA (developer lines of credit, pre-development loans, construction financing, bridge financing, permanent financing, PPA/leases, grants, credit enhancement) as specified in the Contractual FA Programs detail in the budget schedule (for IPC) and subgrants (for other CPC Lenders)

IPC has grouped the 48 jurisdictions served into the following categories based on their regulatory and market conditions:

- **Fourteen "early action" states and Washington, DC** where regulatory and market conditions are most favorable: CA, CT, DC, IL, ME, MD, MA, MN, NV, NJ, NY, OR, VT, VA and WA.
    - TA and FA will launch in these jurisdictions in Years 1-2 and continue through Year 5.
- **Twenty-five "priority" states and Puerto Rico** where there are opportunities for developers to expand "beachheads" if they receive comprehensive support from CPC TA providers. CPC Lenders have identified a pipeline of potential projects in some of these jurisdictions. This category includes states without enabling legislation that have voluntary utility programs and at least some residential-serving community solar or multifamily residential rooftop solar generation capacity already built: AZ, CO, DE, FL, GA, HI, ID, IN, MI, MO, MT, NE, NH, NM, NC, ND, OH, OK, PA, PR, RI, SC, TN, TX, UT, and WI.
    - TA and FA will launch in these jurisdictions in Years 2-3 and continue through Year 5.
- **Seven "long-term" states** where market conditions are most challenging and where deployment may not get underway until Years 4-5 of the SFA performance period due to current regulatory constraints that will be addressed as part of the CPC TA strategy. These states would comprise the "raced to the top" jurisdictions, although it is possible, based on future (negative) changes to the regulatory environment, that some "priority" states might also be included in the "race to the top" jurisdictions. These states consist of: AK, AL, IA, KS, LA, SD, and WV.
    - TA and FA will launch in these jurisdictions in Year 4 and continue through Year 5. The Program will look for opportunities to launch earlier if possible.

Additional key action items to support Program outputs and outcomes over period of performance consist of:

- Program performance reviews with CPC members and the Steering Committee to adjust strategies, tactics, and resource allocations to work toward Program objectives.

- Audits to review compliance with 20% resident savings goals.

- Quarterly deployment analysis to review geographic, LIDAC community, "race to the top" and other allocation strategies; analysis of private capital mobilized.

- Monitoring of 15% portfolio limit on enabling upgrades.

- Review of which project models (as detailed in the Meaningful Benefits Plan section) and geographies are gaining success or lagging, to inform potential modifications to TA and FA strategy.

**Section 5        Reporting Requirements**

IPC executes the reporting requirements of 2 CFR § 200.329 by using multiple sources of program evidence to collect and track data to describe environmental, geographical, and social outputs and outcomes. IPC will work with EPA to establish standardized reporting requirements and identify tools to support reporting. IPC integrates program evaluation activities into our reporting plan, including assessing effectiveness and efficiency achieving outputs and outcomes.

IPC's Subrecipient UNH will lead CPC evaluation efforts. Evaluation activities will encompass, at a minimum, the following areas: define output and outcome metrics – identify clear definitions of outputs and outcomes to enhance consistency of reporting across organizations: analyze program reporting data – using large data sets (e.g. CDFI reporting data, Census data, business and consumer credit data) to help distill themes and findings to inform community development practice; utilize formative evaluation to improve program implementation; incorporate participatory research methods - include voices from LIDACs to seek to implement programs that are relevant and equitable; and evaluate organizational impacts for investees - track and evaluate longitudinal data on the health and activity of organizations, consisting of community lenders, mission-driven community solar developers, small businesses, community development corporations, and others, in an effort to measure GGRF impact.

CPC members will, in addition to submission to EPA, publish data, evidence, or evaluation reports in trade journals and on their publicly available websites and provide feedback to our customers and participants to support research and analysis.

IPC measures projected versus actual impact data for metrics (e.g., generation, energy savings, and $CO_2$ emissions avoided). Other impact data examples include technology-level reporting (e.g., types and capacity of technologies deployed), customer-level reporting (e.g., credit profiles, customer types, and market segments), environmental reporting (e.g., $CO_2$/NOX/SOX saved), and overall market-level reporting (e.g., job creation and health benefits).

IPC will designate dedicated personnel to be responsible for the timely submission of all required reports and will adhere to the requirements of EPA Order 5700.7A1, Environmental Results under Assistance Agreements.

There are several dimensions along which program outputs and outcomes will be tracked and reported, including the following as informed or modified by EPA guidance on metrics and reporting:

| Metrics and Reporting (by geography, FA/TA type, type of project/model,) | | | |
|---|---|---|---|
| **Program Activities** | **Climate and Air Pollution Benefits** | **Equity and Community Benefits** | **Market Transformation** |
| - Award funds deployed<br><br>- FA funds deployed<br><br>- TA funds deployed<br><br>- Building activities on operations, impacts, outcomes (in adherence with ORDER 1000.33 03/25/2022)<br><br>- Reports on program feedback from program participants | - No. of projects financed<br><br>- Solar and storage capacity installed<br><br>- Clean energy generated<br><br>- GHGs reduced and/or avoided<br><br>- Other air pollution reduced and/or avoided | - HH served, amount of savings, resiliency benefits<br><br>- Solar jobs created, workers trained, wages increased<br><br>- Projects executed using tools promoting good jobs & community benefits<br><br>- Outreach to disadvantaged business enterprises<br><br>- Community solar in community ownership models | - Award funds deployed<br><br>- FA funds deployed<br><br>- Total non-Award capital or similar mobilized<br><br>- Total private sector financing mobilized<br><br>- No. of community-based organizations engaged<br><br>- Changes in net metering caps, interconnection timelines, and Solar Renewable Energy Credit values |

1. Performance Reports

Semi-Annual Report

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report will cover activities from the preceding two quarters.

Final Report

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient will detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,

- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports will cover transactions originated in the preceding two quarters.

**Section 6        Budget Narrative**

**6.1 Project Budget**

Please refer to the detailed descriptions as well as the Excel-based supplement Attachment E: Budget Table "Detailed Budget Table" for more detail on a line-by-line basis of the following summarized table, all amounts in Millions:

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total | FA $ | FA % |
|---|---|---|---|---|---|---|---|---|
| Personnel | 1.3 | 3.1 | 3.5 | 3.5 | 3.6 | 15.0 | - | 0.00% |
| Fringe | 0.4 | 0.8 | 0.9 | 0.9 | 1.0 | 4.0 | - | 0.00% |
| Travel | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | - | 0.00% |
| Equipment | - | - | - | - | - | - | - | 0.00% |
| Supplies | * | * | * | * | * | 0.1 | - | 0.00% |
| Contractual | 12.7 | 29.1 | 56.5 | 25.1 | 16.9 | 140.2 | 131.6 | 93.87% |
| Other | 18.1 | 19.5 | 21.1 | 13.6 | 12.6 | 84.9 | 55.1 | 64.90% |
| Total Direct Cost | 32.5 | 52.6 | 82.1 | 43.2 | 34.2 | 244.6 | 186.7 | 76.33% |
| Indirect costs | 0.5 | 0.9 | 1.0 | 1.0 | 0.9 | 4.3 | - | 0.00% |
| Total Costs | 33.0 | 53.5 | 83.1 | 44.2 | 35.2 | 248.9 | 186.7 | 75.01% |

* Amount not shown due to rounding.

The table above is subject to rounding, and does not include the $0.4M of in-kind assistance from the U.S. Department of Energy, which is otherwise included in the "Other" category.

**Personnel**  -

IPC staff with direct time charged to the Program are individually listed on the Excel Attachment E file, with anticipated salaries and Full Time Equivalency ("FTE") by position. Each employee's FTE was calculated based on their anticipated hire date within the program's period of performance years. Descriptions and applicability of each role to the Program have been listed on the tab labeled "Personnel Descriptions". As a small organization, certain senior management and support staff included in the budget are directly involved in PA; Year 1 allocates more time from these individuals to assist with Program implementation and drops off in later years as dedicated Program staff is hired. Actual personnel time will be accurately tracked between federal and non-federal programs according to IPC's Policy and Procedures on Employee Time Tracking. With the majority of program staff being hired by the end of Year 2, staffing levels ramp from Year 1 to Year 2, and then are projected to be consistent from Year 3 through Year 5. (total 5-year cost: $14,985,485)

IPC has a time-card entry policy and approval system to record time for allocation between federal and non-federal programs, and only allowable time will be charged to the Program in accordance with 2 CFR 200.430.

Costs provided in the budget for personnel include pre-award costs. Pre-award costs for personnel include time dedicated by IPC staff directly pursuant to the negotiation and in anticipation of the Award, where such costs are necessary for efficient and timely performance. These costs include time spent by IPC staff preparing the workplan, narratives, and budget documents, as well as internal and external meetings with other IPC staff, EPA staff, coalition members, outside counsel and other service providers that will be engaged to ensure performance and compliance with the federal award. Note that there are no pre-award costs greater than 90 days prior to the award date. (Total pre-award personnel: $141,536)

**Fringe Benefits**  -

Without an approved rate, IPC calculated reasonable fringe benefits at a rate of 27% on the basis of personnel cost. In accordance with 2 CFR 200.431, fringe benefit includes items such as FICA, retirement, employer share of health costs, vacation, sick, benefits administration and allowable education costs. The budgeted rate reflects an estimate based on actual IPC fringe benefits as a percentage of gross personnel cost over the last three years. Actual fringe benefits charged to the federal program will be calculated using this percentage on the basis of actual personnel time charged to the federal program. (total 5-year cost: $4,046,088)

Costs provided in the budget for fringe include pre-award costs, which will be calculated on the same basis as such pre-award personnel charges. (Total pre-award fringe: $38,215)

**Travel**  -

IPC adheres to its Board of Director-approved Travel and Business Expense Reimbursement Policy (Travel Policy), which was reviewed and approved by the EPA. That policy used General Services Administration (GSA) rates for per diem meals, incidentals and lodging as a guide when it was developed. IPC's Travel Policy provides a daily allotment of up to $69 per day for meals and incidentals (as opposed to the GSA standard rate of $68 per day) and requires staff to choose reasonably priced lodging, but does not specify a rate (as opposed to the GSA standard rate of $110 per day). IPC, as a non-governmental entity, does not have a federal negotiated or group lodging rate and thus pays the retail rate available at the time of booking. The amount included in our budget is an expected average based on historical costs, but actual costs per night will vary. The Travel Policy also requires travelers to select the lowest-priced coach airfare available when flying to their destination. Collectively referred to as "local travel" in the budget, the costs of taxis, tolls, parking, and use of personal vehicles is budgeted at $40 per day. Mileage, when use of an employee's personal vehicle is required for business purposes, is calculated at the mileage rate as set and published by the Internal Revenue Service (currently $0.67/mile). Lastly, IPC's Travel Policy allows for the use of rental vehicles when required for business purposes.

Budgeted amounts for Program travel are for IPC Program staff to implement the workplan and achieve Program goals within our timeline by attending conferences and meetings, monitoring projects financed under the Program, connecting with partners, and additional objectives

outlined in the workplan. The location of travel will vary, but will be exclusively within the United States and all included travel will be conducted exclusively to serve the Program workplan. The budget includes 10-12 travel activities per year on average, each attended by 2-3 Program staff beginning in Year 1, ramping up in Year 2, and settling down in Years 3-5. There will be no travel by members of IPC's Board of Directors and similar officials allocable to this EPA award. Travel needs can be summarized as: a) travel for conferences, events and trainings that require registration, and b) travel to meet with partners and/or Program related project sites.

a) Travel for conferences, events, and trainings applicable to the successful delivery of the Program.

- Planned destination: To be determined, as specific conference/events/trainings have not yet been identified, all within the United States
- Airfare – $650 per round trip
- Meals and incidentals – Up to $69/day for 4 days
- Lodging – $250/night for 3 nights
- Local travel - $60/day for 4 days
- Conference registration - $750/trip

Estimated cost: $149,296 over 5 years for 56 total trips, or $2,666 per trip.

b) Travel to meet with partners and/or Program related project site visits to monitor progress, and ensure work is on track with established timelines and specifications. Site visits will also be used for quality assurance by inspecting materials and construction, and for verifying compliance with regulatory standards, safety protocols, and environmental guidelines. Additionally, site visits will provide an opportunity to discuss progress, and address any concerns, as well as to troubleshoot and resolve any issues that may affect the project's successful completion.

- Planned destination: within the Program's target geographies
- Airfare – $650 per round trip
- Meals and incidentals – Up to $69/day for 3 days
- Lodging – $250/night for 2 nights
- Local travel - $60/day for 3 days

Estimated cost: $195,199 over 5 years for 127 total trips, or $1,537 per trip.

Total travel estimated cost per above: $344,495 over 5 years.

Travel is budgeted for senior Program staff, including the Vice President, Program Directors and Managers, Transaction Directors and Managers, junior Program staff, and Officers and Directors from IPC. All travel will be conducted by IPC staff and will relate to implementation of the workplan and the achievement of Program goals.

No international travel will occur. Attachment E provides additional detail.

**Equipment**  -

IPC will not acquire any tangible, non-expendable, personal property having a useful life of more than one year and an acquisition cost of $5,000 or more per unit.

**Supplies** -

Staff specific supplies are to support their day to day work in administration, engagement, and Program management. All supplies will be acquired within the protocols identified in IPC's Procurement Policy, in alignment with the federal procurement standards of 2 CFR 200. All goods and services budgeted are for professional use only.

Employee Computer Workstations (estimated total cost: $72,000)

New Program staff are provided with necessary or appropriate supplies to meet their job performance needs, including computer workstations with necessary or appropriate accessories, monitors, printers, and input devices. Costs will be less than $5,000 per item. Total cost per computer workstation includes a computer, monitors, peripheral and input devices plus shipping, sales taxes, and warranties and are estimated to be $2,000 for each new Program staff member. Our budget contemplates the purchase of 15 workstations for the Program staff between Years 1 and 2, plus 15 replacement workstations after three years due to obsolescence in Years 4 and 5, plus three additional workstations each in Years 3 and 5 to cover non-warranty damage/replacements, in line with. IPC standard IT equipment replacement policy that equipment is replaced upon expiration of manufacturers' warranty (generally three years). Upon staff departures, workstation equipment is to be returned to IPC. Whenever possible, returned equipment ais refreshed and redeployed to replacement Program staff. We use an expected rate of attrition of approximately 20% for staff departures that need a replacement workstation. Where damage is not covered by warranty or workstation equipment is beyond repair for redeployment, replacements will be acquired as indicated above. Total number of machine purchases budgeted per the above is 36 over 5 years, at $2,000 each, is the total budgeted amount of $72,000.

**Contractual** -

In order to implement the outlined activities within our workplan the following contractual services are included to support the program. There are no named contractors at this time. Reference is made below to the categories listed on Attachment E. While in most cases the actual vendor and contract length is yet to be determined, where it is known it is listed below. IPC will seek efficient and cost-effective services to maximize fiscal prudence. All contractual services will be competitively procured within the protocols of IPC's Procurement Policy, which aligns with 2 CFR Part 200 and EPA's Best Practice Guide for Procuring Services, Supplies and Equipment Under EPA Assistance Agreements, including the definitions for "Micro-purchase threshold" and "Simplified Acquisition Threshold" and the related rules. The specific expertise needed for each contractual area is described below and will be included in the competitive process. Additionally,

only multi-resource firms will be considered and no individual contributor consultants will be selected. (**Total contractual budget: $140,337,545)**

- **EPA Compliance:**
  - Scope of Work: To assist IPC in meeting federal program compliance requirements on an ongoing basis. This will include periodic review of our internal program monitoring tasks such as subrecipient monitoring, policy and procedure compliance, DBA/BABA compliance, periodic reporting compliance, and other workplan tasks.
  - Experience needed to meet grant objectives: The vendor selected for this scope of work will need to have an established background in federal award compliance with a reference list of clients and awards that are of similar magnitude and complexity to our award.
  - Duration: 5 years (full duration of Program)
  - Procurement method: One vendor will be selected under a formal competition.
  - Total 5-year budget: $4,710,000 (based upon survey of qualified vendors that provide this service in order to obtain an approximate value.)

- **Technical Assistance (TA) Programs:**
  - Scope of Work: To perform work related to best practices in program design and implementation. Technical Assistance includes helping solar project developers and contractors with sourcing and developing appropriate project finance capital stack solutions that deliver on Program objectives, project pipeline development, community and customer engagement strategies, project-specific deal support; and assisting IPC with development of underwriting and loan documentation standards, development and implementation of associated training solutions, and education strategies for policy stakeholders in nascent markets.
  - Experience needed to meet grant objectives: Vendors selected will need to have expertise in developing pipeline and financing of community solar and multifamily solar projects serving low-income communities, customer and community engagement strategies for deploying solar in low-income communities, clean energy curriculum development and training, policy education expertise, an established footprint in the markets being served and/or have pre-established programs that can be expanded upon with grant funding.
  - Duration: Year 1 to Year 5
  - Procurement method: More than one vendor will be selected using a competitive process.
  - Total 5-year budget: $1,234,800

- **Impact Reporting:**
  - Scope of Work: Developing impact metrics and assessing the environmental impact of projects, development, and annual refinement of 20% savings methodologies based on project models, and annual sample auditing of 20% savings for participating residents.

- o Experience needed to meet grant objectives: Will need to have demonstrable history developing impact metrics, generating non-financial models and savings methodologies, and/or have a history with environmental impacts.
- o Duration: Year 1 to Year 5
- o Procurement method: One vendor will be selected under a formal competition.
- o Total 5-year budget: $675,000

- **Project Finance Support Vendor/Firm:**

  - o Scope of Work: Performing work related to developing and/or utilizing financial tools and analysis to determine cost-effectiveness, energy savings, and financial sustainability that underpins the prioritization of projects and mitigates financial risk with appropriate financial returns and impact per SFA dollars deployed. The financial tools and analysis will address both project-level, FA product-level and portfolio-wide evaluation.
  - o Experience needed to meet grant objectives: Will need to have demonstrable history developing and maintaining advanced financial models that align with environmental impacts and energy savings.
  - o Duration: Year 1 to Year 4
  - o Procurement method: One vendor will be selected under a formal competition.
  - o Total 5-year budget: $342,530

- **Asset Management Software Enhancements:**

  - o Scope of Work: To efficiently manage projects, IPC will acquire new software/modules/addons as necessary or appropriate. Expected software includes new software purchases, such as asset management software, as well as addons, such as a data warehouse, which will be assessed on an as needed basis in order adhere to the reporting, compliance and impact requirements of the Program. Included in these costs are contractor relationships called Managed Service Providers ("MSP") to provide technical expertise beyond internal capabilities and are required to assist with implementation objectives.
  - o Experience needed to meet grant objectives: For MSPs that are engaged to implement these enhancements must have experience with Salesforce and other similar software as both an administrator and software developer.
  - o Duration: Year 1 to Year 5
  - o Procurement method: One or more vendors will be selected in accordance with IPC's Procurement Policy.
  - o Total 5-year budget: $480,000

- **Federal Single Audit:**

  - o Scope of Work: As specified in the guidance at 2 CFR 200 Subpart F, a Single Audit is required for any year in which expenditures are greater than the threshold described in the guidance. This provider will perform the work required to complete a federal single audit. In general, due to the nature of audit providers'

engagements and any required independence rules, engagements are generally for one-year terms.

- o Experience needed to meet grant objectives: Demonstrable history performing financial and federal single audits with a proven track record and affiliation with nationally recognized organizations such as the American Institute of Certified Public Accountants (AICPA). Intricate experience with complex single audit requirements, compliance supplements, and submission to the Federal Audit Clearinghouse (FAC) will be required.
- o Duration: Year 1 to Year 5, in one-year increments.
- o Procurement method: One vendor will be selected for each reporting year using a competitive process.
- o Total 5-year budget: $216,245

- **SOC2 Compliance/Audit:**

  - o Scope of Work: To help ensure the privacy and security of customer data provided under the Program, an audit of IPC's Systems and Organization Controls (SOC) will be performed. The firm selected to perform the SOC audit will assess IPC's control, risk, information, and monitoring environments. On a regular basis, this firm will perform a "readiness assessment" and "gap analysis" to identify gaps in our controls and processes and provide advice to implement changes to mitigate risks. Additionally, an audit scope will be determined (SOC Report/Type) and the requisite audit will be performed.
  - o Experience needed to meet grant objectives: Extensive experience providing SOC audits to similar organizations as IPC. The firm should also be affiliated with the AICPA and provide a clear timeline, defined audit scope and transparent reporting.
  - o Duration: Year 1 to Year 5
  - o Procurement method: One vendor will be selected using a competitive process.
  - o Total 5-year budget: $600,000

- **Legal:**

  The following outlines the need for legal services to ensure compliance with federal regulations and to provide transactional support for the Program. Given the complexities around federal funding guidelines, as a requirement of the Terms and Conditions of the award, expert legal counsel is essential to mitigate risks and ensure successful project execution. In general, we have summarized our legal needs into two categories; Compliance and Transactional. Legal includes pre-award costs paid to outside expert legal counsel in the amount of $11,700.

  - o Scope of Work:
    - ▪ **Regulatory and Compliance:** We require legal counsel to address regulatory and compliance issues including regulatory analysis and advice related to EPA and SFA guidelines rules and regulations; the development and review of internal policies and procedures; and risk assessment to

identify and mitigate compliance-related risks. These services are critical to avoid potential penalties, legal liabilities, and loss of federal funding. Ensuring adherence to federal regulations will protect Program interests and foster a transparent and accountable management of funds.

▪ **Transactional:** We require legal support for drafting, reviewing, and negotiating various contracts in jurisdictions around the country. By obtaining this legal support at a Program level, this work will ensure that all agreements comply with local and federal guidelines in these jurisdictions and protect Program interests, while being cost effective in comparison to performing this work on an individual project basis.

o Experience needed to meet grant objectives: Legal firms must demonstrate that the attorneys at their firms possess adequate educational background and hold Bar admission required to perform work in the states where they are practicing. Additionally, firms should have adequate resources to staff our needs with relevant experience necessary to advise on the matters for which they are engaged.

o Duration: Year 1 to Year 5

o Procurement method: More than one vendor will be selected in accordance with IPC's Procurement Policy.

o Total 5-year budget: $501,000

- **Financial Assistance Products:**
As described in Section 2 above, the Program includes a full range of Financial Assistance products. A complete description of each Financial Assistance product can be found in the tables and narrative within Section 2. All contracts will be procured through a competitive process in accordance with IPC's Procurement Policy, which aligns with guidelines within 2 CFR 200.320. There are no named contract recipients at this time. Expertise needed to perform the grant objectives will be included in each procurement. Contracts will be initiated beginning in Year 1 and initiations will continue through Year 5 as Financial Assistance is deployed. The duration of each contract will vary depending on the size and complexity of each project and the type of product utilized. (total 5-year budget: $126,992,420)

A summary of each product and the associated budget is as follows:
  o **Developer Line of Credit:** This is a short-term line of credit for nascent for-profit and nonprofit solar project developers. Funding will support eligible projects and be available to the developer for up to 2 years. Competitively procured. (total 5-year budget: $4,735,600)
  o **Pre-Development Loans:** This is a short-term financing product for developers and property owners for work conducted and costs incurred during the pre-development phase of eligible projects, prior to commencement of construction. Competitively procured. (total 5-year budget: $4,042,731)

- o **Construction Financing:** This is a short-term traditional financing product for developers and property owners that will support project construction. Competitively procured. (total 5-year budget: $23,729,944)
- o **Bridge Financing:** Oftentimes referred to as interconnection or tax credit financing, bridge loans are a short-term financing product for developers and other types of eligible entities that acts as a bridge between payments made for electric grid interconnection deposits paid to utilities or amounts paid during construction that are expected to be returned to the entity as a tax credit or incentive. Competitively procured. (total 5-year budget: $11,216,357)
- o **Permanent Financing:** This is a long-term traditional financing product for project/property owners that can be used for eligible projects. Loans have varying term lengths and interest rates. Competitively procured. (total 5-year budget: $69,333,229)
- o **Grants:** In conjunction with loan products, grants will be included in the capital stacks of eligible projects. For eligible residential rooftop solar or residential-servicing community solar projects, project and property owners can utilize grant funds for pre-development, construction, ownership, operation, or maintenance of a project, be used to offset the cost of community solar subscriptions to achieve the minimum savings threshold, or any other allowable expenses related to the projects. Competitively procured. (total 5-year budget: $13,934,559)

- **Deal based costs support:**
  There are many costs in financial transactions that traditionally, in the normal course of business, are passed on to end-use customers during closing of a transaction and beyond. These costs cause barriers to entry for borrowers because many end-users do not have the means to afford these typical project costs. In such circumstances, IPC will subsidize or contractually account for these costs in a manner which prevents these costs from being passed on to program beneficiaries. For each of the contract types listed below, the duration of the contract will be dictated by the needs of the individual project. Whenever possible, a provider that is local to the community being served will be selected. In general, these costs can be summarized as follows:
  - o **Project Appraisals:** As part of the underwriting process for long-term FA and solar asset projects, appraisals are generally required to be performed by firms who are experts in this area. On average, appraisals cost approximately $5,500 per project. Vendors for these services must demonstrate experience performing appraisals for similar projects in the applicable jurisdictions. Vendors will be procured in accordance with IPC's Procurement Policy. (total 5-year budget: $445,500)
  - o **UCC, KYC and Title:** The diligence and underwriting process includes certain costs, including UCC-1, Know-Your-Customer (KYC), and Title inquiries/insurance. These actions help mitigate certain financial risks or secure collateral on the investment. Costs for these filings vary, but typically total approximately $1,800 per project. The Vendors for these services must currently operate within the UCC, KYC and

Title industries, be eligible to perform work within each project's geography, show experience with similar projects, and will be procured in accordance with IPC's Procurement Policy. (total 5-year budget: $291,600)

- o **Development fees:** Project developers often charge a fee for their services for designing and developing projects. Our intention is to cover these costs for borrowers, so that borrowed dollars go as far as possible towards project costs. These fees are approximately 0.5% of total project costs. Developers that provide these services should have experience completing projects of similar size and complexity to those in which they would be engaged. Developers would be procured via a competitive process in accordance with IPC's Procurement Policy. (total 5-year budget: $789,150)

- o **Transaction legal:** While commercially reasonable efforts will be taken to standardize the programmatic terms of each FA type, this will not eliminate underwriting, documentation, and legal review. Legal costs vary depending on the size of a project and complexity of the transaction; we estimate legal costs to be approximately 1.5% of a project's cost. Legal firms must demonstrate that the attorneys at their firms possess adequate educational background and hold Bar admission required to perform work in the states where they are practicing. Additionally, firms should have adequate resources to staff our needs with relevant experience necessary to advise on the matters for which they are engaged. Vendors for these services will be procured in accordance with IPC's Procurement Policy. Whenever possible, a local firm in the community of the program participant will be selected to provide this service. (total 5-year budget: $2,795,300)

- o **Project inspections:** Due to varying requirements across the country related to activating electricity generating projects on the local grid, inspections are generally required by utilities prior to allowing connections to the activated. A local vendor must be selected in each case that is familiar with both the type of equipment that is installed and the local utility. These costs will vary by vendor and jurisdiction; typically these costs are approximately $8,000 per project. The Vendors for these services should have relevant experience performing inspections of projects of similar size and complexity and be fully registered and licensed with the necessary regulatory authorities and local utilities. Vendors will be procured in accordance with IPC's Procurement Policy. (total 5-year budget: $264,000)

**Construction (if applicable)** -

IPC will not acquire real property or equipment.

**Other** -

Other costs include only those types of direct costs that do not fit in any of the specific budget categories, this includes credit enhancements, subawards, participant support costs, and

rental/lease of equipment, office space, and meeting or conference facilities (e.g. space rented for a conference, training course, community meeting or temporary use of a laboratory):  (total amount included in Other category: $85,193,239)

**Credit Enhancement**

IPC will provide financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, and will draw down funds as cash reserves.

"Cash reserves" means cash that is drawn down and subsequently held in order to support IPC's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813.

IPC will not use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer. IPC will provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to IPC implementing its strategy. These guidelines will describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that IPC incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy will be IPC's responsibility. This limitation on the extent of the Federal Government's financial commitment to IPC's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties. This is designated to facilitate additional financing by other providers, for example for community solar models where a model is not yet widely accepted or for investment tax credit elective pay and transferability recapture risk. (total 5-year budget: $5,000,000)

**In-Kind Assistance**

In-Kind Assistance from US Department of Energy (total 5-year budget: $400,000)

**Subawards**

IPC has adequate systems in place for complying with: 1) 2 CFR 200.332, the subrecipient eligibility provisions of EPA's National Term and Condition for Subawards, and any program specific restrictions on subrecipient eligibility; 2) 2 CFR 200.332, requirements for pass-through

entities, as described in EPA's National Term and Condition for Subawards; and 3) will have subaward agreements for each subaward that meets the requirements of 2 CFR 200.332(b).

*Subawards to Named Subrecipients* – CPC members, as Subrecipients named in the workplan, provided budgets to support amounts allocated to their organization. Indirect costs identified by the Subrecipient are included and calculated in accordance with 2 CFR § 200.332(b)(4). Current projected annual allocation of subaward funding is indicated individually on Attachment E. Each Subrecipient will be required to submit a draw request to IPC for review, and once approved will be drawn in the normal course and distributed to the Subrecipient.

*Workplan Identified Types of Subawards*– Reserved amount for subawards to workplan identified types of subrecipients, any amounts awarded will follow the same direct and indirect cost guidelines applied to Subrecipients. IPC will provide written guidelines that must be approved by the EPA Project Officer. IPC will not draw down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines will: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

For subawards that are subgrants, IPC will require grantees to confirm that they will comply with the subaward terms and conditions. While subrecipients will undertake activities in overlapping geographic regions, they will be either providing and targeting services to different audiences or be engaging in different activities within the same geographies such that no duplication of services to beneficiaries occurs.

The following table represents the named and unnamed Subrecipients and identified types of Subawards.

| Entity | Description/ Type | Program Activities, award amount, qualifications |
|---|---|---|
| Black Owned Solar Services (**B.O.S.S.**) | Non-profit community-based organization | **Capacity Building, Education & Outreach**<br><br>• Leverage its network of entrepreneurs and expertise in entrepreneurship for culturally appropriate outreach.<br>• Provide capacity building, develop culturally appropriate messaging, and provide education and outreach services.<br>• Conduct regular workshops, trainings, networking, and mentorship opportunities, in person and virtual, on topics relevant to business development and operational capacity.<br>• Offer direct TA to help business respond to private proposal and public announcements<br>• Launch a suppliers series to facilitate outreach by corporate buyers, utilities, and municipalities to suppliers from LIDACs and suppliers who serve LIDACs.<br>• Subaward amount: $7,000,000.<br>• Activities will support up to 6 FTE.<br>• Subgrant |
| Clean Energy Group, Inc. (**CEG**) | Non-profit community-based organization | **TA, Policy Support**<br><br>• Support the deployment of storage for resilience benefits in conjunction with eligible residential-serving solar projects, including early-stage consultations for projects to provide information about solar paired with energy storage, supporting predevelopment activities for prospective projects that incorporate energy storage, and preliminary development support activities).<br>• Provide TA and policy support services related to deploying storage in conjunction with residential-serving solar projects, including energy market structures, supportive programs and incentives, utility practices, and regulatory issues.<br>• Subaward amount: $1,765,000<br>• Activities will support 1 FTE.<br>• Subgrant |
| Coalition for Community Solar Access (**CCSA**) | Non-profit trade association | **TA, Policy Support**<br><br>• Leverage its expertise as a solar industry trade organization in community solar policy and program design.<br>• Provide TA services to developers and policy support services to policy decision makers, including educational assistance for basics of utility interconnection and best practices.<br>• Offer regular webinars, individual offerings and educational materials, and docket monitoring to help developer-recipients engage with relevant state commission dockets.<br>• Provide guidance to developer-recipients seeking to access LIHEAP benefits to support their community solar projects. |

| | | • Subaward amount: $1,986,965<br>• Activities will support approximately 3 FTE.<br>• Subgrant |
|---|---|---|
| Community Housing Capital, Inc. **(CHC)** | Non-profit Community Development Financial Institution (CDFI) | **FA, Education & Outreach**<br><br>• Focus on affordable multifamily models that benefit tenants through the NeighborWorks America network of housing nonprofits it serves.<br>• Provide FA to projects under the Program in the form of project financing and grants.<br>• Provide education and outreach services to its network.<br>• Support developers coming through CPC programs seeking to develop community-owned solar projects in LIDAC. TA will cover eligible activities including site selection, project design & engineering support, community engagement strategies, legal entity and contracting support.<br>• Subaward amount: $11,067,060 ($8,800,000 of financial assistance)<br>• Activities will support up to 2 FTE.<br>• Subgrant |
| GRID Alternatives **(GRID)** | Non-profit community-based organization | **FA, TA, Workforce Development**<br><br>• Focus on community solar models including those with embedded WD.<br>• Provide FA to projects under the Program in the form of project financing and grants.<br>• Provide TA and WD services.<br>• TA and capacity building includes supporting project feasibility and pre-development scopes, assisting with financial analysis, advising on partnership development, and project development consultation or direct co-development support for qualified projects.<br>• WD programming includes implementing direct WD with qualified projects and providing development consultation to partners.<br>• Subaward amount: $11,990,000 ($8,700,000 of financial assistance)<br>• Activities will support up to 4 FTE<br>• Subgrant |
| Interstate Renewable Energy Council **(IREC)** | Non-profit community-based organization | **Workforce Development**<br><br>• Convener of the National Clean Energy Workforce Alliance.<br>• Provide WD services including coordination with local providers and resource mapping to improve clean energy job placement opportunities and create a streamlined workforce pipeline for community solar projects.<br>• Subaward amount: $2,997,347<br>• Activities will support up to 3 FTE.<br>• Subgrant |
| NeighborWorks Capital **(NWC)** | Non-profit CDFI | **FA, Education & Outreach**<br><br>• Focus on affordable multifamily models that benefit tenants through the NeighborWorks America network of housing nonprofits. |

| | | |
|---|---|---|
| | | • Use a community-first approach driven by the voices and aspirations of local residents; resident-led, centered around equity, and representative of their community's goals and priorities.<br>• Provide FA to projects under the Program in the form of project financing and grants .<br>• Provide education and outreach services to its network, including financial capability counseling, resident engagement, and equitable community development.<br>• Subaward amount: $9,400,000 ($8,800,000 of financial assistance)<br>• Activities will support approximately 1 FTE.<br>• Subgrant |
| People's Solar Energy Fund, Inc. (**PSEF**) | Non-profit loan fund | **FA, Capacity Building, Education & Outreach, TA**<br><br>• Focus on community-ownership models of community solar through its member network.<br>• Provide FA to projects under the Program in the form of project financing and grants.<br>• Provide capacity building, education and outreach and TA services to its network, including site selection, project design & engineering support, community engagement strategies, legal entity and contracting support<br>• Help coordinate WD partnerships and support scaling member-developed workforce training programs and curricula.<br>• Subaward amount: $10,421,002 ($4,800,000 of financial assistance)<br>• Activities will support 6-7 FTE<br>• Subgrant |
| ROC USA, LLC (**ROC**) | Non-profit social venture | **FA, TA**<br><br>• Focus on community solar models for resident-owned manufactured home parks.<br>• Provide FA to projects under the Program in the form of project financing and grants.<br>• Provide TA services to its network of projects and partners, including engaging stakeholders and building understanding of the unique structures of resident-owned manufactured home communities, identifying programmatic resources from utility/ratepayer funded programs, and coordinating lenders with developers to build consensus on the best location, size and structure of specific solar projects.<br>• Subaward amount: $1,391,208 ($1,260,000 of financial assistance)<br>• Subgrant |
| University of New Hampshire Carsey School's Center for | Public university | **Program Administration & Governance, Capacity Building, Program Evaluation**<br><br>• Leverage its expertise as part of a Tier 1 research institution to support the community development finance field with clean energy activities.<br>• Provide program administration and governance services, including coordinating participatory governance Steering Committee and program evaluation services. |

| | | |
|---|---|---|
| Impact Finance (**UNH**) | | • Provide capacity building services including developer trainings through multiple modalities, including self-paced and instructor-led online courses which cover consumer and commercial solar finance.<br>• Subaward amount: $1,954,095<br>• Subgrant |
| Sustainable Underwriting for Resiliency & Efficiency, LLC (**SURE**) | Non-profit IPC affiliate | **Education & Outreach, TA**<br><br>• Provide education and outreach services to affordable housing and community lenders and owners related to Program objectives.<br>• Provide TA services to affordable housing and community lenders and owners to support solar deployment including for lenders services that support co-investment on projects under the Program.<br>• Subaward amount: $1,700,000<br>• Subgrant |
| Inclusive Lending, LLC | Non-profit IPC affiliate | **FA**<br><br>• Entity registered as a lender in California.<br>• Provide FA to projects under the Program in the form of project financing and grants in California.<br>• Subaward amount: $7,090,286 ($7,090,286 of financial assistance)<br>• Subgrant |
| IPC SFA Holdings LLC (**ISH**) | Non-profit IPC affiliate | **FA**<br><br>• Develop and own projects funded under the Program.<br>• Provide FA in the form of PPAs or leases.<br>• Subaward amount: $9,455,276 ($9,455,276 of financial assistance)<br>• Subgrant |
| TBD (1 organization) | Non-profit affordable housing or community lending intermediary | **FA, Education & Outreach, TA**<br><br>• Provide FA to projects under the Program in the form of project financing and grants.<br>• Provide education and outreach services to affordable housing and community lenders and owners to support Program objectives.<br>• Provide TA services to affordable housing and community lenders and owners to support solar deployment including for lenders services that support co-investment on projects under the Program.<br>• Subaward amount: $1,575,000 ($1,200,000 of financial assistance<br>• The organization selected for this grant will be reviewed<br>• Subgrant |

**Additional Items**

**Indirect Charges**

In accordance with 2 CFR 200.414(f), as a non-Federal entity without a negotiated indirect rate, IPC requests to use the indirect costs (IDC) calculated using the stated de minimis rate, using the Modified Total Direct Costs (MTDC) basis. For all charges prior to October 1, 2024, the de minimis rate used will be 10%, and for charges after that date the de minimis rate used will be 15%. MTDC includes direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, subawards (up to an allowance of $50,000 for the life of each subaward, regardless of the period of performance of the subawards under the award). IPC will ensure that participant support costs or other items that are excluded from MTDC are properly accounted for when describing how IDCs are distributed. Please refer to the Excel document "Attachment E" for more detail and formulas for the calculation of this amount. Total indirect costs budgeted over the 5-year award are $4,321,148.

| | | |
|---|---|---|
| Personnel | $ | 14,985,485 |
| Fringe | | 4,046,088 |
| Travel | | 344,495 |
| Supplies | | 72,000 |
| Contractual (excluding FA) | | 8,759,575 |
| Subawards (up to $50,000 each) (excluding FA affiliates) | | 600,000 |
| Total MTDC Basis | $ | 28,807,643 |
| **Indirect** | **$** | **4,321,148** |

Indirect costs are costs incurred for a common or joint purpose benefiting more than one cost objective (e.g. Costs that benefit EPA assistance agreements as well as other activities the recipient carries out that may or may not be Federally funded).  As described in 2 CFR 200.403, costs will be consistently charged as either direct or indirect and will not be double charged or inconsistently charged.

2 CFR 200.332(b)(4) provides that IPC must determine the appropriate rate for its subawards to use for indirect costs. Subrecipients that have an active negotiated indirect rate with a cognizant agency have used that rate when determining the amounts of their subawards. All other Subrecipients have utilized the de minimis indirect cost rate.

Indirect costs that are included in pre-award costs total $26,963.

**Ongoing Oversight and Administration**

CPC Lenders will, for certain financial products, include an oversight charge on electricity generated from FA to Program projects, whether in the form of a grant or loan or otherwise, that would accrue over time to CPC Lenders to be used to pay for necessary or appropriate oversight and administration costs. Such charges will not cover government fees and such amount are included in 20% savings calculations.

**Management Fees**

No costs are included for "management fees or similar charges" which refers to expenses added to the direct costs in order to accumulate and reserve funds for ongoing business expenses, unforeseen liabilities, or for other similar costs that are not allowable under EPA assistance agreements

**Ineligible Projects**

No costs are included for activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies

**Fundraising**

No costs for fundraising are included in the budget.

**Conferences and Workshops:**

As part of Technical Assistance and Workforce Development, CPC TA Providers will hold in-person seminars, trainings and workshops.

**Meals and Refreshments:**

No costs for meals and refreshments are included in the budget.

**Fines, penalties, damages and other settlements:**

The budgeted amounts do not include costs resulting from recipient or subrecipient violations of, alleged violations of, or failure to comply with, Federal, State, local, tribal, or foreign laws and regulations as they are unallowable, except when incurred as a result of compliance with specific provisions of the Federal award, or with the prior written approval of the Federal agency.

**No goods or services for personal use:**

All goods and services included in this workplan are for professional use by the Program and Program staff only.

**Insurance and indemnification:**

Costs of insurance are not included as direct costs in this workplan. IPC and other CPC members will maintain all customary business insurance coverage as required by 2 CFR 200.447 as an allowable cost through the indirect rate and seek indemnity consistent with 2 CFR 200.447 (c) and (f).

**Transfer of funds to affiliated entities:** This workplan includes transfer of funds to affiliated entities. IPC will follow EPA's Financial Assistance Conflict of Interest Policy. If the subrecipient is an affiliate that falls within the scope of the policy, then IPC will follow the disclosure requirements.

**Intangible Property:**

The budgeted amounts do not include costs of acquiring intangible property, as defined in 2 CFR 200.1.

**Legal claims:**

The budgeted amounts for contractual legal costs will not be used for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

**Outside of EPA Regions:**

The budgeted amounts do not include activities that support deployment of projects outside the boundaries of the ten EPA regions **Outside of United States**

The budgeted amounts do not include any amounts for work outside of the United States and its territories.

**Geospatial Information**

SFA terms and conditions require the use of geospatial information, Including info identifying geographic location , or application/tools associated with such information – GPS, mapping or statistical data. There are no budgeted amounts related to this information.

**Program Income:**

How CPC Lenders Generate Program Income:

Program Income will be generated based on the following categories of revenue, net of allowable incidental costs: (i) fees associated with origination, underwriting, and closing (and other fees described in the FA product tables in the FA Strategy section) for FA deployment transactions; (ii) loan interest payments on outstanding balances of non-grant FA deployment; (iii) principal

repayments from FA deployment; (iv) PPA payments, lease payments, and electricity sales and applicable incentives.

<u>How the Coalition Will Utilize Program Income:</u>

Program income will be revolved as FA, except as otherwise authorized by EPA to offset related Program costs. For example, a 12-month pre-development loan will mature and its principal will be captured as Program Income at which point CPC Lenders will then recycle the Program Income into a new pre-development loan or other FA. In the first 3 years of the Program, CPC Lenders providing short term financing will use Program Income from FA for deployment of additional short-term FA. Beginning in year 4, CPC Lenders will shift use of Program Income into permanent financing FA.

Accumulated Program Income will be used for ongoing oversight and related Program Administration Activities costs, as approved in this workplan.

<u>Summary of Results:</u>

IPC projects the generation of approximately $46.1 million in Program Income over the period of performance.

**6.2 Procedures and controls for management of award funds**

IPC will expend funds in timely and efficient manner using internal controls that meet the standards outlined in GAO-14-704G, found in our <u>Operating Procedures</u>, and a robust, comprehensive fiscal management system, found in <u>Accounting Department Internal Controls and Procedures</u> (**Accounting Controls**), <u>Procurement Policy For Grants And Cooperative Agreements</u> (**Procurement Policy**), <u>Accounting for Direct and Indirect Costs on Awards Policy</u> (**Cost Policy**), and other policies meeting the requirements of 2 CFR Part 200. They include provisions for allocating expenditures in line with the budget and corrective measures to expend funds as projected. Time is assigned between federal and non-federal programs using <u>Policy and Procedures on Employee Time Tracking</u> (**Time Policy**).

IPC projects that 75% or more of SFA funds (both direct and indirect costs charged to direct costs attributable to FA activities) are expended on Financial Assistance (**FA**) for projects, with the remaining 25% of the budget apportioned to Program Administration (**PA**), Technical Assistance (**TA**) and Workforce Development (**WD**).

**6.3 Additional Workplan and Budget Questions:**

Please see below for our responses to the following questions:

1) Does the scope of work include conducting conferences or workshops?
   - Yes, subrecipients that are providing capacity building and WD services will host instructional workshops/trainings, but not conferences. Many of these workshops will be hosted on an online platform in the format of a webinar or similar.

2) Who is initiating the conference/workshop/meeting?
  - IPC will not host such events, only subrecipients will be hosting workshops/trainings.

3) How is the conference/workshop/meeting being advertised?
  - Through CPC member channels and networks, existing trade organization affiliations, workforce alliance partnerships, social media/contact lists, and public websites, forums, or similar directed at participants.

4) Whose logo will be on the agenda and conference/workshop/meeting materials?
  - The logos of the CPC member, and potentially IPC, CPC, and EPA. In accordance with the Terms and Conditions, the EPA logo, when used, will be displayed in accordance with the EPA Seal and Logo stylebook.

5) What is the percentage distribution of persons attending (i.e. % federal govt, public participants, state and local)?
  - The participation in these workshops will vary depending on the intended audience of the specific training. Some workshops will be geared towards state and local stakeholders, whereas some will be geared towards community-based organizations and local employers, including solar developers. These workshops will be attended by approximately 85% public participants and 10% state and local, and 5% grantee and subgrantee staff. No persons, or 0%, from federal government are anticipated to be in attendance.

6) Will there be proceedings or analysis and will the information be disseminated back to the appropriate (state/local/scientific) community?
  - Yes, whenever these workshops generate a work product, the results of these workshops will be accumulated and presented back to the attendees or to a broader community, as applicable.

7) Do you anticipate program income being generated from this conference/workshop/meeting including registration fees?
  - No, program Income will not be generated from these workshops.

8) Are costs for light refreshments, meals, or beverages included in the workplan or budget?
  - No, costs for light refreshments, meals or beverages are not included in the budget.

9) Will the assistance award result in the development of any copyrighted software or written materials?
  - Yes, over the period of performance certain copyrighted materials will be created.

10) Could an invention result from this project? (If yes, provide disposition instructions).
  - No, we do not anticipate an invention as a result of this project.

11) Does the project involve animal subjects?
- No.

12) Does the project involve collecting identical information from 10 or more people?
- Yes, participants in the instructional workshops will generally need to sign up and provide information in connection with their participation in the workshop. Program evaluation and other Program activities will also involve surveys to more than 10 people.

# Exhibit G

5H - 84087901 - 1    Page 1

| | | GRANT NUMBER (FAIN): 84087901<br>MODIFICATION NUMBER: 1<br>PROGRAM CODE: 5H | DATE OF AWARD<br>01/07/2025 |
|---|---|---|---|

# U.S. ENVIRONMENTAL PROTECTION AGENCY
## Assistance Amendment

| TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>01/07/2025 |
|---|---|
| PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>Not for Profit | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**<br>INCLUSIVE PROSPERITY CAPITAL INC<br>75 Charter Oak Ave<br>STE 1-103<br>Hartford, CT 06106-1903<br>**EIN:** 83-0808658 | **PAYEE:**<br>INCLUSIVE PROSPERITY CAPITAL INC<br>75 Charter Oak Ave<br>STE 1-103<br>Hartford, CT 06106-1903 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Musa Collidge-Asad<br>75 Charter Oak Ave<br>STE 1-103<br>Hartford, CT 06106-1903<br>**Email:** musa.collidgeasad@inclusiveteam.org<br>**Phone:** 860-775-2090 | Bridget Kelly<br>1200 Pennsylvania Ave. NW, 31150<br>Washington, DC 20460<br>**Email:** kelly.bridget@epa.gov<br>**Phone:** 202-566-0718 | Hazeletta Burgess<br>1200 Pennsylvania Ave. NW, 3903R<br>Washington, DC 20460<br>**Email:** Burgess.Hazeletta@epa.gov<br>**Phone:** 202-564-1533 |

## PROJECT TITLE AND EXPLANATION OF CHANGES

The Community Power Coalition "Powering America Together" Program

This amendment removes the 2% funding restriction from the Solar for All award and incorporate the necessary budget and workplan documentation.

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 249,300,000.00 | TOTAL PROJECT PERIOD COST<br>$ 249,300,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,300,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave. NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** LaShaun Phillips - Associate Award Official | DATE<br>01/07/2025 |

5H - 84087901 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 248,900,000 | $ 0 | $ 248,900,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 249,300,000 | $ 0 | $ 249,300,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84087901 - 1     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 14,985,485 |
| 2. Fringe Benefits | $ 4,046,088 |
| 3. Travel | $ 344,495 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 72,000 |
| 6. Contractual | $ 140,337,545 |
| 7. Construction | $ 0 |
| 8. Other | $ 85,193,239 |
| 9. Total Direct Charges | $ 244,978,852 |
| 10. Indirect Costs: 15.00 % Base MTDC | $ 4,321,148 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 249,300,000 |
| 12. Total Approved Assistance Amount | $ 249,300,000 |
| 13. Program Income | $ 46,069,745 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 249,300,000 |

5H - 84087901 - 1     Page 4

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)**

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

**Freely Associated States:** *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

## For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

## Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or

requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such

Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not

"profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

> A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

> B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in

the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as

determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

> 1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

> 2. Privately-owned commercial buildings when they meet the "public function" test;

> 3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

1. Single family homes;

2. Privately-owned, non-mixed-use, multi-family housing properties;

3. Privately-owned residential portions of mixed-use properties;

4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

## 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

## 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities**. As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping
In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement.* EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements
The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

5H - 84087901 - 1    Page 44

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

5H - 84087901 - 1    Page 46

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# Exhibit H

| **From:** | OMS-OGD-PreAward |
| **To:** | michele.kunitz_inclusiveteam.org |
| **Cc:** | Kelly, Bridget (she/her/hers); Pierce, Brandon; Lloyd, Keva |
| **Subject:** | EPA Form 6600-01 Pre-Award Certification Review Request for Inclusive Prosperity Capital, Inc. |
| **Date:** | Monday, April 22, 2024 7:19:38 AM |
| **Attachments:** | ABC INC SAMPLE Acct&FinanPoli&ProcGuide.docx |
| | epa_form_6600_01.pdf |
| | Question 33 & More.docx |
| | Questions 4-47 Sample language- take whats applicable.docx |
| | Form 6600 with Sample Language 8-23-23 - updated.docx |

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Greetings Michele Kunitz!

==We will send you a separate TEAMS invitation to our May 14, 2024, Pre-Award Certification Workshop. You are encouraged to attend.==

Congratulations on your organization being considered for a U.S. Environmental Protection Agency (EPA) assistance agreement award!  Because the total amount of your organization's award is $200,000 or more, we are required under EPA Order 5700.8 to review your systems for controlling and managing federal funds.

This review is an assessment of your administrative and financial systems' ability to manage your awards in accordance with Federal Regulations, Uniform Grants Guidance, EPA guidelines and OMB Circulars.

Please have your organization's authorized representative **complete and return** the attached *Limited Scope Administrative and Financial Review Questionnaire for EPA Assistance Agreement Desk/Onsite Reviews* (EPA Form 6600-01) as soon as possible, accompanied by adequate policies and procedures.

In addition, please substantiate your "yes" responses to the questionnaire with copies of your current:

- accounting procedures,
- audited financial statements (A-133 or another audits, if available),
- conflict of interest policies,
- personnel and timekeeping policies,
- procurement policies,
- property management policies,
- record retention policies, and
- travel policies.

==**Note:**==

1. The pre-award certification will be valid for 4 years. The form should be completed with the mindset of the current award under review, plus possible future awards with EPA. Some of the questions may appear as if the entity is currently performing on EPA awards. The questions, however, are related to this current award under review and possible future awards. The answers to most of the questions (except if not applicable to the entity) should be **"yes."**

1.  Also, the "yes" answers should be addressed in policies and procedures, **including all bullets under such questions, (**we must be able to substantiate all **"yes"** responses and each bullet to your policies and procedures). Please take time to address each bullet in your policies and procedures.

2.  The policies and procedures can be submitted as a "master" document that covers all the above requested policies; or may be individual policies. Make sure they show an effective date.

3.  <u>**Your entity must develop or modify their current policies and procedures to the address the requested information**</u>. The more complete your form and policies and procedures are, the faster the pre-award certification process will be.

<u>**Attachments:**</u> In addition to the Form 6600-01, I am providing you with the following documents to assist with the development of your policies and procedures, as needed:

1.  EPA form 6600-01 – Please answer all questions, as applicable.
2.  Questions 4-47 Sample language – use this document to assist you with the language for your policies and procedures, as deemed necessary. The document is arranged in numerical order to mirror the form.
3.  Question 33 & More – to address question 33 and all the bullets that follows. Your entity's policies and procedures do not have to be as robust, but this information gives you an idea of what's required.
4.  ABC INC SAMPLE – It is exactly as it states a "sample." Your entity's policies and procedures do not have to be as robust, but this information gives you an idea of what's required. It covers all sections of the form.
5.  Form 6600 with Sample Language 8-23-23 – use this document for additional sample languages, **but especially** for purchase threshold requirements and descriptions. Please note – the entity's thresholds for purchases may be lower but not higher than the required threshold limits.

The completed form and supported documents can be submitted via email to the Office of Grants & Debarment (OGD) – Compliance Team at OMS-ARM-OGD-PreAward@epa.gov.

The more complete the form and supporting policies and procedures, the faster the pre-award certification process will be. Thank you for your assistance in the EPA pre-award review process.  If you have any questions, please feel free to contact OMS-ARM-OGD-PreAward@epa.gov.

On behalf of OGD Pre-Award Review Team.

National Policy, Training & Compliance Division
Office of Grants & Debarments
US Environmental Protection Agency
Email: OMS-ARM-OGD-PreAward@epa.gov

Rose Piard-Hylton
Accountant and Compliance Specialist
National Policy, Training & Compliance Division
Office of Grants and Debarment
Piard-Hylton.Rose@epa.gov
(202)564-4427

# Exhibit I

| | |
|---|---|
| **From:** | Kelly, Bridget (she/her/hers) |
| **To:** | Kerry O"Neill; michele.kunitz_inclusiveteam.org; Mark DeBonee; Musa Collidge-Asad |
| **Subject:** | RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All |
| **Date:** | Tuesday, April 23, 2024 1:56:08 PM |
| **Attachments:** | image001.png |

**Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Good Afternoon-

I am following up on David Widawsky's email to express my excitement about working on this project with you. As you are aware, the statute authorizing the EPA to make these grants requires us to obligate the funds by September 30, 2024. I will be your primary point of contact for getting your grant obligated over the next few months.

**What should I be doing now?**
- Celebrate! This application was a huge task, and only 60 awards out of 150 applications were selected.
- Amplify the announcement throughout your networks.
- Identify if there are other main points of contact I should be reaching out to through email other than the ones on this initial email. Please let me know who will be the primary point of contact for the award obligation process.

**What to Expect Next**
- By the first week of May, I will contact you to request updates to the SF-424 and Key Contacts documents and provide specific details on any necessary updates, including, if required, renewing your SAM.gov registration. We will need you to update these forms with the necessary information as soon as possible.
- EPA's Office of Environmental Justice and External Civil Rights (OEJECR) may contact you with requests; please assist them as needed.
- EPA Compliance Team may contact you; please collaborate with them on any required documentation.
- In the coming weeks and months, the EPA's Solar for All Team will provide training and opportunities to collaborate with other grantees to help us move through the obligation process.

Again, congratulations! If you have any immediate questions, please contact me. I'm looking forward to working with you.

Bridget

**From:** SFA <SFA@epa.gov>
**Sent:** Monday, April 22, 2024 12:34 AM
**To:** Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa

Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate
<Hitchings.Nate@epa.gov>; SFA <SFA@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

Good evening,

I hope that you are having a good weekend! Firstly, thank you for the information you provided last week, and for the story you shared in your latest email! I agree – it is an inspiring story, and we shared it not only with our communications folks but the entire Solar for All team.

I am following up on our earlier email with more information about your award and the announcement of the Solar for All selected applicants tomorrow. We appreciate your help as we manage the announcement of this historic program.

Reminder: EPA will announce the selections publicly on **Monday 4/22**, and news of the selections will be **embargoed for press until 5:00 AM ET on 4/22. As already mentioned, we ask that you please keep your selection private until after this news is released.**

EPA intends to award **Inclusive Prosperity Capital's** application a total of **$249,300,000.00** in federal funding, of which **$400,000.00 will be awarded as in-kind services from EPA**. EPA is partnering with the U.S. Department of Energy to develop a National Solar for All Technical Assistance Program for all Solar for All selected applicants. All Solar for All selected applicants will receive $400,000.00 of their total federal funding as services from the National Solar for All Technical Assistance Program. We will provide more information on the services available before you finalize your program budget and workplan.

In advance of the announcement tomorrow, I have also attached the following communications material for your awareness:
1. EPA's draft and embargoed **press release** for Solar for all Announcement with approved Administrator quote. *Please note: this press release is subject to change.*
2. EPA's **social media toolkit** for the Solar for All announcement

You are not required to use any of the attached materials; however, you are welcome to use anything useful from the materials to promote your selection. The press release includes an approved quote from the EPA Administrator, which your organization is welcome to include in your respective public-facing materials. EPA does not need to review any communications your organization chooses to make about this exciting news, and EPA does not have any specific requirements nor guidelines for selected applicant communications besides the embargo on this information previously stated.

Once more, we look forward to working with you! For your awareness, on this email you have contact information for:
- **Bridget Kelly:** The EPA Project Officer who will be assisting you with the initial phases of grant obligation.

**Nate Hitchings**: Our strategic communications advisor who can assist with any questions related to press and communications.

Please note, as previously stated, selection does not guarantee a final award. A final award is contingent on your compliance with all applicable statutes, regulations, and policies; your agreement with the terms and conditions of the award agreement; and the completion of administrative disputes. EPA anticipates making the awards no later than September 30th, 2024— the statutory deadline for EPA to obligate the funds, and meeting that goal is contingent on your engagement in the award process.

Sincerely,
Ellie on behalf of EPA's Office of the Greenhouse Gas Reduction Fund

Elizabeth "Ellie" Charchenko | She/Her
Special Advisor for Implementation
Office of the Greenhouse Gas Reduction Fund
U.S. Environmental Protection Agency
+1 202-948-3823 | charchenko.elizabeth@epa.gov

---

**From:** Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Sent:** Thursday, April 18, 2024 8:40 PM
**To:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Hi GGRF Team,
Related to one of the stories we shared (EnerWealth/Maria Mitchell), wanted to also share this NC PBS piece on the same project that was just posted online, in case it is useful to you: feature on our pilot sites.

It is so inspiring!
(and directly related to one of the program models we want to scale up under our SFA award – so grateful for this opportunity)

**Kerry E. O'Neill**
CEO

OFFICE > 860-257-2884   CELL > 203-258-2550
**kerry.oneill@inclusiveteam.org**

**www.inclusiveprosperitycapital.org**



**From:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>
**Sent:** Thursday, April 18, 2024 3:57 PM
**To:** Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Mark DeBonee
<mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>;
Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate
<Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or
> opening attachments. When in doubt, contact the Helpdesk.

Hi Michele,

EPA does not have any formal protocols or guidelines for selected applicants regarding
announcements like this. We will share the material EPA intends to release shortly before the
announcement for your awareness. This material will likely not come before Sunday, so I do not
recommend waiting to receive our material to prepare.

Many thanks,
Ellie

**From:** Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>
**Sent:** Thursday, April 18, 2024 11:16 AM
**To:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; Mark DeBonee
<mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>;
Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate
<Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when
> deciding whether to open attachments or click on provided links.

Hello GGRF Team,

We have question for you on communications.  Will there be any protocols provided to us for messaging on Monday's announcement?  We are working through our strategy for emails, social media posts, and press releases, but want to ensure that we are in alignment with any requirements or guidance you may have for us.

All the best,

Michele

**From:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>
**Sent:** Wednesday, April 17, 2024 8:59 PM
**To:** Mark DeBonee <mark.debonee@Inclusiveteam.org>; Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Hello Mark and the broader team,

Thank you very much for sharing this information. These stories will help us amplify how this program and these resources will help overburdened communities and households nationwide.

Again, we look forward to working with you.

Many thanks,
Ellie on behalf of Team GGRF

**From:** Mark DeBonee <mark.debonee@Inclusiveteam.org>
**Sent:** Wednesday, April 17, 2024 3:52 PM
**To:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Hello,

Thank you again for the amazing news, we are looking forward to working together.

Please see the attached document that includes the information requested (Press Quote, Point of Contact, Storytelling examples).

If you have any questions or need any additional information, please let us know.

Thank you!

Mark

_____

**Mark A. DeBonee, CPA** (he/him/his)
INCLUSIVE PROSPERITY CAPITAL | CHIEF FINANCIAL OFFICER
860-969-1323 | mark.debonee@inclusiveteam.org

---

**From:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>
**Sent:** Tuesday, April 16, 2024 2:39 PM
**To:** Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Cc:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Hello,

EPA is pleased to notify you that Inclusive Prosperity Capital, Inc.'s application to EPA's Notice of Funding Opportunity *EPA-R-HQ-SFA-23-01: Solar for All* has been selected for an award. The selection decision was made after evaluating and scoring your application in accordance with *Section V.B: Review and Selection Process* of the Notice of Funding Opportunity. We look forward to working with you and appreciate the immense time and effort that went into preparing your application.

Currently, we are informing a **small handful** of selected applicants prior to the public release to prepare communications for the announcement. **Very few** Solar for All selected applicants are receiving this email, and we request that you do not inform anyone outside of those who need to

know in your organization of this information. **We will email you again with more information about your selection and funding amount when we inform all the other selected applicants, prior to the public announcement.**

We will announce the selections publicly on **Monday 4/22**, and news of the selections will be **embargoed for press until 5:00 AM ET on 4/22. As already mentioned, we ask that you please keep your selection extremely close hold until after this news is released.**

As we look ahead to the public announcement, we have several **immediate** requests (we need this information by **4:00pm ET on Wednesday 4/17**).

1. **Press Quote:** We would appreciate if you shared a quote about your selection that we could potentially use for an EPA press release or other similar public-facing materials. Please plan to share the quote as well as the name and title that it should be attributed to.

2. **Point of Contact:** Please include a communications point of contact for your organization so that EPA Public Affairs can coordinate with your team directly on any media requests.

3. **Storytelling Example:** EPA hopes to highlight successful examples/stories of work that you and any coalition partners have done that is **similar to** the work proposed under your application package. For selected applications, EPA will be specifically interested in telling **people-oriented, on-the-ground** stories that highlight the impact this historic investment will have in areas across the country—especially in low-income and disadvantaged communities. We may want to share these stories with national reporters and connect those reporters with individuals directly impacted. If there is a separate communications point of contact for said individuals, please include that information, too.

   Here are several illustrative, fictional examples/stories of what EPA envisions. Please submit factual examples/stories of your own (to the extent available).

   a. **EXAMPLE ONE:** In a small, rural community near **[XYZ CITY]**, Jonathan wanted to secure a better future for his children. With funding provided through **[EXISTING SELECTEE PROGRAM]**, **[SELECTEE]** financed a loan for Jonathan to install residential solar panels. In addition to the energy cost savings, tax credits, and environmental benefits, Jonathan will substantially improve his credit score as he pays off the loan and builds wealth for himself and his children.

   b. **EXAMPLE TWO: [EXISTING SELECTEE PROGRAM]** operates throughout **[XYZ STATE]**, which has experienced some of the most disastrous effects of the climate crisis. **[SELECTEE]** recently partnered with **[XYZ COUNTY]** to invest in the installation of solar panels and battery backup systems for a 150-unit affordable senior housing project. These investments have helped the community reduce energy costs while also building resiliency, ensuring elderly residents can stay in their homes and remain protected against future climate impacts.

Please note: any information you share with us will not be evaluated as part of the review and

selection process, as described in *Section V.B: Review and Selection Process* of the Notice of Funding Opportunity, nor factor into any funding decisions. As indicated in *Section VI.A: Award Notification and Disputes* of the Notice of Funding Opportunity, a selection is not final until all disputes are resolved, and selection does not guarantee funding, as only an authorized Award Official can bind the government to expenditure of funds.

Thank you in advance for your consideration of this request and helping amplify the potential impact from this program. Please let us know if you have any questions.

Sincerely,
David Widawsky
Director, Office of the Greenhouse Gas Reduction Fund
U.S. Environmental Protection Agency

Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.
Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.
Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.

# Exhibit J

| | |
|---|---|
| **From:** | Kelly, Bridget (she/her/hers) |
| **To:** | Mark DeBonee; Kerry O"Neill; michele.kunitz_inclusiveteam.org; Musa Collidge-Asad |
| **Subject:** | RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All |
| **Date:** | Tuesday, April 30, 2024 9:58:41 AM |
| **Attachments:** | image001.png |
| | Form SF424_4_0-V4.0.pdf |
| | Form EPA_KeyContacts_2_0-V2.0.pdf |
| | OGGRF Asset and Project Finance Data Structures Reporting for Solar for All.ics |

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Good afternoon-

I'm writing to ask that you please update the *SF-424* and *Key Contacts* forms that you sent with your application, along with a few other requests. EPA needs the *SF-424* and *Key Contacts* forms to move forward with funding your project.

Solar for All has a large number of awards to obligate before the statutory deadline of September 30, 2024. Due to the number of awards and the tight timeline, the EPA will use a slightly modified obligation process for awarding funds. If you have previously received an EPA grant, the process will differ slightly.

EPA will award the funds conditionally prior to finalizing your budget and workplan and will allow you to draw down up to 2% of your total budget until conditions are met, as specified in the terms and conditions of your award.  Any costs incurred by the recipient beyond these limited funds are at their own risk until conditions are met. Nonprofits cannot draw down any funds until the pre-award certification review is completed.  We will hold a webinar in the coming weeks to explain this process further.

We kindly request that you provide these updates within two weeks (i.e., by 5/14/2024). If you need additional time, please let me know what is causing the delay—in case there is anything I can do to address these delays—and when we can expect the updated forms.

The changes we need to obligate funds are outlined below:

**SF424:**

- Please update the amount in box 18 to match the new funding amount found in Ellie's email, including cents.   **$249,300,000.00**

- Update the project start and end dates in box 17 to **5/1/2024 and 4/30/2029**
- In box 21, please make sure the 'Date Signed' has been updated to match the new date of signature with the above revisions.

**Key Contacts:**
- Please update if there have been any changes in the listed staff

**Public contact request:**

- EPA has already received requests from people interested in deploying solar panels in their homes. We'd like to provide a way for these interested homeowners to contact you, similar to how EPA has included contact information or websites for selected applicants for the National Clean Investment Fund and the Clean Communities Investment Accelerator. Please let me know if there is a website or contact information for your program that we could share on the EPA's Solar for All website or with homeowners who contact us.  We understand that many of you will not yet have a website for your program; however, once you do, please notify me, and EPA will post it on our website.

*Optional:* **Solar for All Data Structures & Reporting Feedback Session:**

On May 7th, 2024, at 2:00 pm EST, all selectees are invited to join an <u>entirely voluntary</u> session to deepen GGRF's engagement and teamwork on data structures and reporting. Your participation is <u>entirely voluntary</u> and may not be reimbursable as a pre-award expense. This session covers (1) asset and (2) project finance, including subsidies of any kind to support Solar for All.
We will share our reporting data structures and templates and look forward to discussing how they can tell the story of this historic investment in our climate and our communities.
If your organization is interested in participating, please forward the attached calendar invites to the <u>relevant</u> team members.
Please **do not forward the invitation *outside of your organization***.


Please respond to this email and confirm receipt.

I'm here to answer any questions you may have. Please don't hesitate to contact me.

Best,
Bridget

---

**From:** Mark DeBonee <mark.debonee@Inclusiveteam.org>
**Sent:** Tuesday, April 23, 2024 2:33 PM
**To:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Hi Bridget,

Received, thank you! Primary point of contact for the obligation process would be Michele Kunitz, our

General Counsel.

For the updates coming for the SF-424, is that just the SF-424 application pages or would that include updating the SF-424A budget information and breakouts by object class and year for the actual award amount?

Thank you!

Mark

_____

**Mark A. DeBonee, CPA** (he/him/his)
Inclusive Prosperity Capital | Chief Financial Officer
860-969-1323 | mark.debonee@inclusiveteam.org

_____

**From:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>
**Sent:** Tuesday, April 23, 2024 1:56 PM
**To:** Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>; Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Good Afternoon-

I am following up on David Widawsky's email to express my excitement about working on this project with you. As you are aware, the statute authorizing the EPA to make these grants requires us to obligate the funds by September 30, 2024. I will be your primary point of contact for getting your grant obligated over the next few months.

**What should I be doing now?**
- Celebrate! This application was a huge task, and only 60 awards out of 150 applications were selected.
- Amplify the announcement throughout your networks.
- Identify if there are other main points of contact I should be reaching out to through email other than the ones on this initial email. Please let me know who will be the primary point of contact for the award obligation process.

**What to Expect Next**
- By the first week of May, I will contact you to request updates to the SF-424 and Key Contacts documents and provide specific details on any necessary updates, including, if required, renewing your SAM.gov registration. We will need you to update these forms

with the necessary information as soon as possible.
- EPA's Office of Environmental Justice and External Civil Rights (OEJECR) may contact you with requests; please assist them as needed.
- EPA Compliance Team may contact you; please collaborate with them on any required documentation.
- In the coming weeks and months, the EPA's Solar for All Team will provide training and opportunities to collaborate with other grantees to help us move through the obligation process.

Again, congratulations! If you have any immediate questions, please contact me. I'm looking forward to working with you.

Bridget

---

**From:** SFA <SFA@epa.gov>
**Sent:** Monday, April 22, 2024 12:34 AM
**To:** Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>; SFA <SFA@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

Good evening,

I hope that you are having a good weekend! Firstly, thank you for the information you provided last week, and for the story you shared in your latest email! I agree – it is an inspiring story, and we shared it not only with our communications folks but the entire Solar for All team.

I am following up on our earlier email with more information about your award and the announcement of the Solar for All selected applicants tomorrow. We appreciate your help as we manage the announcement of this historic program.

Reminder: EPA will announce the selections publicly on **Monday 4/22**, and news of the selections will be **embargoed for press until 5:00 AM ET on 4/22. As already mentioned, we ask that you please keep your selection private until after this news is released.**

EPA intends to award **Inclusive Prosperity Capital's** application a total of **$249,300,000.00** in federal funding, of which **$400,000.00 will be awarded as in-kind services from EPA**. EPA is partnering with the U.S. Department of Energy to develop a National Solar for All Technical Assistance Program for all Solar for All selected applicants. All Solar for All selected applicants will receive $400,000.00 of their total federal funding as services from the National Solar for All Technical Assistance Program. We will provide more information on the services available before you finalize your program budget and workplan.

In advance of the announcement tomorrow, I have also attached the following communications material for your awareness:

1. EPA's draft and embargoed **press release** for Solar for all Announcement with approved Administrator quote. *Please note: this press release is subject to change.*
2. EPA's **social media toolkit** for the Solar for All announcement

You are not required to use any of the attached materials; however, you are welcome to use anything useful from the materials to promote your selection. The press release includes an approved quote from the EPA Administrator, which your organization is welcome to include in your respective public-facing materials. EPA does not need to review any communications your organization chooses to make about this exciting news, and EPA does not have any specific requirements nor guidelines for selected applicant communications besides the embargo on this information previously stated.

Once more, we look forward to working with you! For your awareness, on this email you have contact information for:

- **Bridget Kelly:** The EPA Project Officer who will be assisting you with the initial phases of grant obligation.
- **Nate Hitchings**: Our strategic communications advisor who can assist with any questions related to press and communications.

Please note, as previously stated, selection does not guarantee a final award. A final award is contingent on your compliance with all applicable statutes, regulations, and policies; your agreement with the terms and conditions of the award agreement; and the completion of administrative disputes. EPA anticipates making the awards no later than September 30th, 2024—the statutory deadline for EPA to obligate the funds, and meeting that goal is contingent on your engagement in the award process.

Sincerely,
Ellie on behalf of EPA's Office of the Greenhouse Gas Reduction Fund


Elizabeth "Ellie" Charchenko | She/Her
Special Advisor for Implementation
Office of the Greenhouse Gas Reduction Fund
U.S. Environmental Protection Agency
+1 202-948-3823 | charchenko.elizabeth@epa.gov

---

**From:** Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Sent:** Thursday, April 18, 2024 8:40 PM
**To:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>

**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate
<Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Hi GGRF Team,
Related to one of the stories we shared (EnerWealth/Maria Mitchell), wanted to also share this NC PBS piece on the same project that was just posted online, in case it is useful to you: feature on our pilot sites.

It is so inspiring!
(and directly related to one of the program models we want to scale up under our SFA award – so grateful for this opportunity)

**Kerry E. O'Neill**
CEO

OFFICE > 860-257-2884   CELL > 203-258-2550
kerry.oneill@inclusiveteam.org

www.inclusiveprosperitycapital.org



---

**From:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>
**Sent:** Thursday, April 18, 2024 3:57 PM
**To:** Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Mark DeBonee
<mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>;
Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate
<Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Hi Michele,

EPA does not have any formal protocols or guidelines for selected applicants regarding announcements like this. We will share the material EPA intends to release shortly before the

announcement for your awareness. This material will likely not come before Sunday, so I do not recommend waiting to receive our material to prepare.

Many thanks,
Ellie

**From:** Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>
**Sent:** Thursday, April 18, 2024 11:16 AM
**To:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Hello GGRF Team,

We have question for you on communications.  Will there be any protocols provided to us for messaging on Monday's announcement?  We are working through our strategy for emails, social media posts, and press releases, but want to ensure that we are in alignment with any requirements or guidance you may have for us.

All the best,

Michele

**From:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>
**Sent:** Wednesday, April 17, 2024 8:59 PM
**To:** Mark DeBonee <mark.debonee@Inclusiveteam.org>; Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Hello Mark and the broader team,

Thank you very much for sharing this information. These stories will help us amplify how this program and these resources will help overburdened communities and households nationwide.

Again, we look forward to working with you.

Many thanks,
Ellie on behalf of Team GGRF

---

**From:** Mark DeBonee <mark.debonee@Inclusiveteam.org>
**Sent:** Wednesday, April 17, 2024 3:52 PM
**To:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Hello,

Thank you again for the amazing news, we are looking forward to working together.

Please see the attached document that includes the information requested (Press Quote, Point of Contact, Storytelling examples).

If you have any questions or need any additional information, please let us know.

Thank you!

Mark

---

**Mark A. DeBonee, CPA** (he/him/his)
INCLUSIVE PROSPERITY CAPITAL | CHIEF FINANCIAL OFFICER
860-969-1323 | mark.debonee@inclusiveteam.org

---

**From:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>
**Sent:** Tuesday, April 16, 2024 2:39 PM
**To:** Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>

**Cc:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Hello,

EPA is pleased to notify you that Inclusive Prosperity Capital, Inc.'s application to EPA's Notice of Funding Opportunity *EPA-R-HQ-SFA-23-01: Solar for All* has been selected for an award. The selection decision was made after evaluating and scoring your application in accordance with *Section V.B: Review and Selection Process* of the Notice of Funding Opportunity. We look forward to working with you and appreciate the immense time and effort that went into preparing your application.

Currently, we are informing a **small handful** of selected applicants prior to the public release to prepare communications for the announcement. **Very few** Solar for All selected applicants are receiving this email, and we request that you do not inform anyone outside of those who need to know in your organization of this information. **We will email you again with more information about your selection and funding amount when we inform all the other selected applicants, prior to the public announcement.**

We will announce the selections publicly on **Monday 4/22**, and news of the selections will be **embargoed for press until 5:00 AM ET on 4/22. As already mentioned, we ask that you please keep your selection extremely close hold until after this news is released.**

As we look ahead to the public announcement, we have several **immediate** requests (we need this information by **4:00pm ET on Wednesday 4/17**).

1. **Press Quote:** We would appreciate if you shared a quote about your selection that we could potentially use for an EPA press release or other similar public-facing materials. Please plan to share the quote as well as the name and title that it should be attributed to.

2. **Point of Contact:** Please include a communications point of contact for your organization so that EPA Public Affairs can coordinate with your team directly on any media requests.

3. **Storytelling Example:** EPA hopes to highlight successful examples/stories of work that you and any coalition partners have done that is **similar to** the work proposed under your application package. For selected applications, EPA will be specifically interested in telling **people-oriented, on-the-ground** stories that highlight the impact this historic investment will have in areas across the country—especially in low-income and disadvantaged communities. We may want to share these stories with national reporters and connect those reporters with individuals directly impacted. If there is a separate communications point of contact for said individuals, please include that information, too.

Here are several illustrative, fictional examples/stories of what EPA envisions. Please submit factual examples/stories of your own (to the extent available).

a. **EXAMPLE ONE:** In a small, rural community near **[XYZ CITY]**, Jonathan wanted to secure a better future for his children. With funding provided through **[EXISTING SELECTEE PROGRAM]**, **[SELECTEE]** financed a loan for Jonathan to install residential solar panels. In addition to the energy cost savings, tax credits, and environmental benefits, Jonathan will substantially improve his credit score as he pays off the loan and builds wealth for himself and his children.

b. **EXAMPLE TWO: [EXISTING SELECTEE PROGRAM]** operates throughout **[XYZ STATE]**, which has experienced some of the most disastrous effects of the climate crisis. **[SELECTEE]** recently partnered with **[XYZ COUNTY]** to invest in the installation of solar panels and battery backup systems for a 150-unit affordable senior housing project. These investments have helped the community reduce energy costs while also building resiliency, ensuring elderly residents can stay in their homes and remain protected against future climate impacts.

Please note: any information you share with us will not be evaluated as part of the review and selection process, as described in *Section V.B: Review and Selection Process* of the Notice of Funding Opportunity, nor factor into any funding decisions. As indicated in *Section VI.A: Award Notification and Disputes* of the Notice of Funding Opportunity, a selection is not final until all disputes are resolved, and selection does not guarantee funding, as only an authorized Award Official can bind the government to expenditure of funds.

Thank you in advance for your consideration of this request and helping amplify the potential impact from this program. Please let us know if you have any questions.

Sincerely,
David Widawsky
Director, Office of the Greenhouse Gas Reduction Fund
U.S. Environmental Protection Agency

Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.
Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.

Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.
Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.

# Exhibit K

| | |
|---|---|
| **From:** | Kelly, Bridget (she/her/hers) |
| **To:** | Kerry O"Neill |
| **Cc:** | Mark DeBonee; michele.kunitz_inclusiveteam.org; Musa Collidge-Asad; Charchenko, Elizabeth (she/her/hers) |
| **Subject:** | RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All |
| **Date:** | Wednesday, May 1, 2024 9:18:53 AM |
| **Attachments:** | image001.png |

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Hi Kerry,

Thank you for flagging, I just touched base with Ellie and it would be great if Inclusive Prosperity Capital could expand the award's planned geography to reach states that will not have a state level award  (specifically: adding DE, AL, IA, and KS). We're hoping to maximize coverage and minimize duplication, so we wouldn't be asking for an expansion into geographies covered under the state level awards (e.g. AR, KY, MS, WY).

In addition to the state expansion, please let us know if it would be possible for IPC to reach Northern Mariana and American Samoa (territories not currently covered by state level or multistate awards). We recognize that these are difficult geographies to serve, so please let us know if your team needs more time to consider feasibility.

If you're confident in changing geography (to serve additional states and/or territories), please let us know if you would like us to change it on our website.

Best,
Bridget (and it's okay, I get Kelly a lot!)

---

**From:** Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Sent:** Tuesday, April 30, 2024 4:53 PM
**To:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Thank you Bridget, I mean! (that last name, first, EPA listing threw me!)

**Kerry E. O'Neill**
CEO

**OFFICE >** 860-257-2884  **CELL >** 203-258-2550
**kerry.oneill@inclusiveteam.org**

**www.inclusiveprosperitycapital.org**



---

**From:** Kerry O'Neill
**Sent:** Tuesday, April 30, 2024 4:47 PM
**To:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

Thank you Kelly.

We have a question for you/Ellie on the geographies for SF-424. When I was with Ellie at the Earth Day event she asked me if we would be open to serving **all 50** states + DC and PR and I said we would be. Should we keep the geographies to the 42 states + DC/PR per our application, or should we update to reflect the conversation with Ellie?

We will revert back w/ website/contact info – that is in process right now.

Noted on the 5/7 optional/not reimbursable mtg on data structures. We'll aim to have some folks involved in impact reporting attend that.

**Kerry E. O'Neill**
CEO

**OFFICE >** 860-257-2884  **CELL >** 203-258-2550
**kerry.oneill@inclusiveteam.org**

**www.inclusiveprosperitycapital.org**



---

**From:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>
**Sent:** Tuesday, April 30, 2024 9:57 AM
**To:** Mark DeBonee <mark.debonee@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>; Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Good afternoon-

I'm writing to ask that you please update the *SF-424* and *Key Contacts* forms that you sent with your application, along with a few other requests. EPA needs the *SF-424* and *Key Contacts* forms to move forward with funding your project.

Solar for All has a large number of awards to obligate before the statutory deadline of September 30, 2024. Due to the number of awards and the tight timeline, the EPA will use a slightly modified obligation process for awarding funds. If you have previously received an EPA grant, the process will differ slightly.

EPA will award the funds conditionally prior to finalizing your budget and workplan and will allow you to draw down up to 2% of your total budget until conditions are met, as specified in the terms and conditions of your award.  Any costs incurred by the recipient beyond these limited funds are at their own risk until conditions are met. Nonprofits cannot draw down any funds until the pre-award certification review is completed.  We will hold a webinar in the coming weeks to explain this process further.

We kindly request that you provide these updates within two weeks (i.e., by 5/14/2024). If you need additional time, please let me know what is causing the delay—in case there is anything I can do to address these delays—and when we can expect the updated forms.

The changes we need to obligate funds are outlined below:


**SF424:**

- Please update the amount in box 18 to match the new funding amount found in Ellie's email, including cents.  **$249,300,000.00**
- Update the project start and end dates in box 17 to **5/1/2024 and 4/30/2029**
- In box 21, please make sure the 'Date Signed' has been updated to match the new date of signature with the above revisions.

**Key Contacts:**
- Please update if there have been any changes in the listed staff

**Public contact request:**

- EPA has already received requests from people interested in deploying solar panels in their homes. We'd like to provide a way for these interested homeowners to contact you, similar to how EPA has included contact information or websites for selected applicants for the National Clean Investment Fund and the Clean Communities Investment Accelerator. Please let me

know if there is a website or contact information for your program that we could share on the [EPA's Solar for All website](EPA's Solar for All website) or with homeowners who contact us.  We understand that many of you will not yet have a website for your program; however, once you do, please notify me, and EPA will post it on our website.

*Optional:* **Solar for All Data Structures & Reporting Feedback Session:**

On May 7th, 2024, at 2:00 pm EST, all selectees are invited to join an <u>entirely voluntary</u> session to deepen GGRF's engagement and teamwork on data structures and reporting. Your participation is <u>entirely voluntary</u> and may not be reimbursable as a pre-award expense. This session covers (1) asset and (2) project finance, including subsidies of any kind to support Solar for All. We will share our reporting data structures and templates and look forward to discussing how they can tell the story of this historic investment in our climate and our communities. If your organization is interested in participating, please forward the attached calendar invites to the <u>relevant</u> team members.

Please **do not forward the invitation *outside of your organization***.

Please respond to this email and confirm receipt.

I'm here to answer any questions you may have. Please don't hesitate to contact me.

Best,
Bridget

---

**From:** Mark DeBonee <[mark.debonee@Inclusiveteam.org](mark.debonee@Inclusiveteam.org)>
**Sent:** Tuesday, April 23, 2024 2:33 PM
**To:** Kelly, Bridget (she/her/hers) <[Kelly.Bridget@epa.gov](Kelly.Bridget@epa.gov)>; Kerry O'Neill <[Kerry.ONeill@inclusiveteam.org](Kerry.ONeill@inclusiveteam.org)>; michele.kunitz_inclusiveteam.org <[michele.kunitz@inclusiveteam.org](michele.kunitz@inclusiveteam.org)>; Musa Collidge-Asad <[musa.collidgeasad@Inclusiveteam.org](musa.collidgeasad@Inclusiveteam.org)>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Hi Bridget,

Received, thank you! Primary point of contact for the obligation process would be Michele Kunitz, our General Counsel.

For the updates coming for the SF-424, is that just the SF-424 application pages or would that include updating the SF-424A budget information and breakouts by object class and year for the actual award amount?

Thank you!

Mark

_____

**Mark A. DeBonee, CPA** (he/him/his)
INCLUSIVE PROSPERITY CAPITAL | CHIEF FINANCIAL OFFICER
860-969-1323 | mark.debonee@inclusiveteam.org

---

**From:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>
**Sent:** Tuesday, April 23, 2024 1:56 PM
**To:** Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>; Michele Kunitz
<Michele.Kunitz@Inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa
Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or
> opening attachments. When in doubt, contact the Helpdesk.

Good Afternoon-

I am following up on David Widawsky's email to express my excitement about working on this
project with you. As you are aware, the statute authorizing the EPA to make these grants requires us
to obligate the funds by September 30, 2024. I will be your primary point of contact for getting your
grant obligated over the next few months.

**What should I be doing now?**
- Celebrate! This application was a huge task, and only 60 awards out of 150 applications
  were selected.
- Amplify the announcement throughout your networks.
- Identify if there are other main points of contact I should be reaching out to through
  email other than the ones on this initial email. Please let me know who will be the primary
  point of contact for the award obligation process.

**What to Expect Next**
- By the first week of May, I will contact you to request updates to the SF-424 and Key
  Contacts documents and provide specific details on any necessary updates, including, if
  required, renewing your SAM.gov registration. We will need you to update these forms
  with the necessary information as soon as possible.
- EPA's Office of Environmental Justice and External Civil Rights (OEJECR) may contact you
  with requests; please assist them as needed.
- EPA Compliance Team may contact you; please collaborate with them on any required
  documentation.

- In the coming weeks and months, the EPA's Solar for All Team will provide training and opportunities to collaborate with other grantees to help us move through the obligation process.

Again, congratulations! If you have any immediate questions, please contact me. I'm looking forward to working with you.

Bridget

---

**From:** SFA <SFA@epa.gov>
**Sent:** Monday, April 22, 2024 12:34 AM
**To:** Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>; SFA <SFA@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

Good evening,

I hope that you are having a good weekend! Firstly, thank you for the information you provided last week, and for the story you shared in your latest email! I agree – it is an inspiring story, and we shared it not only with our communications folks but the entire Solar for All team.

I am following up on our earlier email with more information about your award and the announcement of the Solar for All selected applicants tomorrow. We appreciate your help as we manage the announcement of this historic program.

Reminder: EPA will announce the selections publicly on **Monday 4/22**, and news of the selections will be **embargoed for press until 5:00 AM ET on 4/22. As already mentioned, we ask that you please keep your selection private until after this news is released.**

EPA intends to award **Inclusive Prosperity Capital's** application a total of **$249,300,000.00** in federal funding, of which **$400,000.00 will be awarded as in-kind services from EPA**. EPA is partnering with the U.S. Department of Energy to develop a National Solar for All Technical Assistance Program for all Solar for All selected applicants. All Solar for All selected applicants will receive $400,000.00 of their total federal funding as services from the National Solar for All Technical Assistance Program. We will provide more information on the services available before you finalize your program budget and workplan.

In advance of the announcement tomorrow, I have also attached the following communications material for your awareness:

1. EPA's draft and embargoed **press release** for Solar for all Announcement with approved Administrator quote. *Please note: this press release is subject to change.*

2. EPA's **social media toolkit** for the Solar for All announcement

You are not required to use any of the attached materials; however, you are welcome to use anything useful from the materials to promote your selection. The press release includes an approved quote from the EPA Administrator, which your organization is welcome to include in your respective public-facing materials. EPA does not need to review any communications your organization chooses to make about this exciting news, and EPA does not have any specific requirements nor guidelines for selected applicant communications besides the embargo on this information previously stated.

Once more, we look forward to working with you! For your awareness, on this email you have contact information for:
- **Bridget Kelly:** The EPA Project Officer who will be assisting you with the initial phases of grant obligation.
- **Nate Hitchings**: Our strategic communications advisor who can assist with any questions related to press and communications.

Please note, as previously stated, selection does not guarantee a final award. A final award is contingent on your compliance with all applicable statutes, regulations, and policies; your agreement with the terms and conditions of the award agreement; and the completion of administrative disputes. EPA anticipates making the awards no later than September 30th, 2024—the statutory deadline for EPA to obligate the funds, and meeting that goal is contingent on your engagement in the award process.

Sincerely,
Ellie on behalf of EPA's Office of the Greenhouse Gas Reduction Fund


Elizabeth "Ellie" Charchenko | She/Her
Special Advisor for Implementation
Office of the Greenhouse Gas Reduction Fund
U.S. Environmental Protection Agency
+1 202-948-3823 | charchenko.elizabeth@epa.gov

---

**From:** Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Sent:** Thursday, April 18, 2024 8:40 PM
**To:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

**Caution:** This email originated from outside EPA, please exercise additional caution when

> deciding whether to open attachments or click on provided links.

Hi GGRF Team,

Related to one of the stories we shared (EnerWealth/Maria Mitchell), wanted to also share this NC PBS piece on the same project that was just posted online, in case it is useful to you: feature on our pilot sites.

It is so inspiring!

(and directly related to one of the program models we want to scale up under our SFA award – so grateful for this opportunity)

**Kerry E. O'Neill**
CEO

OFFICE > 860-257-2884   CELL > 203-258-2550
**kerry.oneill@inclusiveteam.org**

**www.inclusiveprosperitycapital.org**



---

**From:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>
**Sent:** Thursday, April 18, 2024 3:57 PM
**To:** Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Hi Michele,

EPA does not have any formal protocols or guidelines for selected applicants regarding announcements like this. We will share the material EPA intends to release shortly before the announcement for your awareness. This material will likely not come before Sunday, so I do not recommend waiting to receive our material to prepare.

Many thanks,
Ellie

**From:** Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>
**Sent:** Thursday, April 18, 2024 11:16 AM
**To:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; Mark DeBonee <mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Hello GGRF Team,

We have question for you on communications.  Will there be any protocols provided to us for messaging on Monday's announcement?  We are working through our strategy for emails, social media posts, and press releases, but want to ensure that we are in alignment with any requirements or guidance you may have for us.

All the best,

Michele

**From:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>
**Sent:** Wednesday, April 17, 2024 8:59 PM
**To:** Mark DeBonee <mark.debonee@Inclusiveteam.org>; Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@Inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Hello Mark and the broader team,

Thank you very much for sharing this information. These stories will help us amplify how this program and these resources will help overburdened communities and households nationwide.

Again, we look forward to working with you.

Many thanks,
Ellie on behalf of Team GGRF

---

**From:** Mark DeBonee <mark.debonee@Inclusiveteam.org>
**Sent:** Wednesday, April 17, 2024 3:52 PM
**To:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>;
michele.kunitz_inclusiveteam.org <michele.kunitz@inclusiveteam.org>; Musa Collidge-Asad
<musa.collidgeasad@Inclusiveteam.org>; Kerry O'Neill <Kerry.ONeill@inclusiveteam.org>
**Cc:** Kelly, Bridget (she/her/hers) <Kelly.Bridget@epa.gov>; Hitchings, Nate
<Hitchings.Nate@epa.gov>
**Subject:** RE: Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email originated from outside EPA, please exercise additional caution when
> deciding whether to open attachments or click on provided links.

Hello,

Thank you again for the amazing news, we are looking forward to working together.

Please see the attached document that includes the information requested (Press Quote, Point of
Contact, Storytelling examples).

If you have any questions or need any additional information, please let us know.

Thank you!

Mark

_____
**Mark A. DeBonee, CPA** (he/him/his)
Inclusive Prosperity Capital | Chief Financial Officer
860-969-1323 | mark.debonee@inclusiveteam.org

---

**From:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>
**Sent:** Tuesday, April 16, 2024 2:39 PM
**To:** Michele Kunitz <Michele.Kunitz@Inclusiveteam.org>; Mark DeBonee
<mark.debonee@Inclusiveteam.org>; Musa Collidge-Asad <musa.collidgeasad@Inclusiveteam.org>
**Cc:** GGRF_Application_Review <GGRF_Application_Review@epa.gov>; Kelly, Bridget (she/her/hers)
<Kelly.Bridget@epa.gov>; Hitchings, Nate <Hitchings.Nate@epa.gov>
**Subject:** Application Selected for EPA-R-HQ-SFA-23-01: Solar for All

> **Caution:** This email is from an external source. Please take care when clicking links or

> opening attachments. When in doubt, contact the Helpdesk.

Hello,

EPA is pleased to notify you that Inclusive Prosperity Capital, Inc.'s application to EPA's Notice of Funding Opportunity *EPA-R-HQ-SFA-23-01: Solar for All* has been selected for an award. The selection decision was made after evaluating and scoring your application in accordance with *Section V.B: Review and Selection Process* of the Notice of Funding Opportunity. We look forward to working with you and appreciate the immense time and effort that went into preparing your application.

Currently, we are informing a **small handful** of selected applicants prior to the public release to prepare communications for the announcement. **Very few** Solar for All selected applicants are receiving this email, and we request that you do not inform anyone outside of those who need to know in your organization of this information. **We will email you again with more information about your selection and funding amount when we inform all the other selected applicants, prior to the public announcement.**

We will announce the selections publicly on **Monday 4/22**, and news of the selections will be **embargoed for press until 5:00 AM ET on 4/22. As already mentioned, we ask that you please keep your selection extremely close hold until after this news is released.**

As we look ahead to the public announcement, we have several **immediate** requests (we need this information by **4:00pm ET on Wednesday 4/17**).

1. **Press Quote:** We would appreciate if you shared a quote about your selection that we could potentially use for an EPA press release or other similar public-facing materials. Please plan to share the quote as well as the name and title that it should be attributed to.

2. **Point of Contact:** Please include a communications point of contact for your organization so that EPA Public Affairs can coordinate with your team directly on any media requests.

3. **Storytelling Example:** EPA hopes to highlight successful examples/stories of work that you and any coalition partners have done that is **similar to** the work proposed under your application package. For selected applications, EPA will be specifically interested in telling **people-oriented, on-the-ground** stories that highlight the impact this historic investment will have in areas across the country—especially in low-income and disadvantaged communities. We may want to share these stories with national reporters and connect those reporters with individuals directly impacted. If there is a separate communications point of contact for said individuals, please include that information, too.

   Here are several illustrative, fictional examples/stories of what EPA envisions. Please submit factual examples/stories of your own (to the extent available).

   a. **EXAMPLE ONE:** In a small, rural community near **[XYZ CITY]**, Jonathan wanted to secure a better future for his children. With funding provided through **[EXISTING**

SELECTEE PROGRAM], [SELECTEE] financed a loan for Jonathan to install residential solar panels. In addition to the energy cost savings, tax credits, and environmental benefits, Jonathan will substantially improve his credit score as he pays off the loan and builds wealth for himself and his children.

b. **EXAMPLE TWO: [EXISTING SELECTEE PROGRAM]** operates throughout **[XYZ STATE]**, which has experienced some of the most disastrous effects of the climate crisis. **[SELECTEE]** recently partnered with **[XYZ COUNTY]** to invest in the installation of solar panels and battery backup systems for a 150-unit affordable senior housing project. These investments have helped the community reduce energy costs while also building resiliency, ensuring elderly residents can stay in their homes and remain protected against future climate impacts.

Please note: any information you share with us will not be evaluated as part of the review and selection process, as described in *Section V.B: Review and Selection Process* of the Notice of Funding Opportunity, nor factor into any funding decisions. As indicated in *Section VI.A: Award Notification and Disputes* of the Notice of Funding Opportunity, a selection is not final until all disputes are resolved, and selection does not guarantee funding, as only an authorized Award Official can bind the government to expenditure of funds.

Thank you in advance for your consideration of this request and helping amplify the potential impact from this program. Please let us know if you have any questions.

Sincerely,
David Widawsky
Director, Office of the Greenhouse Gas Reduction Fund
U.S. Environmental Protection Agency

Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.
Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.
Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as

may be permitted by a signed confidentiality agreement between the parties.

Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.

Notice: This electronic mail transmission and any attachments may be confidential. It is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately notify the sender and delete the email. Unintended transmission shall not constitute waiver of its confidentiality. Opening the contents and attachments to this email shall be deemed an agreement to keep the contents confidential, and not to use such information, except as may be permitted by a signed confidentiality agreement between the parties.

# Exhibit L

SENSITIVE BUT UNCLASSIFIED



**Account Profile Inquiry**

Date: 08/18/2025
Time: 12:03 PM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
5H84087901

**Recipient ID:**
0914421

**Recipient Short Name:**
IPC

**Inquiry Results:**

### ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID : | 0914421 |
| Account ID : | 5H84087901 |
| Account Description : | COMMUNITY POWER COALITION |
| 1031/LOC Account : | No |
| Account Type : | Regular Account |
| Group ID : | 8499 |
| Control Account : | No |
| Account Status Indicator : | Liquidated |
| Available Balance : | $17,014,931.55 |
| Create Date : | 08/02/2024 |
| Begin Date : | 05/01/2024 |
| Performance Period End Date : | 08/15/2025 |
| End Date : | 12/08/2025 |
| TAS Distribution Method : | Percentage by Account |
| Allow Book Entry Adjustment : | Yes |
| Allow Warehoused Payments : | Yes |
| CMIA Indicator : | No |

### CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount : | $19,642,967.34 |
| Cumulative Authorized Amount Reset Period : | |
| Annual Reset Month : | |

### GRANT DETAILS

| | |
|---|---|
| Grant : | Yes |
| Federal Award Identification Number (FAIN) : | 5H84087901 |
| CFDA Number : | 66959.000 |
| Total Estimated Grant Amount : | $0.00 |

### AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review : | No |
| Threshold Amount : | |
| Reason for Review : | |

### DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount : | |
| Max Daily Draw Amount : | |
| Max Monthly Draw Amount : | |
| Max Quarterly Draw Amount : | |

### AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount : | $0.00 |
| Certified Date : | |
| Renewal Frequency : | |
| Pending Renewal Frequency : | |
| Pending Automated Renewal Amount : | $0.00 |
| Rollover Reset Quarter : | |
| Default Action : | |

SENSITIVE BUT UNCLASSIFIED

# Exhibit M

5H - 84087901 - 2    Page 1

| | GRANT NUMBER (FAIN): 84087901 | |
|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>Assistance Amendment | MODIFICATION NUMBER: 2<br>PROGRAM CODE: 5H | **DATE OF AWARD**<br>08/07/2025 |
| | **TYPE OF ACTION**<br>No Cost Amendment | **MAILING DATE**<br>08/07/2025 |
| | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>PEND |

| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| INCLUSIVE PROSPERITY CAPITAL INC<br>75 Charter Oak Ave<br>STE 1-103<br>Hartford, CT 06106-1903<br>**EIN:** 83-0808658 | INCLUSIVE PROSPERITY CAPITAL INC<br>75 Charter Oak Ave<br>STE 1-103<br>Hartford, CT 06106-1903 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Musa Collidge-Asad<br>75 Charter Oak Ave<br>STE 1-103<br>Hartford, CT 06106-1903<br>**Email:** musa.collidgeasad@inclusiveteam.org<br>**Phone:** 860-775-2090 | Bridget Kelly<br>1200 Pennsylvania Ave. NW, 31150<br>Washington, DC 20460<br>**Email:** kelly.bridget@epa.gov<br>**Phone:** 202-566-0718 | Jennifer Brooks<br>1200 Pennsylvania Ave. NW, 3903R<br>Washington, DC 20460<br>**Email:** Brooks.Jennifer@epa.gov<br>**Phone:** 202-564-6374 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

The Community Power Coalition "Powering America Together" Program

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements.  Administrative terms and conditions are added.

Per 2 CFR 200.340 (a)(4) and the administrative terms and conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| **BUDGET PERIOD**<br>05/01/2024 - 08/07/2025 | **PROJECT PERIOD**<br>05/01/2024 - 08/07/2025 | **TOTAL BUDGET PERIOD COST**<br>$ 249,300,000.00 | **TOTAL PROJECT PERIOD COST**<br>$ 249,300,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,300,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave. NW<br>Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official for** Phillip Schindel - Acting Director, Grants Mgmt. and Business Operations Division<br>**by** Katherine Tsing-Choy - Award Official Delegate | **DATE**<br>08/07/2025 |

5H - 84087901 - 2    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 248,900,000 | $ 0 | $ 248,900,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 249,300,000 | $ 0 | $ 249,300,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84087901 - 2    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 14,985,485 |
| 2. Fringe Benefits | $ 4,046,088 |
| 3. Travel | $ 344,495 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 72,000 |
| 6. Contractual | $ 140,337,545 |
| 7. Construction | $ 0 |
| 8. Other | $ 85,193,239 |
| 9. Total Direct Charges | $ 244,978,852 |
| 10. Indirect Costs: 15.00 % Base MTDC | $ 4,321,148 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 249,300,000 |
| 12. Total Approved Assistance Amount | $ 249,300,000 |
| 13. Program Income | $ 46,069,745 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 249,300,000 |

## Administrative Conditions

### UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

   a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

   b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

   c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect.  The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

   a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

   b. Explanations on why established outputs/outcomes were not met; and

   c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

   a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

   b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

## Programmatic Conditions

All Programmatic Conditions Remain the Same.

# Exhibit N

| | |
|---|---|
| **From:** | Deutsch, Brandon |
| **To:** | molina.michael@epa.gov |
| **Cc:** | brown.devon@epa.gov; schindel.phillip@epa.gov; Zoli, Elise; Michele.Kunitz@inclusiveteam.org; Snyder, Brent |
| **Subject:** | Re: 5H-84087901, Inclusive Prosperity Capital, Dispute Submission and Disagreement with Amendment |
| **Date:** | Wednesday, August 27, 2025 11:51:59 PM |
| **Attachments:** | image001.png<br>5H-84087901, Inclusive Prosperity Capital, Dispute Submission and Disagreement with Amendment.pdf |

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Principal Deputy Assistant Administrator Molina,

Attached on behalf of Awardee IPC in the above Award, please find our submission disputing EPA's Notice of Termination under 2 CFR 1500.15 and disagreeing with the Assistance Amendment. All information requested by EPA is included in the attached submission.

Our appreciation for your consideration with respect to this submission, and please do not hesitate to reach out to Michele, Elise, Brent or me with any questions.

Best,
Brandon Deutsch

# WILSON SONSINI

**Brandon Deutsch | Associate | Energy and Climate Solutions | Wilson Sonsini Goodrich & Rosati**
One Boston Place | 201 Washington Street | Boston, MA 02108 | direct: 617.598.7857 | bdeutsch@wsgr.com

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

One Boston Place
201 Washington Street, Suite 2000
Boston, Massachusetts 02108-4403

O: 617.598.7800
F: 866.974.7329

ELISE N. ZOLI
Internet: EZOLI@wsgr.com
Direct dial:  857-289-1989

August 27, 2025

Michael Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460
Via email at: molina.michael@epa.gov
With copy to: Brown.devon@epa.gov
With copy to: schindel.phillip@epa.gov

> **Re:** **5H-84087901, Community Power Coalition "Powering America Together" Program ("Award"), Recipient Inclusive Prosperity Capital Inc. ("IPC" or "Awardee"), Dispute Submission under Notice (defined below) and Disagreement with Amendment (defined below)**

Dear Principal Deputy Assistant Administrator Molina:

As directed in the Notice of Termination, dated August 7, 2025 ("Notice") (attached as **Exhibit A**), this correspondence (including all exhibits) timely summarizes the current bases for IPC's objection to, disagreement with and dispute with the U.S. Environmental Protection Agency's ("EPA"): (1) summary form Notice purporting to terminate IPC's Award under the Solar for All ("SFA") program, and (2) Amendment to the Assistance Agreement purporting to amend the Award, dated August 7, 2025, also attached as **Exhibit A** ("Amendment;" collectively, where no distinction is required, the "Notice," which is the "disputed Agency Decision.") IPC's Award was entered into between IPC and EPA more than one year ago, i.e., on July 12, 2024, and expressly provides for the Congressionally mandated obligation and therefore transfer to IPC of $249.3 million dollars in Award funds. As of the date of this submission, EPA has liquidated IPC's ASAP account (a screenshot of which, dated August 18, 2025, is attached as **Exhibit B**), which currently holds $17,014,931.55. We are counsel for and an authorized representative of IPC.

IPC respectfully advises EPA that the form Notice, which we understand has been provided simultaneously to all sixty (60) SFA recipients, including IPC (collectively, "Recipients"), is invalid, and contains material legal errors. As such, the Notice and, therefore, both the purported

**IPC advises EPA or any other U.S. governmental entity that this document in its entirety may contain business sensitive, commercial, financial, trade secrets, proprietary, personal, or otherwise confidential information that is exempt from public disclosure under applicable law (including 2 CFR Part 200, 5 U.S.C. Section 552, 2 CFR Part 1500 and comparable state law). Such information shall be used or disclosed in accordance with this submission. IPC understands that EPA may use or disclose any data or information solely to the extent that is not appropriately marked or restricted.**

WILSON
SONSINI

Principal Deputy Assistant Administrator Molina
August 27, 2025
Page 2

termination of IPC's Award and EPA's seizure or conversion of IPC's fully obligated Award funds (and any later derived Program Income) is illegal. As detailed below, the One Big Beautiful Bill Act ("OBBBA") has no effect on the fully obligated Award funds, nor does it credibly alter or impair EPA's authority or ability to administer of the Award.  That said, to the extent that EPA credibly demonstrates that it lacks resources to administer the Award with its existing more than 12,000 personnel, whom EPA has opined are more than adequate to perform EPA's reduced functions, IPC proposes a resolution that fully meets EPA's obligations under law and practice without resort to termination.

This correspondence is provided as EPA has directed in the Notice, i.e., referencing 2 CFR § 1500.15, and in the spirit of collaboration among important, committed counterparties to the binding legal agreement that is IPC's Award.  It in no way limits IPC's rights to immediate judicial challenge and remedies, and nothing herein waives or can be deemed to waive those rights and remedies, particularly given that EPA's Notice is so expressly contrary to the Award and applicable law that futility considerations necessarily are implicated.

IPC appreciates EPA's express recognition in the Notice that IPC has relied on the Award.  Notice, p. 1.  To be clear and unsurprisingly for an Award in place for more than a year, IPC has properly incurred significant legally binding "financial obligations" (*see, e.g.,* SFA T&Cs, Section III.Q.5 and 2 CFR § 200.343(q)) [1] to both its third-party, EPA-approved Named Subrecipients (totaling approximately $60M) and to its third-party, procured project developers (totaling approximately $48M). IPC, of course, is committed to and must undertake oversight of these subawards and project contracts, the reasonable and necessary costs for which IPC has estimated at over $8.0M over the next thirty-six (36) months (based on a reduced or core team that is continuing, estimated at two-thirds of the current team), with a tail off for post-subaward compliance mandates of over $2.2M for the following twenty-four (24) months (i.e., in 2028 and 2029, consisting of another significant reduction to approximately one-third of the team).

IPC further appreciates that EPA recognizes in the Notice that IPC is entitled to request and receive payment both for: (1) "financial obligations" properly incurred prior to August 7, 2025, e.g., the approximately $108M in grant and loan commitments, and (2) "reasonable and necessary" costs that  continue after August 7, 2025 that were properly incurred before the effective date of this termination, i.e., IPC's Program Administration costs. *See* Notice, p. 1 (*citing* 2 CFR § 200.343) and p. 2 ("Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo."). Further, IPC's requests for payment require EPA's prompt allocation of IPC's Award funds. *See, e.g.*, 2 CFR § 200.344(d) (even in close-out (post-termination), EPA "must not delay payments" to IPC). Delay in or failure of EPA to make the requisite prompt payments to IPC is expected to compound and exacerbate the damages that IPC and its Award partners (defined

---

[1] Additionally, the Government Accountability Office ("GAO") defines an obligation as a: "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States. An agency incurs an obligation, for example, when it places an order, signs a contract, *awards a grant ... .*" GAO, GAO-05-734SP Budget Glossary 70 (September 2005) (emphasis added).

*As set out in the first page of this document, this document contains business sensitive, trade secrets, proprietary, or otherwise confidential information exempt from disclosure.*

**WILSON SONSINI**

Principal Deputy Assistant Administrator Molina
August 27, 2025
Page 3

below) have already suffered via its reliance on the Award and its performance of its obligations thereunder.

<u>Overview and Statement of Legal and Factual Grounds for this Correspondence:</u>

As detailed below, IPC objects to the Notice on the following grounds: (1) the OBBBA does not support EPA's Notice, Amendment or seizure or conversion of IPC's Award funds (*see* Notice at 1); (2) EPA's purported *unilateral termination* of the Award is invalid, because it expressly contravenes the Award-specific Terms and Conditions, dated December 3, 2024 ("SFA T&Cs", attached as **Exhibit C**), the EPA General Terms and Conditions (excerpted in relevant part and attached as **Exhibit D**), and otherwise contravenes applicable law (including 2 CFR Part 200), as the federal courts on a temporary restraining order and preliminary injunction basis have already determined in  another Greenhouse Gas Reduction Fund ("GGRF") matter; (3) EPA's purported *unilateral amendment* is invalid, because it likewise contravenes the SFA T&Cs (*see* SFA T&Cs, Section III.AB) and applicable law; and (4) EPA's claimed inability to administer the Award due to appropriations rescissions by the OBBBA does not support termination of the Award and is readily remediable.

It bears mention that IPC's damages arising from EPA's Notice, particularly viewed in the context of the District Court's preliminary relief in the pending GGRF litigation (which has been administratively stayed pending the District of Columbia Circuit Court of Appeals' review), are reasonably expected to exceed the value of the Award (as detailed below in Section 4).  Thus, and respectfully, EPA's actions are not only illegal, but not in the U.S.'s interest.

### ***Section 1: The OBBBA is not a reasonable basis for termination of the Award.***

Nothing in the OBBBA undermines EPA's "authority" with respect to IPC's fully obligated Award, because the funds are already IPC's. There is no dispute that Congress required EPA *to fully obligate* Solar for All ("SFA") award funds no later than September 30, 2024, and, via its July 2024 Award, EPA transferred and IPC received $249.3M in *fully obligated* funds. *See, e.g.,* 42 U.S.C. § 7434(a)(1) (now repealed) (mandating obligation); EPA Grant Agreement, at p. 2 ("*Obligation/Deobligation*", also including $400,000 in EPA in-kind contributions as part of the Award corpus) (excerpted and attached on a courtesy basis for ease as **Exhibit E**). As such, IPC's Award funds are excluded from Congress's OBBBA directive, which rescinds only the "*unobligated* balance" of GGRF funds: "Section 134 of the Clean Air Act (42 U.S.C. § 7434) is repealed and the *unobligated balance of amounts* made available to carry out that section (*as in effect on the day before the date of enactment of this Act*) are rescinded." OBBBA, § 60002 (emphasis added); *see also* OBBBA, § 50402(a) (rescinding the balance of unobligated Inflation Reduction Act funds). Thus, IPC's fully obligated Award funds are unaffected by the OBBBA.

What Congress in the OBBBA did not do is as important as what it did.  Congress did not in the OBBBA direct EPA to terminate IPC's Award, which remains a fully binding, multi-year agreement which EPA must abide as a matter of law: "Award Agreement means the set of *legally binding documents* between EPA and the Recipient under the federal award." (Emphasis added) (SFA T&Cs, Section I). Likewise, Congress did not in the OBBBA direct EPA to: (1) seize or convert

*As set out in the first page of this document, this document contains business sensitive, trade secrets, proprietary, or otherwise confidential information exempt from disclosure.*

**WILSON SONSINI**

Principal Deputy Assistant Administrator Molina
August 27, 2025
Page 4

IPC's fully obligated funds under its Award, (2) modify the awards, including IPC's Award, or (3) modify the regulations governing those awards (e.g., 2 CFR Parts 200 and 1500). Thus, despite the OBBBA, IPC's Award remains unaffected and binding on EPA and IPC alike. That Award specifies the sole bases for its termination and EPA's rights to IPC's Award funds, none of which EPA has alleged or could allege against IPC (as detailed in Section 4 and not repeated here).

To the contrary, the circumstances surrounding EPA's actions underscore the agency's illegality here. EPA has made no claim that IPC and its fifty-nine (59) contemporaneously awarded states and non-profit organizations, all of which have received SFA funding, simultaneously engaged in the uncured and uncurable serious malfeasance that could lead to simultaneous, unilateral, mass award termination. *See, e.g.*, 2 CFR § 200.339 (identifying EPA's stepwise approach to non-compliance, stating: "The Federal agency or pass-through entity may implement specific conditions if the recipient or subrecipient fails to comply … When the Federal agency or pass-through entity determines that noncompliance cannot be remedied by imposing specific conditions, the Federal agency or pass-through entity may take one or more of the following actions."). Further, IPC is entitled to receive the additional procedural protections afforded by applicable law, all of which are designed to protect IPC against illegal government overreach. *See, e.g.*, 2 CFR § 200.342 ("Upon initiating a remedy for noncompliance (for example … termination), the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action. The Federal agency … must comply with any requirements for hearings, appeals, or other administrative proceedings to which the recipient … is entitled under any statute or regulation applicable to the action involved."); 5 U.S.C. §§ 551-559 (the Administrative Procedure Act, the foundational federal law ensuring that administrative agencies, including EPA, operate within the bounds of the U.S. Constitution and law, affording procedural protections to those interacting with EPA, including SFA awardees).

EPA's reliance on the OBBBA as the basis for termination of the Award is not enough. The stated rationale in the Notice is that, as a result of the OBBBA, EPA "no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All." However, EPA's "substantive legal authority" to oversee IPC's Award is not derived from Section 134, but from 2 CFR Parts 200 and 1500 (as specified in the Award). *See* EPA Grant Agreement, at p. 2 ("Regulatory Authority: 2 CFR 200, 2 CFR 1500 and 40 CFR 33"). Thus, the OBBBA has no effect on EPA's authority with respect to IPC's Award. Likewise, the OBBBA's impact on appropriations does not support a termination (as detailed below in Section 2 and not repeated here).

### *Section 2: EPA can continue to administer the Award despite the OBBBA, obviating the need for termination.*

EPA also claims in the Notice that "… the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated … all appropriations related to Solar for All … [so] … the Agency no longer possesses … the financial appropriations needed to continue

*As set out in the first page of this document, this document contains business sensitive, trade secrets, proprietary, or otherwise confidential information exempt from disclosure.*

**WILSON SONSINI**

Principal Deputy Assistant Administrator Molina
August 27, 2025
Page 5

implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All." EPA overstates its case and proposes a needlessly excessive remedy - termination.

IPC values EPA oversight, but there are many reasonable mechanisms for achieving such oversight. EPA has a proposed administrative budget request that is, by EPA's own assertion, more than adequate basis to maintain EPA's general oversight function, particularly given EPA's claims that its existing 14,130 staff will be reduced to 12, 856 employees without impairing EPA functionality and EPA's termination of many and various programs. See, e.g., EPA, FY2026 EPA Budget in Brief, p. 3 (2026 President's budget "will ensure that [EPA] can carry out its core missions and statutory responsibilities, while eliminating wasteful spending … .").

Even if EPA's claims that it cannot oversee sixty (60) Awards with 12,856 employees were correct, other less draconian remedies than termination exist and should be a priority. For example, to the extent EPA can credibly establish that it no longer possesses personnel sufficient to oversee and administer the Award, SFA recipients could appoint an independent third party to oversee the Award as a contractor (paid with Program Administration funds consistent with IPC's EPA-approved Workplan and Budget). Indeed, EPA's support for the use of independent reviewers in lieu of EPA for compliance purposes is long, broad and time-tested. *See, e.g.,* 40 CFR § 35.3165(d) (enabling EPA to conduct or have awardees "independently conduct" an annual financial and compliance audit, in the context of Clean Water State Revolving Funds, a program comparable to SFA in that the majority of awardees are state entities); 2 CFR Part 200, Subpart F (requiring independent annual audits performed by qualified entities assessing both financial statements and "internal control" compliance with respect to federally funded programs, including EPA programs, where awards are above a certain annual threshold met by IPC here); *see also* EPA's Peer Review and Peer Involvement memorandum, dated January 21, 2006 ("Peer review, a form of peer involvement, is one process through which EPA staff augment their capabilities by inviting independent subject-matter experts to provide objective evaluation of work product."); EPA's Science and Technology Policy Council, Peer Review Handbook p. xiii, 4th Edition (EPA/100-B-15/001) (October 2015) ("EPA has a long-standing history of peer review."); American Economic Association, February 1, 2022 announcement of the opportunity for independent expert reviewers (In the biofuels context, "EPA has instructed [EPA's contractor, Eastern Research Group, Inc.] to formulate a single pool of eighteen (18) candidate external reviewers to provide independent external peer review."). Thus, EPA's purported termination is not necessary to continue the effective oversight of IPC's Award.

### *Section 3: EPA's unilateral Amendment is unlawful.*

EPA issued a unilateral - or one-sided - Amendment to IPC stating: "EPA is terminating this award." *See* Amendment at 1 (Project Title and Explanation of Changes); *see also* Notice at 1 (stating that "the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84087901 awarded to Inclusive Prosperity Capital, Inc."). EPA claims that 2 CFR § 200.340(a)(4) allows it to terminate the Award via its unilateral Amendment. EPA is doubly incorrect.

*As set out in the first page of this document, this document contains business sensitive, trade secrets, proprietary, or otherwise confidential information exempt from disclosure.*

**WILSON
SONSINI**

Principal Deputy Assistant Administrator Molina
August 27, 2025
Page 6

First, contrary to EPA's assertion, unilateral or one-sided amendment of IPC's Award is prohibited by the SFA T&Cs. Section III.AB of the SFA T&Cs expressly states: "EPA Award Official or Grants Management Officer *and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement.* Agreed-upon modifications must be in writing. Oral or *unilateral modifications shall not be effective or binding.*" (Emphasis added). EPA did not negotiate the Amendment with IPC. IPC has not signed, nor would it sign, the Amendment, which did not even include a signature block or any means for IPC to "agree," as the SFA T&Cs require. That is enough to invalidate the Amendment.[2] Thus, EPA's purported Amendment, and the Notice based on that unilateral Amendment, are not "effective" and not "binding" on IPC.

Second, even if the Award did not invalidate unilateral amendments, federal law incorporated into the Award does not allow unilateral amendment as a mechanism to bootstrap an Award termination. As detailed in Section 4, the SFA T&Cs restrict termination to only those circumstances, not present here, "*when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination.*" Section III.Q.5 (emphasis added). Thus, EPA's purported Amendment, and the termination based on that unilateral Amendment, are otherwise illegal and invalid.

### *Section 4: EPA's other publicly claimed bases for termination are invalid and illegal.*

The EPA Administrator has also suggested a separate underlying basis for termination, incorrectly deriding the program as not aligned with the Trump Administration's goals and stating that SFA "diluted [your tax dollars] through up to FOUR pass-through entities … !" (A screenshot of the X post, dated August 7, 2025 at 2:07 PM ET, is attached as **Exhibit F**.). We respectfully submit that affordable energy for American families, businesses and communities is in the public interest. Further, the overwhelming majority of IPC's financial assistance is directly allocated to third-party projects, not via pass-through entities, which means that IPC's direct accountability to EPA is not in question.

To the extent EPA is claiming different or alternative priorities, that avenue is not available to EPA. Specifically, reliance on 2 CFR § 200.340(a)(4), i.e., changed program goals or agency priorities, as a basis for termination of IPC's Award is invalid and illegal. This is because 2 CFR § 200.340(a)(4) is not available to EPA under IPC's Award and, therefore, EPA cannot use it expressly or implicitly as a justification for terminating IPC's Award. *See* 2 CFR § 200.340(b) (requiring EPA to "clearly and unambiguously specify *all termination provisions*" in the SFA T&Cs) (emphasis added). EPA did not specify 2 CFR § 200.340(a)(4) in the termination provisions of IPC's Award. EPA's failure to "clearly and unambiguously" include Section 340(a)(4)

---

[2] Despite the fact that the Amendment is invalid, IPC has not drawn down funds to date and will not draw down funds tomorrow (i.e., within twenty-one (21) days of the Amendment) and has filed its notice of disagreement via this correspondence, thus invalidating any of EPA's other claimed bases for purported termination and, as such, neither needs to be addressed in this correspondence.

*As set out in the first page of this document, this document contains business sensitive, trade secrets, proprietary, or otherwise confidential information exempt from disclosure.*

WILSON
SONSINI

Principal Deputy Assistant Administrator Molina
August 27, 2025
Page 7

as a basis for termination means EPA waived that basis for termination and prohibits its invocation against IPC. Therefore, changed program goals and agency priorities are not legal grounds for termination of IPC's Award.

Indeed, in the SFA T&Cs, EPA maintained a "right to terminate the Assistance Agreement *only* as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, *when* the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination." SFA T&Cs, Section III.Q.5 (emphasis added). In other words, IPC's Award allows for termination "only" in the limited, specific circumstances enumerated in the "when" clause (i.e., "substantial" noncompliance resulting in a "Material[] Impair[ment]" to the Award, "adequate evidence of Waste, Fraud, or Abuse," or "material misrepresentation of eligibility status"). *See* Merriam-Webster Dictionary (last accessed Aug. 27, 2025) ("when," as a subordinating conjunction has a limiting effect meaning "at or during the time that" or "just at the moment that") (*available at*: https://www.merriam-webster.com/dictionary/when). Conversely, EPA has no right to a -termination not within the "when" clause (e.g., for convenience, for agency priorities, etc.). The placement of the "when" clause in the sentence, after the reference to 200.339 and 200.340, underscores that it serves as a limiting clause, narrowing the applicability of 200.339 and 200.340 to the aforementioned enumerated circumstances. *See* SFA T&Cs, Section III.Q.5 (describing EPA's "right to terminate the Assistance Agreement *only* as specified in *2 CFR 200.339* and the version of *2 CFR 200.340* effective as of October 1, 2024, *when* the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status … .") (emphasis added).

What's more, the gravamen of each of the enumerated bases for termination are serious conditions, none of which EPA has alleged here and for which, if EPA did allege them, IPC would have a right of cure and procedural protections. *See, e.g.,* 2 CFR § 200.342 (in "initiating a *remedy for noncompliance* (for example, disallowed costs, a corrective action plan, or termination, [EPA] must provide the recipient with an opportunity to object and provide information challenging the action.") (Emphasis added). This is why 2 CFR § 200.339-200.343 are under the title "Remedies for *Noncompliance,*" meaning that the essence of any EPA termination must reflect non-compliance of the sort that IPC's contract and federal law allow to result, after all necessary processes, in termination. (Emphasis added.)

In the Notice, EPA has alleged no single instance of "substantial" Award "noncompliance" on the part of IPC that has led to a "Material[] Impair[ment]," no evidence, let alone "adequate evidence" of "Waste, Fraud, or Abuse," and no evidence of "material misrepresentation of eligibility status." Thus, its Notice cannot effect a termination. What's more, EPA could not make such allegations to terminate the Award, without making the findings or affording IPC the applicable administrative procedures as a condition precedent to termination. For example, EPA cannot reach a finding of "Material[] Impair[ment]" without a multi-step process consisting of (1) "the issuance of a written determination and finding from EPA that the Recipient has failed to achieve

*As set out in the first page of this document, this document contains business sensitive, trade secrets, proprietary, or otherwise confidential information exempt from disclosure.*

**WILSON SONSINI**

Principal Deputy Assistant Administrator Molina
August 27, 2025
Page 8

sufficient progress" and (2) "the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer … .". SFA T&Cs, Section I (Materially Impaired).

Indeed, the federal courts have already temporarily restrained and preliminarily enjoined as illegal EPA's attempts at summary termination, noting particularly that EPA's claims, and the U.S. Department of Justice's later recantations of EPA's unsupported claims of "waste, fraud and abuse," have undermined EPA's credibility. *See, e.g.*, District Court for the District of Columbia, Memorandum Opinion, *Climate United Fund v. Citibank, N.A., et al.*, 1:25-cv-00698-TSC (D.D.C. Apr. 16, 2025) (issuing temporary restraining order and preliminary injunction for other GGRF recipients who had their awards purportedly terminated); D.C. Circuit Court of Appeals, Motion Panel questions at May 19, 2025 Oral Argument at 21:02– 22:32, *Climate United Fund, et al. v. Citibank, N.A., et al.*, 1:25-cv-00698-TSC (D.C. Cir. May 19, 2025) (in questions, identifying the limited ability to terminate based on aligned priorities and underscoring the excessive nature of EPA's approach); *id.* at 08:38 ("…so why not modify the grants instead of cancelling [them]?"). The courts' skepticism about EPA's summary termination underscores the impropriety of EPA's repeating the process with respect to IPC and the SFA awardees. It therefore renders legitimate the specter of compensatory, consequential and other damages (fees, costs, and other damages) arising from EPA's actions to advance yet another round of unsupported summary terminations. *See, e.g.,* 2 CFR § 200.435 (allowability of specified administrative or litigation expenses). We would expect comparable rejection of EPA's efforts at summary termination here, particularly given that the Award has been in place, undisturbed and with no allegations of non-compliance (resulting in "Material[] Impair[ment],") "adequate evidence" of "Waste, Fraud, or Abuse," or "material misrepresentation of eligibility status" against IPC.

The direct and indirect impacts of EPA's summary termination are profound to IPC, as well as to IPC's subawardees, contractors and Award beneficiaries (collectively, "Award partners") working collaboratively across the nation to develop projects that advance community security, prosperity and health, all of which have required a significant investment of time, money and effort by IPC and IPC's Award partners to advance. *See, e.g.,* District Court for the District of Columbia, Memorandum Opinion, 32-36, *Climate United Fund v. Citibank, N.A., et al.*, 1:25-cv-00698-TSC (D.D.C. Apr. 16, 2025) (finding irreparable harm under a standard highlighting imminent risk of business closure, including finding that "EPA's termination of the grants will … damage their reputations.") (citations omitted).  For example, during and beyond the first year of its Award, IPC completed: (10) binding subaward agreements with all of its unaffiliated Named Subrecipients, and (2) its launch, assessment, selection and the issuance of binding commitments to its first wave of ten (10) projects across four (4) states. Each of these subawardees and project proponents is advancing the deployment of critically important energy infrastructure designed to advance community security in towns across the United States, e.g., supporting emergency community centers in Hurricane-prone regions and freeing up utility capacity for much-needed industrialization efforts (whether manufacturing or data centers) in the face of significant retail electricity price inflation.

*As set out in the first page of this document, this document contains business sensitive, trade secrets, proprietary, or otherwise confidential information exempt from disclosure.*

**WILSON
SONSINI**

Principal Deputy Assistant Administrator Molina
August 27, 2025
Page 9

By way of example, IPC has committed financial assistance to Dwyer Rd Community Solar – a 5MW project serving 750 households with at least 20% savings in New Orleans, Louisiana. This project reflects a larger partnership with Together New Orleans ("TNO"), a local affiliate of Together Louisiana, and the Sisters of the Holy Family ("Sisters"), on whose property the project is being constructed. The Sisters' New Orleans convent operates a school and nursing home, which was restored after Hurricane Katrina (2005) owing to its importance to the New Orleans community. TNO is also part of the Industrial Areas Foundation ("IAF"), which pioneered the modern model of faith- and broad-based organizing. With IPC's funding (in addition to that of the Louisiana Clean Energy Fund and Cornerstone Fund (a CDFI based in Ohio and focused on lending to religious institutions and stakeholders)), the project will better ensure that the New Orleans community served has secure, affordable energy and a hedge against the widespread outages post-Hurricane Katrina. As the New Orleans news publication, *The Lens*, captured it: "When the next major storm strikes New Orleans, the Sisters of the Holy Family motherhouse will shine as a beacon for [the] New Orleans East" community. Delaney Dryfoos, *Nuns Harnessing the Sun*, *The Lens* (Jun. 30, 2024).

EPA's termination upends IPC's contractual commitments, including to the Dwyer Road project and its other project proponents, creating a cascade of responsibility and liability, and negatively impact IPC's and its Award partners' reputations. IPC and its Award partners also have experienced and will continue to experience direct and indirect (including reputational) damages, compounding IPC's claims against EPA. For example, all of IPC's subawardees have already requested Award funds from IPC, and almost all of the subawardees have provided IPC with harm statements detailing the concrete harms caused by EPA's purported termination.

<u>Specific Relief Sought Under the Dispute</u>

IPC respectfully requests EPA's written acknowledgement that the Notice and Amendment are invalid and, to avoid confusion in the SFA marketplace, retraction of these invalid documents, as well as immediate restoration to IPC's ASAP account of IPC's illegally seized or converted Award funds and Program Income, prompt resumption of IPC's normal ASAP access and unimpeded continuation of IPC's Award.

As summarized above, we respectfully advise EPA that IPC has incurred and will continue to incur significant damages because of the Notice. These damages will worsen and may reflect cascading damages to Award partners to whom IPC (and, thus, EPA) will be liable absent prompt resolution of this matter, as specified above. We estimate that those compensatory damages would meet or exceed the Award value, without IPC's recovery of interest, legal expenses and consequential damages. Thus, and on balance, EPA's actions are not in the U.S.'s interest.

Particularly given the patent illegality of EPA's Notice and Amendment, as well as EPA's subsequent seizure and conversion of IPC's Award funds, IPC respectfully reserves all rights to supplement this correspondence either to fully pursue and enforce IPC's rights and remedies with respect to the Notice and Amendment or to account for EPA's actions, or IPC's understanding of EPA's actions, as they may evolve and arise after submission of this timely correspondence. IPC likewise advises EPA that it will continue to advance its pre-Notice financial obligations, the core

*As set out in the first page of this document, this document contains business sensitive, trade secrets, proprietary, or otherwise confidential information exempt from disclosure.*

**WILSON
SONSINI**

Principal Deputy Assistant Administrator Molina
August 27, 2025
Page 10


IPC team required to do so, all of which are allowable, reasonable and necessary costs under the Award expressly authorized in EPA's Notice. Indeed, IPC's respectful position is that IPC's activities to support its pre-Notice obligations mitigates damages that EPA otherwise would incur to and within communities across America.

As always, to the extent that you have any additional questions or concerns, or require additional information, please do not hesitate to contact IPC General Counsel Michele Kunitz at 860-412-4096 or me at 617-461-7062. Either one of us are the designated points of contact; my email is above and Michele's is michele.kunitz@inclusiveteam.org.


                                                    Sincerely,


                                                    Elise N. Zoli

Cc:

Devon Brown, EPA Award Official, U.S. Environmental Protection Agency

Phillip Schindel, Acting Director, Grants Management and Business Operations Division, U.S. Environmental Protection Agency

Michele Kunitz, General Counsel, Inclusive Prosperity Capital

Brent Snyder, Partner, Wilson Sonsini Goodrich & Rosati


Exhibits:

Exhibit A: Notice

Exhibit B: IPC ASAP Account Screenshot (dated August 18, 2025)

Exhibit C: SFA T&Cs

Exhibit D: Excerpt of EPA General Terms and Conditions

Exhibit E: Excerpt of Grant Agreement

Exhibit F: EPA Administrator X Post (dated August 7, 2025 at 2:07 PM ET)


*As set out in the first page of this document, this document contains business sensitive, trade secrets, proprietary, or otherwise confidential information exempt from disclosure.*

**Exhibit A**

**Notice**



# OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**    Termination of EPA Assistance Agreement 5H-84087901 under 2 CFR 200.340

**FROM:**    Devon Brown, EPA Award Official

**TO:**    Michele Kunitz, General Counsel
Inclusive Prosperity Capital Inc

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84087901 awarded to Inclusive Prosperity Capital Inc. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.


cc: Jennifer Brooks, EPA Grant Specialist
    Bridget Kelly, EPA Project Officer
    Musa Collidge-Asad, Grantee Program Manager

5H - 84087901 - 2    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN): 84087901<br>MODIFICATION NUMBER: 2<br>PROGRAM CODE: 5H | DATE OF AWARD<br>08/07/2025 |
|---|---|---|
| | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>08/07/2025 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>Not for Profit | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT: | PAYEE: |
| INCLUSIVE PROSPERITY CAPITAL INC<br>75 Charter Oak Ave<br>STE 1-103<br>Hartford, CT 06106-1903<br>EIN: 83-0808658 | INCLUSIVE PROSPERITY CAPITAL INC<br>75 Charter Oak Ave<br>STE 1-103<br>Hartford, CT 06106-1903 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Musa Collidge-Asad<br>75 Charter Oak Ave<br>STE 1-103<br>Hartford, CT 06106-1903<br>**Email:** musa.collidgeasad@inclusiveteam.org<br>**Phone:** 860-775-2090 | Bridget Kelly<br>1200 Pennsylvania Ave. NW, 31150<br>Washington, DC 20460<br>**Email:** kelly.bridget@epa.gov<br>**Phone:** 202-566-0718 | Jennifer Brooks<br>1200 Pennsylvania Ave. NW, 3903R<br>Washington, DC 20460<br>**Email:** Brooks.Jennifer@epa.gov<br>**Phone:** 202-564-6374 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

The Community Power Coalition "Powering America Together" Program

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 (a)(4) and the administrative terms and conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD<br>05/01/2024 - 08/07/2025 | PROJECT PERIOD<br>05/01/2024 - 08/07/2025 | TOTAL BUDGET PERIOD COST<br>$ 249,300,000.00 | TOTAL PROJECT PERIOD COST<br>$ 249,300,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,300,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave. NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official for** Phillip Schindel - Acting Director, Grants Mgmt. and Business Operations Division<br>**by** Katherine Tsing-Choy - Award Official Delegate | DATE<br>08/07/2025 |

5H - 84087901 - 2     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 248,900,000 | $ 0 | $ 248,900,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 249,300,000 | $ 0 | $ 249,300,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84087901 - 2     Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 14,985,485 |
| 2. Fringe Benefits | $ 4,046,088 |
| 3. Travel | $ 344,495 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 72,000 |
| 6. Contractual | $ 140,337,545 |
| 7. Construction | $ 0 |
| 8. Other | $ 85,193,239 |
| 9. Total Direct Charges | $ 244,978,852 |
| 10. Indirect Costs: 15.00 % Base MTDC | $ 4,321,148 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 249,300,000 |
| 12. Total Approved Assistance Amount | $ 249,300,000 |
| 13. Program Income | $ 46,069,745 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 249,300,000 |

## Administrative Conditions

**UNILATERAL TERMINATION**

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

   a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

   b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

   c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect. The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

   a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

   b. Explanations on why established outputs/outcomes were not met; and

   c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

   a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

   b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

## Programmatic Conditions

All Programmatic Conditions Remain the Same.

**Exhibit B**

**IPC ASAP Account Screenshot (dated August 18, 2025)**

SENSITIVE BUT UNCLASSIFIED



**Account Profile Inquiry**

Date: 08/18/2025
Time: 12:03 PM

| | | |
|---|---|---|
| **ALC/Region:**<br>68128933 | **Agency Short Name:**<br>RTP-Grants | **Account ID:**<br>5H84087901 |
| **Recipient ID:**<br>0914421 | **Recipient Short Name:**<br>IPC | |

**Inquiry Results:**

## ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID : | 0914421 |
| Account ID : | 5H84087901 |
| Account Description : | COMMUNITY POWER COALITION |
| 1031/LOC Account : | No |
| Account Type : | Regular Account |
| Group ID : | 8499 |
| Control Account : | No |
| Account Status Indicator : | Liquidated |
| Available Balance : | $17,014,931.55 |
| Create Date : | 08/02/2024 |
| Begin Date : | 05/01/2024 |
| Performance Period End Date : | 08/15/2025 |
| End Date : | 12/08/2025 |
| TAS Distribution Method : | Percentage by Account |
| Allow Book Entry Adjustment : | Yes |
| Allow Warehoused Payments : | Yes |
| CMIA Indicator : | No |

## CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount : | $19,642,967.34 |
| Cumulative Authorized Amount Reset Period : | |
| Annual Reset Month : | |

## GRANT DETAILS

| | |
|---|---|
| Grant : | Yes |
| Federal Award Identification Number (FAIN) : | 5H84087901 |
| CFDA Number : | 66959.000 |
| Total Estimated Grant Amount : | $0.00 |

## AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review : | No |
| Threshold Amount : | |
| Reason for Review : | |

## DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount : | |
| Max Daily Draw Amount : | |
| Max Monthly Draw Amount : | |
| Max Quarterly Draw Amount : | |

## AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount : | $0.00 |
| Certified Date : | |
| Renewal Frequency : | |
| Pending Renewal Frequency : | |
| Pending Automated Renewal Amount : | $0.00 |
| Rollover Reset Quarter : | |
| Default Action : | |

**1   of   1**

**Exhibit C**

**SFA T&Cs**

**Solar For All (SFA) Terms and Conditions (December 3, 2024)**

I. Definitions ................................................................................................................................. 3

    Air Pollutant .......................................................................................................................... 3
    Award Agreement ................................................................................................................. 3
    Apprentice ............................................................................................................................. 3
    Contracts for Delivery of Financial Assistance ..................................................................... 3
    Eligible Recipient .................................................................................................................. 3
    Eligible Zero-Emissions Technology ..................................................................................... 4
    Environmental Information .................................................................................................. 5
    Environmental Information Operations ................................................................................ 5
    EPA Project Officer ............................................................................................................... 5
    EPA Award Official ............................................................................................................... 5
    Financial Assistance ............................................................................................................. 5
    Freely Associated States ...................................................................................................... 5
    Greenhouse Gas ................................................................................................................... 6
    Low-Income and Disadvantaged Communities ................................................................... 6
    Materially Impaired .............................................................................................................. 7
    Participant Support Costs ..................................................................................................... 7
    Period of Closeout ............................................................................................................... 7
    Period of Performance ......................................................................................................... 7
    Post-Closeout Program Income ........................................................................................... 8
    Program Administration Activities ....................................................................................... 8
    Program Beneficiary ............................................................................................................. 8
    Program Income ................................................................................................................... 8
    Project-Deployment Technical Assistance ............................................................................ 9
    Subaward ............................................................................................................................. 9
    Subrecipient ......................................................................................................................... 9
    Waste, Fraud, or Abuse ........................................................................................................ 9

II. National Programmatic Terms and Conditions ...................................................................... 10

    A. Performance Reporting .................................................................................................. 10
    B. Cybersecurity Condition ................................................................................................ 12
    C. Competency Policy ........................................................................................................ 14
    D. Public or Media Events .................................................................................................. 15
    E. In-Kind Assistance .......................................................................................................... 15
    F. Geospatial Data Standards ............................................................................................. 15
    G. Leveraging and Fundraising .......................................................................................... 15
    H. Quality Assurance ......................................................................................................... 16
    I. Real Property ................................................................................................................... 17
    J. Program Income .............................................................................................................. 18
    K. Use of Logos .................................................................................................................. 18

III. Additional Programmatic Terms and Conditions .................................................................. 19

    A. Solar for All Workplan ................................................................................................... 19
    B. Allowable and Unallowable Activities ............................................................................ 19
    C. Foreign Entity of Concern .............................................................................................. 20
    D. Low-Income and Disadvantaged Communities Expenditure Requirement ..................... 20
    E. Revolving Loan Fund Characterization ........................................................................... 20

F. Subawards to For-Profit Entities ................................................................................................ 20
G. Subawards as Part of Revolving Loan Funds .......................................................................... 21
H. Participant Support Costs ......................................................................................................... 22
I. Contracts for Delivery of Financial Assistance ........................................................................ 22
J. Labor and Equitable Workforce Development Requirements ................................................. 23
K. Build America, Buy America Act ............................................................................................... 26
L. Consumer Protection Requirements ........................................................................................ 27
M. Financial Risk Management Requirements ............................................................................. 28
N. Historic Preservation ................................................................................................................ 29
O. Uniform Relocation Assistance and Real Property Acquisition Policies Act ....................... 30
P. Remedies for Non-Compliance ................................................................................................. 30
Q. Clarifications to EPA General Terms and Conditions ............................................................. 31
R. Period of Performance .............................................................................................................. 33
S. Closeout Agreement ................................................................................................................. 33
T. Accounting Principles ................................................................................................................ 37
U. Internal Controls ........................................................................................................................ 37
V. Audits .......................................................................................................................................... 37
W. EPA Project Officer Oversight and Monitoring ...................................................................... 38
X. Compliant URL Links .................................................................................................................. 39
Y. Flow-Down Requirements ......................................................................................................... 39
Z. Financial Assistance in the Form of Credit Enhancements ................................................... 39
AA. Additional Requirements for Eligible Nonprofit Recipients ................................................ 40
AB. Amendments to Award Agreement ....................................................................................... 41
AC. Preservation of Guidance and Data ....................................................................................... 41
**IV. Administrative Terms and Conditions** ................................................................................ 42
A. General Terms and Conditions ................................................................................................. 42
B. Correspondence Condition ....................................................................................................... 42
C. Intergovernmental Review Period ........................................................................................... 42
D. Pre-Award Costs ........................................................................................................................ 43
E. New Recipient Training Requirement ...................................................................................... 43

## I. Definitions

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

3

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;
    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"
    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);
    d. Being funded by public or charitable contributions; and
    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

4

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

**Freely Associated States:** Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.
- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.3 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.
- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.
- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing

6

Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity. Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the

7

date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided

8

under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. National Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

10

**1. Progress Reports**

*Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

*Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

11

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

**2. Transaction and Project-Level Report**
The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

**B. Cybersecurity Condition**

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

12

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to

contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

**C. Competency Policy**
In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

14

**D. Public or Media Events**
For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

**E. In-Kind Assistance**
This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

**F. Geospatial Data Standards**
All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**G. Leveraging and Fundraising**

**1. Leveraging**
The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

**2. Fundraising**
2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

**H. Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

**1. Quality Management Plan (QMP)**

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

16

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**
• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.
• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.
• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

**I. Real Property**
In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

**Disposition**
If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

**Recordation**
As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

**K. Use of Logos**
If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must not be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

### III. Additional Programmatic Terms and Conditions

**A. Solar for All Workplan**
**1. EPA-approved Solar for All Workplan**
The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

**2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period**
The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

**B. Allowable and Unallowable Activities**
The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

**C. Foreign Entity of Concern**
As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

**D. Low-Income and Disadvantaged Communities Expenditure Requirement**
The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

**E. Revolving Loan Fund Characterization**
EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

**F. Subawards to For-Profit Entities**
The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;
2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

20

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

**G. Subawards as Part of Revolving Loan Funds**

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

21

**H. Participant Support Costs**

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

> A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

> B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

**I. Contracts for Delivery of Financial Assistance**
**2 CFR 200 Procurement Standards**

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;

22

- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

**J. Labor and Equitable Workforce Development Requirements**

**1. Davis-Bacon and Related Acts (DBRA)**
**A.   Program Applicability**
As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

23

- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

**B.   Davis-Bacon and Related Acts**
Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C.   Recipient Responsibilities When Entering Into and Managing Contracts:**

    **a.   Solicitation and Contract Requirements:**
        **i.   Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
        **ii.   Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
    **b.   After Award of Contract**:

      i.  **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

      ii.  **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

D.  **Recipient Responsibilities When Establishing and Managing Additional Subawards:**

    a.  **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

    b.  **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

    c.  **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

E.  **Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

    a.  **Solicitation and Contract Requirements:**

        i.  **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

        ii.  **Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

    b.  **After Award of Contract**:

        i.  **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

        ii.  **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F.  DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

**1. Compliance with Federal Statutes and Regulations**
The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

**2. Free and Fair Choice to Join a Union**
In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

**K. Build America, Buy America Act**
The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;
2. Privately-owned commercial buildings when they meet the "public function" test;
3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Single family homes;
2. Privately-owned, non-mixed-use, multi-family housing properties;
3. Privately-owned residential portions of mixed-use properties;
4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);
2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;
3. Federal Housing Administration Insured Multifamily Mortgages;
4. HUD Section 8 Funding;
5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

### L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;
2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;
3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;
4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and
5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

**M. Financial Risk Management Requirements**

**1. Cash Management Requirements**
The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

**2. Climate-Related Financial Risks**
The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

**3. Additional Requirements**
The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

**N. Historic Preservation**

**National Historic Preservation Act (NHPA)**
Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

29

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

**Archeological and Historic Preservation Act (AHPA)**
This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

**O. Uniform Relocation Assistance and Real Property Acquisition Policies Act**
The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

**P. Remedies for Non-Compliance**
The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

**Q. Clarifications to EPA General Terms and Conditions**
EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

**1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

**2. Establishing and Managing Subawards**
2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e.,

31

governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

**R. Period of Performance**
The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must **"**notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance.**"**

**S. Closeout Agreement**
As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

**1. Allowable Activities**
The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

**2. Reporting Requirements**
After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

**3. Low-Income and Disadvantaged Communities Expenditure Requirements**
The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and

benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

**4. Cash Management Requirements**

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

**5. Remedies for Non-Compliance**

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

**6. Suspension and Debarment**

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

**7. Non-Discrimination**

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

35

**8. Record-Keeping**
In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

**9. Other Federal Requirements**
The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

**10. Amendments to the Closeout Agreement**
The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

**11. Audit Requirements**
The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify

the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

37

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

**W. EPA Project Officer Oversight and Monitoring**
Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.
2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;
3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;
4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;
5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;
6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;
7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;
8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial

38

Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

**X. Compliant URL Links**
The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

**Y. Flow-Down Requirements**
As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

**Z. Financial Assistance in the Form of Credit Enhancements**
If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity

providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

**AA. Additional Requirements for Eligible Nonprofit Recipients**

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

**1. Incorporation and Control**
The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

**2. Governance Requirements**

**A. Board Size and Composition**
The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

**B. Board Independence**
The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

**C. Board Policies and Procedures**

40

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel
The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

### AB. Amendments to Award Agreement
The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

### AC. Preservation of Guidance and Data
Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

## IV. Administrative Terms and Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order

12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

**D. Pre-Award Costs**

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

**E. New Recipient Training Requirement**

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

43

**Exhibit D**

**Excerpt of EPA General Terms and Conditions**

Environmental Protection Agency

# General Terms and Conditions

*Effective October 1, 2024*

**Revision History:**

The Environmental Protection Agency's General Terms and Conditions *are published and become effective October 1st at the start of the federal fiscal year.* Any additions, revisions, or changes to the terms and conditions after October 1 will be summarized below.

| T&C Number | Effective Date | Description of Changes |
|---|---|---|
| #54 | 4/03/2025 | Added new T&C on Federal anti-discrimination laws. |
| #3 | 4/03/2025 | Added a new termination provision if the award no longer effectuates the program goals or agency priorities. |
| #27 | 4/03/2025 | Updated pursuant to a class exception to subparts of 40 CFR Part 33 issued on March 17, 2025. |
| #8, 42, 47 | 4/03/2025 | Revised in accordance with administration priorities. |
| #41 | 4/26/2025 | Added a new T&C on the procurement of synthetic nucleic acids and benchtop nucleic acid synthesis equipment. |
| #15 | 3/12/2025 | The Federal Subaward Reporting System (FSRS) was decommissioned and replaced fully by the System for Award Management (SAM.gov), all references to FSRS have been replaced with SAM.gov to reflect this change. |
| #18 | 11/26/2024 | Added language on the de minimis rate for grants amended to incorporate the October 2024 Revisions to 2 CFR Part 200. |

**Table of Contents**

Preface ...................................................................................................................................................2

Financial Information .............................................................................................................................3

Selected Items of Cost ...........................................................................................................................5

Reporting and Additional Post-Award Requirements...........................................................................11

Programmatic General Terms and Conditions......................................................................................24

Public Policy Requirements...................................................................................................................33

**Preface**

1. **Introduction**
   (a) These terms and conditions are in addition to the assurances and certifications made as part of the award and terms, conditions, and restrictions reflected on the official assistance award document. Recipients **must** review their official award document for additional administrative and programmatic requirements. Failure to comply with the general terms and conditions outlined below and those directly reflected on the official assistance award document may result in enforcement actions as outlined in 2 CFR 200.339 and 2 CFR 200.340.
   (b) If the EPA General Terms and Conditions have been revised, EPA will update the terms and conditions when it provides additional funding (incremental or supplemental) prior to the end of the period of performance of this agreement. The recipient must comply with the revised terms and conditions after the effective date of the EPA action that leads to the revision. Revised terms and conditions do not apply to the recipient's expenditures of EPA funds or activities the recipient carries out prior to the effective date of the EPA action. EPA will inform the recipient of revised terms and conditions in the action adding additional funds.

2. **Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards**
   This award is subject to the requirements of the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 and 2 CFR Part 1500. 2 CFR 1500.2, Adoption of 2 CFR Part 200, states the EPA adopts the Office of Management and Budget (OMB) guidance Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards to Non-Federal Entities (subparts A through F of 2 CFR Part 200), as supplemented by 2 CFR Part 1500, as the EPA policies and procedures for financial assistance administration. 2 CFR Part 1500 satisfies the requirements of 2 CFR 200.110(a) and gives regulatory effect to the OMB guidance as supplemented by 2 CFR Part 1500. This award is also subject to applicable requirements contained in EPA programmatic regulations located in 40 CFR Chapter 1 Subchapter B.

3. **Termination (Updated 4/03/2025)**
   Consistent with 2 CFR 200.340, EPA may terminate this award in part or its entirety:
   (a) If a recipient or subrecipient fails to comply with the terms and conditions of the award, including statutory or regulatory requirements;
   (b) With the consent of the recipient when both the recipient and the EPA agree upon the termination conditions, which include the effective date and, in the case of partial termination, the portion to be terminated;
   (c) If a recipient sends the EPA a written notification of the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated; however, if the EPA determines that the remaining portion of the Federal award will not accomplish the

purposes for which the Federal award was made, the EPA may terminate the award in its entirety; or

(d) Pursuant to the programmatic terms and conditions specified in the Federal award.

(e) By the EPA or pass-through entity to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities. **This provision applies to all new awards and funding amendments (incremental and supplemental) made on or after April 3, 2025.**

**Financial Information**

4. **Reimbursement Limitation**
   EPA's financial obligations to the recipient are limited by the amount of federal funding awarded to date as reflected on the award document. If the recipient incurs costs in anticipation of receiving additional funds from EPA, it does so at its own risk. See 2 CFR 1500.9.

5. **Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**
   **Electronic Payments.** Recipients must be enrolled or enroll in the Automated Standard Application for Payments (ASAP) system to receive payments under EPA financial assistance agreements unless:
   - EPA grants a recipient-specific exception;
   - The assistance program has received a waiver from this requirement;
   - The recipient is exempt from this requirement under 31 CFR 208.4; or,
   - The recipient is a fellowship recipient pursuant to 40 CFR Part 46.

   EPA will not make payments to recipients until the ASAP enrollment is completed or if recipients fall under one of the above categories. EPA's Research Triangle Park Finance Center (RTPFC) will initiate the ASAP enrollment based on the key contact information on the grant application. The "payee" on the key contacts form will receive an email from ASAP indicating the steps required for completing the enrollment. Recipients may request exceptions using the procedures below.

   Under this payment mechanism, the recipient initiates an electronic payment request online via ASAP, which is approved or rejected based on the amount of available funds authorized by EPA in the recipient's ASAP account. Approved payments are credited to the account at the financial institution of the recipient organization set up by the recipient during the ASAP enrollment process.

   Additional information concerning ASAP and enrollment can be obtained by contacting the EPA RTPFC, at rtpfc-grants@epa.gov, or by visiting: https://www.fiscal.treasury.gov/asap/.

   EPA will grant exceptions to the ASAP enrollment requirement only in situations in which the recipient demonstrates to EPA that receiving payment via ASAP places an undue administrative or financial management burden on the recipient or EPA determines that granting the waiver is in the public interest. Recipients may request an exception to the requirement by following the procedures specified in RAIN-2018-G06-R.

**Proper Payment Drawdown (for recipients other than states)**

(a) As required by 2 CFR 200.305(b), the recipient must draw funds from ASAP only for the minimum amounts needed for actual and immediate cash requirements to pay employees, contractors, subrecipients or to satisfy other obligations for allowable costs under this assistance agreement. The timing and amounts of the drawdowns must be as close as administratively feasible to actual disbursements of EPA funds. Disbursement within 5 business days of drawdown will comply with this requirement and the recipient agrees to meet this standard when performing this award.

(b) Recipients may not retain more than 5% of the amount drawn down, or $1,000 whichever is less, 5 business days after drawdown to materially comply with the standard. Any EPA funds subject to this paragraph that remain undisbursed after 5 business days must be fully disbursed within 15 business days of draw down or be returned to EPA.

(c) If the recipient draws down EPA funds in excess of that allowed by paragraph b., the recipient must contact rtpfc-grants@epa.gov for instructions on whether to return the funds to EPA. The recipient  must comply with the requirements at 2 CFR 200.305(b)(11)  regarding depositing advances of Federal funds in interest bearing accounts.

(d) Returning Funds: Pay.gov is the preferred mechanism to return funds. It is free, secure, paperless, expedient, and does not require the recipient//vendor to create an account. Contact RTPFC-Grants at rtpfc-grants@epa.gov to obtain complete instructions. Additional information is available at the Pay.gov website. Information on how to repay EPA via check is available at https://www.epa.gov/financial/makepayment. Instructions on how to return funds to EPA electronically via ASAP are available at https://www.fiscal.treasury.gov/asap/.

(e) Failure on the part of the recipient to materially comply with this condition may, in addition to EPA recovery of the un-disbursed portions of the drawn down funds, lead to changing the payment method from advance payment to a reimbursable basis. EPA may also take other remedies for noncompliance under 2 CFR 200.208 and/or 2 CFR 200.339.

(f) If the recipient believes that there are extraordinary circumstances that prevent it from complying with the 5-business day disbursement requirement throughout the performance period of this agreement, recipients  may request an exception to the requirement by following the procedures specified in RAIN-2018-G06-R. EPA will grant exceptions to the 5-business day disbursement requirement only if the recipient demonstrates that compliance places an undue administrative or financial management burden or EPA determines that granting the exception is in the public interest. EPA will grant exceptions to the 5-business day disbursement requirement only if the recipient demonstrates that compliance places an undue administrative or financial management burden or EPA determines that granting the exception is in the public interest.

**Proper Payment Drawdown for State Recipients**

In accordance with 2 CFR 200.305(a), payments are governed by Treasury-State Cash Management Improvement Act (CMIA) agreements and default procedures codified at 31 CFR Part 205, Subparts A and B and Treasury Financial Manual (TFM) 4A-2000, "Overall Disbursing Rules for All Federal Agencies" unless a program specific regulation (e.g. 40 CFR 35.3160 or 40 CFR 35.3560) provides

**Exhibit E**

**Excerpt of Grant Agreement**

5H - 84087901 - 0   Page 1

| | | GRANT NUMBER (FAIN): 84087901 MODIFICATION NUMBER: 0 PROGRAM CODE: 5H | DATE OF AWARD 07/12/2024 |
|---|---|---|---|
| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** Grant Agreement | TYPE OF ACTION New | MAILING DATE 07/17/2024 |
| | | PAYMENT METHOD: ASAP | ACH# PEND |

| RECIPIENT TYPE: Not for Profit | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT: | PAYEE: |
| INCLUSIVE PROSPERITY CAPITAL INC 75 CHARTER OAK AVE STE 1-103 HARTFORD, CT 06106-1903 **EIN:** 83-0808658 | INCLUSIVE PROSPERITY CAPITAL INC 75 Charter Oak Ave Suirw 1-103 Hatford, CT 06106-1903 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Musa Collidge-Asad C/O Inclusive Prosperity Capital 75 Charter Oak Ave Ste 1-103 Hartford, CT 06106 **Email:** musa.collidgeasad@inclusiveteam.org **Phone:** 860-775-2090 | Bridget Kelly 1200 Pennsylvania Ave NW, 31150 Washington, DC 20460 **Email:** kelly.bridget@epa.gov **Phone:** 202-566-0718 | Shana Etheridge OGD - GMBOD, 3903R 1200 Pennsylvania Ave NW Washington, DC 20460 **Email:** etheridge.shana@epa.gov **Phone:** 202-564-9777 |

**PROJECT TITLE AND DESCRIPTION**

The Community Power Coalition "Powering America Together" Program - "Note: A special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.
Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan. The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.
No subawards are included in this assistance agreement.

| BUDGET PERIOD 05/01/2024 - 04/30/2029 | PROJECT PERIOD 05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST $ 0.00 | TOTAL PROJECT PERIOD COST $ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 249,300,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,300,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Barbara Proctor - Associate Award Official | DATE 07/12/2024 |

5H - 84087901 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 248,900,000 | $ 248,900,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 249,300,000 | $ 249,300,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41019 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 248,900,000 |
| | | | | | | | | | $ 248,900,000 |

5H - 84087901 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 249,300,000 |
| 15. Total EPA Amount Awarded To Date | $ 249,300,000 |

**Exhibit F**

**EPA Administrator Zeldin X Post (dated August 7, 2025 at 2:07 PM ET)**



**Lee Zeldin** ✔ 🔲
@epaleezeldin

The One Big Beautiful Bill eliminated the Greenhouse Gas Reduction Fund, which included a $7 billion pot called "Solar for All".

In some cases, your tax dollars were diluted through up to FOUR pass-through entities, each taking their own cut off the top!

The bottom line is this: EPA no longer has the statutory authority to administer the program or the appropriated funds to keep this boondoggle alive.

Today, the Trump EPA is announcing that we are ending Solar for All for good, saving US taxpayers ANOTHER $7 BILLION!



0:00 / 2:15

2:07 PM · Aug 7, 2025 · **518.6K** Views

# Exhibit O

| | |
|---|---|
| **From:** | Schindel, Phillip |
| **To:** | bdeutsch@wsgr.com; ezoli@wsgr.com; Michele Kunitz; bsnyder@wsgr.com |
| **Cc:** | Molina, Michael; Nguyen, Tiana; Brown, Devon |
| **Subject:** | Acknowledgements for Dispute & ADR - FW: 5H-84087901, Inclusive Prosperity Capital, Dispute Submission and Disagreement with Amendment |
| **Date:** | Monday, September 15, 2025 12:29:36 PM |
| **Attachments:** | image001.png |

> **Caution:** This email is from an external source. Please take care when clicking links or opening attachments. When in doubt, contact the Helpdesk.

Good morning Mr. Deutsch,

On behalf of the Agency and Michael Molina, Principal Deputy Assistant Administrator for the Office of Mission Support, this email acknowledges Inclusive Prosperity Capital's formal disagreement and dispute of the termination of its assistance agreement 5H-8408791, as well as a concurrent request for Alternative Dispute Resolution.

No additional information or documentation is being requested from the organization at this time. Mr. Molina's staff will contact you to let you know if the agency requests any additional information or documentation from the organization.

Specific to the formal dispute, in accordance with 2 CFR 1500.17, a decision will be issued regarding this dispute by February 23, 2026. If this timeline changes, Mr. Molina's staff will reach back out to inform you.

Sincerely,


Phillip Schindel
Acting Director
US EPA Grants Management and Business Operations Division
202-564-5293
Schindel.Phillip@epa.gov


---

**From:** Brown, Devon <brown.devon@epa.gov>
**Sent:** Thursday, August 28, 2025 11:05 AM
**To:** Schindel, Phillip <Schindel.Phillip@epa.gov>
**Cc:** Acosta, Savannah <Acosta.Savannah@epa.gov>; Oneil, Walker <Oneil.Walker@epa.gov>
**Subject:** FW: 5H-84087901, Inclusive Prosperity Capital, Dispute Submission and Disagreement with Amendment

Disagreement & Dispute

---

**From:** Deutsch, Brandon <bdeutsch@wsgr.com>

**Sent:** Wednesday, August 27, 2025 11:51 PM
**To:** Molina, Michael <molina.michael@epa.gov>
**Cc:** Brown, Devon <brown.devon@epa.gov>; Schindel, Phillip <schindel.phillip@epa.gov>; ezoli@wsgr.com; Michele Kunitz <Michele.Kunitz@inclusiveteam.org>; Snyder, Brent <bsnyder@wsgr.com>
**Subject:** Re: 5H-84087901, Inclusive Prosperity Capital, Dispute Submission and Disagreement with Amendment

You don't often get email from bdeutsch@wsgr.com. Learn why this is important

**Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Principal Deputy Assistant Administrator Molina,

Attached on behalf of Awardee IPC in the above Award, please find our submission disputing EPA's Notice of Termination under 2 CFR 1500.15 and disagreeing with the Assistance Amendment. All information requested by EPA is included in the attached submission.

Our appreciation for your consideration with respect to this submission, and please do not hesitate to reach out to Michele, Elise, Brent or me with any questions.

Best,
Brandon Deutsch

**WILSON SONSINI**

**Brandon Deutsch | Associate | Energy and Climate Solutions | Wilson Sonsini Goodrich & Rosati**
One Boston Place | 201 Washington Street | Boston, MA 02108 | direct: 617.598.7857 | bdeutsch@wsgr.com

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

# Exhibit P

SENSITIVE BUT UNCLASSIFIED



**Account Profile Inquiry**

Date: 08/07/2025
Time: 4:43 PM

| | |
|---|---|
| **ALC/Region:** 68128933 | **Agency Short Name:** RTP-Grants |
| **Recipient ID:** 0914421 | **Recipient Short Name:** IPC |

**Account ID:** 5H84087901

**Inquiry Results:**

## ACCOUNT DETAILS

| | | |
|---|---|---|
| **Requestor ID** | : | 0914421 |
| **Account ID** | : | 5H84087901 |
| **Account Description** | : | COMMUNITY POWER COALITION |
| **1031/LOC Account** | : | No |
| **Account Type** | : | Regular Account |
| **Group ID** | : | 8499 |
| **Control Account** | : | No |
| **Account Status Indicator** | : | Open |
| **Available Balance** | : | $246,271,964.21 |
| **Create Date** | : | 08/02/2024 |
| **Begin Date** | : | 05/01/2024 |
| **Performance Period End Date** | : | 04/30/2029 |
| **End Date** | : | 08/30/2029 |
| **TAS Distribution Method** | : | Percentage by Account |
| **Allow Book Entry Adjustment** | : | Yes |
| **Allow Warehoused Payments** | : | Yes |
| **CMIA Indicator** | : | No |

## CUMULATIVE AUTHORIZATIONS

| | | |
|---|---|---|
| **Cumulative Authorized Amount** | : | $248,900,000.00 |
| **Cumulative Authorized Amount Reset Period** | : | |
| **Annual Reset Month** | : | |

## GRANT DETAILS

| | | |
|---|---|---|
| **Grant** | : | Yes |
| **Federal Award Identification Number (FAIN)** | : | 5H84087901 |
| **CFDA Number** | : | 66959.000 |
| **Total Estimated Grant Amount** | : | $0.00 |

## AGENCY PAYMENT REVIEW

| | | |
|---|---|---|
| **Agency Review** | : | No |
| **Threshold Amount** | : | |
| **Reason for Review** | : | |

## DRAW AMOUNTS

| | | |
|---|---|---|
| **Max Total Draw Amount** | : | |
| **Max Daily Draw Amount** | : | |
| **Max Monthly Draw Amount** | : | |
| **Max Quarterly Draw Amount** | : | |

## AUTOMATED AUTHORIZATION RENEWALS

| | | |
|---|---|---|
| **Authorized Renewal Amount** | : | $0.00 |
| **Certified Date** | : | |
| **Renewal Frequency** | : | |
| **Pending Renewal Frequency** | : | |
| **Pending Automated Renewal Amount** | : | $0.00 |
| **Rollover Reset Quarter** | : | |
| **Default Action** | : | |

**1 of 1**

SENSITIVE BUT UNCLASSIFIED

# Exhibit Q

SENSITIVE BUT UNCLASSIFIED



## Account Profile Inquiry

Date: 08/11/2025
Time: 7:11 PM

| | | |
|---|---|---|
| **ALC/Region:** 68128933 | **Agency Short Name:** RTP-Grants | **Account ID:** 5H84087901 |
| **Recipient ID:** 0914421 | **Recipient Short Name:** IPC | |

**Inquiry Results:**

### ACCOUNT DETAILS

| | |
|---|---|
| **Requestor ID :** | 0914421 |
| **Account ID :** | 5H84087901 |
| **Account Description :** | COMMUNITY POWER COALITION |
| **1031/LOC Account :** | No |
| **Account Type :** | Regular Account |
| **Group ID :** | 8499 |
| **Control Account :** | No |
| **Account Status Indicator :** | Suspended |
| **Available Balance :** | $17,014,931.55 |
| **Create Date :** | 08/02/2024 |
| **Begin Date :** | 05/01/2024 |
| **Performance Period End Date :** | 04/30/2029 |
| **End Date :** | 08/30/2029 |
| **TAS Distribution Method :** | Percentage by Account |
| **Allow Book Entry Adjustment :** | Yes |
| **Allow Warehoused Payments :** | Yes |
| **CMIA Indicator :** | No |

### CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| **Cumulative Authorized Amount :** | $19,642,967.34 |
| **Cumulative Authorized Amount Reset Period :** | |
| **Annual Reset Month :** | |

### GRANT DETAILS

| | |
|---|---|
| **Grant :** | Yes |
| **Federal Award Identification Number (FAIN) :** | 5H84087901 |
| **CFDA Number :** | 66959.000 |
| **Total Estimated Grant Amount :** | $0.00 |

### AGENCY PAYMENT REVIEW

| | |
|---|---|
| **Agency Review :** | No |
| **Threshold Amount :** | |
| **Reason for Review :** | |

### DRAW AMOUNTS

| | |
|---|---|
| **Max Total Draw Amount :** | |
| **Max Daily Draw Amount :** | |
| **Max Monthly Draw Amount :** | |
| **Max Quarterly Draw Amount :** | |

### AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| **Authorized Renewal Amount :** | $0.00 |
| **Certified Date :** | |
| **Renewal Frequency :** | |
| **Pending Renewal Frequency :** | |
| **Pending Automated Renewal Amount :** | $0.00 |
| **Rollover Reset Quarter :** | |
| **Default Action :** | |

**1 of 1**

SENSITIVE BUT UNCLASSIFIED