IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INCLUSIVE PROSPERITY CAPITAL, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 26-1031 C<br>(Chief Judge Solomson) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

WILLIAM J. GRIMALDI
Assistant Director

LIRIDONA SINANI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530
Telephone: (202) 353-2188
Facsimile: (202) 307-0972
Email: Liridona.Sinani@usdoj.gov

*Attorneys for Defendant*

Dated: October 23, 2026

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .................... 2

INTRODUCTION .................... 1

ISSUES PRESENTED .................... 2

STATEMENT OF FACTS .................... 3

- I. In 2022, Congress Added Section 134 To The Clean Air Act .................... 3
- II. EPA Implemented Section 134(a)(1) Through "Solar for All" Grant Agreements .................... 4
- III. Congress Repealed Section 134, And EPA Terminated The Solar For All Grant Agreements, Including IPC's .................... 7
- IV. IPC Challenges EPA's Termination Of The Grant Agreement .................... 7

ARGUMENT .................... 8

- I. The Court Should Dismiss Count III For Lack of Subject Matter Jurisdiction .................... 8
  - A. Standard Of Review For A Motion To Dismiss Under Rule 12(b)(1) .................... 8
  - B. Section 134 of the Clean Air Act Is Not a Money-Mandating Statute .................... 9
    - 1. Section 134 Lacks Mandatory Language .................... 9
    - 2. The Remedy IPC Seeks Is Enforcement Of What It Asserts Is a Statutory Mandate .................... 13
    - 3. Damages Are Tied To A Strings-Attached, Government-Administered Grant Program .................... 17
- II. The Court Should Dismiss Counts II, IV, And V For Failure To State A Claim Upon Which Relief Can Be Granted .................... 19
  - A. Standard Of Review For A Motion To Dismiss Under Rule 12(b)(6) .................... 19
  - B. The Court Should Dismiss Count II Because IPC's Breach Of Good Faith And Fair Dealing Claim Is Duplicative Of Its Breach Of Contract Claim .................... 20
  - C. The Court Should Dismiss Count IV Because IPC Fails To State A Plausible Illegal Exaction Claim .................... 22
  - D. The Court Should Dismiss Count V Because IPC Fails To State A Claim For An Unconstitutional Taking .................... 26

CONCLUSION .................... 29

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*112 Genesee St., LLC v. United States*,
166 F.4th 1017 (Fed. Cir. 2026) ..... passim
*Allegre Villa, Ltd. P'ship v. United States*,
60 Fed. Cl. 11 (2004) ..... 27
*Am. Bankers Ass'n v. United States*,
932 F.3d 1375 (Fed. Cir. 2019) ..... 20
*Am. Pelagic Fishing Co., L.P. v. United States*,
379 F.3d 1363, 1372 (Fed. Cir. 2004) ..... 26
*Acceptance Ins. Cos., Inc. v. United States*,
583 F.3d 849, 854 (Fed. Cir. 2009) ..... 26
*Andres v. United States*,
2005 WL 6112616 (Fed. Cl. July 28, 2005) ..... 23
*Arizona v. United States*,
494 F.2d 1285 (Ct. Cl. 1974) ..... 27
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 19, 22
*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 ..... 19, 20
*BGT Holdings LLC v. United States*,
984 F.3d 1003 (Fed. Cir. 2020) ..... 21
*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ..... 9, 13, 14, 18
*Centex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005) ..... 21
*Clear Creek Cmty. Servs. Dist. v. United States*,
132 Fed. Cl. 223 (2017) ..... 27
*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) ..... 23, 27
*Dep't of Nat. Res. v. United States*,
227 Ct. Cl. 552 (1981) ..... 27
*Dimare Fresh, Inc. v. United States*,
808 F.3d 1301 (Fed. Cir. 2015) ..... 20
*Dobyns v. United States*,
915 F.3d 733 (Fed. Cir. 2019) ..... 20, 21
*Dow Jones & Co., Inc. v. Ablaise Ltd.*,
606 F.3d 1338 (Fed. Cir. 2010) ..... 8
*Eastport S.S. Corp. v. United States*,
372 F.2d 1002 (Ct. Cl. 1967) ..... 23
*Hanger, LLC v. United States*,
170 Fed. Cl. 473 (2024) ..... 27
*Kania v. United States*,
650 F.2d 264 (Ct. Cl. 1981) ..... 27

*Katz v. Cisneros*,
16 F.3d 1204 (Fed. Cir. 1994) ........ 14, 15, 16
*Lovett v. United States*,
81 F.3d 143 (Fed. Cir. 1996) ........ 20
*Lummi Tribe of the Lummi Rsrv. v. United States*,
870 F.3d 1313 (Fed. Cir. 2017) ........ 8, 18, 23
*Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
763 F.2d 1441 (D.C. Cir. 1985) ........ 14
*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ........ 8, 9, 10, 11
*Metcalf Constr. Co. v. United States*,
742 F.3d 984 (Fed. Cir. 2014) ........ 20
*National Center for Mfg. Sciences v. United States*,
114 F.3d 196 (Fed. Cir. 1997) ........ 18, 19
*Nat'l Veterans Legal Servs. Program v. United States*,
968 F.3d 1340 (Fed. Cir. 2020) ........ 23
*Piszel v. United States*,
121 Fed. Cl. 793 (2015) ........ 23
*Piszel v. United States*,
833 F.3d 1366 (Fed. Cir. 2016) ........ 23, 25, 26, 27
*Portland Mint v. United States*,
102 F.4th 1371 (Fed. Cir. 2024) ........ 21
*Precision Pine & Timber, Inc. v. United States*,
596 F.3d 817 (Fed. Cir. 2010) ........ 21
*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988) ........ 9
*San Juan City Coll. v. United States*,
391 F.3d 1357 (Fed. Cir. 2004) ........ 27
*State of Texas v. United States*,
537 F.2d 466 (Ct. Cl. 1976) ........ 27
*Lindsay v. United States*,
295 F.3d 1252 (Fed. Cir. 2002) ........ 20
*Taylor v. United States*,
303 F.3d 1357 (Fed. Cir. 2002) ........ 9
*Terry v. United States*,
103 Fed. Cl. 645 (2012) ........ 20
*United States v. King*,
395 U.S. 1 (1969) ........ 10
*United States v. Mitchell*,
445 U.S. 535 (1980) ........ 8
*United States v. Mitchell*,
463 U.S. 206 (1983) ........ 8
*United States v. Testan*,
424 U.S. 392 (1976) ........ 8, 10
*United States v. White Mountain Apache Tribe,*
537 U.S. 465 (2003) ........ 8

*Hughes Commc'ns Galaxy, Inc. v. United States*,
271 F.3d 1060 (Fed. Cir. 2001) ........ 26
*Sun Oil Co. v. United States*,
572 F.2d 786 (Ct. Cl. 1978) ........ 26
*Virgin Islands Port Auth. v. United States*,
922 F.3d 1328 (Fed. Cir. 2019) ........ 22
*Westfed Holdings, Inc. v. United States*,
52 Fed. Cl. 135 (2002) ........ 23, 25

**Statutes**

5 U.S.C. § 702 ........ 14
15 U.S.C. § 9009c(a)(7)(A) ........ 12
28 U.S.C. § 1491 ........ 8
28 U.S.C. § 1491(a)(1) ........ 8
42 U.S.C. § 7434 ........ 3
42 U.S.C. § 7434(a)(1) ........ passim
42 U.S.C. § 7434(b) ........ 12
42 U.S.C. § 7434(b)(1) ........ 18
42 U.S.C. § 18062(a) ........ 11
Pub. L. No. 117-169, 136 Stat. 1818 ........ 3
Pub. L. No. 119-21, 139 Stat. 72 ........ 3, 7
U.S. Const. amend. V ........ 26

**Rules**

Rule 12(b)(6) of the RCFC ........ 1, 19, 20

**Regulations**

2 C.F.R. 200.305(b)(13) ........ 25
2 C.F.R. 200.344 ........ 25
2 C.F.R. Part 200 ........ 4, 5
2 C.F.R. Part 200, Subpart E ........ 24
2 C.F.R. Part 200, Subparts B ........ 5
2 C.F.R. Part 1500 ........ 5, 24
2 C.F.R. Parts 200 and 1500 ........ 5
2 C.F.R. § 1500.2 ........ 5
2 C.F.R. §§ 200.100, 200.101(a) ........ 4, 25
2 CFR 33 ........ 5
2 CFR 200 ........ 5
2 CFR 1500 ........ 5
2 CFR Part 200, Subpart E ........ 5
2 CFR Part 1500 ........ 5

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss Count III of the complaint filed by plaintiff, Inclusive Prosperity Capital, Inc. (IPC), for lack of subject matter jurisdiction. Pursuant to Rule 12(b)(6) of the RCFC, defendant respectfully requests that the Court dismiss Counts II, IV and V of IPC's complaint for failure to state a claim upon which relief can be granted.

## INTRODUCTION

In 2022, Congress added Section 134 to the Clean Air Act, a provision of which appropriated $7 billion to the Environmental Protection Agency (EPA) to make grants to eligible recipients to carry out greenhouse gas emission reduction activities. To implement the statute, EPA announced a funding opportunity, titled Solar for All, and then selected numerous grantees, including IPC. Subsequently, Congress repealed Section 134, and EPA terminated its grant agreement with IPC. EPA's stated rationale for the termination was that Congress had terminated the statutory authority and all appropriations related to the Solar for All program.

IPC brings this suit challenging EPA's termination of the grant agreement. IPC's challenge rests on five counts: (I) breach of the express terms of IPC's grant agreement; (II) breach of the duty of good faith and fair dealing; (III) violation of money-mandating statute, Section 134 of the Clean Air Act; (IV) illegal exaction; and, (V) in the alternative, unconstitutional taking. The Court should dismiss Counts II through V.

At the outset, the Court lacks subject matter jurisdiction over Count III because Section 134 of the Clean Air Act is not money-mandating. Recently, the United States Court of Appeals for the Federal Circuit announced that discerning whether a statutory provision is money-mandating "involves analyzing a non-exhaustive set of the statutory provision's attributes, including: (1) mandatory statutory language; (2) the nature of the remedy; and (3) whether the

damages are tied to a strings-attached, Government-administered program like a grant program." *112 Genesee St., LLC v. United States*, 166 F.4th 1017, 1022 (Fed. Cir. 2026). Each of these factors strongly weighs against a finding that Section 134 is money-mandating. First, the statute lacks any mandatory language directed to the EPA. Second, IPC seeks enforcement of what it asserts is a statutory mandate to disperse grant funding, a remedy that the Supreme Court has held falls outside this Court's jurisdiction. And third, any damages would be tied to strings attached to the grant money and require an ongoing relationship between the Government and IPC. Ultimately, in Count III, IPC improperly recasts this contract dispute as a violation of a money-mandating statute.

The Court should dismiss Counts II, IV, and V for failure to state a claim upon which relief may be granted. Count II is a duplicate of Count I, and thus redundant. Counts IV and V improperly assert a Fifth Amendment claim over funds covered by the grant agreement between EPA and IPC. The Federal Circuit has recognized that grants may be creatures of contract. As such, traditional principles with respect to Fifth Amendment claims as they relate to contractual suits apply. These principles foreclose both claims, even though they are pled alternatively. With respect to an illegal exaction claim, the Federal Circuit has previously held that grant monies come with strings attached, and those strings make a grant recipient's interest in its grant funds a contingent interest. Because EPA provided these funds to IPC conditionally based on the terms of the grant agreement, IPC fails to state a claim for illegal exaction. And because IPC's right to the grant funds rises and falls with the grant agreement, dismissal of Count V is also appropriate.

**ISSUES PRESENTED**

1. Whether the now repealed Section 134 of the Clean Air Act is money-mandating;

2. Whether the Court should dismiss Counts II, IV, and V of IPC's complaint for failure to state a claim for which relief may be granted.

## STATEMENT OF FACTS

### I. In 2022, Congress Added Section 134 To The Clean Air Act

On August 16, 2022, the President signed into law the Inflation Reduction Act (IRA), which amended the Clean Air Act by adding to it Section 134. Pub. L. No. 117-169, 136 Stat. 1818, 2065-66 (Aug. 16, 2022).

Section 134 of the Clean Air Act appropriated $26.97 billion to the EPA Administrator for a "Greenhouse Gas Reduction Fund." *Id.* at 2065-66 (codified at 42 U.S.C. § 7434), *repealed by*, One Big Beautiful Bill Act, Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025). Of that total, Congress appropriated $7 billion to EPA "to make grants, on a competitive basis" to "eligible recipients" for the purpose of providing financial and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies" and "to carry out other greenhouse gas emission reduction activities, as determined appropriate by the Administrator." 42 U.S.C. § 7434(a)(1).

Section 134 identified eligible recipients to include states, municipalities, tribal governments, or eligible nonprofit organizations. *Id.* §§ 7434(a)(1), (c)(1). The statute established strict conditions governing the use of funds received by eligible recipients:

> An eligible recipient that receives a grant . . . shall use the grant in accordance with the following:
>
> **(1) Direct investment**
>
> The eligible recipient shall—
>
> (A) provide financial assistance to qualified projects at the national, regional, State, and local levels;
>
> (B) prioritize investment in qualified projects that would otherwise lack access to financing; and

> (C) retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability.
>
> **(2) Indirect investment**
>
> The eligible recipient shall provide funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the State, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers.

*Id.* § 7434(b).

Congress appropriated the funding "for fiscal year 2022 . . . to remain available until September 30, 2024," and stated that the funding was appropriated for the EPA "to make grants . . . beginning not later than 180 calendar days after the date of enactment of this section" (i.e. February 12, 2023). *Id.* § 7434(a)(1).

## II. EPA Implemented Section 134(a)(1) Through "Solar for All" Grant Agreements

In 2023, EPA announced a funding opportunity, titled Solar for All, to implement Section 134(a)(1). ECF No. 1-2 at 2, 6-7. EPA subsequently selected 60 grantees to receive Solar for All funding, including IPC. ECF No. 1-2 at 130, 133, 294.

EPA's grant agreement with IPC was "subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments." ECF No. 1-2 at 243. The applicable regulations include 2 C.F.R. Part 200, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (uniform guidance), which govern Federal grants.[1] *See* 2 C.F.R. §§ 200.100, 200.101(a); ECF No. 1-2 at 244 (citing

[1] The uniform guidance covers the full lifecycle of a grant—from pre-award to termination and closeout—and sets forth extensive cost principles and audit requirements

"2 CFR 200, 2 CFR 1500, and 2 CFR 33"). EPA's grant regulations at 2 C.F.R. Part 1500 adopt and supplement the uniform guidance in 2 C.F.R. Part 200. *See* 2 C.F.R. § 1500.2. The grant agreement provided that EPA would "cost-share 100.00% of all approved budget period costs incurred" by IPC, "up to and not exceeding federal funding of $249,300,000.00." ECF No. 1-2 at 243. The grant agreement covered a five-year period of performance. *See id.*

In exchange, IPC agreed to, for example, (1) "comply with the statutory requirements of Section 134 of the Clean Air Act," ECF No. 1-2 at 276; (2) "comply with the current EPA general terms and conditions,"[2] *id.* at 246; (3) submit "[p]rogress [r]eports" and "transaction and project-level report[s]," "in accordance with information collection instruments approved through GGRF [Greenhouse Gas Reduction Fund] Accomplishment Reporting," *id.* at 255-257; (4) develop an EPA-approved "Quality Management Plan," *id.* at 261; (5) develop an EPA-approved "Quality Assurance Project Plan," *id.*; and (6) adhere to the grant regulations within 2 C.F.R. Parts 200 and 1500, *see e.g., id.* at 244, 263, 265-266. IPC also "agree[d] to implement this grant in accordance with its EPA-approved Solar for All Workplan." *Id.* at 264.

The grant agreement gave EPA an "[o]versight and [m]onitoring" role "to ensure that eligible [r]ecipients effectively carry out the significant scale, complexity, and novelty of the Solar for All Program." ECF No. 1-2 at 284. Those oversight and monitoring activities included, among other things, (1) "[p]articipating in project activities," (2) "[r]eviewing the

---

applicable to Federal grants. 2 C.F.R. Part 200, Subparts B, C, D, E, F. IPC's grant agreement provided that "[a]ll costs charged to the award to support [allowable activities] must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500." ECF No. 1-2 at 265.

[2] IPC provided an excerpt of the general terms and conditions in effect at the time of termination as part of Exhibit N to its complaint. *See* ECF No. 1-2 at 405-408.

qualifications of key personnel," (3) "[c]losely monitoring the [r]ecipient's management and oversight of [s]ubrecipients and procedures," (4) "[c]losely monitoring the [r]ecipient's performance," (5) "[r]eviewing and commenting on performance reports," and (6) "[v]erifying that the recipient is expending the award on allowable activities." *Id.* at 284-285.

EPA's general terms and conditions, which the grant agreement incorporated, describe how monies were to be disbursed. *See* ECF No. 1-2 at 246, 407. IPC was required to be enrolled in the Automated Standard Application for Payments (ASAP) system to receive payments unless granted an exception. ECF No. 407. ASAP is an "electronic system that federal agencies use to quickly and securely transfer money to recipient organizations." *Automated Standard Application for Payments*, Bur. Fis. Serv., https://www.fiscal.treasury.gov/asap (last visited Oct. 23, 2026) (cited in ECF No. 1-2 at 407). The Bureau of the Fiscal Service within the Department of the Treasury centrally manages ASAP. *See id.* Federal agencies enroll funding recipients in ASAP, authorize payments from the accounts, and otherwise manage their accounts. *Id.* Recipients then request payments from these accounts. *Id.*

The terms and conditions, relying on applicable regulations, placed parameters on IPC's drawdown of the funding from ASAP, including, among others, that:

> (a) "[IPC] must draw funds from ASAP only for the minimum amounts needed for actual and immediate cash requirements to pay employees, contractors, subrecipients or to satisfy other obligations for allowable costs under this assistance agreement";
>
> (b) [IPC] may not retain more than 5% of the amount drawn down, or $1,000 whichever is less, 5 business days after drawdown . . . Any [such] EPA funds . . . that remain undisbursed after 5 business days must be fully disbursed within 15 business days of draw down or be returned to EPA";
>
> (c) IPC must return funds drawn down in excess.

ECF No. 1-2 at 408.

## III. Congress Repealed Section 134, And EPA Terminated The Solar For All Grant Agreements, Including IPC's

On July 4, 2025, Congress "repealed" Section 134—the provision that authorized the Greenhouse Gas Reduction Fund, including Solar for All—and "rescinded" all "unobligated balances of amounts made available to carry out that section." Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025).

EPA subsequently terminated IPC's grant agreement in August 2025. ECF No. 1-2 at 86. EPA explained that Congress's repeal of Section 134 "repeals the underlying authority for the Solar for All Program," such that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients." *Id.* As such, EPA issued a termination amendment to IPC. *Id.* at 331-336.

EPA explained that, given "the early nature" of any expenditures made, EPA "expect[s] any harms to interests suffered to be remedied and remediable by the close out process[]." ECF No. 1-2 at 86; *see also id.* at 334 (providing that "[c]osts after termination are allowable" pursuant to the regulations). EPA confirmed that, through the closeout process, each grantee would be entitled to "allowable costs incurred up to the date of [termination]," certain costs incurred "after this termination," and "reasonable and necessary costs" incurred to close out their grant. *Id.* at 87.

## IV. IPC Challenges EPA's Termination Of The Grant Agreement

On July 20, 2026, IPC brought this action challenging EPA's termination of IPC's grant agreement. *See* ECF No. 1. IPC alleges five counts in its complaint: (I) breach of the express terms of IPC's grant agreement; (II) breach of the duty of good faith and fair dealing; (III) violation of money-mandating statute (Section 134 of the Clean Air Act); (IV) illegal exaction;

and, (V) in the alternative, unconstitutional taking. *Id.* at 27-33. In its prayer for relief, IPC requests "money damages or compensation to IPC in an amount to be determined at trial," interest, and attorney fees and costs. *Id.* at 34.

## ARGUMENT

### I. The Court Should Dismiss Count III For Lack of Subject Matter Jurisdiction

#### A. Standard Of Review For A Motion To Dismiss Under Rule 12(b)(1)

Subject matter jurisdiction is a threshold requirement that must be determined at the outset of a case. *Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010). The jurisdiction of the United States Court of Federal Claims is established and limited by the Tucker Act. *See* 28 U.S.C. § 1491. The Tucker Act is a waiver of sovereign immunity, and it must be strictly construed. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980).

The Tucker Act authorizes the Court of Federal Claims to exercise jurisdiction over claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding intort." 28 U.S.C. § 1491(a)(1). However, the Tucker Act "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). To come within the waiver of sovereign immunity stated in the Tucker Act, a plaintiff must identify a "money-mandating" source of substantive law that creates the right to money damages. *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983); *Testan*, 424 U.S. at 398).

A statute is money-mandating if it can "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 322 (2020) (quoting *United States v. White Mountain Apache Tribe,* 537

U.S. 465, 472 (2003)). Discerning whether a statutory provision can be "fairly interpreted" as mandating compensation "involves analyzing a non-exhaustive set of the statutory provision's attributes, including: (1) mandatory statutory language; (2) the nature of the remedy; and (3) whether the damages are tied to a strings-attached, Government-administered program like a grant program." *112 Genesee St.*, 166 F.4th at 1022 (citing *Me. Cmty. Health,* 590 U.S. at 324-25 and *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988)). Plaintiff bears the burden of establishing jurisdiction. *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

### B. Section 134 of the Clean Air Act Is Not a Money-Mandating Statute

In count III, IPC improperly recasts this contract dispute as a violation of a money-mandating statute. But Section 134 of the Clean Air Act lacks the explicit waiver of sovereign immunity required by the Tucker Act. An analysis of the three factors set forth in *112 Genesee Street* makes clear that Section 134 is not money-mandating. First, the statute lacks any mandatory language that would be required to waive sovereign immunity under the Tucker Act. Second, IPC seeks to enforce what it asserts is a statutory mandate to disburse funding and to alter the ongoing relationship between the parties—relief that does not fall within Tucker Act jurisdiction. And third, any damages would be tied to strings attached to the grant money and require ongoing Government relationship, which by law makes the statute not money-mandating.

#### 1. Section 134 Lacks Mandatory Language

As the Supreme Court has explained, "[s]tatutory 'shall pay' language often reflects congressional intent to create both a right and a remedy under the Tucker Act." *Me. Cmty. Health*, 590 U.S. at 296 (citation modified). To come within the Tucker Act's waiver of sovereign immunity, the statute must command compensation by the Federal government for damages sustained. *See id.,* 590 U.S. at 322. Section 134 of the Clean Air Act does not provide

such a statutory command. Thus, the statutory text does not favor interpreting Section 134 as money-mandating.

Section 134 appropriated money to the EPA "to make grants, on a competitive basis" to "eligible recipients" for the purpose of providing financial and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies" and "to carry out other greenhouse gas emission reduction activities, as determined appropriate by the Administrator." 42 U.S.C. § 7434(a)(1).[3] Absent from the statute is any directive that the EPA "shall pay" compensation or "shall award" grants to any eligible recipients. The absence of such language is "significant," *Me. Cmty. Health*, 590 U.S. at 296, particularly because "a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed,'" *Testan*, 424 U.S. at 399 (quoting *United States v. King*, 395 U.S. 1, 4 (1969)). Indeed, Section 134 is dissimilar to statutes that have created a payment obligation on the part of the Government. The most recent Supreme Court and Federal Circuit decisions finding statutes to be money-mandating—*Maine Community Health* and *112 Genesee Street*, respectively—exemplify the differences.

In *Maine Community Health*, the Supreme Court addressed the Affordable Care Act (ACA), which expanded healthcare coverage and created online marketplaces where insurers could sell health insurance plans. 590 U.S. at 300. The ACA contained several initiatives to encourage insurers to participate and to defray their costs and risks. *Id.* In particular, the "Risk Corridors" program was meant to "compensate insurers for unexpectedly unprofitable plans during the marketplaces' first three years." *Id.*

[3] IPC's Count III is premised on 42 U.S.C. § 7434(a)(1). ECF No. 1 ¶¶ 116, 120.

The statute creating the Risk Corridors program stated that the Secretary of Health and Human Services (HHS) "shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016." 42 U.S.C. § 18062(a). It further stated that HHS "shall provide" that if an insurance plan lost a specified amount of money, then HHS "shall pay to the plan" a certain amount based on a calculation stated in the statute. *See id.* at § 18062(b)(1). The plaintiffs were insurers who experienced losses under the Risk Corridors program but had not been paid due to a lack of appropriated funds. *Me. Cmty. Health*, 590 U.S. at 304-06. The plaintiffs sought a money judgment for these unpaid sums. *Id.* at 305-06.

The Supreme Court concluded that the Risk Corridors statute "imposed a legal duty of the United States that could mature into a legal liability" through the insurers' participation in the healthcare exchanges. *Id.* at 310. This conclusion flowed from the statute's "express terms and context"; in particular, its use of mandatory language. *Id.* The Supreme Court concluded that the statute's "triple mandate" that HHS "shall establish and administer" the program, "shall provide" for payment according to the statutory formula, and "shall pay" qualifying insurers put the statute "comfortably within" the class of money-mandating statutes. *Id.* at 324–25.

In *112 Genesee Street*, the Federal Circuit addressed a statute creating the Restaurant Revitalization Fund (RRF), which was designed to provide financial assistance grants to eligible restaurants and other similar businesses for revenue lost due to the COVID-19 pandemic. 166 F.4th at 1020. Congress appropriated $28.6 billion for the RRF and required the Small Business Administration (SBA) to administer the program. *Id.* The RRF statute stated that the SBA "shall use amounts in the Fund to make grants" and "shall award grants to eligible entities in the order in which the applications are received." *Id.* (citation omitted). The statute also directed that the amounts paid to recipients "shall be equal to the pandemic-related revenue loss of the

eligible entity." *Id.* (citations omitted). Further, the statute established a formula for determining the "pandemic-related revenue loss" of an eligible entity: "the gross receipts . . . of the eligible entity during 2020 subtracted from the gross receipts of the eligible entity in 2019." 15 U.S.C. § 9009c(a)(7)(A); *see also* 166 F.4th at 1020. Plaintiffs were restaurants that did not receive RRF grants even though they alleged that they all submitted applications on the first day of the program.

Looking at the statutory text and context, the Federal Circuit found "no functional difference" between "shall award grants" in the RRF statute and the "shall pay" in the Risk Corridors statute in *Maine Community Health*. 166 F.4th at 1023. The court focused on the RRF's plain statutory mandate that the SBA shall use the funds to make grants, shall make the grants in the order applications were received, and shall pay amounts using a statutory formula. *Id.* at 1020, 1023-24. Additionally, the court contrasted these directives with another pandemic relief provision, which used non-mandatory "may make initial grants" language, to underscore its conclusion that the "shall" language in the RRF statute made the directives mandatory. *Id.* at 1023. Accordingly, the Federal Circuit concluded that the statutory language "weigh[ed] in favor of it establishing a money mandate within Tucker Act jurisdiction." *Id.*

Unlike the mandatory language in the statutes at issue in *Maine Community Health* and *112 Genesee Street*, Section 134 lacks any "shall" directive to the EPA. Unsurprisingly, IPC does not identify any such language in its complaint, a fact fatal to its claim. *See* ECF No. 1 ¶¶ 110-120. The only "shall" directive in Section 134 is a mandate to the grant recipients in how they can spend the grant money. 42 U.S.C. § 7434(b) ("An eligible recipient that receives a grant . . . shall use the grant in accordance with the following . . ."). This demonstrates that Congress knew to make a directive explicit; if it intended to mandate EPA to do anything, it

knew how to say so. Therefore, nothing in Section 134 can be fairly interpreted as mandating compensation by the Government.

Thus, the lack of mandatory statutory language weighs heavily against interpreting Section 134 as money-mandating.

### 2. The Remedy IPC Seeks Is Enforcement Of What It Asserts Is a Statutory Mandate

In this case, the absence of mandatory language in Section 134 is sufficient to conclude that the statute is not money-mandating. However, the nature of the relief that IPC seeks further demonstrates that Count III is outside this Court's jurisdiction. IPC seeks to enforce what it asserts is a statutory mandate in 42 U.S.C. § 7434(a)(1)—"to disperse $7 billion dollars in grant funding." Otherwise, IPC's requested relief shows that, although dressed as a "violation of a money-mandating statute" claim, IPC's actual claim in Count III is contractual.

Recently, in *112 Genesee Street*, the Federal Circuit explained that "[t]he nature of the relief provided by the statute . . . can impact whether a plaintiff's claim for monetary compensation falls within Tucker Act jurisdiction." *112 Genesee St.*, 166 F.4th at 1024. Retrospective relief is that for which money damages may be appropriate under the Tucker Act; prospective, specific relief is that which belongs in district court. 166 F.4th at 1024. The court reached this conclusion relying on the Supreme Court's decision in *Bowen*, which disallowed a suit for money damages despite the "shall pay" language of the statute. *Id.*

In *Bowen*, the Commonwealth of Massachusetts sued in district court challenging the refusal of the HHS Secretary to reimburse it for funds it expended under a Medicaid program and the court of appeals affirmed in favor of the State. *See* 487 U.S. at 885-89. The statute at issue had directed "that the Secretary 'shall pay' certain amounts for appropriate Medicaid services." *Id.* at 900-01. In its petition for certiorari, the Secretary argued that the Claims Court

had exclusive jurisdiction over the claim, not the district court. *Id.* at 890-91. The Supreme Court rejected this argument, holding that the relief sought by the State, the release of Medicaid funds, was not "money damages," and that the case was not excluded from the waiver of sovereign immunity in the Administrative Procedure Act (5 U.S.C. § 702). *Id.* at 893. In particular, the Supreme Court noted that the State's case "is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* at 900 (emphasis in original). Any payment made by the Government would be "a mere by-product of [the district court's] primary function of reviewing the Secretary's interpretation of federal law." *Id.* at 910. The Supreme Court further explained that "[d]amages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (quoting *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (internal citation omitted) (emphasis in original)).

Here, as explained above, Section 134 does not mandate EPA to pay money or award grants. Nevertheless, IPC is attempting to enforce what it asserts is the statutory mandate in 42 U.S.C. § 7434(a)(1) "to disperse $7 billion dollars in grant funding[.]" ECF No. 1 ¶ 120; *see also id.* ¶ 116. Through this assertion, IPC seeks specific relief in the form of payment of money—a portion of the $7 billion—to which IPC believes it is entitled under its preferred statutory interpretation.

The Federal Circuit's ruling in *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994) also

confirms that the Court does not possess subject-matter jurisdiction over Count III. In *Katz*, the owner of the company Hollywood Associates Limited Partnership (Hollywood Associates) appealed an order of a district court transferring his case to the Court of Federal Claims. 16 F.3d at 1205. The case involved the Government's Section 8 housing program. *Id.* In administering the Section 8 program, the Department of Housing and Urban Development (HUD) entered into contracts with Public Housing Agencies (PHAs). *Id.* A PHA would then enter into contracts with private developers to rehabilitate housing and provide rental units. *Id.* These contracts contained provisions for the amount of contract rent paid by the PHA to the developer on the tenants' behalf. *Id*. Contract rent was determined by HUD regulations and was "based on the project owner's costs of acquiring, owning, managing and maintaining the rehabilitated units." *Id.*

Hollywood Associates entered into such a contract and calculated the rent based on the interest rate of 9.25 percent received from its lender, plus costs, points, and other fees that it had to pay to obtain this rate. *Id.* at 1206. In the course of an audit performed by HUD, HUD determined that the contract rents being paid to Hollywood Associates were too high and should be based on the 9.25 percent interest rate only, without add-ons. *Id.* HUD ordered Hollywood Associates to reduce rents and recover overpayments. *Id.* Hollywood Associates challenged HUD's interpretation of its regulations and asserted that the upfront costs to its lender needed to be taken into account. *Id.* Hollywood Associates brought suit in district court, but the district court agreed with HUD that the case belonged in the Court of Federal Claims because it involved a Government contract. *Id.*

However, the Federal Circuit held that, as in *Bowen*, Hollywood Associates "seeks payments to which it alleges it is entitled pursuant to federal statute and regulations; it does not

seek money as compensation for a loss suffered." *Id.* at 1208. Hollywood Associates sought to "compel HUD to perform the calculation of contract rents" in accordance with its regulations. *Id.* "That a payment of money may flow from a decision that HUD has erroneously interpreted or applied its regulation does not change the nature of the case." *Id.* Furthermore, because Hollywood Associates sought an adjudication of the lawfulness of HUD's regulatory interpretation, this was prospective relief that would have a future impact on the ongoing relationship between the parties. *Id.* at 1209. Therefore, "no relief is available in the Court of Federal Claims here because the case challenges the interpretation of law which controls payment to Hollywood Associates." *Id.*

In its allegation that Section 134 is money-mandating, IPC also asserts that EPA violated OBBBA when it terminated the grant agreement with IPC. ECF No. 1 ¶¶ 3-6, 118-119. In particular, IPC alleges that EPA's stated reasons for terminating the grant agreement—that OBBBA "repeal[ed] the underlying authority" for the Solar for All program and that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the [Solar for All] program"—are erroneous. *Id.* ¶¶ 3-6, 118-119. This is a challenge to EPA's interpretation of law in that IPC seeks to hold as unlawful EPA's interpretation of the OBBBA as removing authority or funding to administer the Solar for All program. IPC also seeks to alter the relationship between the parties in the future.

To be clear, in Count III, "IPC incorporates by reference the allegations contained in Paragraphs 1 through 91" of its complaint. ECF No. 1 ¶ 110. In addition to demonstrating that Section 134 is not a money-mandating statute, those paragraphs demonstrate that the essence of IPC's claim is contractual, not based on a money-mandating statute. In previous paragraphs, IPC alleges, in part: (1) "EPA officially awarded IPC a[ Solar for All] grant valued at $249,300,000";

(2) "IPC's Grant Agreement imposed a series of requirements and conditions on the award, all of which IPC satisfied"; (3) "[f]ollowing incorporation of IPC's EPA-approved Workplan, IPC issued [Subrecipient Agreements (SRAs)] to 10 entities named in IPC's EPA-approved Workplan" with an "the aggregate committed value [of] $59.97 million"; (4) subsequently, "IPC [] committed $48 million in Financial Assistance to 10 projects," "formalized in Commitment Packages," which "aligned with [Solar for All] requirements for 'Contracts for Delivery of Financial Assistance'"; (5) "[t]hose SRAs and Commitment Packages represent binding, legal commitments IPC entered with the understanding and expectation that the entirety of the amount of the SFA Grant Award would be available to IPC over the life of the grant"; (6) "IPC's reasonable reliance on the Grant Agreement, as well as EPA's expected good faith and fair dealing, caused IPC to direct internal resources, align business practices, and forgo other opportunities to implement its binding commitments to EPA's SFA program. *Id.* ¶¶ 37, 41, 55, 59, 87, 90. As relief, IPC seeks "money damages or compensation to IPC in an amount to be determined at trial[.]" ECF No. 1 at 34. These allegations compel the conclusion that the essence of IPC's claim is contractual, and any remedy would necessarily flow from the Court deciding the liability and damages, if any, under the grant agreement, not Section 134.

Accordingly, the nature of the remedy does not favor interpreting Section 134 as money-mandating.

**3. Damages Are Tied To A Strings-Attached, Government-Administered Grant Program**

"Statutes that award monetary benefits through grant programs establishing strings-attached funding requirements or requiring ongoing Government relationships in administration of the grant programs may not be money-mandating." *112 Genesee St.*, 166 F.4th at 1025. Section 134's establishment of a "Greenhouse Gas Reduction Fund" appropriating money to the

EPA to establish and administer grant programs with strings attached to the funds weighs against the statute being money mandating.

Section 134 does not authorize a free and clear transfer of money from the Government. Instead, the statute provides strict limitations on the use of the funds. Under Section 134, an eligible recipient that receives a grant and uses it for direct investment, "shall use the grant," to "(A) provide financial assistance to qualified projects"; (B) prioritize investment in qualified projects that would otherwise lack access to financing"; and (C) "retain, manage, recycle, and monetize all repayments and other revenue . . . to ensure continued operability." 42 U.S.C. § 7434(b)(1). Moreover, for indirect investments, "[t]e eligible recipient shall provide funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects . . ." *Id.* § 7434(b)(2). Section 134, therefore, "does not authorize a free and clear transfer of money," a fatal feature which has rendered similar grant programs ineligible for a money judgment under Federal Circuit precedent. *See Lummi,* 870 F.3d at 1319 (holding that the statute at issue was not money-mandating because "the underlying claim is not for presently due money damages" but instead merely for a larger "strings-attached" grant.); *National Center for Mfg. Sciences v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997); (since funds had to be used for enumerated scientific research, plaintiffs "would not be entitled to a monetary judgment that would allow it to use [ ] funds [ ] for any purpose, without restriction.").

Additionally, Section 134's limitations on the use of funds and the grant agreements entered pursuant to Section 134 require ongoing Government relationships in administration of the Solar for All program, further demonstrating that the statute is not money-mandating. *Bowen*, 487 U.S. at 905. As set forth above, and further discussed Argument Sections II.C and

D, below, EPA entered into the grant agreement with the IPC to implement Section 134. IPC agreed to, for example, (1) "comply with the statutory requirements of Section 134 of the Clean Air Act," ECF No. 1-2 at 276; (2) submit "[p]rogress [r]eports" and "transaction and project-level report[s]," *id.* at 255-57; and (3) "implement this grant in accordance with its EPA-approved Solar for All Workplan," *id.* at 264. The grant agreement gave EPA an "[o]versight and [m]onitoring" role "to ensure that eligible [r]ecipients effectively carry out the significant scale, complexity, and novelty of the Solar for All Program." ECF No. 1-2 at 284. Those oversight and monitoring activities included, among other things, (1) "[p]articipating in project activities," (2) "[r]eviewing the qualifications of key personnel," (3) "[c]losely monitoring the [r]ecipient's management and oversight of [s]ubrecipients and procedures," (4) "[c]losely monitoring the [r]ecipient's performance," (5) "[r]eviewing and commenting on performance reports," and (6) "[v]erifying that the recipient is expending the award on allowable activities." *Id.* at 284-285.

Accordingly, Section 134's strict limitations on the use of grant funds and the complex ongoing relationship that would be necessary to continue the Solar for All program strongly weighs against interpreting Section 134 as money-mandating.

## II. The Court Should Dismiss Counts II, IV, And V For Failure To State A Claim Upon Which Relief Can Be Granted

### A. Standard Of Review For A Motion To Dismiss Under Rule 12(b)(6)

A party may assert by motion the defense of "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under this standard, a party's pleading must contain factual allegations that

establish "more than a sheer possibility that a defendant has acted unlawfully" or a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements." *Id.* To this end, it is well settled that a complaint should be dismissed pursuant to Rule 12(b)(6) "when the facts asserted by the [plaintiff] do not entitle [it] to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

In deciding a motion to dismiss under RCFC 12(b)(6), the Court assumes that all undisputed facts alleged in the complaint are true and draws all reasonable inferences in the plaintiff's favor. *See Lovett v. United States*, 81 F.3d 143, 145 (Fed. Cir. 1996). The Court, however, is not required to accept legal conclusions asserted in the complaint. *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019). Nor is the Court required to accept as true "allegations that contradict matters properly subject to judicial notice or by exhibit." *Terry v. United States*, 103 Fed. Cl. 645, 652 (2012) (quotation marks and citation omitted).

When considering whether to dismiss an action for failure to state a claim, the Court may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (citation modified).

**B. The Court Should Dismiss Count II Because IPC's Breach Of Good Faith And Fair Dealing Claim Is Duplicative Of Its Breach Of Contract Claim**

The Court should dismiss IPC's claim for breach of the implied duty of good faith and fair dealing because it duplicates IPC's claim of a breach of contract and presents the same ultimate legal question through a separate count that is superseded by the express contract language.

Every contract "imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019)

(citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). To establish a breach of the implied duty of good faith and fair dealing, a party must identify a "specific promise" that was undermined. *Id.* at 739. The implied duty cannot be used to circumvent express language in an agreement that addresses the dispute. *See Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010). Nor can it be used to imply new obligations not contemplated by a contract. *See Dobyns*, 915 F.3d at 739-40. Where a "breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim are based on the same facts, the latter claim should be dismissed as redundant." *Portland Mint v. United States*, 102 F.4th 1371, 1384 (Fed. Cir. 2024); *see also BGT Holdings LLC v. United States*, 984 F.3d 1003, 1016-17 (Fed. Cir. 2020) (holding that the duty of good faith and fair dealing is "preempt[ed]" when the contract provides the mechanism for a plaintiff's dispute). Accordingly, consistent with *Portland Mint*, a plaintiff's claim for breach of the duty of good faith and fair dealing should be dismissed where, as here, it coincides with a plaintiff's breach of contract claim. 102 F.4th at 1384.

In Count II, IPC fails to plead a specific promise that was implied by the grant agreement. IPC simply alleges that it entered into the grant agreement "with the reasonable expectation that the EPA would comply with the terms of the Grant Agreement and that EPA would act in good faith and deal fairly with IPC." ECF No. 1 ¶ 107. But this paragraph simply reiterates the basic legal standard for a claim for breach of the duty of good faith and fair dealing. *Compare Dobyns*, 915 F.3d 733, 739 ("A party breaches the contract when it fails to abide by th[e] implied duty [of good faith and fair dealing], which includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'") (quoting *Centex Corp. v. United States*, 395 F.3d 1283,

1304 (Fed. Cir. 2005)). The paragraph does not identify what specific expectations were implied by the grant. IPC instead improperly asks the Court to accept the legal conclusion couched as a factual allegation. *See Ashcroft*, 556 U.S. at 678.

Otherwise, IPC's claim for breach of the duty of good faith and fair dealing in Count II is merely duplicative of its breach of contract claim in Count I. In Count I, IPC alleges that EPA's termination of IPC's grant agreement violated the agreement's express terms, which set forth the only circumstances under which the EPA could terminate the contract: "(1) substantial noncompliance that materially impairs performance, (2) adequate evidence of waste, fraud, or abuse, or (3) a misrepresentation of eligibility status." ECF No. 1 ¶ 98-99. In Count II, IPC alleges that "EPA did not comply with the terms of IPC's Grant Agreement knowing the basis of termination was not supported by the Grant Agreement itself or by the [One Big Beautiful Bill Act (OBBBA)]." *Id.* ¶ 105. Alleging "EPA did not comply with the terms of IPC's Grant Agreement" is another way of stating that EPA breached the agreement. Put differently, the Court could not analyze IPC's claim for breach of the implied duty of good faith and fair dealing without interpreting the express termination provisions of the grant agreement in the same manner as would be done to decide the breach of contract claim.

Because IPC fails to state a claim for a breach of the duty of good faith and fair dealing, and instead duplicates its breach of contract claim in Count II, the Court should dismiss Count II.

### C. The Court Should Dismiss Count IV Because IPC Fails To State A Plausible Illegal Exaction Claim

IPC fails to state a plausible illegal exaction claim because IPC only had a contingent interest in the money that it claims EPA illegally exacted.

An illegal exaction occurs when the plaintiff has paid money to the Government and it

seeks return of that money which was "improperly . . . taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Virgin Islands Port Auth. v. United States*, 922 F.3d 1328, 1333 (Fed. Cir. 2019) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)). The essence of an illegal exaction is when "the Government has the citizen's money in its pocket." *Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1348 (Fed. Cir. 2020) (internal quotation marks omitted). An illegal exaction claim is distinguishable from a breach of contract claim in that, in the former "the claimant has paid money over to the Government that he once had in his pocket," and in the latter "the claimant is seeking payment of money the claimant has never received." *Andres v. United States*, 2005 WL 6112616, at *3 (Fed. Cl. July 28, 2005); *accord Piszel v. United States*, 121 Fed. Cl. 793, 802 (2015), *aff'd*, 833 F.3d 1366 (Fed. Cir. 2016) (stating that "[b]ecause plaintiff cannot show that he has paid any money to the government directly or 'in effect,' he fails to state a plausible illegal exaction claim in the complaint.").

As the Federal Circuit has stated, "[a]n illegal exaction claim must be based on property *taken* from the claimant, not property left *unawarded* to the claimant." *Lummi*, 870 F.3d at 1319. "[F]ailure to disburse property that was never in the claimant's possession or control [cannot] constitute[] an exaction." *Id.* Further, a plaintiff cannot state an illegal exaction claim where it is provided grant monies on a contingent basis. *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1349 (Fed. Cir. 2021) (affirming motion to dismiss illegal exaction claim in context of FEMA agreement for disaster assistance). There is no illegal exaction claim when "money is prevented from coming into plaintiff's account." *Piszel*, 833 F.3d at 1382 (quoting *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 153 (2002)) (brackets omitted).

IPC's illegal exaction claim, in its simplest form, alleges that once EPA deposited the grant funds into IPC's ASAP account, the funds became IPC's money. *See* ECF No. 1 ¶¶ 124-127. However, the contingencies attached to the grant funds are fatal to IPC's claim. As set forth in Argument Section I.B.3, above, Section 134 set forth numerous contingencies regarding how the funds were to be used. Additionally, the grant agreement contains numerous contingencies. A grant recipient could only draw down funds for "actual and immediate cash requirements to pay employees, contractors, subrecipients or to satisfy other obligations." ECF No. 1-2 at 408 (cited in ECF No. 1-2 at 246). Moreover, the grant recipient faced restrictions on the costs it could incur both under the grant agreement and pursuant to regulation. *See* ECF No. 1-2 at 243 ("This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments"); *id.* at 265 ("All costs charged to the award to support these activities must meet the requirements for allowability under 2 C.F.R. Part 200, Subpart E as well as applicable provisions of 2 C.F.R. Part 1500."). The grant agreement also contained numerous monitoring requirements, labor law compliance provisions, auditing requirements, and more.

Regarding ASAP accounts, the grant agreement required IPC "to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period." ECF No. 1-2 at 277. Additionally, EPA's standard terms and conditions—incorporated into the grant agreement—not only contain a mechanism by which EPA reviews drawdowns, but demonstrate the clearinghouse nature of ASAP accounts. *Id.* at 246 ("The Recipient agrees to comply with the current EPA General Terms and Conditions."). Specifically,

> the recipient initiates an electronic payment request online via ASAP, which is approved or rejected based on the

> amount of available funds authorized by EPA in the recipient's ASAP account. Approved payments are credited to the account at the financial institution of the recipient organization set up by the recipient during the ASAP enrollment process. . . . Any EPA funds subject to this paragraph that remain undisbursed after 5 business days must be fully disbursed within 15 business days of draw down or be returned to EPA.

ECF No. 407-408. In sum, EPA not only maintained extensive control and oversight over the ASAP accounts but retained the right to have funds returned in some circumstances. *See, e.g.*, 2 C.F.R. 200.305(b)(13). This is fatal to IPC's claim. *Columbus Reg'l Hosp.*, 990 F.3d at 1349 ("Columbus never had an unconditional interest in the disputed funds in this case, because FEMA expressly reserved the right to recover those funds for certain reasons within a specific period of time."). Moreover, as these terms and conditions demonstrate, the most plaintiff could allege occurred was that money was prevented from going into its own bank account. Because of this, there is no illegal exaction. *Piszel*, 833 F.3d at 1382 ("no illegal exaction where money is 'prevented from coming into [a] plaintiff's account'") (quoting *Westfed Holdings, Inc. v*, 52 Fed. Cl. at 153).

The cost regulations further emphasize the contingent nature of the grant funds. Cost regulations require that costs must be "incurred," "allowable," "reasonable," and "allocable," as extensively detailed in the regulations. *E.g.*, 2 C.F.R. §§ 200.100, 200.343, 200.403, 200.404, 200.405. Thus, the agreements and incorporated regulations promise to reimburse certain categories of incurred costs not to exceed the grant's value, contingent upon meeting certain standards including allowability, allocability, and reasonableness. These are the precise "strings" the Federal Circuit found fatal to an illegal exaction claim in *Columbus Regional Hospital*. The fact that the grant funds were deposited into an ASAP account designated for IPC

does not change the contingent nature of IPC receiving these funds. The grant agreements and regulations impose numerous strings on the grant funds, and EPA retained extensive control over and oversight of these grants throughout. *See* 2 C.F.R. 200.344. Therefore, IPC cannot show a vested property interest in monies that remained in its ASAP account and fails to state an illegal exaction claim.

**D. The Court Should Dismiss Count V Because IPC Fails To State A Claim For An Unconstitutional Taking**

In Count V, IPC alleges that "EPA's invasion of IPC's account and seizure of IPC's funds constitutes a taking of IPC's private property in violation of the Fifth Amendment." This claim fails because plaintiff's right to monies in an ASAP account does not exist independent of its grant agreement.

Under the Fifth Amendment, no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. In evaluating whether governmental action constitutes a taking for Fifth Amendment purposes, the Court must determine "whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). When a claimant lacks such a property interest, nothing has been taken, and thus the claimant cannot maintain a takings claim. *See Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). When entering contracts, "'the Government acts in its commercial or proprietary capacity . . ., rather than its sovereign capacity' and therefore the 'remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights.'" *Piszel,* 833 F.3d at 1376 (quoting *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001)). An allegation of "interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Sun Oil Co. v.*

*United States*, 572 F.2d 786, 818 (Ct. Cl. 1978) (citations omitted). "'[W]hen a party believes the government has interfered with its property rights in the context of a government contract, it must seek recourse for the alleged wrong 'in contract rather than under a takings claim.'" *PGB Hanger, LLC v. United States*, 170 Fed. Cl. 473, 481 (2024) (quoting *Piszel*, 833 F.3d at 1376) (dismissing takings claim pled in the alternative for failure to state a claim).

Although parties are not "categorically precluded from alleging takings claims in the alternative, takings claims in the government contract context are only viable when 'the right at issue is not governed by the terms the parties' contract' or when [based on] 'rights that arise independently from the contract[.]'" *Id.* (quoting *Allegre Villa, Ltd. P'ship v. United States*, 60 Fed. Cl. 11, 18 (2004)). In short, this Court looks to the origin of the right at issue. If it is created by the terms of a contract, a takings claim is not viable. *Clear Creek Cmty. Servs. Dist. v. United States*, 132 Fed. Cl. 223, 262-63 (2017). That is the case here.

Although much of this Court's precedent on this issue relates to procurement type contracts, the reasoning applies to the grant agreement at issue in this litigation. The sole property right IPC alleges—money deposited in an ASAP account that was subject to EPA control and oversight "and the income therefrom"—is fatal to its takings claim. ECF No. 1 ¶ 131. IPC has not alleged any basis for an interest in the funds housed in an ASAP account outside of its grant. The Federal Circuit and its predecessor courts have long treated federal grant agreements as contracts. *See Columbus Reg'l Hosp.,* 990 F.3d at 1338 (citing *San Juan City Coll. v. United States*, 391 F.3d 1357, 1360–62 (Fed. Cir. 2004); *State of Texas v. United States*, 537 F.2d 466 (Ct. Cl. 1976); *Dep't of Nat. Res. v. United States*, 227 Ct. Cl. 552, 554 (1981); *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981); and *Arizona v. United States*, 494 F.2d 1285, 1287–88 (Ct. Cl. 1974)). Because IPC only alleges a taking of funds bestowed

on it as a creature of its contract with the Government, its claim for a taking fails.

The nature of ASAP accounts highlights IPC's lack of property interest in these funds. The Treasury Financial Manual defines ASAP as a "recipient-initialized payment and information system, designed to provide a single point of contact for the request and delivery of **federal funds.**" *Glossary*, Tres. Fin. Experience, https://tfx.treasury.gov/glossary (last visited Oct. 20, 2026) (emphasis added); *see also* 1 TFM 4A Chap. 3000 Sec. 3020 (incorporating glossary definition of ASAP Accounts). The Bureau of the Fiscal Service centrally manages ASAP accounts. *See* https://www.fiscal.treasury.gov/asap (last visited Oct. 23, 2026) (cited in ECF No. 1-2 at 407). Federal agencies enroll funding recipients in ASAP, authorize their payments, and manage their accounts; recipients then request payments from these pre-authorized accounts. *Id.; see also* 1 TFM 4A, Chap. 3000, Sec. 30115 (explaining that ASAP enables a funding recipient to receive federal funds into its own bank account by ACH or wire). Put another way, ASAP acts as a clearinghouse for certain appropriations from the Federal government to private parties. Only after a private party initiates a request does money move out of a Department of Treasury account to a private institution via ACH or wire. *See* 1 TFM 4A, Chap. 3000, Sec. 30115. In short, IPC cannot state a taking claim because the only reason it has an ASAP account is to request transfer of federal funds to its account as it performs its obligations under the grant agreement. Accordingly, any dispute over the entitlement, timing or availability of those funds implicates the contractual relationship itself, not Fifth Amendment taking concern.

In short, IPC only alleges a right to funds in an ASAP account. Those funds are governed by the terms of its grant agreement. Because IPC alleges in the other counts of the complaint that it is entitled to monies provided to it by virtue of its contractual relationship with

the United States, its takings claim fails.

## CONCLUSION

For these reasons, the Court should dismiss Count III of plaintiff's complaint for lack of subject matter jurisdiction and dismiss Counts II, IV, and V of plaintiff's complaint for failure to state a claim upon which relief can be granted.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

WILLIAM J. GRIMALDI
Assistant Director

s/ Liridona Sinani
LIRIDONA SINANI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530
Telephone: (202) 353-2188
Facsimile: (202) 307-0972
Email: Liridona.Sinani@usdoj.gov

*Attorneys for Defendant*

Dated: October 23, 2026